HERRICK, FEINSTEIN LLP
Stephen B. Selbst
Two Park Avenue
New York, NY 10016
(212) 592-1400
sselbst@herrick.com

*Attorneys for Orlando Lender LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                              :
In re:                                        :      Chapter 11
                                              :
EMPIRE EQ WGI, LLC,                           :
                                              :
                    Debtor.                   :      Case No.: 19-23188 (RDD)
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

<div align="center">

**NOTICE OF MOTION OF**
**ORLANDO LENDER LLC**
**FOR DISMISSAL OF CHAPTER 11 CASE**

</div>

**PLEASE TAKE NOTICE** that a hearing (the "Hearing") to consider the motion

(the "Motion") of Orlando Lender LLC ("Lender"), seeking entry of an order, pursuant to 11

U.S.C. § 1112(b), dismissing the above-captioned chapter 11 case, shall be held before the

Honorable Judge Robert D. Drain, Bankruptcy Judge of the United States Bankruptcy Court for

the Southern District of New York, at 300 Quarropas Street, White Plains, New York 10601 on

**August 6, 2019 at 10:00 a.m.** (prevailing Eastern Time).

**PLEASE TAKE FURTHER NOTICE** that objections to the Motion, if any, must

be in writing, shall conform to the Bankruptcy Rules and the Local Rules of the Bankruptcy Court,

and shall be filed with the Bankruptcy Court electronically in accordance with General Order M-

242 (General Order M-242 and the User's Manual for the Electronic Case Filing System can be

found at www.nysb.uscourts.gov), by registered users of the Bankruptcy Court's case filing system

and, by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect or any other Windows-based word processing format (with a hard copy delivered directly to Chambers), and shall be served in accordance with General Order M-242 upon (a) counsel for Lender, Herrick, Feinstein LLP, 2 Park Avenue, New York, NY 10016 (Attn: Stephen B. Selbst, Esq.); (b) Office of the United States Trustee; Attention: Serene K. Nakano; and (c) all parties who have timely filed requests for notice under Role 2002 of the Bankruptcy Rules, so as to be received no later than **July 30, 2019 at 4:00 p.m.** (prevailing Eastern Time).

Dated: New York, New York
      June 27, 2019

HERRICK, FEINSTEIN LLP

By: _ /s/ Stephen B. Selbst _
    Stephen B. Selbst
Two Park Avenue
New York, NY 10016
(212) 592-1400
sselbst@herrick.com

*Attorneys for Orlando Lender LLC*

HERRICK, FEINSTEIN LLP
Stephen B. Selbst
Two Park Avenue
New York, NY 10016
(212) 592-1400
sselbst@herrick.com

*Attorneys for Orlando Lender LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                        :
In re:                                  :        Chapter 11
                                        :
EMPIRE EQ WGI, LLC,                     :
                                        :
                 Debtor.                :        Case No.: 19-23188 (RDD)
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## MOTION OF ORLANDO LENDER LLC
## FOR DISMISSAL OF CHAPTER 11 CASE

Orlando Lender LLC ("Lender"), by its counsel Herrick, Feinstein LLP, as and for its

motion (the "Motion") seeking entry of an order, pursuant to 11 U.S.C. § 1112(b), dismissing the

above-captioned chapter 11 case (the "Chapter 11 Case") of Empire EQ WGI, LLC ("Debtor"),

respectfully represents as follows:

### PRELIMINARY STATEMENT

1.        Debtor's chapter case was filed to prevent Lender from completing a foreclosure

sale scheduled for June 18, 2019 on its sole asset, its membership interests in Empire EQ Hotel

LLC, a Delaware limited liability company (the "Owner"), that owns vacant real estate in Orlando,

Florida. This is a classic bad-faith filing; Debtor has no real creditors and no employees. But in an

attempt to disguise Debtor's true status, it filed a false and misleading chapter 11 petition, which

improperly listed the holders of equity interests in Debtor as unsecured creditors and included

Owner debts as Debtor obligations, all in an attempt to bolster the apparent legitimacy of the filing.

2.      There are other disturbing aspects to this chapter 11 filing that also demonstrate bad

faith. The chapter 11 petition was signed by David Goldwasser "Goldwasser" on behalf of GC

Realty Advisors, which purports to be a new member of Debtor. Goldwasser is a felon who was

convicted of bank fraud approximately 15 years ago and was incarcerated in federal prison for his

crimes. Although the Note was issued to Lender less than three months ago after a lengthy

negotiation, Lender has never had dealings with Goldwasser or GC Realty Advisors, even though

Goldwasser is described as "President" and an "authorized signatory" on behalf of Debtor.

3.      The purported admission of GC Realty Advisors breached covenants in the loan

documents between Debtor and Lender, which raises questions about whether the admission of

GC Realty Advisors is valid, and more importantly, whether Debtor's chapter 11 filing was validly

authorized. Lender's position is that the chapter 11 petition filed by Debtor was not properly

authorized, and the case law is clear that where a debtor has not obtained proper organic authority

for a filing, the remedy is dismissal.

4.      In its chapter 11 petition, Debtor claimed that its proceeding was related to the

chapter 11 cases of 53 Stanhope LLC et al, case 19-23013 (RDD) (Jointly Administered) as an

"affiliate." The 53 Stanhope LLC cases involve residential real estate developments in Brooklyn,

New York. Those cases have different owners and different creditors than Debtor here; the only

connection is that their chapter 11 petitions were also signed by Goldwasser. Even though

Goldwasser is the apparent link between the 53 Stanhope cases and Debtor here, there are no true

ties between the cases, and the instant case should not be treated as related to the 53 Stanhope

cases. Debtor's spurious attempt to link the cases is further evidence of bad faith.

## BACKGROUND

5.      Debtor filed its petition for relief on June 17, 2019, one day prior to the scheduled foreclosure sale of its membership interests in Owner. The United States Trustee has not appointed a statutory committee of unsecured creditors.

### A.      The Planned Project Development

6.      Owner was formed to develop and build a 299-room hotel in Orlando, Florida (the "Project"), which was represented to Lender that it would be operated under the Le Meridien flag. To further that goal, in August 2017, Owner acquired a parcel of real estate (the "Property"), had the Property rezoned to permit construction of the Project, and engaged an architect and other service providers to assist in the preliminary stages of the development process.

7.      Owner also borrowed $5,500,000 from Paradigm Credit Corporation II, secured by a mortgage on the Property, which mortgage loan matures in July, 2019.

8.      In connection with the Project,  Real Estate Holdings LLC ("Arch") AWH Partners, LLC ("AWH" and, together with Arch, "Investor"), on the one hand, and Owner and Dovi Leshes ("Leshes" or "Partner" and, together with Owner, the "EQ Parties"), entered into a letter of intent dated as of January 11, 2019 (the "Letter of Intent") with respect to a proposed joint venture to own, develop and operate the Project.[1]

9.      Arch Advisors LLC, an affiliate of Lender ("Arch Advisor"), and Owner entered into that certain Development Advisory Services Agreement dated April 5, 2019 (the "Services Agreement"), pursuant to which Arch Advisors contracted to provide development advisory services through the design and construction of the Project.

---

[1] In some documents, Leshes's name is spelled "Lesches."

### B.    Loan to Debtor

10.    To provide additional funds for the development of the Project, Lender made a loan of up to $1,500,000 to Debtor as a mezzanine loan. The mezzanine loan made by Lender is evidenced by a Promissory Note dated April 5, 2019 (the "Note"), a copy of which is attached hereto as Exhibit A.

11.    Debtor secured its obligations under the Note by entering into that certain Pledge Agreement between Debtor and Lender dated April 5, 2019 (the "Pledge Agreement"), a copy of which is attached hereto as Exhibit B. Pursuant to the Pledge Agreement, Debtor pledged to Lender all the membership interests (the "Interests") in Owner.

### C.    Goldwasser's Role

12.    In connection with the issuance of the Note, Debtor delivered to Lender a Manager's Certificate, a copy of which is attached hereto as Exhibit C, which contained a copy of the operating agreement of Debtor (the "Operating Agreement") as Exhibit C-3. Exhibit A to the Operating Agreement contains a list of the names of Debtor's members and the amount of equity capital contributed by each member. Neither Goldwasser nor GC Realty Advisors is listed on Exhibit A to the Operating Agreement. Indeed, the Note provides that at all time, Leshes would be in control of the Project. See Exhibit A at 10.

13.    Section 6(b) of the Note provides that each of Debtor and Owner "have been and shall continue to be a Single Purpose Entity." Sections 6(b)(t) and (u) further provide that Debtor:

> (t) has and will continue to have an operating agreement, certificate of formation or other organizational document which has been approved by Lender, (u) has not and will not engage in, seek or consent to any asset sale, transfer of the partnership, membership or shareholder interests, or amendments of its operating agreement, certificate of formation or other organizational documents.

Note at §§6(b)(t) and 6(b)(u). Since the issuance of the Note, Debtor has not requested permission, and Lender has not granted permission, for Debtor to admit new members.

4

14.     Although Goldwasser signed Debtor's chapter 11 petition on behalf of GC Realty, at no time during the negotiation of the Letter of Intent, the Services Agreement, or the Note did any representative of any of the Arch entities have any knowledge of, or dealings with, him.

15.     Goldwasser is a convicted felon; he pleaded guilty to defrauding Key Bank and First Union Bank of Port Chester in mortgage frauds. For his crimes, he was incarcerated for 27 months in federal prison. According to a report published on June 17, 2019 in *The Real Deal*, a newspaper that serves the New York real estate community, a copy of which is attached hereto as Exhibit D, he was released from prison in September 2005.

### D.     Owner and Debtor Defaults

16.     In connection with the development of the Project, Owner engaged Behar Peteranecz, Inc. ("BPI"), a firm of architects based in St. Petersburg, Florida to provide services pursuant to a contract dated January 3, 2018, as amended (the "BPI Contract"). A dispute subsequently arose between Owner and BPI regarding payment of fees that BPI claimed were due to it.

17.     On October 1, 2018, BPI commenced an action in the Ninth Judicial Court of the State of Florida (the "Florida Court"), styled *Behar Peteranecz, Inc. v. Empire EQ Hotel, LLC*, case 2018-CA- 010690, seeking a declaration of the enforceability of the BPI Contract, asserting a claim for damages of $681,902.17, and seeking to foreclose a *lis pendens* it had filed against the Property. Owner disputed the validity and enforceability of the BPI Contract and moved to dismiss the action.

18.     BPI had entered into an agreement with Stantec Consulting Services, Inc. ("Stantec"), pursuant to which Stantec acted as a subconsultant to BPI. Stantec alleged that Owner was in default of its payment obligations to it, and on February 22, 2019, Stantec filed an action in the Florida Court, filed a *lis pendens* against the Property, and sought to foreclose its *lis pendens*.

19.    Owner, Stantec and BPI entered into negotiations to resolve the pending actions, which resulted in a settlement agreement dated March 25, 2019 (the "Settlement Agreement"). Under the Settlement Agreement, the parties agreed to mediate the amount due by Owner, which was in dispute. But pending a resolution of the amounts due, Owner was to pay $500,000 at the signing of the agreement and was obligated to make additional payments of $75,000 every two weeks thereafter until the balance was paid in full.

20.    The initial payment due under the Settlement Agreement was made and was funded from the proceeds of the Note issued by Debtor. But Leshes, on behalf of Owner, initially refused to fund the first installment payment of $75,000, which was due April 19, 2019, contending that, notwithstanding the Settlement Agreement, the services of BPI and Stantec were materially deficient. Owner eventually made the first payment, albeit late. Leshes then refused to make the second installment payment, which was due May 3, 2019. When Owner failed to make the May 3 payment, BPI advised Owner on May 9, 2019 that Owner was in breach of the Settlement Agreement and that BPI would reactivate its claims pending in the Florida Court.

21.    Owner's failure to make payments due to BPI under the Settlement Agreement was an Event of Default under the Note and Lender issued its first notice of default to Debtor on April 23, 2019. By letters dated April 23, 2019 and April 26, 2019, copies of which are attached hereto as Exhibit E and Exhibit F, Lender notified Debtor of Events of Default under the Note and demanded payment in full of amounts due under the Note, which demand remains unsatisfied as of the date hereof. When Debtor failed to cure the defaults identified in the April 23 notice of default, Lender accelerated the Note in accordance with its terms.

22.     By notice dated May 16, 2019, a copy of which is attached hereto as <u>Exhibit G</u>, Lender gave notice to Debtor that it intended to sell the Interests at a foreclosure sale to be conducted on June 18, 2019.

**E.     The Improper Unsecured Creditors**

23.     Section 6(b)(a)(i) of the Note further provides that the sole business purpose of Debtor is "owning of its equity interest in Owner and activities incidental thereto and obtaining the Loan." Section 6(b)(a)(ii) of the Note provides that the business of Owner is limited to "owning, developing, using and operating the Property." As the quoted language makes clear, Debtor was to be a holding company, while the development of the Project was to be conducted through Owner.

24.     In its chapter 11 petition, Debtor has listed as unsecured creditors each of the members of Debtor listed on <u>Exhibit A</u> to the Operating Agreement, save for Leshes. As shown below, the chapter 11 petition has listed as their respective claim amounts the same figure shown as the amount of such members' equity investment in Debtor, except that (x) Leshes does not appear on the list of unsecured creditors, and (y) the purported claim of Joseph Harris is $1,259 higher than his investment amount.

| Name | Equity Investment per Operating Agreement | Unsecured Claim per Chapter 11 Petition |
|---|---|---|
| Abes Corner LLC | $50,000 | $50,000 |
| Avi Leshes | $150,000 | $150,000 |
| EDJF Holdings LLC | $250,000 | $250,000 |
| David Eyzenberg | $430,000 | $430,000 |
| Empire EQ Hotel Owner LLC | $100,000 | $100,000 |
| Joseph Harris | $58,741 | $60,000 |
| Dov Leshes | $11,600,873 | N/A |

25.     Debtor's chapter 11 petition also lists purported trade creditors whose claims are related to the development of the Project, and not to Debtor. Illustratively, the chapter 11 petition lists claims of (a) $10,840 for Celebration Landscape and Design, (b) $13,152.10 for Harris Civil Engineers LLC, and (c) $37,500 for Singer Kitchen Equipment. But documentary evidence establishes that each of these trade creditors provided services to and invoiced Owner, not Debtor. Attached hereto as Exhibit H, Exhibit I, and Exhibit J are invoices issued by Celebration Landscape and Design, Harris Civil Engineers LLC, and Singer Kitchen Equipment, all of which are addressed to Owner.

26.     Debtor's attempt to characterize those trade claims as its own obligations violates its "single purpose entity" covenant, which expressly precludes Debtor from taking on or assuming such obligations. *See* Note at 6(b).

27.     But more importantly, by listing the claims of such trade creditors as obligations of Debtor in its chapter 11 petition, Debtor has made intentionally false representations to this Court in an attempt to disguise the transparent bad faith of its filing.

**F.     Misrepresentations by Leshes**

28.     In connection with the negotiation of the Note, Leshes represented to Lender that he had a personal net worth of $75,000,000. When Lender asked for proof of that figure, Leshes represented that his assets were held in a trust, but that he had discretionary control over the trust, and he delivered to Lender an opinion of counsel to Borrower and Owner, that the trust was valid and subsisting under Florida law.  Leshes later delivered a copy of the purported trust instrument to Lender, which has been advised by counsel that the purported trust agreement is not a trust, but appears to be a cut-and-paste markup of an operating agreement for a limited liability company.

29.     Leshes has also misrepresented costs incurred by the Project. In 2018, he delivered to Lender a closing statement, a copy of which is attached hereto as Exhibit K, that purported to

show that Owner had paid approximately $8,400,000 for the Property. But documents on file in

the Comptroller's Office of Orange County, Florida show that the Property was acquired for

$6,400,000, as shown on <u>Exhibit L</u>.

## ARGUMENT

**A.   THE CHAPTER 11 CASE SHOULD BE DISMISSED BECAUSE GOLDWASSER LACKED THE REQUISITE CORPORATE AUTHORITY TO FILE THE CHAPTER 11 PETITION**

30.    Section 1112 of the Bankruptcy Code provides that a chapter 11 case may be

dismissed "for cause," stating at Subsection (b)(1) that:

> Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 [11 USCS §§ 701 et seq.] or dismiss a case under this chapter [11 USCS §§ 1101 et seq.], whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) [11 USCS § 1104(a)] of a trustee or an examiner is in the best interests of creditors and the estate.

31.    Furthermore, "[i]t is settled that the lack of authority to file a voluntary chapter 11

bankruptcy petition by the party filing it constitutes an independent ground for 'cause' for relief

under § 1112(b) of the Bankruptcy Code." *In re 167 W. 133rd St. Hous. Dev. Fund Corp.*, 2018

WL 4637460, *6 (Bankr. S.D.N.Y. Sept. 25, 2018)(compiling cases). The movant bears the burden

of establishing that the filing party lacked the authority to file the bankruptcy petition on behalf of

the Debtor. *Id.*

32.    To assess whether the filing party possessed the requisite authority, courts look to

the corporation's governing documents. *Id.* at *7 (examining the debtor's Certificate of

Incorporation and By-Laws to determine the signatory lacked authority to execute corporate

documents, warranting dismissal).

9

33.     A review of the corporate governing documents reveals that neither Goldwasser nor GC Realty Advisors possessed the requisite signing authority to file a chapter 11 petition on behalf of Debtor. Neither Goldwasser nor GC Realty Advisors is listed as a member on Debtor's Operating Agreement. *See* Exhibit C at Exhibit A to Exhibit C-3.

34.     Moreover, the Note expressly provides that Leshes would be in control of the Project. Exhibit A at 10. Under the terms of the Note, Debtor specifically agreed not to engage in any "transfer of the partnership, membership or shareholder interest, or amendments of its operating agreement," and has neither requested permission to admit new members nor had such permission granted by Lender since the issuance of the Notes. *See* Exhibit A at §6(b)(u). No representative of any of Lender's entities has had any knowledge of dealings with either Goldwasser or GC Realty Advisors during the negotiation of the Letter of Intent, the Services Agreement or the Note.

35.     Where, as here, movants have established the filing party lacked authority to act on behalf of a debtor, courts have found "cause" under § 1112(b) of the Bankruptcy Code to dismiss the case. *In re 167 W. 133rd St.*, 2018 WL 4637460 at *12. (dismissing the chapter 11 petition where the filing party was not a member of Debtor corporation's board and therefore lacked authority to act on behalf of Debtor). Lender respectfully submits that Debtor's Chapter 11 Case be dismissed due to the filing party's lack of requisite authority.

**B.     THE CHAPTER 11 CASE SHOULD BE DISMISSED AS A BAD FAITH FILING**

36.     It is well settled that "cause" warranting dismissal or conversion under Section 1112 of the Bankruptcy Code includes the filing of a bankruptcy petition in bad faith. *In re C-TC 9th Ave. Partnership. v. Norton Movant (In re C-TC 9th Ave. Pshp.)*, 113 F.3d 1304, 1310 (2d Cir. 1997); *see also Baker v. Latham Sparrowbush Assoc. (In re Cohoes Indus. Terminal, Inc.)*, 931

F.2d 222, 227-28 (2d Cir. 1991); *In re Kaplan Breslaw Ash, LLC*, 264 B.R. 309, 334 (Bankr. S.D.N.Y. 2001); *In re Schur Mgmt. Co., Ltd.*, 323 B.R. 123, 127 (Bankr. S.D.N.Y. 2005).

37.     To establish a presumption that a petition was filed in bad faith, a movant must fulfill a two-pronged standard; demonstrating "*both* objective futility of the reorganization process *and* subjective bad faith in filing the petition." *In re General Growth Props., Inc.*, 409 B.R. 43, 56 (Bankr. S.D.N.Y. 2009) (emphasis in original).

38.     The objective futility prong examines "whether a reorganization is realistically possible." *In re 167 W. 133rd St.*, 2018 WL 4637460 at *8. To satisfy this prong, a movant must show Debtor has no "potentially viable business in place to protect and rehabilitate." *In re Artisanal 2015, LLC*, 2017 WL 5125545, *9 (Bankr. S.D.N.Y. Nov. 3, 2017).

39.     Debtor has represented that its sole business purpose is the "owning of its equity interest in Owner and activities incidental thereto and obtaining the Loan." See Exhibit A at Section 6(b)(a)(i).  The disarray at Owner demonstrates the objective futility of Debtor's ability to reorganize. The development of the Project is at a standstill; Owner has no liquidity and a trail of unpaid creditors and lawsuits. Owner has failed to satisfy amounts due under the Settlement Agreement and is facing the impending maturity of the Owner mortgage loan.

40.     The lack of viability of the Project, and *a fortiori,* Debtor, is further evidenced by Owner's inability to pay those trade creditors involved in the development of the Project who appear on the chapter 11 petition: Celebration Landscape and Design, Harris Civil Engineers LLC, and Singer Kitchen Equipment, which list claims for unpaid services totaling $61,591.10. *See* Exhibits H, I, and J.

41.     Further, Owner's outstanding obligations to BPI and Stantec, albeit ostensibly resolved through the Settlement Agreement, resulted a delayed payment of the first installment of

$75,000 *and* an outright refusal to make the May 3, 2019 payment of $75,000. Owner continues to owe substantial amounts to BPI and Stantec. The evidence overwhelmingly demonstrates Debtor lacks any legitimate viable business purpose because there is no business at the Owner level on which to base a reorganization. That conclusion fulfills the objective futility prong of the bad faith filing test.

42.     The subjective bad faith prong examines Debtor's intent at the time of the filing to determine whether Debtor "actually intends to use chapter 11 to reorganize and rehabilitate itself and not simply to cause hardship or delay to its creditors by invoking the automatic stay." *In re RCM Global Long Term Capital Appreciation Fund*, 200 B.R. 514, 522 (Bankr. S.D.N.Y. 1996). *In re C-TC 9th Ave. Pshp.*, the Second Circuit has found the following eight factors to be indicative of a bad faith filing giving rise to "cause" for dismissal:

(1) the debtor has only one asset;

(2) the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors;

(3) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt;

(4) the debtor's financial condition is, in essence, a two party dispute between Debtor and secured creditors which can be resolved in the pending state foreclosure action;

(5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of Debtor's secured creditors to enforce their rights;

(6) the debtor has little or no cash flow;

(7) the debtor can't meet current expenses including the payment of personal property and real estate taxes; and

(8) the debtor has no employees.

113 F.3d at 1311.

43.     The Chapter 11 Case should be dismissed because an analysis of the *C-TC* factors overwhelmingly demonstrates a bad faith filing. Examining *C-TC* factor (1), Debtor has just a sole asset: its membership interests in Empire EQ Hotel LLC.

44.     With regard to *C-TC* factor (2); the petition artificially inflates the number and value of the unsecured creditors and claims by improperly listing the members of Debtor, all of whom are "insiders" as defined by 11 U.S.C. Section 101, which states at Subsection 101(31):

(31) The term "insider" includes . . .

> (B) if the debtor is a corporation—
>
> (i)  director of the debtor;
>
> (ii)  officer of the debtor;
>
> (iii)  person in control of the debtor. . .

*See* Exhibit A*; See also Schubert v. Lucent Techs., Inc. (In re Winstar Communs., Inc.)*, 2003 WL 21356090, *8 (Bankr. D.Del. May 29, 2003) (finding a corporation whose role was to "provide financing and built-out services" was an insider, clarifying that "[t]he definition of an insider is inclusive, so Plaintiff is not limited to the examples given in the Bankruptcy Code."). Debtor not only lists improper "insiders" among its creditors, but also includes the purported trade creditors – Celebration Landscape and Design, Harris Civil Engineers LLC, and Singer Kitchen Equipment – whose claims total $61,591.10. As proven by the documentary evidence, the services of each of those trade creditors were invoiced to the Owner, rather than Debtor, and as obligations of the Owner, they are improperly included on the chapter 11 petition's creditor list. Removing these impermissibly listed insiders from the chapter 11 petition leaves only a handful of creditors with claims totaling $2,721,982.37 – more than half of which is Lender's disputed $1,500,000 secured claim. It weighs against a debtor when "supposedly unsecured claims" listed on the petition are

small in relation to the movant's secured claim, as is the case here, especially once the improperly added unsecured claims of Debtor's LLC members are disregarded. *Id.*

45.     *C-TC* factors (3) and (4) clearly cut against Debtor, as Lender sought to exercise its right to the now-frustrated foreclosure sale following the occurrence of the Events of Default, *see, e.g.,* Exhibit A at §9(b); Exhibit G.

46.     With regard to *C-TC* factor (5), Debtor's filing of the petition the evening prior to the foreclosure sale clearly weighs against it in the bad faith analysis. *In re Valid Value Props., LLC*, 2017 WL 123751, *6 (Bankr. S.D.N.Y. Jan. 5, 2017) (dismissing the petition as a bad faith filing and emphasizing "[t]he filing of a petition on the 'eve of foreclosure or eviction' is not sufficient alone to constitute bad faith 'cause' to lift the automatic stay, but is one of many circumstances which can be considered in a totality of the circumstances analysis.")

47.     Regarding *C-TC* factor (6), upon information and belief, which is supported by the documented misrepresentation of the purchase price of the Property and Leshes's personal net worth, the myriad Events of Default, the outstanding bills of the trade creditors, and the late and outstanding payments to BPI and Stantec under the Settlement Agreement, Debtor lacks cash flow, indicating the filing was made in bad faith. *See* Exhibits E, F, H, I, J, K, and L. Debtor's lack of cash flow has rendered it unable to pay current expenses, which further indicates a bad faith filing under *C-TC* factor (7).

48.     Finally, Debtor has no employees, satisfying *C-TC* factor (8). Lender has established that each of the eight indicators of a subjective bad faith filing weigh in favor of finding cause to dismiss this Chapter 11 Case.

49.     Not only do each of the eight subjective bad faith indicators point to Debtor's bad faith in filing the petition, but, upon information and belief, Debtor goes even further by

fraudulently asserting the relation between the above-captioned case and the case 53 Stanhope

LLC et al, case 19-23013 (RDD) (Jointly Administered). The latter involves real estate

developments in Brooklyn, New York, with different owners and creditors than those in the instant

case. The only connection between the two cases is that Goldwasser signed both of their chapter

11 petitions; there are no true ties between the cases. Debtor's specious attempt to shoehorn the

instant case in alongside another case already within this Court's purview smacks of forum

shopping, an independent indicator of bad faith.  *In re 167 W. 133rd St.*, 2018 WL 4637460 at *11

(finding "[Chapter 11 petition filer's] forum shopping likewise evidences her bad faith in filing

this case").

50.     Having satisfied the its burden of satisfying both the objective and subjective

prongs of the bad faith filing analysis, movants have established a rebuttable presumption that the

filing was made in bad faith. *Id.* at *8.

51.     The burden now shifts to Debtor 'to establish good and sufficient reasons why the

relief should not be granted'" by demonstrating that "'unusual circumstances exist establishing

that 'dismissal is not in the best interests of creditors and the estate.'" *Id.*

52.     In analyzing movant's rebuttable presumption and any potential response of

Debtor, this Court has "wide discretion" to determine whether cause exists under § 1112(b) and

how to dispose of a case it determines was filed in bad faith, since such a filing is an abuse of the

judicial process and the jurisdiction of the bankruptcy court." *Id.*

53.     Once cause has been established, this Court may dismiss the petition, convert the

action into a Chapter 7 proceeding, or, as an "extraordinary remedy," appoint a trustee or examiner.

*In re Euro–American Lodging Corp.,* 365 B.R. 421, 426 (Bankr. S.D.N.Y. 2007).

## **<u>CONCLUSION</u>**

For all the reasons set forth herein, Lender respectfully requests that the Court enter the

order dismissing Debtor's Chapter 11 Case, attached hereto as <u>Exhibit M</u>, and grant Lender such

other and further relief as may be just and proper.

Dated: New York, New York
      June 27, 2019

                            HERRICK, FEINSTEIN LLP

                            By:   */s/ Stephen B. Selbst*
                                 Stephen B. Selbst
                            Two Park Avenue
                            New York, NY 10016
                            (212) 592-1400

                            *Attorneys for Orlando Lender LLC*

# Exhibit A

**EXECUTION COPY**

## PROMISSORY NOTE

$1,500,000.00
April 5 , 2019
New York, New York

FOR VALUE RECEIVED, the undersigned, **EMPIRE EQ WGI LLC**, a Delaware limited liability company, having its principal place of business at c/o Empire Equities, 3 Columbus Circle, 15th Floor, New York, New York 10019 (the "Borrower"), hereby unconditionally promises to pay to the order of **ORLANDO LENDER LLC**, a New York limited liability company (together with its successors and assigns, the "Lender"), at its principal place of business c/o Arch Companies, 524 Broadway, Suite 405, New York, NY 10012, or at such other place as the Lender may from time to time designate in writing the principal amount of up to One Million Five Hundred Thousand and 00/100 U.S. Dollars (US $1,500,000.00) or so much thereof as may be outstanding from time to time (the "Loan") in lawful money of the United States of America, with interest thereon to be computed from the date of this Promissory Note (as amended or modified from time to time, this "Note") at the interest rate provided below, and to be paid in accordance with the further terms and conditions of this Note and the other Loan Documents (as defined below). Borrower is the sole member of **EMPIRE EQ HOTEL LLC**, a Delaware limited liability company ("Owner").

1.   Pledge Agreement.  As security for the performance of the Obligations (as defined below), pursuant to that certain Pledge Agreement by and between the Borrower and the Lender dated as of the date hereof and being executed and delivered simultaneously herewith substantially in the form of Exhibit A attached hereto (as amended or modified from time to time, the "Pledge Agreement" and, together with this Note and any other document, agreement or instrument executed and delivered in connection with the Note and/or the Pledge Agreement, as each of the same may be amended or modified from time to time, the "Loan Documents"), Borrower is pledging and granting a security interest in 100% of the limited liability company membership interest in and issued by Owner to and for the benefit of the Lender.  As used herein, "Obligations" means the Loan and all other indebtedness and obligations now or hereafter existing under this Note and the other Loan Documents, including, without limitation, (i) principal, (ii) interest, (iii) fees, costs and expenses, (iv) future advances, (v) all amounts owed under any extension, renewal or modification of any of the foregoing and (vi) any of the foregoing that arises after the filing of a petition by or against the Borrower under any federal, state or foreign bankruptcy, insolvency, receivership or similar law.  Lender is entitled to exercise the rights and remedies with respect to the Obligations provided for under this Note and the other Loan Documents or otherwise available at law or in equity.

2.   Prepayments; No Additional Borrowings.  This Note may be prepaid in whole or in part at any time prior to the Maturity Date (as defined below), at the Borrower's sole election, upon the payment to Lender of the Exit Fee.  "Exit Fee" means, with respect to any repayment or prepayment of the outstanding principal amount of the Loan, an amount equal to One Hundred Eighty Thousand and 00/100 Dollars ($180,000.00), less any amounts actually paid to Lender on account of regular Interest on the outstanding principal amount of the Loan, but in no event less than Zero Dollars ($0.00).  All payments hereunder shall be made in lawful money of the United States of America at such place as the Lender may from time to time designate in writing to the Borrower.  Payments shall be credited first to the costs associated with collection and enforcement

of this Note, then to all other costs, expenses and indemnification obligations payable hereunder, then to default interest, if any, due hereunder, then to the accrued and unpaid interest then due and payable, then to the Exit Fee and thereafter the remainder shall be applied to principal hereof. Borrower may request and receive only one borrowing hereunder in respect of the Loan and any amount borrowed and repaid hereunder in respect of the Loan may not be reborrowed.

3.      Maturity Date; Interest; Refinance.

(a)      The Obligations shall be due and payable in full on July 19, 2019 (as the same may be accelerated, the "Maturity Date").

(b)      The Borrower promises to pay interest ("Interest") on the outstanding principal amount of the Loan from the date hereof through and including the Maturity Date at the rate of fifteen percent (15%) per annum compounded monthly (computed on the basis of a 360-day year) (the "Interest Rate").  Interest shall accrue on the outstanding principal amount of the Loan. On or before the fifth (5th) day of each calendar month (or, if any such date shall not be a Business Day, on the next succeeding Business Day to occur after such date) (each, a "Payment Date"), Borrower shall pay to Lender interest that has accrued on the outstanding principal balance of the Loan for the immediately preceding calendar month by wire transfer of immediately available funds to an account designated by the Lender. Notwithstanding the foregoing, if this Note is executed on any day other than the first (1st) day of the calendar month in which the Note is executed, then the first interest payment shall be prorated for the number of days that the Loan is outstanding during such calendar month (the "Stub Amount"). "Business Day" or "business day" means any day other than a Saturday or a Sunday, a Non-Working Jewish Holiday or any day on which banks are required or permitted to be closed in the State of New York.  "Non-Working Jewish Holiday" means from sundown through one hour following sundown based upon Eastern Standard Time on the two days of Rosh Hashanah, Yom Kippur, the first two days of Sukkot, Shmini Atzeret, Simchat Torah, the first two days and the seventh and eighth days of Passover, the two days of Shavuot and Tisha Be'Av.

(c)      Anything to the contrary in Section 3(b) notwithstanding, upon the occurrence and during the continuance of an Event of Default (as defined below), interest on the outstanding principal balance of the Loan shall accrue from the date of the occurrence of such Event of Default until such Event of Default is cured or waived, payable on demand in immediately available funds, at a rate (the "Default Rate") equal to the lesser of (i) twenty-two percent (22%) per annum, compounded monthly, and (ii) the maximum rate of interest permitted under applicable law.

(d)      Anything in this Note or any other Loan Document notwithstanding, all proceeds received by Borrower and/or Owner from any refinancing of the existing land loan encumbering the Property (the "Bridge Loan") and/or such future loan which Owner borrows to refinance the Bridge Loan (the "Construction Loan") shall be referred to herein, as context may require, as the "Senior Loan", will be used to repay the Loan and all other sums due Lender under the Loan Documents to Lender, as a mandatory prepayment, as set forth in the introductory paragraph of this Note prior to the payment of any sum to any other party and prior to any distribution by Borrower or Owner to their respective direct or indirect members, partners and/or shareholders except Borrower shall cause Owner to make a distribution to Borrower in an amount

sufficient to repay the Loan and all other sums due Lender under the Loan Documents, and Borrower shall use such distribution to pay the same to Lender. For the purpose of clarity and avoidance of doubt, the Loan and all other sums due Lender under the Loan Documents shall be repaid in full simultaneously with, and as a condition precedent to, the closing of the Construction Loan.

4.    <u>Conditions Precedent to Initial Advance</u>.  Lender shall have no obligation to fund the initial advance of Loan proceeds to Borrower in the amount of up to Eight Hundred Thousand and 00/100 Dollars ($800,000.00) (the "<u>Initial Advance</u>") unless the following conditions shall have been satisfied as determined by Lender in its sole discretion (unless otherwise expressly noted):

(a)    Borrower shall deliver to Lender a Phase I environmental report that is satisfactory to Lender with no Phase II recommendation;

(b)    Owner shall have entered into a Development Advisory Services Agreement with Arch Advisors LLC (collectively, "<u>Arch</u>"), which is reasonably satisfactory to Lender (the "<u>Arch Agreement</u>");

(c)    Owner shall have entered into a Development Advisory Services Agreement with AWH Development Services, LLC or one or more of its affiliates ("<u>AWH</u>"), which is reasonably satisfactory to Lender (the "<u>AWH Agreement</u>"; and together with the Arch Agreement, the "<u>Development Advisory Agreements</u>" and each a "<u>Development Advisory Agreement</u>");

(d)    [Reserved];

(e)    Lender shall be satisfied in its sole and absolute discretion with its due diligence regarding Lesches, the Owner, the Project and any other entities or matters related the foregoing as Lender deems necessary in its sole and absolute discretion;

(f)    Lesches shall have provided to Lender proof of at least Seven Million and 00/100 Dollars ($7,000,000.00) of readily available cash (to be verified in a format acceptable to Lender in its sole and absolute discretion) (the "<u>Liquidity Requirement</u>"), which proof Lesches shall be required to update on a regular basis promptly upon the reasonable request of Lender;

(g)    The existing development consulting agreement between Lesches and AWH dated November 5, 2018 shall have been terminated and evidence of the same has been delivered to Lender;

(h)    Lender shall have received evidence that the title report from PropertyInfo Title Search Services (File #: 12-24-28-9655-00-024; Associated File # 12346902) (the "<u>Title Report</u>") remains current with no new exceptions thereto and that the Owner is still the sole fee owner of the Property. ;

(i)    Borrower has (1) delivered to Lender a true and complete copy of the executed Settlement Agreement and Mutual Release, dated March 25, 2019, by and among Owner, Stantec Consulting Services Inc. and Behar Peteranecz, Inc. (the "<u>Settlement Agreement</u>") in

substance and form previously approved by Lender and Owner, providing, that, among other things, the Settlement Payment Schedule (as defined in the Settlement Agreement) has been established and implemented and (2) delivered evidence satisfactory to Lender that Owner has made all payments currently due, and is not otherwise in default, under such Settlement Agreement; and

(j)     Skorman Development Corp. has either dismissed the appeal it filed to the Development Review Committee of Owner's approval to build the Project or Owner has obtained approval from the Orange County Board of County Commissioners to build the Project.

(k)     Borrower shall have satisfied the Ongoing Equity Obligation (as defined below).

5.     Conditions Precedent to Subsequent Funding.

(a)     Lender shall have no obligation to fund any subsequent advance of Loan proceeds to Borrower in the amount of up to Two Hundred Thousand and 00/100 Dollars ($200,000.00) (each such advance, a "Initial Subsequent Advance") unless the following conditions shall have been satisfied as determined by Lender in its sole discretion (unless otherwise expressly noted):

(i)     A letter of intent reasonably acceptably to Lender shall have been executed and delivered by Owner and Construction Lender;

(ii)     Borrower shall have satisfied the Ongoing Equity Obligation (as defined below);

(iii)     Initial Subsequent Advance request is utilized for the items identified under "Targeted Lender LOI Executed" on Schedule 4, in each of the foregoing instances subject to any reallocation of line items on Schedule 4 acceptable to Lender in its sole discretion; and

(iv)     No Event of Default shall have occurred and be continuing.

(b)     Lender shall have no obligation to fund any subsequent advance of Loan proceeds to Borrower in the amount of up to Five Hundred Thousand and 00/100 Dollars ($500,000.00) (each such advance, a "Secondary Subsequent Advance"; Initial Subsequent Advance and Secondary Subsequent Advance are collectively "Subsequent Advance") unless the following conditions shall have been satisfied as determined by Lender in its sole discretion (unless otherwise expressly noted):

(i)     All conditions set forth in Section 5(a) have been previously satisfied;

(ii)     Lender shall have approved of the use of such Subsequent Advance subject to any reallocation of line items on Schedule 4 acceptable to Lender in its sole discretion;

HF 12674042v.6

(iii)    The holder of any Construction Loan (the "Construction Lender"; the holder of the Bridge Loan and the Construction Lender shall be referred to herein, as context may require, as the "Senior Lender") shall have approved of AWH and Arch or a joint venture consisting of affiliates of AWH and Arch ("AWH/Arch"), as the developer and asset manager for the Project;

(iv)    Owner shall have entered into an Asset Management Agreement with AWH/Arch which is reasonably satisfactory to Lender (the "Asset Management Agreement"), and such Asset Management Agreement shall have been approved by the Construction Lender;

(v)    The Development Advisory Agreements shall have been approved by the Bridge Lender and Construction Lender and Lender has determined, in its sole discretion, that Owner is not in default under such Development Advisory Agreements and that all Development Fee (as defined in the Development Advisory Agreement) then due and owing have been paid in full;

(vi)    AWH/Arch shall have reviewed and approved of the Project Budget, which will include a detailed description of sources and uses;

(vii)    Borrower shall have (1) received all construction design documents from the architect of the Project and shall have promptly delivered the same to Lender (as such construction design documents have been approved by Lender, the "Plans and Specifications"); and (2) delivered evidence satisfactory to Lender that it is not in default of the Settlement Agreement;

(viii)    Any other items requested by Lender is its sole discretion;

(ix)    Borrower shall deliver to Lender a title commitment which shall not reflect any encumbrances, exceptions or other matters except (i) any security document which secures the Senior Loan, and (ii) any other encumbrances, exceptions or other matters which are acceptable to Lender in its sole and absolute discretion;

(x)    Borrower shall have satisfied the Ongoing Equity Obligation (as defined below);

(xi)    Lender shall have reviewed and approved of the equity investment by each of Owner and Dov Lesches, an individual ("Lesches"), in the Project, as well as detailed historical financials of Owner and Lesches; and

(xii)    No Event of Default shall have occurred and be continuing.

6.    Representations and Warranties.  The Borrower hereby represents and warrants as follows:

(a)    <u>Organization, Good Standing, Power and Qualification</u>.    Each of the Borrower and Owner is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization and has all requisite power and authority to carry on its business as presently conducted and as proposed to be conducted.    Each of the Borrower and Owner is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have a Material Adverse Effect (as defined below).    For purposes of this Note and the other Loan Documents, "<u>Material Adverse Effect</u>" means a material adverse effect on the business, assets (including intangible assets), liabilities, condition (financial or otherwise), property, prospects, operations or results of operations of the Borrower or any of its Affiliates having a direct or indirect interest in the Property.    "<u>Affiliates</u>" means, as to any person or entity (a "<u>Person</u>"), any other Person that (i) owns directly or indirectly twenty percent (20%) or more of all equity interests in such Person or is under common ownership, directly or indirectly, with twenty percent (20%) or more of all equity interests of such Person, and/or (ii) is in direct and/or indirect Control of, is directly and/or indirectly Controlled by or is under common direct and/or indirect ownership or Control with such Person, and/or (iii) is a direct director, officer or manager of such Person, and/or (iv) is the spouse, issue, parent of any of the foregoing Persons.    "<u>Control</u>" means with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, through the ownership of voting securities, by contract or otherwise.    The terms "<u>Controlled</u>", "<u>Controlling</u>" and common "<u>Control</u>" shall have correlative meanings

(b)    <u>Single Purpose Entity</u>.    Each of Borrower and Owner have been and shall at all times continue to be a Single Purpose Entity.    Neither Borrower nor Owner has made or will make any loans or advances to any third party (including any Affiliate).    "<u>Single Purpose Entity</u>" means a Person, other than an individual, which (a) is formed or organized solely for the purpose of (i) in the case of Borrower, owning of its equity interest in the Owner and activities incidental thereto and obtaining the Loan, or (ii) in the case of the Owner, owning, developing, using and operating the Property and the Project, (b) does not engage in any business unrelated to the Property and the Project and activities incidental thereto and financing thereof, (c) has not and will not have any assets other than those related to its interest in the Property or the financing thereof or any indebtedness other than the any third party mortgage loan secured by the Property and any third party mezzanine financing relating to or secured by the direct or indirect ownership of the Property or the Project, (d) maintains its own separate books and records and its own accounts, in each case which are separate and apart from the books and records and accounts of any other Person, (e) holds itself out as being a Person, separate and apart from any other Person, (f) does not and will not commingle its funds or assets with those of any other Person, (g) conducts its own business in its own name, (h) maintains separate financial statements, (i) pays its own liabilities and expenses out of its own funds, (j) observes all partnership, corporate or limited liability company formalities, as applicable, (k) pays the salaries of its own employees, if any, and maintains a sufficient number of employees, if any, in light of its contemplated business operations, (l) does not guarantee or otherwise obligate itself with respect to the debts of any other Person or hold out its credit as being available to satisfy the obligations of any other Person, (m) does not acquire obligations or securities of any other Person, including its partners, members or shareholders, (n) allocates fairly and reasonably shared expenses, including, without limitation, any overhead for shared office space, if any, (o) uses separate stationery, invoices, and checks, (p) maintains an arms-length relationship with its affiliates, (q) does not and will not pledge its assets for the benefit of any other Person or make any loans or advances to any other Person,

HF 12674042v.6

(r) does and will continue to correct any known misunderstanding regarding its separate identity, (s) maintains adequate capital in light of its contemplated business operations, provided, however, that nothing contained herein shall require any member of Borrower to contribute additional capital to Borrower, (t) has and will continue to have an operating agreement, certificate of formation or other organizational document which has been approved by Lender, (u) has not and will not engage in, seek, or consent to the dissolution, winding up, liquidation, consolidation or merger and has not and will not engage in, seek or consent to any asset sale, transfer of the partnership, membership or shareholder interests, or amendments of its operating agreement, certificate of formation or other organizational documents, and (v) will file its own tax returns.

(c)        Authorization; No Contravention; Enforceability.  The execution, delivery and performance by the Borrower of this Note and the other Loan Documents (i) is within its power and authority and has been duly authorized by all necessary limited liability action; (ii) does not contravene the terms of its certificate of formation, operating agreement (or similar agreement) or any other organizational documents (including any amendments to any of the foregoing; (iii) will not violate, conflict with, result in any breach or contravention of or default under any law, statute, rule, regulation, judgment, order, writ or decree, or under any contract, agreement or contractual obligation, or any order or decree directly relating to it; and (iv) will not result in any violation or be in conflict with or constitute an event which results in the creation of any Lien (as defined below).  All action required to be taken by the Borrower and its direct and indirect members, partners and shareholders in order to authorize the Borrower to execute, deliver and perform its obligations under the Loan Documents has been taken prior to the date hereof.  This Note and the other Loan Documents, when executed and delivered by the Borrower to the extent party thereto, shall constitute valid and legally binding obligations of the Borrower, enforceable against the Borrower in accordance with their respective terms.

(d)        No Consents.  No consent, approval, authorization or other action by, or filing or registration with, any governmental authority of the United States of America, the State of New York, the State of Florida, the State of Delaware or any other state or jurisdiction of any of the foregoing (each, a "Governmental Authority"), nor any other Person is required by or on behalf of the Borrower to execute and deliver the Loan Documents and to close the Loan other than those consents, approvals, authorizations, actions filings and registrations as to which the requisite consents, approvals, or authorizations have been obtained, the requisite actions have been taken and the requisite filings and registrations have been accomplished.

(e)        Litigation.  Except as set forth on Schedule 1 attached hereto, there is no claim, action, suit, proceeding, arbitration, complaint, charge or investigation pending or, to the Borrower's knowledge, threatened (i) against or involving the Borrower or any of its Affiliates or (ii) that questions the validity, enforceability or priority of the liens and security granted under Loan Documents or the right of the Borrower to enter into and perform its obligations thereunder.

(f)        Compliance with Other Instruments.  The Borrower is not in violation or default (i) of any provisions of its organizational documents or any amendment thereto, (ii) of any instrument, judgment, order, writ or decree, (iii) under any note, indenture or mortgage, or (iv) under any lease, agreement, Material Contract (defined below) or other contract or purchase order to which it is a party or by which it is bound, or, of any provision of statute, rule or regulation

HF 12674042v.6

applicable to the Borrower which could reasonably be expected to result in a Material Adverse Effect.

(g)     Title; Absence of Liens; Insurance.  Each of the Borrower and Owner has good and valid title to all of its property and assets, free and clear of all Liens, claims, charges, mortgages, pledges, security interests, restrictions or other encumbrances (collectively, "Liens"), except as set forth on Schedule 2 attached hereto.  Each of the Borrower and Owner keeps its property adequately insured and maintains (i) insurance to such extent and against such risks, including fire, as is customary with companies in the same or similar businesses, and (ii) such other insurance as may be required by law. A true and correct copy of the Title Report is attached hereto as Exhibit 6(g).

(h)     Liabilities.  Borrower does not have any liability or obligation, absolute or contingent (individually or in the aggregate) other than those previously disclosed to Lender.

(i)     Disclosure.  The Borrower has disclosed to the Lender all agreements, instruments and corporate or other restrictions to which it or its affiliates are subject, and all other matters known to it, Owner and their respective manager.  Attached hereto as Schedule 3 is a true, complete and correct list of all material contracts, agreements or understandings to which the Borrower or Owner is a party (each, a "Material Contract").  Other than the Settlement Agreement, there are no other prior or current agreements with any other architect with respect to the Property or the Project.

(j)     Reliance.  The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Loan Documents and that such Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same. Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Lender or any parent, subsidiary or affiliate of Lender. Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or Affiliate of Lender of any equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies. Borrower acknowledges that Lender engages in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Borrower or its affiliates.

(k)     Property Development. Owner is the fee owner of property located on a portion of Lot 2, Plat of Westwood Section 12, Township 24 South, Range 28 East, Orange County, Florida (the "Property"), on which Owner shall develop an approximately 299-key Le Meridian branded hotel to be managed by Spire with approximately 10,010 square feet of food and beverage space to be managed by an affiliate of The ONE Group Hospitality, Inc. and 21,825 square feet of conference space (the "Project"), with a development cost not to exceed $110,000,000 (the "Project Budget"; the Project and the Project Budget are hereinafter referred to collectively as the "Business Plan").

HF 12674042v.6

(l)     Recycled Entity.

(1)     Borrower and Owner are and always have been duly formed, validly existing, and in good standing in the state of its formation and in all other jurisdictions where it is qualified to do business.

(2)     Borrower and Owner are not now, nor have they ever been, party to any lawsuit, arbitration, summons, or legal proceeding that is still pending or that resulted in a judgment against it that has not been paid in full, and there are no liens of any nature against Borrower or Owner except as set forth on Schedule 6(l)(2).

(3)     Borrower and Owner are in compliance with all laws, regulations, and orders applicable to it and have received all permits necessary for it to operate.

(4)     Borrower and Owner are not involved in any dispute with any taxing authority.

(5)     Borrower and Owner have paid all taxes which it owes.

(6)     Borrower and Owner have never owned any property other than the Property and Pledged Collateral, respectively, and personal property necessary or incidental to its ownership or operation of the Property and Pledged Collateral, as applicable, and has never engaged in any business other than the ownership and operation of the Property and Pledged Collateral, as applicable.

(7)     Borrower and Owner have provided Lender with complete financial statements that reflect a fair and accurate view of the entity's financial condition.

(8)     Borrower and Owner have no material contingent or actual obligations not related to the Property and Pledged Collateral, as applicable.

(9)     Borrower and Owner have at all times since the date of its respective formation been a Single Purpose Entity.

All of the representations and warranties made herein shall survive the execution and delivery of this Note and the other Loan Documents and the making of the Loan.

7.     Covenants.  Until the payment in full of all Obligations, the Borrower covenants and agrees as follows:

(a)     Certain Notices. The Borrower shall immediately notify the Lender, in writing, of (i) any actual or threatened actions, suits, claims, investigations or proceedings (each a "Proceeding") with respect to which it or any of its Affiliates may be subject, (ii) any Event of Default or any default under any document, agreement or instrument evidencing any other indebtedness of the Borrower or the Owner, including, without limitation, the documents evidencing the Senior Loan (the "Senior Loan Documents"), (iii) any default under any Material Contract, (iv) any actual event, change, condition or effect which could reasonably be expected to result in a Material Adverse Effect on the Pledged Collateral (as defined in the Pledge Agreement), (v) any notice, approval, denial or other written correspondence from any Governmental Authority with respect to the Property or the Project (and shall provide Lender with a copy of the same), (vi) any notice or report delivered in connection with the Senior Loan or any other loan which encumbers the Property from time to time (and shall provide Lender with a copy of the same), and

HF 12674042v.6

(vii) any notice given by, or sent to, Starwood (M) International, Inc., including, without limitation, any notice given by, or sent to, Owner, Borrower, or, to Borrower's knowledge, AWH (and, if such notice is in writing, shall provide Lender with a copy of the same).

(b)    Payment of Obligations.  The Borrower shall, or shall cause Owner to, pay or discharge when due or cause to be paid or discharged all claims or demands, and all taxes levied or imposed upon the Borrower or the Owner upon the income, profits or property of the Borrower or the Owner; provided, however, that the Borrower or the Owner shall not be required to pay or discharge or cause to be paid or discharged any such claim, demand, or tax the amount, applicability or validity of which is being contested in good faith by appropriate proceedings and for which adequate provision has been made.

(c)    Liquidity Requirement.  Lesches shall maintain the Liquidity Requirement until the Loan has been indefeasibly repaid in full.  If Lesches shall fail to maintain the Liquidity Requirement at any time during the term of the Loan and such failure results in a Material Adverse Effect (as determined by Lender in its sole discretion), such failure shall be an Event of Default hereunder.

(d)    Conduct of Business.

(i)    The Borrower shall, and shall cause the Owner to, (i) take all actions required to assure that it remains duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation, (ii) take all actions required to assure that it maintains all permits to conduct its business as currently conducted and proposed to be conducted, and (iii) conduct its business in compliance in all material respects with all applicable laws.

(ii)    The Borrower shall, and shall cause the Owner to, maintain insurance with responsible and reputable insurance companies or associations (including comprehensive general liability, hazard, property, rent and business interruption insurance) with respect to the Property and the Project, in such amounts and covering such risks as is required by law or as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and located and in any event in amount, adequacy and scope as in effect on the date hereof.

(e)    Reporting.  Borrower shall promptly furnish the Lender with (i) copies of all financial reports and statements required pursuant to the terms of the Senior Loan Documents as and when required pursuant thereto, (ii) monthly financial reports with respect to Borrower and Owner including copies of all invoices and proof of payment of such invoices, and (iii) any other financial reports that Lender shall reasonably request.

(f)    Protective Provisions.  Absent prior written consent of the Lender, the Borrower shall not, and shall not permit or cause the Owner or their manager to:

(i)    enter into or otherwise permit any merger, consolidation or other business combination, or refinancing or recapitalization, or any other transaction or series of transaction resulting in (a "Change of Control") the Project and the Property not being under the Control of Lesches (the "Key Person");

(ii)      create or permit the creation of any liens, claims or encumbrances on its assets (including the Property and the Pledged Collateral) other than those under the Senior Loan Documents;

(iii)      sell, transfer, convey, assign or otherwise dispose of any its assets (including the Property and the Pledged Collateral);

(iv)      create or incur any liability or obligation, absolute or contingent (individually or in the aggregate) (including executing and delivering any agreement with a contractor or construction consultant);

(v)      commence (or permit any Affiliate to commence) any case, proceeding or other action relating to bankruptcy, insolvency, liquidation or reorganization or other relief for debtors, or take any action (or permit any Affiliate to take any action) to dissolve, liquidate or wind up;

(vi)      take any action (or permit any Affiliate to take any action) that could impair its ability to perform any of its payment or other obligations under the Senior Loan Documents or otherwise;

(vii)      enter into, amend, assume, incur or permit to exist any agreement or other arrangement (other than the Senior Loan Documents) that prohibits, restricts or imposes any condition upon the ability of the Borrower to create, incur or permit to exist any lien, claim or encumbrance upon any of Borrower's assets or property (whether now owned or hereafter acquired);

(viii)      enter into any agreement, settlement or other arrangement, or enter into any amendment or modification to any currently existing agreement or other arrangement, that by its terms restricts or prohibits the ability of the Borrower to pay or perform the Obligations;

(ix)      amend, modify or terminate the Development Advisory Agreement;

(x)      amend, modify or terminate the Senior Loan Documents;

(xi)      amend, modify or terminate any Material Contract;

(xii)      cause or permit Owner to consent to or cause changes to zoning, development rights or other entitlements pertinent to the Property that would result in a Material Adverse Effect with respect to Owner's ability to construct the Project;

(xiii)      commence demolition or construction of the Project;

(xiv)      cause or permit the expiration of any building permit in connection with the Project;

(xv)      modify the Business Plan or Plans and Specifications in connection with the Project;

HF 12674042v.6

(xvi)    execute any document listed in Section 4 or 5 hereof as a condition precedent to funding of Loan proceeds; or

(xvii)    take any action or commit to do (or permit any Affiliate to take any action or commit to do) any of the foregoing unless the consummation of such action or commitment will result in payment in full of all Obligations.

If Borrower shall take any of the foregoing actions without the prior written consent of the Lender, such action shall constitute an Event of Default hereunder.

8.    Use of Proceeds.

(a)    Lender shall be entitled to an origination fee in the amount of $257,400.00 (the "Origination Fee"), which Origination Fee shall be deemed fully-earned and payable upon execution of this Note; provided that Lender agrees to defer the payment of the Origination Fee to such date that is the earliest to occur of  the sale of the Property or the Pledged Collateral, the occurrence of an Event of Default, or repayment of Loan, in each instance, as determined by Lender.

(b)    Borrower will use the proceeds of the Loan solely to pay for verifiable expenses in connection with the Project which have been approved by Lender in advance, including (i) payment of a development fee to Arch Advisors LLC, (ii) payment of up to four (4) months of interest payments on the Senior Loan, (iii) payment to the Interest Reserve as described in Section 8(c) below or any reserve account described in Section 8(d) below, and (iv) any other uses approved by Lender.

(c)    On the date hereof, an amount equal to four (4) months of interest payments on the Loan and the Stub Amount shall be deposited into a reserve account held by Lender (the "Interest Reserve") and applied to pay interest on the Loan on each Payment Date.  At such time as the balance of the Interest Reserve drops to $0, Borrower shall immediately replenish the Interest Reserve with an amount equal to three (3) months of interest payments on the Loan. Borrower's failure to comply with the provisions of this Section 8(c) shall constitute an Event of Default hereunder.

(d)    To the extent the Senior Loan Documents do not require reserves for monthly payments of insurance premiums and/or real estate taxes with respect to the Property, Borrower shall reserve an amount equal to three (3) months' worth of insurance premiums and/or real estate taxes with Lender in reserve account(s) held by Lender, and when the balance of such reserve account(s) drops to $0, Borrower shall immediately replenish the applicable reserve account with an amount equal to three (3) months' worth of insurance premiums and/or real estate taxes, as applicable.  Borrower's failure to comply with the provisions of this Section 8(d) shall constitute an Event of Default hereunder.

(e)    Borrower hereby irrevocably authorizes and directs Lender to make the payments set forth on the Schedule of Permitted Payments attached hereto as Schedule 4 from proceeds of the Initial Advance.  With respect to any Subsequent Advance, Borrower hereby irrevocably authorizes and directs Lender (but Lender shall not have an obligation) to (i) make any payments due and payable to Senior Lender under the Senior Loan Documents if Borrower has

HF 12674042v.6

not timely delivered such payments to Senior Lender, and Lender shall otherwise have prior approval over the use of Loan proceeds in any Subsequent Advance as set forth in Section 5(a) hereof, and (2) extend the maturity date of the existing Bridge Loan and make any and all payments to Senior Lender therefor if Borrower has not delivered evidence satisfactory to Lender that Borrower has extended such Senior Loan at least ten (10) days prior to the expiration of the notice period to extend the Senior Loan.  Lender may advance funds in excess of the stated amount of this Loan in order to make payments under the Senior Loan as herein provided and such payments shall be deemed to increase the Loan evidenced hereby as protective advances secured by the Pledge Agreement.

(f)     Borrower shall deposit from the Initial Advance at Closing into an account held by Lender (the "DMA Reserve Account") the sum of $30,000 on the date hereof and thereafter by no later than the 25th day of each calendar month for payments of the fees due to AWH and Arch under the Development Advisory Agreement, respectively and the sum of $291,666.68 for the Secondary Subsequent Advance.  On the 1st day of each calendar month immediately succeeding the date of this Note, Borrower directs Lender to disburse to AWH $8,744.94 and to Arch $21,255.06 from the funds in the DMA Reserve Account, if any, in satisfaction of Owner's obligations thereunder, which disbursement shall be treated as a capital contribution by Borrower to Owner.  Notwithstanding the foregoing, Borrower directs Lender to disburse any Monthly Development Fee Catch-up Payments (as defined within the Development Advisory Agreement) as and when due. Borrower grants to Lender a first-priority perfected security interest in the DMA Reserve Account and any and all sums now or hereafter deposited in the DMA Reserve Account as additional security for payment of the Obligations.  Until expended or applied in accordance herewith, the DMA Reserve Account and the funds deposited therein shall constitute additional security for the Obligations.  The provisions of this Section (together with the other related provisions of the other Loan Documents) are intended to give Lender "control" of the DMA Reserve Account and serve as a "security agreement" and a "control agreement" with respect to the same, in each case, within the meaning of the UCC.  Borrower acknowledges and agrees that the DMA Reserve Account is subject to the sole dominion, control and discretion of Lender, its authorized agents or designees, subject to the terms hereof, and Borrower shall have no right of withdrawal with respect to the DMA Reserve Account except with the prior written consent of Lender or as otherwise provided herein.  The funds on deposit in the DMA Reserve Account shall not constitute trust funds and may be commingled with other monies held by Lender.

9.     Defaults and Remedies.

(a)     An "Event of Default" shall occur if:

(i)     the Borrower shall (A) default in the payment of any interest that has accrued on the Loan (including Default Interest) pursuant to the terms of any Loan Document (without any notice from Lender), (B) fail to pay the outstanding principal balance of the Loan (together with all accrued and unpaid interest due thereon and all other amounts due hereunder) on the Maturity Date (without any notice from Lender), (C) fail to provide Lender with evidence acceptable to Lender in its sole discretion that Borrower (or Lesches or the Owner) has paid any and all payments set forth on Schedule 4 in full (whether or not proceeds of the Loan are available therefor) by the date set forth on the respective line item therefor either directly to the payee thereunder or to an account designated by Lender or otherwise consented by Lender (the "Ongoing

Equity Obligation"), or (D) fail to pay any other amount due and payable to Lender under the Loan Documents within five (5) Business days after delivery of notice of non-payment (only with respect to this clause (C));

(ii)     any representation, warranty, certification or statement made by or on behalf of the Borrower or the Owner in this Note or any of the other Loan Documents or in any certificate or other document delivered pursuant hereto or thereto shall have been incorrect in any material respect when made and such inaccuracy has a Material Adverse Effect;

(iii)     the Borrower or Owner shall default beyond the expiration of any applicable notice and/or cure periods (as principal or guarantor) in the payment of principal of any indebtedness (other than this Note) when and as the same shall become due and payable whether at stated maturity, by acceleration or otherwise, unless diligently contested in good faith by Borrower or Owner;

(iv)     any event or condition shall occur that results in the acceleration of the maturity of any indebtedness of the Borrower or Owner (other than this Note), unless diligently contested in good faith by Borrower or Owner;

(v)     any provision of any Loan Document shall for any reason cease to be valid, binding and enforceable in accordance with its terms (or the Borrower shall challenge the enforceability of any Loan Document or shall assert in writing, or engage in any action based on any such assertion, that any provision of any of the Loan Documents has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms), or any security interest created under any Loan Document shall cease to be a valid and perfected first priority security interest (including the Pledged Collateral) purported to be covered thereby;

(vi)     an involuntary proceeding shall be commenced or an involuntary petition shall be filed in a court of competent jurisdiction by a party other than Lender seeking (a) relief in respect of the Borrower or Owner, or of a substantial part of its property or assets, under Title 11 of the United States Code, as now constituted or hereafter amended, or any other Federal, state or foreign bankruptcy, insolvency, receivership or similar law, (b) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or Owner, or for a substantial part of any of its property or assets, or (c) the winding up or liquidation of the Borrower or Owner; and such proceeding or petition shall continue undismissed for ninety (90) days, or an order or decree approving or ordering any of the foregoing shall be entered;

(vii)     the Borrower or Owner shall (a) voluntarily commence any proceeding or file any petition seeking relief under Title 11 of the United States Code, as now constituted or hereafter amended, or any other Federal, state or foreign bankruptcy, insolvency, receivership or similar law, (b) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or the filing of any petition described in clause (a) of this Section 9(a)(vii), (c) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or Owner, or for a substantial part of its property or assets, (d) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (e) make a general assignment for the benefit of creditors, (f) become

- 14 -

unable, admit in writing its inability or fail generally to pay its debts as they become due or (g) take any action for the purpose of effecting any of the foregoing;

(viii)    the occurrence of any event described as an Event of Default in any other Loan Document or any Development Advisory Agreement;

(ix)    the occurrence of an Event of Default under any loan or other credit facility secured by the Property or any interest therein, including, without limitation, the Senior Loan;

(x)    a Change of Control shall have occurred with respect to the Borrower or Owner;

(xi)    one or more judgments for the payment of money in an aggregate amount in excess of $10,000 (to the extent not covered by insurance) shall be rendered against the Borrower or any Affiliate and the same shall remain undischarged for a period of ninety (90) days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to levy upon assets or properties of the Borrower or Affiliate to enforce any such judgment;

(xii)    Borrower shall, or shall cause or permit Owner to, lease, license or otherwise grant an option to lease or buy the Property or any interest therein;

(xiii)    Lesches shall fail to maintain the Liquidity Requirement, resulting in a Material Adverse Effect, as set forth in Section 7(c) hereof;

(xiv)    the Borrower shall violate any covenant set forth in Section 7(f) hereof;

(xv)    failure by the Borrower to fund and maintain reserve accounts as described in Sections 8(c) and 8(d) hereof; or

(xvi)    the Borrower's members and/or managers resolve by proper procedure to, or an order, judgment or decree is entered to, wind-up, dissolve or liquidate the Borrower;

(xvii)    Any mortgagee of Owner breach the terms and conditions of the intercreditor agreement with Lender;

(xviii)    Borrower defaults in the performance of its monetary and/or non-monetary obligations under the Settlement Agreement; or

(xix)    Borrower permits or causes Owner or its manager to, or Borrower or its manager terminates the Development Advisory Agreement.

(b)    Upon the occurrence of an Event of Default, Lender shall have the right in its sole and absolute discretion, but not the obligation, to market the Property for sale; provided, however, that Lender agrees to market the Property for no less than six (6) weeks before Lender

HF 12674042v.6

shall exercise its rights or remedies provided at law, in equity or under the Loan Documents to cause a sale of the Property.

(c)     Acceleration.  If an Event of Default occurs under clauses (a)(i), (vi), or (vii) of this Section 9, then the outstanding principal of and all accrued interest on this Note shall automatically and without any action on the part of the Lender, become immediately due and payable, without presentment, demand, protest or notice of any kind, all of which are expressly waived.  If any other Event of Default occurs and is continuing, the Lender, by written notice to the Borrower, may declare the entire principal of and accrued interest on the Loan to be due and payable immediately.  Upon such declaration, such principal and interest shall become immediately due and payable.  The Lender may rescind an acceleration and its consequences if all existing Events of Default have been cured or waived, except nonpayment of principal or interest that has become due solely because of the acceleration, and if the rescission would not conflict with any judgment or decree.  Any notice or rescission shall be given in the manner specified in Section 17.

10.     Suits for Enforcement.

(a)     Upon the occurrence and during the continuance of any one or more Events of Default, the Lender may proceed to protect and enforce its rights by suit in equity, action at law or by other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Note or any other Loan Document or in aid of the exercise of any power granted in this Note or any other Loan Document, or may proceed to enforce the payment of the Obligations, or to enforce any other legal, beneficial or equitable right of the Lender of this Note or any other Loan Documents.

(b)     The Lender may direct the time, method and place of conducting any proceeding for any remedy available to it.

(c)     Should the indebtedness evidenced by this Note or any other Loan Document or any part hereof or thereof be collected at law or in equity or in bankruptcy, receivership or other court proceedings, or this Note or any other Loan Documents placed in the hands of attorneys for collection, the Borrower agrees to pay, in addition to principal and interest due and payable hereon, all costs of collection, including reasonable attorneys' fees and expenses, incurred by the Lender in collecting or enforcing this Note or any such other Loan Document.

11.     Indemnification.  The Borrower agrees to indemnify, defend and hold the Lender, its employees, members, shareholders, directors, officers, employees, managers, affiliates, consultants and agents (the "Lender Indemnitees") harmless from and against any liability, obligation, claim, cost, loss, judgment, damage or expense (including reasonable legal fees and expenses) (collectively, "Liabilities") incurred or suffered by any of the Lender Indemnitees as a result of or arising out of or in connection with (i) the Loan Documents, (ii) any breach by the Borrower of any representation, warranty, covenant or agreement contained herein (or any facts or circumstances constituting any such breach or violation), (iii) any proceeding initiated or brought by any third party relating to or involving the Borrower or any of its Affiliates, or (iv) any liability for brokerage or finders' fees or other commissions based on agreements, arrangements or understandings made by the Borrower or any of its Affiliates for services rendered for or on

- 16 -

behalf of the Borrower or any such Affiliate in connection with the transactions contemplated hereby.

12.  <u>No Impairment</u>.  The Borrower shall not, by amendment of its organizational documents or agreements or through reorganization, consolidation, merger, dissolution, sale of assets or another voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Note or any other Loan Document, but will at all times in good faith assist in the carrying out of all such terms and in the taking of all such action as may be necessary or appropriate in order to protect the rights of the holder of this Note against impairment.

13.  <u>Remedies Cumulative</u>.  No remedy herein conferred upon the Lender is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or otherwise.  To the extent permitted by applicable law and notwithstanding anything contained in the Loan Documents to the contrary, the Borrower and the Lender severally hereby waive presentment for payment, demand, protest and notice of dishonor.

14.  <u>Waivers; Amendment; Remedies</u>.

(a)  No course of dealing between the Borrower and the Lender or any delay on the part of the Lender in exercising any rights hereunder shall operate as a waiver of any right. The Borrower and all endorsers, sureties and guarantors of this Note hereby jointly and severally waive presentment, demand for payment, notice of dishonor, notice of protest, and protest in connection with the delivery, acceptance, performance, default, endorsement or guaranty of this Note.  No delay by the Lender hereof in exercising any power or right hereunder shall operate as a waiver of any power or right, nor shall an single or partial exercise of any power or right preclude other or further exercise thereof, or the exercise of any other power or right hereunder or otherwise. No waiver or modification of the terms hereof shall be valid unless set forth in writing by the Lender and then only to the extent set forth therein.

(b)  Any amendment, supplement or modification of or to any provision of this Note or any other Loan Document shall be effective only if it is made or given in writing and signed by all of the parties hereto or thereto.  Any waiver of any provision of this Note or any other Loan Document, and any consent to any departure by any party from the terms of any provision of this Note or any other Loan Document shall be effective (i) if in writing and (ii) only in the specific instance and for the specific purpose for which made or given.  Except where notice is specifically required by this Note or any other Loan Document, no notice to or demand on any party in any case shall entitle such party to any other or further notice or demand in similar or other circumstances.  The Borrower recognizes that, in general, borrowers who experience difficulties in honoring their loan obligations, in an effort to inhibit or impede lenders from exercising the rights and remedies available to lenders pursuant to mortgages, notes, loan agreements or other instruments evidencing or affecting loan transactions, frequently present in court the argument, without merit, that some loan officer or administrator of the lender made an oral modification or made some statement (including, without limitation, a statement via email) that could be interpreted as an extension or modification or amendment of one or more debt instruments and that the borrower relied to its detriment upon such "oral or de facto modification of the loan document."  For that reason, and in order to protect the Lender from such allegations in connection

with the transactions contemplated by the Loan Documents, the Borrower acknowledges that this Note, the other Loan Documents, and all instruments referred to in any of them can be extended, modified or amended only by a written agreement executed by the both Borrower and Lender and that none of the rights or benefits of the Lender can be waived permanently except in a written instrument executed by the Lender, and then only to the extent expressly set forth in such instrument. The Borrower further acknowledges the Borrower's understanding that no officer or administrator of the Lender has the power or the authority from the Lender to make an oral or de facto extension or modification or amendment of any such instrument or agreement on behalf of the Lender and that the Borrower cannot reasonably or justifiably rely on any unwritten or unsigned extension or modification or amendment or waiver, including, without limitation, any email correspondence purportedly effecting such extension or modification or amendment or waiver.

(c)     The parties hereto agree that the breach by any party of the provisions of this Note would result in substantial damage to the other parties which would be difficult, if not impossible, to ascertain, and by reason of that fact the parties agree that in the event of any such breach, the Lender shall have the right to enforce this Note by injunction or other proceeding in equity without the posting of a bond or other security. The remedies provided for herein are cumulative and are not exclusive of any remedies that may be available to the parties hereto at law, in equity or otherwise, and without the posting of a bond or other security.

15.     <u>Successors and Assigns; Transfer</u>.

(a)     This Note shall inure to the benefit of and be binding upon the successors and permitted assigns of the parties hereto. All of the covenants, stipulations, promises and agreements in this Note contained by or on behalf of the Borrower shall bind its successors and assigns, whether so expressed or not. The Lender may not assign any of its rights under this Note and any other Loan Document, except to an affiliate. The Borrower may not assign any of its rights or obligations under this Note (including by way of merger, sale of equity interests, by operation of law or otherwise) without the prior written consent of the Lender, and any such purported assignment by the Borrower without the written consent of the Lender shall be void and of no effect.

(b)     Each transferee of this Note acknowledges that this Note has not been registered under the Securities Act of 1933, as amended, and may not be transferred except pursuant to an applicable exemption from the requirements thereof.

16.     <u>Replacement of Note</u>. On receipt by the Borrower of an affidavit of an authorized signatory of the Lender stating the circumstances of the loss, theft, destruction or mutilation of this Note (and in the case of any such mutilation, on surrender and cancellation of such Note), the Borrower, at Borrower expense, will promptly execute and deliver, in lieu thereof, a new Note of like tenor. If required by the Borrower, such Lender must provide indemnity sufficient in the reasonable judgment of the Borrower to protect the Borrower from any loss which it may suffer if a lost, stolen or destroyed Note is replaced.

HF 12674042v.6

17.    <u>Notices</u>.

(a)    All notices, demands, approvals, consents, authorizations and other communications provided for or permitted hereunder shall be made in writing and shall be (I) mailed by first-class, registered or certified mail, return receipt requested, postage prepaid, (II) sent by nationally recognized overnight courier, or (III) delivered by hand delivery (including delivery by nationally recognized courier), and in addition to one of the foregoing methods shall also be contemporaneously delivered via e-mail, addressed as follows:

(i)    If to the Lender:

c/o Arch Companies,
524 Broadway, Suite 405
New York, NY 10012
Attn:  Jeffrey Simpson
E-mail: jsimpson@archcre.com

With a copy to:

Herrick Feinstein LLP
2 Park Avenue
New York, New York 10016
Attention: Yariv C. Ben-Ari, Esq.
E-mail: ybenari@herrick.com

(ii)    if to the Borrower:

c/o Empire Equities
3 Columbus Circle, 14th Floor
New York, NY 10019
Attn:  Dov Lesches
E-mail: dovi@empireeq.com

with a copy to:

The Bernstein Law Firm
3050 Biscayne Boulevard, Suite #403
Miami, FL 33137
Attention: Jason Pear, Esq.
E-mail:  Jason@bernstein-lawfirm.com  and  Michael@bernstein-lawfirm.com

(b)    All such notices and communications which shall be mailed, sent, delivered or transmitted in the manner described above shall be deemed given, served or delivered at such time as it is received by the addressee upon presentation or at such times as delivery is attempted in the case of any change in address as to which notice was not given to the other party as required hereunder or in the case of a refusal to accept delivery.

- 19 -

HF 12674042v.6

(c)      A notice given by a counsel to, and on behalf of, a party to this Note shall have the same force and effect as a notice given by such party.  Any party may change its notice address hereunder by delivering a notice of such changed address in accordance with the terms and conditions of this Section 17.

18.      <u>Creditor/Debtor Relationship</u>.

(a)      Borrower acknowledges and agrees that the Loan and the Loan Documents have been negotiated at arm's length with the benefit of advice of counsel and is in the best interests of the Borrower.

(b)      Borrower agrees and acknowledges that notwithstanding the fact that one or more direct or indirect partners, members and shareholders of Lender may now or in the future be the same as one or more of the direct or indirect partners, members and shareholders of the Borrower, Lender is a wholly separate and distinct Person, separate and distinct from the Borrower and neither Lender nor Borrower shall be deemed to be Controlled by, under common Control with or Controlling the other.

(c)      Borrower recognizes, acknowledges and agrees that the relationship created between the Lender and Borrower by the Lender making the Loan and Lender's execution, delivery and performance of the Loan Documents is solely and exclusively that of debtor/borrower and creditor/lender.  Nothing in the Loan Documents shall be construed to create or give rise to (i) any joint venture, partnership, tenancy-in-common, or joint tenancy relationship, or any other relationship other than debtor/borrower and creditor/lender, between Lender, on the one hand, and Borrower and any Affiliates of Borrower, on the other hand, or (ii) any rights, duties or obligations of the Lender to any of Borrower or any of its Affiliates of any kind or nature except as expressly set forth in the Loan Documents.  Borrower agrees never to institute or cause to be instituted or continue prosecution of, directly or indirectly, derivatively or otherwise, any suit or cause of action or proceeding against the Lender, in its capacity as lender or otherwise, in contravention of the foregoing.

(d)      Borrower waives and releases any and all defenses, affirmative defenses, set-offs, claims, counterclaims or causes of action of any kind or nature which any of Borrower or any of its Affiliates might assert on behalf of itself or any such Affiliates against the Lender in its capacity as lender, relating to the Loan or to the Loan Documents, or the enforcement by the Lender of its rights and remedies thereunder, to the extent arising out of or relating to the fact and circumstance that Lender or any Affiliate of Lender is providing services to Owner, Borrower or any of their respective Affiliates, and Borrower agrees never to institute or cause to be instituted or continue prosecution of, directly or indirectly, derivatively or otherwise any suit or cause of action or proceeding of any kind or nature whatsoever against the Lender, in its capacity as lender or otherwise, in contravention of the foregoing.

(e)      Borrower, on behalf of itself and its Affiliates hereby agrees not to directly or indirectly assert against any of the Lender or any Affiliate of Lender any claim, argument or defense, whether grounded on equitable subordination principles under Section 510 of the United States Bankruptcy Code or under any other section contained in Chapter 5 of the United States Bankruptcy Code, or otherwise, that the relationship of the Lender and the Borrower as evidenced

HF 12674042v.6

by the Loan Documents is not solely and exclusively that of debtor/borrower and creditor/lender or that the liens and security interests granted to the Lender in the Pledged Collateral as security for the Loan is not fully perfected and enforceable first-priority liens and security interests.

(f)     Reference is made to that certain Letter of Intent (the "LOI") dated as of January 11, 2019 by and among Arch Real Estate Holdings LLC, AWH Development Services, LLC and Owner, and accepted and agreed to by Lesches.  The parties hereto acknowledge and agree that this Loan constitutes the "Interim Funds" referenced in the LOI and that if the transactions contemplated by the LOI (which the Parties hereby acknowledge shall continue to be of full force and effect) do not occur, the Borrower shall have no defenses, affirmative defenses, set-offs, claims, counterclaims or causes of action of any kind or nature against Lender in connection therewith.  Borrower hereby waives and releases any and all defenses, affirmative defenses, set-offs, claims, counterclaims or causes of action of any kind or nature which any of Borrower or any of its Affiliates might assert on behalf of itself or any such Affiliates against the Lender to the extent arising out of or relating to the fact and circumstance that any transactions contemplated by the LOI did not occur.

19.     Signatures; Counterparts.  Telefacsimile or other electronic transmissions of any executed original document and/or retransmission of any executed telefacsimile or other electronic transmission shall be deemed to be the same as the delivery of an executed original.  At the request of any party hereto, the other parties hereto shall confirm telefacsimile or other electronic transmissions by executing duplicate original documents and delivering the same to the requesting party or parties.  This Note may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.

20.     Governing Law; Jurisdiction; Waiver of Jury Trial.

(a)     **THIS NOTE SHALL BE GOVERNED BY, CONSTRUED IN ACCORDANCE WITH, AND ENFORCED UNDER THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS OR INSTRUMENTS ENTERED INTO AND PERFORMED ENTIRELY WITHIN SUCH STATE.**

(b)     **THE BORROWER HEREBY IRREVOCABLY AGREES THAT ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS NOTE OR ANY OTHER TRANSACTION DOCUMENT OR ANY AGREEMENTS OR TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY MAY BE BROUGHT IN COURTS HAVING JURISDICTION OVER THE DISPUTE AND LOCATED IN THE COUNTY OF NEW YORK, NEW YORK AND HEREBY EXPRESSLY SUBMITS TO THE PERSONAL JURISDICTION AND VENUE OF SUCH COURTS FOR THE PURPOSES THEREOF AND EXPRESSLY WAIVES ANY CLAIM OF IMPROPER VENUE AND ANY CLAIM THAT SUCH COURTS ARE AN INCONVENIENT FORUM. THE BORROWER HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO ITS ADDRESS SET FORTH IN SECTION 17, OR TO THE BERNSTEIN LAW FIRM, WHICH IS HEREBY**

HF 12674042v.6

**APPOINTED BY BORROWER AS ITS AUTHORIZED AGENT TO TAKE, RECEIVE AND FORWARD COPIES OF SUCH PROCESS TO BORROWER, SUCH SERVICE TO BECOME EFFECTIVE TEN (10) DAYS AFTER SUCH MAILING.**

(c)   **THE LENDER AND BORROWER HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS NOTE OR ANY OF THE OTHER DOCUMENTS CONTEMPLATED HEREBY, ANY RIGHTS OR OBLIGATIONS HEREUNDER OR THEREUNDER OR THE PERFORMANCE OF SUCH RIGHTS AND OBLIGATIONS.**

21.   <u>Severability</u>.   If any one or more of the provisions contained herein, or the application thereof in any circumstance, is held invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions hereof shall not be in any way impaired, unless the provisions held invalid, illegal or unenforceable shall substantially impair the benefits of the remaining provisions hereof.

22.   <u>Entire Agreement</u>.   This Note (together with the exhibits and schedules hereto, and the other Loan Documents) is intended by the parties as a final expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the parties hereto in respect of the subject matter contained herein and therein.   There are no restrictions, promises, warranties or undertakings, other than those set forth or referred to herein or therein.   This Note (together with the exhibits and schedules hereto, and the other Loan Documents) supersede all prior agreements, term sheets, letters of intent, and understandings between the parties with respect to such subject matter.

23.   <u>Certain Expenses</u>.   The Borrower will pay all actual out of pocket expenses of the Lender (including, without limitation, all fees, charges and disbursements of Lender's counsel) in connection with this Note, the other Loan Documents, the transactions contemplated hereby and thereby and any amendments, consents, waivers and/or investigations related thereto and enforcement of rights thereunder. Lender and Borrower acknowledge and agree that on or prior to the date hereof, Borrower has deposited with Lender a deposit in the amount of $65,000.00, which deposit has been expended on actual out of pocket due diligence and legal expenses.

24.   <u>Publicity</u>.   Except as may be required by applicable law, Borrower shall not issue a publicity release or announcement or otherwise make any public disclosure concerning this Note, the other Loan Documents or the transactions contemplated hereby or thereby, without prior written approval from the Lender.   If any announcement is required by law to be made by Borrower, prior to making such announcement Borrower will deliver a draft of such announcement to Lender and shall give Lender an opportunity to comment thereon.

25.   TIME IS OF THE ESSENCE AGAINST BORROWER WITH RESPECT TO ALL PROVISIONS OF THIS NOTE AND THE OTHER LOAN DOCUMENTS.

26.   <u>Headings</u>.   The headings in this Note are for convenience of reference only and shall not limit or otherwise affect the meaning hereof.

HF 12674042v.6

27.     <u>Usury</u>.  This Note is subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the principal balance due hereunder at a rate which could subject Lender to either civil or criminal liability or would otherwise cause any provision of this Note to be rendered unenforceable as a result of being in excess of the maximum interest rate which Borrower is permitted by applicable law.  If by the terms of this Note, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of such maximum rate, the interest rate hereunder shall be deemed to be immediately and retroactively reduced to such maximum rate and all previous payments in excess of the maximum rate shall be deemed to have been payments in reduction of the principal amount of this Note and not on account of the interest due hereunder.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

HF 12674042v.6

IN WITNESS WHEREOF, the Borrower has executed this Note as of the date first written above.

> **EMPIRE EQ WGI LLC,**
> a Delaware limited liability company
>
> By: _____
> Name:  Dov Leshes
> Title:   Manager

STATE OF NEW YORK           )
                                              ) SS.:
COUNTY OF NEW YORK      )

On the 25 day of March in the year 2019 before me the undersigned, personally appeared **DOV LESHES**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacit(ies) and that by his/her/their signature(s) on the instrument the individual(s) or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

> BARBARA JEAN QUEVEDO
> NOTARY PUBLIC, STATE OF NEW YORK
> Registration No. 01QU4964968
> Qualified in Richmond County
> Commission Expires April 16, 2022

ACKNOWLEDGED AND ACCEPTED:

**ORLANDO LENDER LLC**
a New York limited liability company
p
By: _____
     Name:  Jeffrey Simpson
     Title:   Authorized Signatory

[Signature Page – Promissory Note]

IN WITNESS WHEREOF, the Borrower has executed this Note as of the date first written above.

**EMPIRE EQ WGI LLC,**
a Delaware limited liability company

By: _____
     Name:  Dov Leshes
     Title:   Manager

STATE OF NEW YORK     )
                       ) SS.:
COUNTY OF NEW YORK    )

On the __ day of March in the year 2019 before me the undersigned, personally appeared **DOV LESHES**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacit(ies) and that by his/her/their signature(s) on the instrument the individual(s) or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

ACKNOWLEDGED AND ACCEPTED:

**ORLANDO LENDER LLC**
a New York limited liability company
p
By: _____
    Name:  Jeffrey Simpson
    Title:   Authorized Signatory

[Signature Page – Promissory Note]

## **Schedule 1**

## **LITIGATION**

A.  *Behar Peteranecz, Inc. v. Empire EQ Hotel, LLC*, 2018-CA-010690 pending in the Circuit Court of the Ninth Judicial Circuit, in and for Orange County, Florida; and

B.  *Stantec Consulting Services Inc. v. Empire EQ Hotel, LLC*, which was assigned case number 2019-CA-002655-O pending in the Circuit Court of the Ninth Judicial Circuit, in and for Orange County, Florida.

## Schedule 2

## ENCUMBRANCES

None other than as indicated on Title Commitment attached as Exhibit 6(G), in particular 4(A) and 8 of the Requirements on same.

**Schedule 3**

**Material Contracts**

a.   Behar Peteranecz, Inc.

b.   Engagement Letter with Eyzenberg and Company dated May 29, 2018

c.   Mortgages as set forth on Schedule 2.

**Schedule 4**

**Schedule of Permitted Payments**

[attached]

| | | Total | Arch | Empire | Notes |
|---|---|---|---|---|---|
| | **1. Initial Funding** | | | | |
| 3/27/2019 | | | | | |
| | Behar Peteranecz / Stantec (AE team) | 500,000.00 | | | |
| | Celano Design (Interiors) | 25,000.00 | | | |
| | Sr. Loan Interest Reserve | - | | | Held by Senior Lender per Escrow Agreement |
| | Outstanding Sr. Loan Interest | - | | | None |
| | Arch Pref / Mezz Reserve | 60,833.33 | | | 4 months |
| | Moss and Associates (pre-con GMP process) | - | | | Borrower paid prior to closing |
| | Development Fee | 30,000.00 | | | 1 month |
| | Fees for First American | 3,939.00 | | | |
| | Pay Off Existing 2nd Lender | 150,000.00 | | | Any additional funds required will be paid directly by Empire |
| | Legal - Catch Up Existing Legal | 48,423.08 | | | Net amount of legal outstanding at closing |
| | Legal - Future Legal | - | | | None at closing |
| | | 818,195.41 | 800,000.00 | 18,195.41 | |
| 4/3/2019 | | | | | |
| 4/10/2019 | | | | | |
| | Legal - Future Legal | 25,000.00 | | | Next Deposit for Legal |
| | Behar Peteranecz / Stantec (True Up Payment) | 75,212.58 | | | |
| | Behar Peteranecz / Stantec | 75,000.00 | | | |
| | | 175,212.58 | 0.00 | 175,212.58 | |
| 4/17/2019 | **2. Target Lender LOI Executed** | | | | |
| 4/24/2019 | | | | | |
| | Lender Deposit | 100,000.00 | | | Additional legal deposit may be required for AWH / Arch - $TBD |
| | Development Fee | 30,000.00 | | | 1 month |
| | Behar Peteranecz / Stantec (AE team) | 75,000.00 | | | |
| | | 205,000.00 | 200,000.00 | 5,000.00 | |
| 5/1/2019 | | | | | |
| | Legal - Future Legal | 25,000.00 | | | Next Deposit for Legal |
| | | 25,000.00 | 0.00 | 25,000.00 | |
| | **3. Targeted Secondary Funding** | | | | |
| 5/8/2019 | | | | | |
| | Development Fee (Remainder) | 291,666.68 | | | Catch up on accrued balance for 4 months |
| | The Bernstein Law Firm (legal, excluding LOI) | 17,500.00 | | | |
| | Celano Design (Interiors) | 60,000.00 | | | |
| | Property Tax | 87,482.97 | | | Amount if Paid by May 31st; increase to $96,455.44 if date is missed |
| | Legal | 20,000.00 | | | |
| | Behar Peteranecz / Stantec (AE team) | 75,000.00 | | | |
| | | 551,649.65 | 500,000.00 | 51,649.65 | |
| 5/15/2019 | | | | | |
| | Legal - Future Legal | 25,000.00 | | | Next Deposit for Legal |
| | | 25,000.00 | 0.00 | 25,000.00 | |
| 5/22/2019 | | | | | |
| | Development Fee | 30,000.00 | | | 1 month |
| | Behar Peteranecz / Stantec (AE team) | 75,000.00 | | | |
| | | 105,000.00 | 0.00 | 105,000.00 | |
| 5/29/2019 | | | | | |
| 6/5/2019 | | | | | |
| | Behar Peteranecz / Stantec (AE team) | 75,000.00 | | | |
| | | 75,000.00 | 0.00 | 75,000.00 | |
| 6/12/2019 | | | | | |
| | **4. Targeted Close With Construction Lender** | | | | |
| 6/19/2019 | | | | | |
| 6/26/2019 | | | | | |
| | Development Fee | 30,000.00 | | | 1 month |
| | | 30,000.00 | 0.00 | 30,000.00 | |

## Schedule 6(l)(2)

## Liens of any nature against Borrower or Owner

A.  Claim of Lien filed by Behar Peteranecz, Inc. and recorded in the public records of Orange County, Florida at Doc #20180477490

B.  Claim of Lien filed by Stantec Consulting Services Inc. and recorded in the public records of Orange County, Florida at Doc #20180687830

**Schedule 6(g)**

**Title Report**

[SEE ATTACHED]

# PropertyInfo Title Search Services

# TITLE SEARCH REPORT

File #: 12-24-28-9655-00-024

Associated File # 12346902

**PropertyInfo Title Search Services** and/or their agent has searched the Orange County, Florida records for the period shown relative to title to the real property described below, and provides the following title search report (TSR) for A1A Title Services LLC

**Search Type:** FL COM Refinance Loan

The search period was to 2/7/2019 at 08:00.

| | |
|---|---|
| Property Address: | Westwood Boulevard, Orlando FL 32821 |
| Seller: | |
| Buyer/Borrower: | Empire Eq Hotel LLC, a Florida Limited Liability Company |
| Title Vested In: | EMPIRE EQ HOTEL LLC, a Florida limited liability company, by virtue of that certain Special Warranty Deed recorded in Official Records Instrument 20170458664, of the Public Records of Orange County, Florida. |

Interest or Estate (Fee Simple/Leasehold):   FEE SIMPLE

## Legal Description

The land referred to herein below is situated in the County of Orange, State of Florida, and is described as follows:

Parcel 1: (Also known as Lot 4)

A portion of Lot 2, WESTWOOD, according to the plat thereof, as recorded in Plat Book 20, Pages 132 and 133, of the Public Records of Orange County, Florida, lying in Section 12, Township 24 South, Range 28 East, Orange County, Florida, being more particularly described as follows:

Commence at the Northeast corner of said Lot 2; thence run S 89°46'17" W, along the Northerly line of said Lot 2, a distance of 46.00 feet for the POINT OF BEGINNING; thence, departing said Northerly line, run S 00°13'43" E, a distance of 554.82 feet to a point on the Northerly right-of-way line of Westwood Boulevard, as shown and described on the plat WESTWOOD BOULEVARD RIGHT-OF-WAY - PHASE II, as recorded in Plat Book 15, Page 80, Public Records of Orange County, Florida; said point being a point on a non-tangent curve, concave Southeasterly, having a radius of 1045.82 feet and a central angle of 14°47'24"; thence run Southwesterly, along said Northerly right-of-way line, the following courses and distances; on a chord bearing of S 71°34'53" W, run 269.96 feet along the arc of said curve to the point of tangency thereof; thence run S 64°11'11" W, a distance of 10.18 feet; thence, departing said Northerly right-of-way line, run N 27°34'38" W, a distance of 209.91 feet; thence run N 05°42'29" W, a distance of 440.66 feet to a point on the aforesaid Northerly line of said Lot 2, WESTWOOD; said point being a point on a non-tangent curve, concave Southerly, having a radius of 5603.59 feet and a central angle of 02°56'22"; thence run Easterly, along said Northerly line, the following courses and distances; on a chord bearing of N 86°08'56" E, run 287.48 feet along the arc of said curve to a point; thence run N 89°46'17" E, a distance of 116.58 feet to the POINT OF BEGINNING.

AND

Parcel 2:
Together with that certain Ingress and Egress Easement described in Exhibit "C" to that certain Easement Agreement recorded in Official Records Book 9556, Page 3072, Public Records of Orange County, Florida.

AND

Parcel 3:
Together with that certain Shared Access Easement described in Exhibit "D" to that certain Master Easement and Restrictive Covenant Agreement recorded in Official Records Book 9407, Page 1437, Public Records of Orange County, Florida.

## Taxes

**Mortgages, Liens & Court**

Record Mortgage executed by EMPIRE EQ HOTEL LLC, a Florida limited liability company, to the Proposed Insured encumbering the lands described in Schedule "A".

The Company will require the following as to EMPIRE EQ HOTEL LLC, a Florida limited liability company:

A. Satisfactory evidence must be furnished establishing that EMPIRE EQ HOTEL LLC, a Florida limited liability company is duly organized, validly existing, and in good standing under the laws of Florida currently and at date it acquired an interest in the insured property. On-line confirmation of both of the foregoing is sufficient.

B. The mortgage to be insured must be executed by a manager of a manager-managed limited liability company or a member of a member-managed limited liability company unless there is a recorded certified statement of authority which limits that authority. The online information provided by the Florida Department of State, Division of Corporations can be relied upon to obtain the identity of the manager or the member, as the case may be.

C. If the members or managers are not identified in the articles of organization or the Department of State, Division of Corporation's website, the operating agreement must be produced. If an operating agreement does not exist or the information in the operating agreement conflicts with the information on file with the Division of Corporations, a recorded certified Statement of Authority certified by the Florida Secretary of State is to be recorded in official records of the county where the property lies.

D. If a certified Statement of Authority, which is less than 5 years old is recorded in official records in the county where the property lies, you may rely upon it to establish the authority and identity of the party(ies) to execute the deed or mortgage to be insured. Determination must be made that the Statement of Authority has not been cancelled, limited by a subsequent Statement of Authority or a statement of disassociation by the named member or manager such as being a debtor in bankruptcy.

E. If a power of attorney is to be used to mortgage the property on behalf of the limited liability company, absent a recorded certified statement of authority, review the articles of organization and the operating agreement to confirm the delegation of authority is permitted.

Record Release of the insured property from the Mortgage, Assignment of Rents, Security Agreement and Fixture Filing, recorded 08/17/2017, in Official Records Instrument 20170458665, in the original principal amount of $5,450,000.00 from EMPIRE EQ HOTEL LLC, a Florida limited liability company, to Westwood Orlando ASLI V L.L.L.P., a Delaware limited liability limited partnership, modified by Subordination Agreement recorded 07/31/2018, in Official Records Instrument 20180449670, and further modified by Memorandum of Conditional Settlement and Loan Modification Agreement recorded 07/31/2018, in Official Records Instrument 20180449671, all of the Public Records of Orange County, Florida.

The Company will require the following as to Westwood Orlando ASLI V L.L.L.P., a Delaware limited liability limited partnership:

A) Satisfactory evidence must be furnished establishing that Westwood Orlando ASLI V L.L.L.P., a Delaware limited liability limited partnership is a LLLP in good standing under the laws of Florida.
B) An affidavit from one or more general partners should be executed stating: (1) that the general partner executing the Satisfaction of Mortgage is authorized under the partnership agreement or has obtained the consent of all the general partners to Satisfy the Mortgage of the LLLP's real property; (2) that the LLLP has not been dissolved; and (3) that the Westwood Orlando ASLI V L.L.L.P., a Delaware limited liability limited partnership's agreement has not been revoked or amended to prohibit the subject transaction.
C) A determination should be made that a limitation on the authority of the general partner executing the Satisfaction of Mortgage has not been recorded.
D) Westwood Orlando ASLI V L.L.L.P., a Delaware limited liability limited partnership in Bankruptcy: Satisfactory evidence, in the form of an affidavit, must be furnished to establish that the general partner who executed Satisfaction of Mortgage on behalf of Westwood Orlando ASLI V L.L.L.P., a Delaware limited liability limited partnership is not a debtor in a bankruptcy proceeding.

NOTE: The purpose of this requirement is to establish the proper person to execute the Satisfaction of Mortgage on behalf of Westwood Orlando ASLI V L.L.L.P., a Delaware limited liability limited partnership.

Record Release of the insured property from the Mortgage, Assignment of Rents, Security Agreement and Fixture Filing, recorded 07/31/2018, in Official Records Instrument 20180449667, of the Public Records of Orange County, Florida, in the original principal amount of $5,500,000.00 from Empire EQ Hotel LLC, a Florida limited liability company, to Paradigm Credit Corporation II, a New York corporation.

Satisfactory evidence must be furnished establishing that Paradigm Credit Corporation II, a New York corporation, is duly organized, validly existing and in good standing under the laws of its state of incorporation. In addition, if the proposed instrument of Satisfaction of Mortgage, is to be executed by an officer other than a Vice President, Chief Executive Officer, or President, a certified resolution authorizing said officer to execute on behalf of the corporation must be recorded.

NOTE: The purpose of this requirement is to establish the proper person to execute the Satisfaction of Mortgage on behalf of Paradigm Credit Corporation II, a New York corporation.

Record Release of Assignment of Leases and Rents executed by Empire EQ Hotel LLC, as assignor, to Paradigm Credit Corporation II, as assignee, recorded on 07/31/2018, in Official Records Instrument 20180449668, of the Public Records of Orange County, Florida.

Record the termination of UCC Financing statement naming Paradigm Credit Corporation II, as secured party, and Empire EQ Hotel LLC, as debtor, filed 07/31/2018 of record in Official Records Instrument 20180449669, of the Public Records of Orange County, Florida.

Record Release of Claim of Lien executed by Behar Peteranecz, Inc., against Empire EQ Hotel LLC, in the original amount of $681,902.17, recorded in Official Records Instrument 20180477490, of the Public Records of Orange County, Florida.

Dismissal with prejudice of litigation and discharge of Lis Pendens filed under Case No. 2018CA010690-O, Orange County, Florida, as disclosed by Notice of Lis Pendens filed 10/04/2018, recorded in Official Records Instrument 20180587803, of the Public Records of Orange County, Florida.
NOTE: We have not made a complete examination of said proceedings.

Record Release of Claim of Lien executed by Stantec Consulting Services Inc., against Empire EQ Hotel LLC, in the original amount of $241,074.00, recorded in Official Records Instrument 20180687830, together with Notice of Contest of Lien recorded 01/30/2019, in Official Records Instrument 20190059749, of the Public Records of Orange County, Florida.

Payment of any and all Special Assessments, Bills, Charges or Municipal Liens levied and/or assessed.

Taxes for the year 2018 under Tax ID 12-24-28-9655-00024 in the gross amount of $84,920.36 and special assessments, if any must be paid.


## Additional Matters of Record

Taxes and assessments for the year 2019 and subsequent years, which are not yet due and payable.

Any lien arising under Chapter 159, Florida Statutes, in favor of any city, town, village or port authority for unpaid service charges for service by any water system, sewer system or gas system servicing the lands described herein.

Notice of Restrictions on Real Estate recorded in Official Record Book 2244, Page 736, of the Public Records of Orange County, Florida.

Restrictions, covenants, conditions, and easements of the Declaration for "Westwood" recorded in Official Record Book 3047, Page 371; as amended by the Amendment to Declaration recorded in Official Record Book 3283, Page 2047; as partially assigned in the Partial Assignment of Restrictive Covenants recorded in Official Record Book 4502, Page 326; as amended by the Notice of Extending Declaration of Covenants, Conditions and Restrictions for "Westwood" recorded in Official Record Book 9881, Page 2145, all of the Public Records Orange County, Florida, which includes provisions for the collection of assessments.

Developers Agreement recorded in Official Records Book 3650, Page 503, of the Public Records of Orange County, Florida.

Terms, conditions, covenants, restrictions and easements as set forth in Warranty Deed recorded in Official Records Book 3711, Page 2551, as partially released by Quit Claim Deed recorded in Official Records Book 5408, Page 4591, of the Public Records of Orange County, Florida.

Easement granted to Southern Bell Telephone and Telegraph Company recorded in Book 4057, Page 3183, of the Public Records of Orange County, Florida.

Resolution of the Board of County Commissioners Amending and Restating a Municipal Service Benefit Unit for Streetlighting for Orangewood/Westwood Area recorded in Book 6541, Page 4075; as amended by that certain Resolution of the Board of County Commissioners Amending and Restating a Municipal Service Benefit for Streetlighting for Orangewood/Westwood Area recorded in Book 9612, Page 2084; as further amended and restated by that certain Resolution of the Board of County Commissioners Amending and Restating a Municipal Service Benefit for Streetlighting for Orangewood/Westwood Area recorded in Instrument No. 20170190835, of the Public Records of Orange County, Florida.

Easements, restrictions, reservations, and covenants of WESTWOOD, according to the plat thereof, as recorded in Plat Book 20, Pages 133 and 134, of the Public Records of Orange County, Florida.

Orange County Wastewater Capacity Permit 01-01585, Status of Permit Notice recorded in Official Records Book 5518, Page 1673; and Orange County Wastewater Capacity Permit 02-01818, Status of Permit Notice recorded in Official Records Book 5518, Page 1677, of the Public Records of Orange County, Florida.

Terms and conditions of Development Agreement for Westwood Connector recorded in Official Records Book 5771, Page 4279, as amended by the First Amendment recorded in Official Records Book 6230, Page 785 and Second Amendment recorded in Official Records Book 6739, Page 2059, of the Public Records of Orange County, Florida.

Construction, Access & Maintenance Easement in favor of Orange County recorded in Book 6739, Page 2068, of the Public Records of Orange County, Florida

Access and Maintenance Easement Agreement in favor of Orange County recorded in Book 6036, Page 4789, of the Public Records of Orange County, Florida.

Terms conditions of Assignment/Designation of Development Capacity by Westwood Blvd., LTD., a Florida limited partnership and BVC Partners IX, LLC, a Florida limited liability company, recorded in Official Records Book 9407, Page 1243 amended by Official Records Book 9556, Page 3042 and together with Official Records Book 9556, Page 3050, of the Public Records of Orange County, Florida.

Terms, conditions, restrictions, reservations, and easements of the Master Easement and Restrictive Covenant Agreement by and between Great Orlando Wheel Corporation, a Delaware corporation, and BVC Partners IX, LLC, a Florida limited liability company, as recorded in Official Records Book 9407, Page 1437, of the Public Records of Orange County, Florida.

Terms and conditions of Easement Agreement recorded in Official Records Book 9556, Page 3072, of the Public Records of Orange County, Florida.

Curb Cut Agreement by and between BVC Partners XI, LLC, a Florida limited liability company, and BVC Partners XII, LLC, a Florida limited liability company, recorded in Book 9861, Page 6947, of the Public Records of Orange County, Florida.

Assignment/Designation of Development Capacity (Lot 4) recorded in Book 9861, Page 6935, of the Public Records of Orange County, Florida.

Assignment of Density Rights (Lot 4) recorded in Book 10193, Page 9108, of the Public Records of Orange County, Florida.

The following matters shown on that certain survey prepared by Ganung-Belton Associates, Inc. dated February 3, 2009, Job Number 90121.21X: (as disclosed by prior title evidence)

a. Encroachment of retaining wall along the Eastern property line into Lot 4;

b. Encroachment of electric riser box within the 60' Transportation Easement in the Southeastern corner of Lot 4;

c. Encroachment of traffic control pole located in the Southeastern corner of Lot 4 outside of easement area; and

d. Encroachment of electric meter located in the Southeastern corner of Lot 4 without benefit of an easement.

Any existing unrecorded leases and all rights there under of the lessees and of any person claiming by, through or under the lessees

## County Notes

Tax Contact Info:
407-836-4145; 407-836-2700

Tax Site:
http://www.octaxcol.com/

**Notice:** This report, as written (and any supplements or amendments hereto), is issued solely for use in connection with the issuance of Commitments for Title Insurance, Policies of Title Insurance, Preliminary and Final Judicial Reports, or Title Guaranties of Stewart Title Guaranty Company. This report shall not be considered, nor used as a commitment or policy of title insurance.

THIS REPORT IS NOT AN ABSTRACT, EXAMINATION, REPORT, OR REPRESENTATION OF FACT OR TITLE AND DOES NOT CREATE AND SHALL NOT BE THE BASIS OF ANY CLAIM FOR NEGLIGENCE, NEGLIGENT MISREPRESENTATION OR OTHER TORT CLAIM OR ACTION. THE SOLE LIABILITY OF COMPANY AND ITS TITLE INSURANCE AGENT SHALL ARISE UNDER AND BE GOVERNED BY THE CONDITIONS OF THE COMMITMENT

## **EXHIBIT A**

[SEE ATTACHED]

**EXECUTION COPY**

## PLEDGE AGREEMENT

THIS **PLEDGE AGREEMENT**, dated as of April __, 2019 (this "Agreement"), by and between **EMPIRE EQ WGI LLC**, a Delaware limited liability company (the "Pledgor"), and **ORLANDO LENDER LLC**, a New York limited liability company (hereinafter referred to herein as the "Lender").

**WHEREAS**, pursuant to a Promissory Note, dated as of the date hereof (as amended, supplemented, restated or otherwise modified from time to time, the "Note") between the Pledgor and the Lender, the Lender agreed to make a loan (the "Loan") to the Pledgor as provided therein;

**WHEREAS**, as a condition to making the Loan, the Lender required the Pledgor to secure Pledgor's obligations under the Note by entering into this Agreement; and

**WHEREAS**, Pledgor wishes to secure its obligations under the Note by entering into this Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Pledgor hereby agrees as follows:

1.      Definitions.  (a) Capitalized terms used but not defined in this Agreement shall have the meanings assigned thereto in the Note; and (b) the following terms when used in this Agreement shall have the following meanings:

"Pledged Collateral" means (i) all right, title and interest of the Pledgor in and to the limited liability company interests in the Subsidiary, whether now existing or hereafter arising, including without limitation, all rights of the Pledgor in and to the Pledgor's capital accounts and Capital Accounts (as defined in the Subsidiary LLCA), the Pledgor's Percentage Interests (as defined in the Subsidiary LLCA), and all rights of the Pledgor as a Member under (and as defined in) the Subsidiary LLCA, including all rights to secure distributions thereunder and all rights to request and obtain withdrawal of Pledgor's capital thereunder; (ii) any and all securities (both certificated and uncertificated) and financial assets, and all other property interests which may subsequently be delivered or transferred by or for the account of the Pledgor to the Lender pursuant to any Loan Document as additional security for the Obligations; (iii) any of the foregoing when put in transit to the Lender; (iv) all dividends of every kind which shall become and be due and payable or distributable on or in respect of all or any of the securities and financial assets referred to in clauses (i) and (ii); (v) all payments and other distributions of every kind whatsoever which shall become and be due and payable or distributable on account of the purchase, redemption, repurchase or other retirement of all or any of such securities and financial assets; (vi) all of the Pledgor's now owned or hereafter acquired or arising "accounts", "supporting obligations", "deposit accounts", "goods", "documents", "chattel paper" (including electronic chattel paper), in each case as defined in the UCC, including any rights to payment for the sale or lease of goods or rendition of services, whether or not they have been earned by performance; (vii) all contract rights; (viii) all money, cash, cash equivalents, securities and other property of any kind of the Pledgor held directly or indirectly by the Lender; (ix) all other property of the Pledgor in which the Lender may at any time be granted a Lien as collateral for the Obligations; and (x) all Proceeds of the foregoing, including, without limitation, the roll-over or reinvested proceeds of the foregoing.  Any delivery or transfer

- 1 -

of any of the Pledged Collateral to an agent or custodian designated by the Lender shall be deemed a delivery or transfer to the Lender.

"Pledged Interests" means the limited liability company interests of the Pledgor in the Subsidiary constituting Pledged Collateral, together with all certificates evidencing ownership of such interests, and all claims, powers, privileges, benefits, remedies, voting rights, options or rights of any nature whatsoever which currently exist or may be issued or granted by the Subsidiary to Pledgor while this Agreement is in effect.

"Proceeds" means all "proceeds" as such term is defined in Section 9-102(a)(64) of the Uniform Commercial Code and, in any event, shall include, without limitation, all dividends or other income from the Pledged Interests, collections thereon or distributions with respect thereto.

"Subsidiary" means EMPIRE EQ HOTEL LLC, a Delaware limited liability company.

"Subsidiary LLCA" means the Limited Liability Company Agreement of the Subsidiary, dated as of February 1, 2019, a true, correct and complete copy of which is attached as Exhibit 1 to this Agreement.

"UCC" or "Uniform Commercial Code" shall mean the Uniform Commercial Code as in effect in the State of New York.

2.      Security Interest.  The Pledgor hereby irrevocably and unconditionally pledges and grants to the Lender a first priority security interest and continuing Lien on the Pledged Collateral, to secure the punctual payment and performance of all Obligations.

3.      Perfection.  At any time and from time to time, at the expense of the Pledgor, the Pledgor will promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable, or that the Lender may reasonably request, to perfect and protect any security interest granted or purported to be granted hereby or to enable the Lender to exercise and enforce its rights and remedies hereunder with respect to any Pledged Collateral.  Without limiting the generality of the foregoing, (i) whether or not the Pledged Collateral is evidenced by certificates, the Pledgor hereby authorizes and permits the Lender to file in such places as the Lender may determine a UCC Financing Statement naming the Pledgor as debtor and the Lender as secured party with respect to the Pledged Collateral, in form and substance satisfactory to the Lender in its sole and reasonable determination, and without the requirement of the Pledgor's signature; and (ii) with respect to the Pledged Collateral that is not evidenced by certificates, the Pledgor agrees to execute and deliver to the issuer of such securities and such other third parties as may be determined to be necessary or appropriate by the Lender, such instruments in form and substance satisfactory to the Lender in its sole and reasonable determination to acknowledge and register the pledge of the securities hereunder in their books and records and to deliver statements of account upon the Lender's request therefore.  Without limiting the generality of the foregoing, Pledgor hereby authorizes the filing of financing statements (and amendments of financing statements and continuation statements) that name Pledgor as debtor and Lender as secured party and that cover all personal property or all assets of Pledgor, whether now owned or hereafter acquired and the proceeds thereof.  Pledgor hereby

- 2 -

ratifies the filing of any such financing statements (or amendments of financing statements or continuation statements) that were filed prior to the execution hereof.

Concurrently with the execution and delivery of this Agreement, the Pledgor shall (a) cause the Subsidiary to execute and deliver to Lender an Acknowledgment and Consent with respect to this Agreement in the form of Exhibit 2 hereto and (b) send written instructions in the form of Exhibit 3 hereto to the Subsidiary, and (c) cause the Subsidiary to, and the Subsidiary shall, deliver to the Lender the Confirmation Statement and Instruction Agreement in the form of Exhibit 4 hereto pursuant to which the Subsidiary will confirm that it has registered the pledge effected by this Agreement on its books and agrees to comply with the instructions of the Lender in respect of the Pledged Interests without further consent of the Pledgor or any other Person.

If the interests underlying the Pledged Interests have been (or subsequently are) certificated, then concurrently with the execution and delivery of this Agreement (or promptly after certification), the Pledgor shall deliver to the Lender each original certificate, if any, evidencing the Pledged Interests (which certificates shall constitute "security certificates" (as defined in the Uniform Commercial Code)), together with an undated, irrevocable membership power and power of attorney, coupled with an interest covering each such certificate duly executed in blank in the form approved by Lender (in its sole discretion).

Upon the occurrence and during the continuance of an Event of Default, Lender shall have the right, at any time, in its discretion upon written notice to Pledgor, to transfer to or to register in the name of Lender or its nominee any or all of the Pledged Collateral. Prior to or concurrently with the execution and delivery of this Agreement, Pledgor shall deliver to Lender an assignment of limited liability company interest endorsed by Pledgor in blank (an "Assignment of Interest"), in the form set forth on Exhibit 5 hereto, for the Pledged Interests, transferring all of such Pledged Interests in blank, duly executed by Pledgor and undated. Lender shall have the right, at any time in its discretion upon the occurrence and during the continuance of an Event of Default and without notice to Pledgor, to transfer to, and to designate on such Pledgor's Assignment of Interest, any Person to whom the Pledged Interests are sold in accordance with the provisions hereof. In addition, Lender shall have the right at any time to exchange any Assignment of Interest representing or evidencing the Pledged Interests or any portion thereof for one or more additional or substitute Assignments of Interest representing or evidencing smaller or larger percentages of the Pledged Interests represented or evidenced thereby, subject to the terms thereof.

4.    Representations and Warranties. The Pledgor represents and warrants as follows:

(a)    The Subsidiary has opted in to Article 8 of the UCC. The Subsidiary has not previously issued any certificates evidencing the Pledged Collateral.

(b)    The Pledgor is the legal and beneficial owner of all the Pledged Collateral free and clear of any Lien, security interest or other encumbrance except in favor of the Lender. No effective financing statement or other instrument similar in effect covering all or any part of the Pledged Collateral is on file in any recording office except naming the Lender as secured party.

(c)    The pledge of the Pledged Collateral pursuant to this Agreement creates a valid first priority security interest in the Pledged Collateral, securing the payment of the

Obligations, and all filings and other actions necessary or desirable to perfect and protect such security interest have been duly made or taken.

(d)     No authorization, approval or consent of, and no notice to or filing with or action by, any governmental authority or regulatory body or under the operating agreement of Pledgor or the Subsidiary LLCA is required for (i) the pledge by the Pledgor of the Pledged Collateral pursuant to this Agreement, the grant by the Pledgor of the security interest hereby granted or the execution, delivery or performance of this Agreement by the Pledgor, (ii) the perfection of or exercise by the Lender of its rights and remedies provided for in this Agreement or (iii) the exercise by the Lender of the voting or other rights provided for in this Agreement or the remedies in respect of the Pledged Collateral pursuant to this Agreement (and upon such exercise, for Lender or the purchaser of such Pledged Collateral to be admitted as a member of the Subsidiary to the full extent of the Pledged Interests).

(e)     The Pledgor has full right, power and authority to enter into this Agreement and to grant the security interest in the Pledged Collateral made hereby, and this Agreement constitutes the legal, valid and binding obligation of the Pledgor enforceable against the Pledgor in accordance with its terms.

(f)     The Pledged Interests constitute 100% of the limited liability company interests in the Subsidiary. The Pledgor neither owns nor holds any interest, right or claim in the Subsidiary other than the Pledged Interests.  Pledgor will not, nor will Pledgor permit or cause the Subsidiary to issue any additional equity interest, including limited liability company interests without the Lender's prior written consent.  A true, correct and complete organizational and ownership chart of the Pledgor, the Subsidiary and the Property is attached hereto as Exhibit 6 and is hereby incorporated by reference.

(g)     The execution, delivery and performance by the Pledgor of this agreement are within the powers of the Pledgor, and do not or will not (i) violate any law or regulation, or any other decree of any court or governmental authority or regulatory body, (ii) violate the operating agreement of Pledgor or the Subsidiary LLCA, or (iii) result in or require the creation or imposition of any Lien, security interest or other encumbrance upon any of the property of the Pledgor except in favor of the Lender.

(h)     Except as expressly set forth in the Subsidiary LLCA, there are no restrictions on the transfer of the Pledged Interests pledged by Pledgor hereunder, and the Pledgor has the right to transfer such Pledged Interests free and clear of any Lien, security interest or other encumbrance and without the consent of the creditors of the Pledgor or the consent of any other person, entity or governmental authority and upon the occurrence of an Event of Default and the transfer of the Pledged Interests to the Lender, the Lender will have all of the rights of the Pledgor with respect thereto.

(i)     The Pledgor is, and at all times has been, organized exclusively under the laws of the State of Delaware.

(j)     The exact name of the Pledgor is: **EMPIRE EQ WGI LLC**.

- 4 -

(k)     The Subsidiary LLCA provides that the limited liability company interests in the Subsidiary are "securities" governed by and within the meaning of Article 8 of the UCC (including Section 8-102(a)(15) thereof).

(l)     Except as otherwise disclosed by that certain Phase I environmental report dated February 5, 2018 issued by Terracon Consultants, Inc. as project H1187044 (or Phase II environmental report, if required) in respect of the Property delivered to Lender (referred to below as the "Environmental Report"), a copy of which has been provided to Lender, (a) there are no Hazardous Substances (defined below) or underground storage tanks in, on, or under the Property, except those that are both (i) in compliance with all Environmental Laws (defined below) and with permits issued pursuant thereto and (ii) fully disclosed to Lender in writing pursuant to the Environmental Report; (b) there are no past, present or threatened Releases (defined below) of Hazardous Substances in, on, under or from the Property which have not been fully remediated in accordance with Environmental Law; (c) there is no threat of any Release of Hazardous Substances migrating to the Property; (d) there is no past or present non-compliance with Environmental Laws, or with permits issued pursuant thereto, in connection with the Property which has not been fully remediated in accordance with Environmental Law; (e) Pledgor does not know of, and has not received, any written or oral notice or other communication from any Person (including but not limited to a governmental entity) relating to Hazardous Substances or Remediation (defined below) thereof, of possible liability of any Person pursuant to any Environmental Law, other environmental conditions in connection with the Property, or any actual or potential administrative or judicial proceedings in connection with any of the foregoing; and (f) Pledgor has truthfully and fully provided to Lender, in writing, any and all information relating to conditions in, on, under or from the Property that is known to Pledgor and that is contained in files and records of Pledgor, including but not limited to any reports relating to Hazardous Substances in, on, under or from the Property and/or to the environmental condition of the Property.

(i)     "Environmental Law" means any present and future federal, state and local laws, statutes, ordinances, rules, regulations and the like, as well as common law, relating to protection of human health or the environment, relating to Hazardous Substances, relating to liability for or costs of other actual or threatened danger to human health or the environment.

(ii)     "Environmental Law" includes, but is not limited to, the following statutes, as amended, any successor thereto, and any regulations promulgated pursuant thereto, and any applicable state or local statutes, ordinances, rules, regulations and the like addressing similar issues: the Comprehensive Environmental Response, Compensation and Liability Act; the Emergency Planning and Community Right-to-Know Act; the Hazardous Substances Transportation Act; the Resource Conservation and Recovery Act (including but not limited to Subtitle I relating to underground storage tanks); the Solid Waste Disposal Act; the Clean Water Act; the Clean Air Act; the Toxic Substances Control Act; the Safe Drinking Water Act; the Occupational Safety and Health Act; the Federal Water Pollution Control Act; the Federal Insecticide, Fungicide and Rodenticide Act; the Endangered Species Act; the National Environmental Policy Act; and the River and Harbors Appropriation Act.

(iii)     "Environmental Law" also includes, but is not limited to, any applicable present and future federal, state and local laws, statutes ordinances, rules, regulations and the like, as well as common law: conditioning transfer of property upon a negative declaration

- 5 -

or other approval of a governmental authority of the environmental condition of the Property; requiring notification or disclosure of Releases of Hazardous Substances or other environmental condition of the Property to any Governmental Authority or other Person, whether or not in connection with transfer of title to or interest in property; imposing conditions or requirements in connection with permits or other authorization for lawful activity; relating to nuisance, trespass or other causes of action related to the Property; and relating to wrongful death, personal injury, or property or other damage in connection with any physical condition or use of the Property.

(iv)    "Hazardous Substances" includes but is not limited to any and all substances (whether solid, liquid or gas) defined, listed, or otherwise classified as pollutants, hazardous wastes, hazardous substances, hazardous materials, extremely hazardous wastes, or words of similar meaning or regulatory effect under any present or future Environmental Laws or that may have a negative impact on human health or the environment, including but not limited to Microbial Matter, petroleum and petroleum products, asbestos and asbestos-containing materials, polychlorinated biphenyls, lead, radon, radioactive materials, flammables and explosives, but excluding substances of kinds and in amounts ordinarily and customarily used or stored in similar properties for the purposes of cleaning or other maintenance or operations and otherwise in compliance with all Environmental Laws.

(v)    "Release" with respect to any Hazardous Substance includes but is not limited to any release, deposit, discharge, emission, leaking, leaching, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing or other movement of Hazardous Substances.

(vi)    "Remediation" includes but is not limited to any response, remedial, removal, or corrective action; any activity to clean up, detoxify, decontaminate, contain or otherwise remediate any Hazardous Substance; any actions to prevent, cure or mitigate any Release of any Hazardous Substance; any action to comply with any Environmental Laws or with any permits issued pursuant thereto; any inspection, investigation, study, monitoring, assessment, audit, sampling and testing, laboratory or other analysis, or evaluation relating to any Hazardous Substances or to anything referred to herein.

5.    Distributions.  The Pledgor agrees that: (i) any distribution in kind received by the Pledgor from any party for or on account of the Pledged Collateral, including distributions of stock as a dividend or split of any of the Pledged Collateral, shall be immediately delivered to the Lender in the form received with any required endorsement; and (ii) any note or other instrument executed and delivered to the Pledgor by any party to evidence any obligation of such party with respect to the Pledged Collateral shall be immediately delivered with any required endorsement to the Lender.  All such items shall be held by the Lender in accordance with the terms of this Agreement. Until the Obligations are repaid in full, the Pledgor shall not have the right to receive any distributions for or on account of the Pledged Collateral.  Notwithstanding the foregoing to the contrary, to the extent the Pledgor receives any distributions, it shall hold same in trust for the benefit of the Lender and shall immediately deliver all distributions for or on account of the Pledged Collateral to the Lender in the form received.

6.    Certain Rights and Duties of Lender.  The Pledgor acknowledges that:

(a)     the Lender has no duty of any type with respect to the Pledged Collateral except for the use of due care in safekeeping any of the Pledged Collateral actually in the physical custody of the Lender;

(b)     prior to the occurrence of any Event of Default, the Lender's rights with respect to the Pledged Collateral shall be limited to the Lender's rights as a secured party and pledgee and the right to perfect its security interest, preserve, enforce and protect the Lien granted hereunder and its interest in the Pledged Collateral; and

(c)     the Lender may sell, assign or grant participations in any of the Obligations and any of the Pledged Collateral and that the Lender's purchaser, assignee or participant shall have the same rights and privileges with respect to such Obligations and Pledged Collateral as the Pledgor grants to the Lender under this Agreement.

7.     <u>Events of Default; Remedies</u>.

(a)     Solely upon the occurrence of any Event of Default, the Lender, with or without notice to the Pledgor and without demand for additional collateral, may (i) transfer the Pledged Collateral into the name of the Lender or its nominee and vote any Pledged Collateral constituting securities or closely held capital stock; (ii) sell at public or private sale any or all of the Pledged Collateral, which the Lender may purchase free from any right of redemption; (iii) exercise any rights that may be available to the owner of the Pledged Collateral under any governing documents of the issuer of any such Pledged Collateral, including exercising any rights of redemption or withdrawal; or (iv) at its discretion in its own name or in the name of the Pledgor take any action for the collection of the Pledged Collateral, including the filing of a proof of claim in insolvency proceedings, and may receive the proceeds thereof and execute releases therefor.

(b)     Notwithstanding anything else to the contrary herein, after deducting its reasonable expenses, including reasonable attorney's fees, incurred in the sale or collection of the Pledged Collateral, the Lender shall apply the proceeds to the Obligations and shall account to the Pledgor for any surplus.

(c)     The Pledgor agrees that (i) the Lender has no obligation to sell or otherwise liquidate the Pledged Collateral in any particular order or to apply the proceeds thereof to any particular portion of the Obligations, and (ii) in connection with any secured party's sale, the Lender is authorized, if it deems it advisable to do so, in order to comply with any applicable securities laws, to restrict the prospective bidders or purchasers to persons who will represent and agree that they are purchasing the Pledged Collateral for their own account for investment, and not with a view to the distribution or re-sale thereof.  Sales made subject to such restriction shall be deemed to have been made in a commercially reasonable manner.

8.     <u>Rights of the Pledgor; Voting</u>.  So long as no Event of Default has occurred and is continuing, the Pledgor shall have the right to vote and any other consensual rights with respect to any of the Pledged Collateral except (unless the Lender consents thereto) those which, in the Lender's reasonable discretion, would contravene the Note, this Agreement or any other Loan Document, or any other agreement between the Pledgor and the Lender or which might materially reduce the value of the Pledged Collateral.  The Pledgor shall not take any such action without the

- 7 -

prior written approval of the Lender (which approval the Lender may withhold in its sole discretion).  Upon the occurrence and during the continuance of an Event of Default, the Lender shall have the exclusive right to exercise such rights, and the Pledgor shall take all such steps as may be necessary to effectuate such rights until the Lender notifies the Pledgor of the release of such rights, including without limitation, the right to provide a loan directly to the Subsidiary or any of its subsidiaries for the purposes of covering any shortfall in necessary capital, provided, Pledgor fails to do so within the time required under the Subsidiary LLCA.  Without the prior written consent of the Lender, which shall not be unreasonably withheld or delayed, the Pledgor shall not, directly or indirectly (i) vote to enable, or take any other action to permit the Subsidiary to issue any additional limited liability company interests, or to issue any other securities convertible into or granting the right to purchase or exchange for any limited liability company interests in the Subsidiary, (ii) except as permitted by the Loan Documents, sell, assign, transfer, exchange or otherwise dispose of, or grant any option with respect to, the Pledged Collateral, or (iii) create, incur, authorize or permit to exist any Lien or option in favor of, or any claim of any person or entity  with respect to, any of the Pledged Collateral, or any interest therein, except for the Lien provided for by this Agreement and otherwise permitted under the Note.  The Pledgor shall defend the right, title and interest of the Lender in and to the Pledged Collateral against the claims and demands of all persons or entities whomsoever.  Any violation of the preceding sentence shall also constitute an Event of Default.  The Pledgor will not, unless all actions necessary, in the Lender's reasonable opinion, to protect and perfect the Liens and security interests intended to be created hereunder with respect to the Pledged Interests shall have been taken, (A) change its name, identity, chief executive office, or structure, or (B) reorganize or reform under the laws of another jurisdiction.

9.      <u>Transfer or Liens</u>.  The Pledgor agrees that Pledgor will not sell, transfer or convey any interest in, grant any option with respect to, or suffer or permit any Lien, security interest or other encumbrance to be created upon or with respect to, any of the Pledged Collateral during the term of this Agreement, except to or in favor of the Lender.

10.      <u>Power of Attorney, Etc</u>.  The Pledgor hereby irrevocably constitutes and appoints the Lender the true and lawful attorney-in-fact for and on behalf of the Pledgor with full power of substitution and revocation in its own name or in the name of the Pledgor to make, execute, deliver and record any and all financing statements, continuation statements, assignments, proofs of claim, powers of attorney, leases, discharges or other instruments or agreements which the Lender in its sole but reasonable discretion may deem necessary or advisable to perfect, preserve, enforce or protect the Lien granted hereunder and its interest in the Pledged Collateral and to carry out the purposes of this Agreement, including but without limiting the generality of the foregoing, any and all proofs of claim in bankruptcy or other insolvency proceedings of the Pledgor, with the right to collect and apply to the Obligations all distributions and dividends made on account of the Pledged Collateral.  The rights and powers conferred on the Lender by the Pledgor are expressly declared to be coupled with an interest and shall be irrevocable until all the Obligations are paid and performed in full.  A carbon, photographic, or other reproduction of a security agreement (including this Agreement) or a financing statement is sufficient as a financing statement.

11.      <u>Indemnity and Expenses</u>.

- 8 -

**EXECUTION COPY**

(a)    The Pledgor agrees to and hereby indemnifies the Indemnified Parties from and against any and all claims, damages, losses, liabilities and expenses arising out of, or in connection with, or resulting from, this Agreement (including, without limitation, enforcement of this Agreement) other than such as arise from the gross negligence or willful misconduct of the Indemnified Parties, its agents and/or employees.

(b)    Pledgor covenants and agrees, at its sole cost and expense, to protect, defend, indemnify, release and hold Indemnified Parties harmless from and against any and all Environmental Losses (as defined below) imposed upon or incurred by or asserted against any Indemnified Parties (as defined below) and directly or indirectly arising out of or in any way relating to any one or more of the following: (a) any presence of any Hazardous Substances in, on, above, or under the Property; (b) any past, present or threatened Release of Hazardous Substances in, on, above, under or from the Property; (c) any activity by Pledgor, any Person affiliated with Pledgor, and any tenant or other user of the Property in connection with any actual, proposed or threatened use, treatment, storage, holding, existence, disposition or other Release, generation, production, manufacturing, processing, refining, control, management, abatement, removal, handling, transfer or transportation to or from the Property of any Hazardous Substances at any time located in, under, on or above the Property; (d) any activity by Pledgor, any Person affiliated with Pledgor, and any tenant or other user of the Property in connection with any actual or proposed Remediation of any Hazardous Substances at any time located in, under, on or above the Property, whether or not such Remediation is voluntary or pursuant to court or administrative order, including but not limited to any removal, remedial or corrective action; (e) any past, present or threatened non-compliance or violations of any Environmental Laws (or permits issued pursuant to any Environmental Law) in connection with the Property or operations thereon, including but not limited to any failure by Pledgor, any Person affiliated with Pledgor, and any tenant or other user of the Property to comply with any order of any governmental authority in connection with any Environmental Laws; (f) the imposition, recording or filing or the threatened imposition, recording or filing of any Environmental Lien encumbering the Property; (g) any administrative processes or proceedings or judicial proceedings in any way connected with any matter addressed in this Agreement; (h) any past, present or threatened injury to, destruction of or loss of natural resources in any way connected with the Property, including but not limited to costs to investigate and assess such injury, destruction or loss; (i) any acts of Pledgor, any Person affiliated with Pledgor, and any tenant or other user of the Property in arranging for disposal or treatment, or arranging with a transporter for transport for disposal or treatment, of Hazardous Substances at any facility or incineration vessel containing such or similar Hazardous Substances; (j) any acts of Pledgor, any Person affiliated with any Pledgor, and any tenant or other user of the Property in accepting any Hazardous Substances for transport to disposal or treatment facilities, incineration vessels or sites from which there is a Release, or a threatened Release of any Hazardous Substance which causes the incurrence of costs for Remediation; (k) any personal injury, wrongful death, or property or other damage arising under any statutory or common law or tort law theory, including but not limited to damages assessed for private or public nuisance or for the conducting of an abnormally dangerous activity on or near the Property; and (l) any misrepresentation or inaccuracy in any representation or warranty or material breach or failure to perform any covenants or other obligations pursuant to this Agreement or the other Loan Documents.  The term "Indemnified Parties" includes Lender, any Person who is or will have been involved in the origination of the Loan, any Person who is or will have been involved with the servicing of the Loan, any Person in whose name the liens created by this Agreement is or will have been recorded, Persons who may

- 9 -

**EXECUTION COPY**

hold or acquire or will have held a full or partial interest in the Loan, as well as custodians, trustees and other fiduciaries who hold or have held a full or partial interest in the Loan for the benefit of third parties) as well as the respective directors, officers, shareholders, partners, employees, agents, servants, representatives, contractors, subcontractors, affiliates, subsidiaries, participants, successors and assigns of any and all of the foregoing (including but not limited to any other Person who holds or acquires or will have held a participation or other full or partial interest in the Loan or the Property, whether during the term of the Loan or as a part of or following a foreclosure of the Loan and including, but not limited to, any successors by merger, consolidation or acquisition of all or a substantial portion of Lender's assets and business).  The term "Environmental Losses" includes any actual losses, damages, costs, fees, expenses, claims, suits, judgments, awards, liabilities (including but not limited to strict liabilities), obligations, debts, diminutions in value, fines, penalties, charges, costs of Remediation (whether or not performed voluntarily), amounts paid in settlement, foreseeable and unforeseeable consequential damages, litigation costs, reasonable attorneys' fees, engineers' fees, environmental consultants' fees, and investigation costs (including but not limited to costs for sampling, testing and analysis of soil, water, air, building materials, and other materials and substances whether solid, liquid or gas), of whatever kind or nature, and whether or not incurred in connection with any judicial or administrative proceedings, actions, claims, suits, judgments or awards.

(c)      The Pledgor will upon demand pay to the Lender the amount of any and all out-of-pocket reasonable expenses, including the reasonable fees and expenses of its counsel and of any experts and agents, that the Lender may incur in connection with (i) the sale of, collection from, or other realization upon, any of the Pledged Collateral, (ii) the exercise or enforcement of any of the rights of the Lender hereunder, or (iii) any action taken by the Lender pursuant to this Agreement and the other Loan Documents.

(d)      By execution of this Agreement, Dov Leshes agrees to guaranty Pledgor's obligations and liabilities under this Section 11.

(e)      For purposes of this Section 11 only, Pledgor shall mean **EMPIRE EQ WGI LLC** and Dov Leshes, jointly and severally. This indemnity shall survive the repayment and the performance of the Obligations by Pledgor.

12.      Amendments.  No amendment of any provision of this Agreement shall in any event be effective unless the same shall be in writing and signed by the Pledgor and the Lender.  No waiver of any provision of this Agreement, nor consent to any departure by the Pledgor herefrom, shall in any event be effective unless the same shall be in writing and signed by the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  No failure to exercise or any delay in exercising on the part of the Lender any right, power or privilege under this Agreement shall operate as a waiver thereof.  No single or partial exercise of any right, power or privilege under this Agreement shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

13.      Security Interest Absolute.   All rights of the Lender and security interests hereunder, and all obligations of the Pledgor hereunder, shall be absolute and unconditional irrespective of:

- 10 -

(a)     any lack of validity or enforceability of the Note or any other Loan Document;

(b)     any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to departure from any of the Loan Documents;

(c)     any taking and holding of collateral or guarantees for all or any of the Obligations, or any amendment, alteration, exchange, substitution, transfer, enforcement, waiver, subordination, termination or release of any collateral or such guarantees, or any non-perfection of any collateral, or any consent to departure from any such guaranty;

(d)     any manner of application of collateral, or proceeds thereof, to all or any of the Obligations, or the manner of sale of any collateral;

(e)     any consent by the Lender to the restructuring of the Obligations, or any other restructuring or refinancing of the Obligations or any portion thereof.

(f)     any modification, compromise, settlement or release by the Lender, by operation of law or otherwise, collection or other liquidation of the Obligations or the liability of any guarantor, or of any collateral, in whole or in part, and any refusal of payment by the Lender, in whole or in part, from any obligor or guarantor in connection with any of the Obligations, whether or not with notice to, or further assent by, or any reservation of rights against, the Pledgor; or

(g)     any other circumstance (including, without limitation, any statute of limitations) which might otherwise constitute a defense available to, or a discharge of, any third party pledgor.

14.     <u>Certain Understandings of Parties</u>. The parties hereto acknowledge and agree that the Pledged Interests and the Certificate of Limited Liability Company Interest in the Subsidiary which has been delivered to Lender on the date hereof constitute and will constitute "certificated securities" (as defined in the UCC). Pledgor therefore covenants and agrees that Pledgor shall not, directly or indirectly, without the prior written consent of Lender, alter, amend modify, supplement or change in any way, Section 3.4 of the Subsidiary LLCA as in effect on the date hereof.

15.     <u>Irrevocable Proxy</u>.  Solely with respect to Article 8 Matters (defined below), Pledgor hereby unconditionally and Irrevocably grants and appoints Lender, from the date of this Agreement until the termination of this Agreement in accordance with its terms, as Pledgor's true and lawful proxy, for and in Pledgor's name, place and stead to vote the Pledged Collateral in the Subsidiary by Pledgor, whether directly or indirectly, beneficially or of record, now owned or hereafter acquired, with respect to such Article 8 Matters.  The proxy and powers granted to Lender by Pledgor pursuant to this Agreement are coupled with an interest and are given to secure the performance of Pledgor's obligations under this Agreement. The proxy granted and appointed in this Section 15 shall include the right to sign Pledgor's name (as a member of the Subsidiary) to any consent, certificate or other document relating to an Article 8 Matter and the Pledged Collateral that applicable law may permit or require, to cause the Pledged Collateral to be voted in accordance with the preceding sentence.  Pledgor hereby represents and warrants that there are no other proxies

- 11 -

**EXECUTION COPY**

and/or powers of attorney with respect to any Article 8 Matter and the Pledged Collateral that Pledgor may have granted or appointed.  Pledgor will not give a subsequent proxy or power of attorney or enter into any other voting agreement with respect to the Pledged Collateral with respect to any Article 8 Matter and any attempt to do so with respect to an Article 8 Matter shall be void and of no effect.  As used herein, an "Article 8 Matter" means any action, decision, determination or election by the Subsidiary or its members that its limited liability company interests or other equity interests be, or cease to be, a "security" within the meaning of Article 8 of the Uniform Commercial Code (including Section 8-102(a)(15) thereof), and all other matters related to any such action, decision, determination or election.

16.    Termination.  This Agreement shall automatically terminate upon the satisfaction of the Note and all Obligations under the Loan Documents, except that any provisions that are expressly stated to survive the satisfaction or termination of this Agreement shall survive such satisfaction or termination.

17.    Notices.  Except as otherwise specifically provided for herein, any notice, demand, authorization, approval, consent or communication hereunder shall be given in accordance with Section 17 of the Note.

18.    Construction.  The term "Pledgor" and all pronouns referring thereto as used herein shall be construed in the masculine, feminine, neuter or singular or plural as the context may require.

19.    Successors and Assigns; Binding Effect.  This Agreement shall inure to the benefit of the Lender and its successors and assigns and shall bind the Pledgor and the successors, representatives, legal representatives and/or heirs and assigns of the Pledgor.

20.    Choice of Law; Waiver Of Jury Trial; Jurisdiction.

(i)    THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, AND MADE BY PLEDGOR AND ACCEPTED BY LENDER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE  NOTE SECURED HEREBY WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT TO THE EXTENT THAT THE UNIFORM COMMERCIAL CODE REQUIRES THE APPLICATION OF THE LAW OF ANOTHER JURISDICTION WITH RESPECT TO THE PERFECTION, PRIORITY OR ENFORCEMENT OF THE SECURITY INTERESTS CREATED HEREBY.  TO THE FULLEST EXTENT PERMITTED BY LAW, PLEDGOR HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT (OTHER THAN ANY ACTION IN

RESPECT OF THE CREATION, PERFECTION OR ENFORCEMENT OF A LIEN OR SECURITY INTEREST CREATED PURSUANT TO ANY LOAN DOCUMENTS NOT GOVERNED BY THE LAWS OF THE STATE OF NEW YORK), AND THE NOTE, AND THIS AGREEMENT AND THE NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK INCLUDING SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(ii)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR PLEDGOR ARISING OUT OF OR RELATING TO THIS AGREEMENT (OTHER THAN ANY ACTION IN RESPECT OF THE CREATION, PERFECTION OR ENFORCEMENT OF A LIEN OR SECURITY INTEREST CREATED PURSUANT TO ANY LOAN DOCUMENTS NOT GOVERNED BY THE LAWS OF THE STATE OF NEW YORK) SHALL BE INSTITUTED SOLELY IN THE FEDERAL OR STATE COURTS LOCATED IN THE COUNTY OF NEW YORK, STATE OF NEW YORK ONLY PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND PLEDGOR WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND PLEDGOR HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.

(iii)    PLEDGOR, DOV LESHES AND LENDER EACH HEREBY AGREES TO WAIVE ITS RIGHTS TO A JURY TRIAL ON ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, OR ANY DEALINGS BETWEEN PLEDGOR, DOV LESHES AND LENDER. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. PLEDGOR, DOV LESHES AND LENDER EACH ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO LENDER TO ENTER INTO A BUSINESS RELATIONSHIP WITH PLEDGOR. PLEDGOR AND DOV LESHES EACH REPRESENTS AND WARRANTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH WAIVER IS KNOWINGLY AND VOLUNTARILY GIVEN FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED, EITHER ORALLY OR IN WRITING, AND THE WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, REPLACEMENTS, REAFFIRMATIONS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT, OR ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(iv)    <u>Counterpart Signatures</u>. This Agreement, and any notices to be given pursuant to this Agreement, may be executed in any number of counterparts and by the parties hereto or thereto, as applicable, in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same

- 13 -

instrument. Any counterpart delivered electronically (including as a .pdf attachment to an e-mail) shall constitute an original for all purposes hereunder.

21.     <u>Acknowledgments and Agreement of Pledgor</u>.  Pledgor hereby acknowledges and agrees as follows:

(a)     Pledgor recognizes, acknowledges and agrees that the relationship created between the Lender and Pledgor by the Lender making the Loan and Lender's execution, delivery and performance of the Loan Documents is solely and exclusively that of debtor/borrower and creditor/lender.  Nothing in the Loan Documents shall be construed to create or give rise to (i) any joint venture, partnership, tenancy in common, or joint tenancy relationship, or any other relationship other than debtor/borrower and creditor/lender, between Lender and Pledgor or any Subsidiary Company, or (ii) any rights, duties or obligations of the Lender to any of Pledgor or the Subsidiary of any kind or nature except as expressly set forth in the Loan Documents.  Pledgor agrees never to institute or cause to be instituted or continue prosecution of, directly or indirectly, derivatively or otherwise, any suit or cause of action or proceeding against the Lender in its capacity as lender or otherwise in contravention of the foregoing.

(b)     Pledgor, on behalf of itself and the other Subsidiary Companies hereby agrees not to directly or indirectly assert against the Lender any claim, argument or defense, whether grounded on equitable subordination principles under Section 510 of the United States Bankruptcy Code or under any other section contained in Chapter 5 of the United States Bankruptcy Code, or otherwise, that the relationship of the Lender and the Pledgor as evidenced by the Loan Documents is not solely and exclusively that of debtor/borrower and creditor/lender or that the liens and security interests granted to the Lender in the Pledged Collateral as security for the Loan is not fully perfected and enforceable first priority liens and security interests.

**[Remainder of Page Intentionally Left Blank]**

HF 12673748v.5

**IN WITNESS HEREOF**, this Agreement has been executed by the Pledgor and the Lender.

<u>**PLEDGOR:**</u>

**EMPIRE EQ WGI LLC**, a Delaware limited liability company

By: _____
        Name: Dov Lesches
        Title:  Manager

<u>**LENDER:**</u>

**ORLANDO LENDER LLC**, a New York limited liability company

By: _____
        Name: Jeffrey Simpson
        Title:  Authorized Signatory

**The undersigned hereby agrees to be bound by the obligations under <u>Section 11</u>**

_____
**DOV LESCHES**, an individual

STATE OF NEW YORK              )
                                                        ) ss:
COUNTY OF NEW YORK          )

On the ___ day of March in the year 2019, before me, the undersigned, personally appeared **DOV LESCHES**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
                    NOTARY PUBLIC

[Signature Page – Pledge Agreement]

## Exhibit 1 to Pledge Agreement

### Subsidiary LLCA

[See attached]

**<u>Exhibit 2 to Pledge Agreement</u>**

**FORM OF ACKNOWLEDGMENT AND CONSENT**

**[attached]**

## ACKNOWLEDGMENT AND CONSENT

Reference is made to that certain Pledge Agreement, dated as of April __, 2019 (as amended, supplemented or otherwise modified from time to time, the "Pledge Agreement"), by **EMPIRE EQ WGI LLC**, a Delaware limited liability company ("Pledgor"), in favor of **ORLANDO LENDER LLC**, a New York limited liability company (together with its successors and assigns, "Lender").  For the purposes of this Acknowledgement and Consent, all initially capitalized terms not herein defined shall have the respective meanings ascribed thereto in the Pledge Agreement or in the Note referred to therein.

The Subsidiary hereby (a) acknowledges receipt of a copy of the executed Pledge Agreement and the other Loan Documents, (b) consents to the Pledge Agreement and the other Loan Documents, (c) agrees to comply with the terms and provisions of the Pledge Agreement and the other Loan Documents, (d) agrees not to do anything or cause, permit or suffer anything to be done which is prohibited by, or contrary to, the terms of the Pledge Agreement or the other Loan Documents, and (e) agrees to notify Lender promptly in writing of the occurrence of any Event of Default. Subsidiary agrees to register on its books and records Lender's security interest in the Pledged Interests as provided in the Pledge Agreement.

[SIGNATURES FOLLOW]

Date: April __, 2019

**SUBSIDIARY:**

**EMPIRE EQ HOTEL LLC**, a Delaware limited liability company

By: _____

Name: Dov Lesches

Title:   Manager

STATE OF NEW YORK            )
                             )  ss:
COUNTY OF NEW YORK           )

On the ___ day of March in the year 2019, before me, the undersigned, personally appeared **DOV LESCHES**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____

NOTARY PUBLIC

**<u>Exhibit 3 to Pledge Agreement</u>**

**Form of Instruction to Register Pledge**

**[attached]**

**Instruction to Register Pledge**

April __, 2019

To:   **EMPIRE EQ HOTEL LLC**, a Delaware limited liability company ("Subsidiary")

In accordance with the requirements of that certain Pledge Agreement, dated as of April __, 2019 (as amended, supplemented or otherwise modified from time to time, the "Pledge Agreement"), by **EMPIRE EQ WGI LLC**, a Delaware limited liability company ("Pledgor"), in favor of **ORLANDO LENDER LLC**, a New York limited liability company (together with its successors and assigns "Lender") (for the purposes of this Instruction to Register Pledge, all initially capitalized terms not herein defined shall have the respective meanings ascribed thereto in the Pledge Agreement), you are hereby instructed to register the pledge of the following interests in the name of Lender as follows:

The 100% limited liability company interests in Subsidiary, including without limitation all of the following property now owned or at any time hereafter acquired by Pledgor or in which Pledgor now has or at any time in the future may acquire any right, title or interest:

(a)      all additional limited liability company interests of, or other equity interests in, the Issuer and options, warrants, and other rights hereafter acquired by Pledgor in respect of such limited liability company or other equity interests (whether in connection with any capital increase, recapitalization, reclassification, or reorganization of the Issuer or otherwise) (all such limited liability company and other equity interests, including the Pledged Interests, and all such options, warrants and other rights being hereinafter collectively referred to as the "Pledged Interests");

(b)      all certificates, instruments, or other writings representing or evidencing the Pledged Interests, and all accounts and general intangibles arising out of, or in connection with, the Pledged Interests;

(c)      any and all moneys or property due and to become due to Pledgor now or in the future in respect of the Pledged Interests, or to which Pledgor may now or in the future be entitled to in its capacity as a partner of the Issuer, whether by way of a dividend, distribution, return of capital, or otherwise;

(d)      all other claims which Pledgor now has or may in the future acquire in its capacity as a partner of the Issuer against the Issuer and its property;

(e)      all rights of Pledgor under the Subsidiary LLCA (and all other agreements, if any, to which Pledgor is a party from time to time which relate to its ownership of the Pledged Interests), including, without limitation, all voting and consent rights of Pledgor arising thereunder or otherwise in connection with Pledgor's ownership of the Pledged Interests; and

(f)      to the extent not otherwise included, all Proceeds of any or all of the foregoing.

You are hereby further authorized and instructed to execute and deliver to Lender the Confirmation Statement and Instruction Agreement in the form of Exhibit 4 to the Pledge Agreement pursuant to which you will confirm that you have registered the pledge effected by the Pledge Agreement on your books and agree to comply with the instructions of Lender in respect of the Pledged Interests without further consent of Pledgor or any other Person.

[SIGNATURE FOLLOWS]

Date: April __, 2019

**PLEDGOR:**

**EMPIRE EQ WGI LLC**, a Delaware limited liability company

By: _____
Name: Dov Lesches
Title:  Manager

STATE OF NEW YORK          )
                          ) ss:
COUNTY OF NEW YORK        )

On the ___ day of March in the year 2019, before me, the undersigned, personally appeared **DOV LESCHES**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
NOTARY PUBLIC

[Signature Page – Instruction to Register Pledge]

**Exhibit 4 to Pledge Agreement**

**Form of Confirmation Statement and Instruction Agreement**

**[attached]**

**Confirmation Statement and Instruction Agreement**

April __, 2019

To:    Orlando Lender LLC
       c/o Arch Companies
       524 Broadway, Suite 405
       New York, NY 10012
       Attn:  Jeffrey Simpson

        Pursuant to the requirements of that certain Pledge Agreement, dated as of April __, 2019 (as amended, supplemented or otherwise modified from time to time, the "Pledge Agreement"), by **EMPIRE EQ WGI LLC**, a Delaware limited liability company ("Pledgor") in favor of **ORLANDO LENDER LLC**, a New York limited liability company (together with its successors and assigns "Lender") (for the purpose of this Confirmation Statement and Instruction Agreement, all initially capitalized terms not herein defined shall have the respective meanings ascribed thereto in the Pledge Agreement), this Confirmation Statement and Instruction Agreement relates to the Pledged Interests (as defined in the Pledge Agreement), issued by **EMPIRE EQ HOTEL LLC**, a Delaware limited liability company (the "Issuer").

        Issuer hereby (a) acknowledges receipt of a copy of the executed Pledge Agreement and the other Loan Documents, (b) consents to the Pledge Agreement and the other Loan Documents, (c) agrees to comply with the terms and provisions thereof, (d) agrees not to do anything or cause, permit or suffer anything to be done which is prohibited by, or contrary to, the terms of the Pledge Agreement or the other Loan Documents, and (e) agrees to notify Lender promptly in writing of the occurrence of any Event of Default.

        On the date hereof, Issuer hereby confirms that the registered owner of 100% of the limited liability company interests in Issuer is: **EMPIRE EQ WGI LLC**, a Delaware limited liability company.  The registered pledgee of the Pledged Interests is:  **ORLANDO LENDER LLC**, a New York limited liability company limited liability company, together with its successors and assigns.

        In connection with the pledge of the Pledged Collateral to Lender by the Pledgor, the Issuer hereby represents, warrants and agrees with Lender as follows:

        Issuer has registered the Pledged Interests in the name of the registered pledgee on the date hereof. No other pledge or other interest adverse to that of the registered pledgee is currently registered on the books and records of the Issuer.

        The Issuer shall deliver directly to Lender at its address set forth above, any and all instruments and/or certificates evidencing any right, option or warrant, and all new, additional or substituted securities issued to, or to be received by, the Pledgor by virtue of its ownership of the Pledged Interest issued by the Issuer or upon exercise by the Pledgor of any option, warrant or right attached to such Pledged Interest;

- 1 -

The Issuer shall pay directly to Lender any and all cash distributions which might be declared and payable (including any unpaid distributions accrued prior to the date hereof) on any of the Pledged Interests or any of the other Pledged Collateral issued by the Issuer;

At any time upon and during the continuance of an Event of Default, upon Lender's written instructions, the Issuer shall register the transfer of such Pledged Interests to Lender or its nominee, as applicable;

The Pledged Interest has been duly authorized and validly issued and is not subject to, nor will the Issuer at any time permit it to become subject to, any restrictions governing its issuance, transfer, ownership or control other than those currently set forth in the Subsidiary LLCA; and

Until the Obligations are paid in full (exclusive of provisions which shall survive full payment), the Issuer agrees to comply with the instructions of Lender, without any further consent from Pledgor or any other person or entity.

Notwithstanding any other right or remedy to which Lender is entitled under the Pledge Agreement or the Loan Documents, the Issuer agrees that, upon the occurrence and continuance of an Event of Default, Lender shall determine to exercise its right to sell all or any of the Pledged Collateral issued by the Issuer, the Issuer will, upon Lender's request and at the Pledgor's expense: (a) provide Lender with such other information and projections as may be necessary or, in Lender's opinion, advisable to enable Lender to effect the sale of such Pledged Collateral; (b) do or cause to be done all such other acts and things as may be necessary to make the sale of such Pledged Collateral or any part thereof valid and binding and in compliance with applicable law; and (c) do or cause to be done all such other acts and things as may be necessary to constitute Lender or Lender's designees or transferees a member of the Issuer.

Lender is hereby authorized, upon the occurrence and continuance of an Event of Default, and in connection with any sale of the Pledged Collateral issued by the Issuer, to deliver or otherwise disclose to any prospective purchaser of such Pledged Collateral (i) any information and projections provided to Lender by Issuer and/or Pledgor and (ii) any other information in Lender's possession relating to the Issuer, Pledgor or such Pledged Collateral.

**[Signature page follows]**

Date: April __, 2019

**Very truly yours:**

**EMPIRE EQ HOTEL LLC**, a Delaware limited liability company

By: _____
        Name: Dov Lesches
        Title:   Manager

**ACKNOWLEDGED AND AGREED:**

**PLEDGOR:**

**EMPIRE EQ WGI LLC**, a Delaware limited liability company

By: _____
        Name: Dov Lesches
        Title:   Manager

**LENDER:**

**ORLANDO LENDER LLC,**
a New York limited liability company

By: _____
        Name: Jeffrey Simpson
        Title:   Authorized Signatory

STATE OF NEW YORK      )
                            ) ss:
COUNTY OF NEW YORK    )

On the ___ day of March in the year 2019, before me, the undersigned, personally appeared **DOV LESCHES**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
**NOTARY PUBLIC**

[Signature Page – Confirmation Statement and Instruction Agreement]

**Exhibit 5 to Pledge Agreement**

**FORM OF ASSIGNMENT OF LIMITED LIABILITY COMPANY INTEREST**

**[attached]**

## ASSIGNMENT OF LIMITED LIABILITY COMPANY INTEREST

THIS **ASSIGNMENT OF LIMITED LIABILITY COMPANY INTEREST** (this "Assignment of Limited Liability Company Interest"), dated as of _____ __, 20__ (the "Effective Date"), is made by **EMPIRE EQ WGI LLC**, a Delaware limited liability company (together with its successors and assigns, the "Assignor") to _____ (the "Assignee").

## RECITALS

Assignor has entered into a certain Pledge Agreement dated as of April __, 2019 (as amended, supplemented or otherwise modified from time to time, the "Pledge Agreement"), with **ORLANDO LENDER LLC**, a New York limited liability company (together with its successors and assigns, "Lender").  Unless otherwise noted, terms defined in the Pledge Agreement are used herein as defined therein.

The Assignor is the registered owner of 100% of the limited liability company interests in EMPIRE EQ HOTEL LLC, a Delaware limited liability company ("Subsidiary"), existing under and evidenced by the Subsidiary LLCA.  Under the Subsidiary LLCA, the Assignor has certain rights, title and interest in and to Subsidiary and its assets and distributions (collectively, the "Interest").

Lender has required that the Assignor shall have executed and delivered this Assignment of Limited Liability Company Interest.

NOW THEREFORE, in consideration of the premises and of the mutual covenants and agreements contained herein, the parties hereto agree as follows:

Section 1.  Assignment and Acceptance of Assigned Interest.  As of the Effective Date, the Assignor hereby sells, transfers, conveys and assigns (without recourse and, except as set forth herein, representation or warranty) to the Assignee all of the Assignor's right, title and interest in and to the Interest and of its rights under the Subsidiary LLCA, including, without limitation, all its (a) rights to receive moneys due and to become due under or pursuant to the Subsidiary LLCA, (b) rights to receive proceeds of any insurance, indemnity, warranty or guaranty with respect to the Jo Subsidiary LLCA, (c) claims for damages arising out of or for breach of or default under the Subsidiary LLCA, and (d) rights to perform thereunder and to compel performance, and otherwise exercise all rights and remedies thereunder.  The Assignor's right, title and interest in the Interest and of the Assignor's rights under the Subsidiary LLCA that are being assigned to the Assignee pursuant to the Pledge Agreement are hereinafter referred to as the "Assigned Interest".  The Assignee, upon the execution of this Assignment of Limited Liability Company Interest, hereby accepts from the Assignor the Assigned Interest and agrees to become a successor member of Subsidiary in the place and stead of the Assignor to the extent of the Assigned Interest and to be bound by the terms and provisions of the Subsidiary LLCA.

Section 2.   Capital Account.  On or prior to the Effective Date, the Assignee shall notify each of the other members in Subsidiary, if any, required to be so notified under the terms of the Subsidiary LLCA and thereafter, the portion of all profits and losses, and all other items of income, gain, loss, deduction or credit, allocable to the Assigned Interest shall be credited or charged, as the case may be, to the Assignee and the Assignee shall be entitled to the portion of all distributions, payments or other allocations payable in respect of the Assigned Interest, regardless of the source of such distributions, payments or other allocations or the date on which they were earned.

HF 12673748v.5

Section 3.    Representations and Warranties of the Assignor.  The Assignor represents to Assignee, as of the Effective Date of this Assignment of Limited Liability Company Interest, and to Lender as of the Effective Date of the Pledge Agreement, that:

(a)  This Assignment of Limited Liability Company Interest has been duly executed and delivered by the Assignor and is a valid and binding obligation of the Assignor, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and general principles of equity; and

(b)  The Assignor is the sole owner of the Assigned Interest free and clear of any liens, except for the liens created by the Pledge Agreement.

Section 4.    Filings.  On or as soon as practicable after the Effective Date, the Assignee shall file and record or cause to be filed and recorded with all proper offices or agencies all documents and instruments required to effect the terms herein, if any, including, without limitation, (a) this Assignment of Limited Liability Company Interest and (b) any limited liability company and assumed or fictitious name certificate or certificates and any amendments thereto.

Section 5.    Future Assurances.  Each of the Assignor and the Assignee mutually agrees to cooperate at all times from and after the date hereof with respect to any of the matters described herein, and to execute such further deeds, bills of sale, assignments, releases, assumptions, notifications or other documents as may be reasonably requested for the purpose of giving effect to, evidencing or giving notice of the assignment evidenced hereby.

Section 6.    Successors and Assigns.  This Assignment of Limited Liability Company Interest shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns.

Section 7.    Modification and Waiver.  No supplement, modification, waiver or termination of this Assignment of Limited Liability Company Interest or any provisions hereof shall be binding unless executed in writing by all parties hereto and the original or a copy of such writing has been delivered to Assignee.

Section 8.    Counterparts.  Any number of counterparts of this Assignment of Limited Liability Company Interest may be executed (including via .pdf).  Each counterpart will be deemed to be an original instrument and all counterparts taken together will constitute one agreement.  Delivery of an executed counterpart of a signature page to this Assignment of Limited Liability Company Interest by facsimile, telecopier or other electronic means shall be as effective as delivery of a manually executed counterpart of this Assignment of Limited Liability Company Interest.

Section 9.    Execution; Effective Date.  This Assignment of Limited Liability Company Interest will be binding and effective and will result in the assignment of the Assigned Interest on the Effective Date.

Section 10.  Governing Law.  This Assignment of Limited Liability Company Interest will be governed by the laws of the State of New York.

[SIGNATURE PAGE FOLLOWS]

- 2 -

IN WITNESS WHEREOF, the Assignor has caused this Assignment of Limited Liability Company Interest to be executed and delivered as of the Effective Date.

**ASSIGNOR:**

**EMPIRE EQ WGI LLC**, a Delaware limited liability company

By: _____

Name: Dov Lesches
Title:   Manager

STATE OF NEW YORK            )
                             ) ss:
COUNTY OF NEW YORK           )

On the ___ day of March in the year 2019, before me, the undersigned, personally appeared **DOV LESCHES**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
NOTARY PUBLIC

[Signature Page – Assignment of Limited Liability Company Interest]

**Exhibit 6 to Pledge Agreement**

**Organizational chart of the Pledgor, the Subsidiary and the Property**

(see attached)



# Exhibit B

# PLEDGE AGREEMENT

THIS **PLEDGE AGREEMENT**, dated as of April ⁵ , 2019 (this "Agreement"), by and between **EMPIRE EQ WGI LLC**, a Delaware limited liability company (the "Pledgor"), and **ORLANDO LENDER LLC**, a New York limited liability company (hereinafter referred to herein as the "Lender").

**WHEREAS**, pursuant to a Promissory Note, dated as of the date hereof (as amended, supplemented, restated or otherwise modified from time to time, the "Note") between the Pledgor and the Lender, the Lender agreed to make a loan (the "Loan") to the Pledgor as provided therein;

**WHEREAS**, as a condition to making the Loan, the Lender required the Pledgor to secure Pledgor's obligations under the Note by entering into this Agreement; and

**WHEREAS**, Pledgor wishes to secure its obligations under the Note by entering into this Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Pledgor hereby agrees as follows:

1.    Definitions.  (a) Capitalized terms used but not defined in this Agreement shall have the meanings assigned thereto in the Note; and (b) the following terms when used in this Agreement shall have the following meanings:

"Pledged Collateral" means (i) all right, title and interest of the Pledgor in and to the limited liability company interests in the Subsidiary, whether now existing or hereafter arising, including without limitation, all rights of the Pledgor in and to the Pledgor's capital accounts and Capital Accounts (as defined in the Subsidiary LLCA), the Pledgor's Percentage Interests (as defined in the Subsidiary LLCA), and all rights of the Pledgor as a Member under (and as defined in) the Subsidiary LLCA, including all rights to secure distributions thereunder and all rights to request and obtain withdrawal of Pledgor's capital thereunder; (ii) any and all securities (both certificated and uncertificated) and financial assets, and all other property interests which may subsequently be delivered or transferred by or for the account of the Pledgor to the Lender pursuant to any Loan Document as additional security for the Obligations; (iii) any of the foregoing when put in transit to the Lender; (iv) all dividends of every kind which shall become and be due and payable or distributable on or in respect of all or any of the securities and financial assets referred to in clauses (i) and (ii); (v) all payments and other distributions of every kind whatsoever which shall become and be due and payable or distributable on account of the purchase, redemption, repurchase or other retirement of all or any of such securities and financial assets; (vi) all of the Pledgor's now owned or hereafter acquired or arising "accounts", "supporting obligations", "deposit accounts", "goods", "documents", "chattel paper" (including electronic chattel paper), in each case as defined in the UCC, including any rights to payment for the sale or lease of goods or rendition of services, whether or not they have been earned by performance; (vii) all contract rights; (viii) all money, cash, cash equivalents, securities and other property of any kind of the Pledgor held directly or indirectly by the Lender; (ix) all other property of the Pledgor in which the Lender may at any time be granted a Lien as collateral for the Obligations; and (x) all Proceeds of the foregoing, including, without limitation, the roll-over or reinvested proceeds of the foregoing.  Any delivery or transfer

of any of the Pledged Collateral to an agent or custodian designated by the Lender shall be deemed a delivery or transfer to the Lender.

"<u>Pledged Interests</u>" means the limited liability company interests of the Pledgor in the Subsidiary constituting Pledged Collateral, together with all certificates evidencing ownership of such interests, and all claims, powers, privileges, benefits, remedies, voting rights, options or rights of any nature whatsoever which currently exist or may be issued or granted by the Subsidiary to Pledgor while this Agreement is in effect.

"<u>Proceeds</u>" means all "proceeds" as such term is defined in Section 9-102(a)(64) of the Uniform Commercial Code and, in any event, shall include, without limitation, all dividends or other income from the Pledged Interests, collections thereon or distributions with respect thereto.

"<u>Subsidiary</u>" means EMPIRE EQ HOTEL LLC, a Delaware limited liability company.

"<u>Subsidiary LLCA</u>" means the Limited Liability Company Agreement of the Subsidiary, dated as of February 1, 2019, a true, correct and complete copy of which is attached as <u>Exhibit 1</u> to this Agreement.

"<u>UCC</u>" or "<u>Uniform Commercial Code</u>" shall mean the Uniform Commercial Code as in effect in the State of New York.

2.    <u>Security Interest</u>.  The Pledgor hereby irrevocably and unconditionally pledges and grants to the Lender a first priority security interest and continuing Lien on the Pledged Collateral, to secure the punctual payment and performance of all Obligations.

3.    <u>Perfection</u>.  At any time and from time to time, at the expense of the Pledgor, the Pledgor will promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable, or that the Lender may reasonably request, to perfect and protect any security interest granted or purported to be granted hereby or to enable the Lender to exercise and enforce its rights and remedies hereunder with respect to any Pledged Collateral.  Without limiting the generality of the foregoing, (i) whether or not the Pledged Collateral is evidenced by certificates, the Pledgor hereby authorizes and permits the Lender to file in such places as the Lender may determine a UCC Financing Statement naming the Pledgor as debtor and the Lender as secured party with respect to the Pledged Collateral, in form and substance satisfactory to the Lender in its sole and reasonable determination, and without the requirement of the Pledgor's signature; and (ii) with respect to the Pledged Collateral that is not evidenced by certificates, the Pledgor agrees to execute and deliver to the issuer of such securities and such other third parties as may be determined to be necessary or appropriate by the Lender, such instruments in form and substance satisfactory to the Lender in its sole and reasonable determination to acknowledge and register the pledge of the securities hereunder in their books and records and to deliver statements of account upon the Lender's request therefore.  Without limiting the generality of the foregoing, Pledgor hereby authorizes the filing of financing statements (and amendments of financing statements and continuation statements) that name Pledgor as debtor and Lender as secured party and that cover all personal property or all assets of Pledgor, whether now owned or hereafter acquired and the proceeds thereof.  Pledgor hereby

- 2 -

ratifies the filing of any such financing statements (or amendments of financing statements or continuation statements) that were filed prior to the execution hereof.

Concurrently with the execution and delivery of this Agreement, the Pledgor shall (a) cause the Subsidiary to execute and deliver to Lender an Acknowledgment and Consent with respect to this Agreement in the form of Exhibit 2 hereto and (b) send written instructions in the form of Exhibit 3 hereto to the Subsidiary, and (c) cause the Subsidiary to, and the Subsidiary shall, deliver to the Lender the Confirmation Statement and Instruction Agreement in the form of Exhibit 4 hereto pursuant to which the Subsidiary will confirm that it has registered the pledge effected by this Agreement on its books and agrees to comply with the instructions of the Lender in respect of the Pledged Interests without further consent of the Pledgor or any other Person.

If the interests underlying the Pledged Interests have been (or subsequently are) certificated, then concurrently with the execution and delivery of this Agreement (or promptly after certification), the Pledgor shall deliver to the Lender each original certificate, if any, evidencing the Pledged Interests (which certificates shall constitute "security certificates" (as defined in the Uniform Commercial Code)), together with an undated, irrevocable membership power and power of attorney, coupled with an interest covering each such certificate duly executed in blank in the form approved by Lender (in its sole discretion).

Upon the occurrence and during the continuance of an Event of Default, Lender shall have the right, at any time, in its discretion upon written notice to Pledgor, to transfer to or to register in the name of Lender or its nominee any or all of the Pledged Collateral. Prior to or concurrently with the execution and delivery of this Agreement, Pledgor shall deliver to Lender an assignment of limited liability company interest endorsed by Pledgor in blank (an "Assignment of Interest"), in the form set forth on Exhibit 5 hereto, for the Pledged Interests, transferring all of such Pledged Interests in blank, duly executed by Pledgor and undated. Lender shall have the right, at any time in its discretion upon the occurrence and during the continuance of an Event of Default and without notice to Pledgor, to transfer to, and to designate on such Pledgor's Assignment of Interest, any Person to whom the Pledged Interests are sold in accordance with the provisions hereof. In addition, Lender shall have the right at any time to exchange any Assignment of Interest representing or evidencing the Pledged Interests or any portion thereof for one or more additional or substitute Assignments of Interest representing or evidencing smaller or larger percentages of the Pledged Interests represented or evidenced thereby, subject to the terms thereof.

4.    Representations and Warranties. The Pledgor represents and warrants as follows:

(a)    The Subsidiary has opted in to Article 8 of the UCC. The Subsidiary has not previously issued any certificates evidencing the Pledged Collateral.

(b)    The Pledgor is the legal and beneficial owner of all the Pledged Collateral free and clear of any Lien, security interest or other encumbrance except in favor of the Lender. No effective financing statement or other instrument similar in effect covering all or any part of the Pledged Collateral is on file in any recording office except naming the Lender as secured party.

(c)    The pledge of the Pledged Collateral pursuant to this Agreement creates a valid first priority security interest in the Pledged Collateral, securing the payment of the

HF 12673748v.5

Obligations, and all filings and other actions necessary or desirable to perfect and protect such security interest have been duly made or taken.

(d)      No authorization, approval or consent of, and no notice to or filing with or action by, any governmental authority or regulatory body or under the operating agreement of Pledgor or the Subsidiary LLCA is required for (i) the pledge by the Pledgor of the Pledged Collateral pursuant to this Agreement, the grant by the Pledgor of the security interest hereby granted or the execution, delivery or performance of this Agreement by the Pledgor, (ii) the perfection of or exercise by the Lender of its rights and remedies provided for in this Agreement or (iii) the exercise by the Lender of the voting or other rights provided for in this Agreement or the remedies in respect of the Pledged Collateral pursuant to this Agreement (and upon such exercise, for Lender or the purchaser of such Pledged Collateral to be admitted as a member of the Subsidiary to the full extent of the Pledged Interests).

(e)      The Pledgor has full right, power and authority to enter into this Agreement and to grant the security interest in the Pledged Collateral made hereby, and this Agreement constitutes the legal, valid and binding obligation of the Pledgor enforceable against the Pledgor in accordance with its terms.

(f)      The Pledged Interests constitute 100% of the limited liability company interests in the Subsidiary. The Pledgor neither owns nor holds any interest, right or claim in the Subsidiary other than the Pledged Interests.  Pledgor will not, nor will Pledgor permit or cause the Subsidiary to issue any additional equity interest, including limited liability company interests without the Lender's prior written consent.  A true, correct and complete organizational and ownership chart of the Pledgor, the Subsidiary and the Property is attached hereto as Exhibit 6 and is hereby incorporated by reference.

(g)      The execution, delivery and performance by the Pledgor of this agreement are within the powers of the Pledgor, and do not or will not (i) violate any law or regulation, or any other decree of any court or governmental authority or regulatory body, (ii) violate the operating agreement of Pledgor or the Subsidiary LLCA, or (iii) result in or require the creation or imposition of any Lien, security interest or other encumbrance upon any of the property of the Pledgor except in favor of the Lender.

(h)      Except as expressly set forth in the Subsidiary LLCA, there are no restrictions on the transfer of the Pledged Interests pledged by Pledgor hereunder, and the Pledgor has the right to transfer such Pledged Interests free and clear of any Lien, security interest or other encumbrance and without the consent of the creditors of the Pledgor or the consent of any other person, entity or governmental authority and upon the occurrence of an Event of Default and the transfer of the Pledged Interests to the Lender, the Lender will have all of the rights of the Pledgor with respect thereto.

(i)      The Pledgor is, and at all times has been, organized exclusively under the laws of the State of Delaware.

(j)      The exact name of the Pledgor is: **EMPIRE EQ WGI LLC**.

- 4 -

(k)      The Subsidiary LLCA provides that the limited liability company interests in the Subsidiary are "securities" governed by and within the meaning of Article 8 of the UCC (including Section 8-102(a)(15) thereof).

(l)      Except as otherwise disclosed by that certain Phase I environmental report dated February 5, 2018 issued by Terracon Consultants, Inc. as project H1187044 (or Phase II environmental report, if required) in respect of the Property delivered to Lender (referred to below as the "Environmental Report"), a copy of which has been provided to Lender, (a) there are no Hazardous Substances (defined below) or underground storage tanks in, on, or under the Property, except those that are both (i) in compliance with all Environmental Laws (defined below) and with permits issued pursuant thereto and (ii) fully disclosed to Lender in writing pursuant to the Environmental Report; (b) there are no past, present or threatened Releases (defined below) of Hazardous Substances in, on, under or from the Property which have not been fully remediated in accordance with Environmental Law; (c) there is no threat of any Release of Hazardous Substances migrating to the Property; (d) there is no past or present non-compliance with Environmental Laws, or with permits issued pursuant thereto, in connection with the Property which has not been fully remediated in accordance with Environmental Law; (e) Pledgor does not know of, and has not received, any written or oral notice or other communication from any Person (including but not limited to a governmental entity) relating to Hazardous Substances or Remediation (defined below) thereof, of possible liability of any Person pursuant to any Environmental Law, other environmental conditions in connection with the Property, or any actual or potential administrative or judicial proceedings in connection with any of the foregoing; and (f) Pledgor has truthfully and fully provided to Lender, in writing, any and all information relating to conditions in, on, under or from the Property that is known to Pledgor and that is contained in files and records of Pledgor, including but not limited to any reports relating to Hazardous Substances in, on, under or from the Property and/or to the environmental condition of the Property.

(i)      "Environmental Law" means any present and future federal, state and local laws, statutes, ordinances, rules, regulations and the like, as well as common law, relating to protection of human health or the environment, relating to Hazardous Substances, relating to liability for or costs of other actual or threatened danger to human health or the environment.

(ii)      "Environmental Law" includes, but is not limited to, the following statutes, as amended, any successor thereto, and any regulations promulgated pursuant thereto, and any applicable state or local statutes, ordinances, rules, regulations and the like addressing similar issues: the Comprehensive Environmental Response, Compensation and Liability Act; the Emergency Planning and Community Right-to-Know Act; the Hazardous Substances Transportation Act; the Resource Conservation and Recovery Act (including but not limited to Subtitle I relating to underground storage tanks); the Solid Waste Disposal Act; the Clean Water Act; the Clean Air Act; the Toxic Substances Control Act; the Safe Drinking Water Act; the Occupational Safety and Health Act; the Federal Water Pollution Control Act; the Federal Insecticide, Fungicide and Rodenticide Act; the Endangered Species Act; the National Environmental Policy Act; and the River and Harbors Appropriation Act.

(iii)      "Environmental Law" also includes, but is not limited to, any applicable present and future federal, state and local laws, statutes ordinances, rules, regulations and the like, as well as common law: conditioning transfer of property upon a negative declaration

- 5 -

or other approval of a governmental authority of the environmental condition of the Property; requiring notification or disclosure of Releases of Hazardous Substances or other environmental condition of the Property to any Governmental Authority or other Person, whether or not in connection with transfer of title to or interest in property; imposing conditions or requirements in connection with permits or other authorization for lawful activity; relating to nuisance, trespass or other causes of action related to the Property; and relating to wrongful death, personal injury, or property or other damage in connection with any physical condition or use of the Property.

(iv)    "Hazardous Substances" includes but is not limited to any and all substances (whether solid, liquid or gas) defined, listed, or otherwise classified as pollutants, hazardous wastes, hazardous substances, hazardous materials, extremely hazardous wastes, or words of similar meaning or regulatory effect under any present or future Environmental Laws or that may have a negative impact on human health or the environment, including but not limited to Microbial Matter, petroleum and petroleum products, asbestos and asbestos-containing materials, polychlorinated biphenyls, lead, radon, radioactive materials, flammables and explosives, but excluding substances of kinds and in amounts ordinarily and customarily used or stored in similar properties for the purposes of cleaning or other maintenance or operations and otherwise in compliance with all Environmental Laws.

(v)    "Release" with respect to any Hazardous Substance includes but is not limited to any release, deposit, discharge, emission, leaking, leaching, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing or other movement of Hazardous Substances.

(vi)    "Remediation" includes but is not limited to any response, remedial, removal, or corrective action; any activity to clean up, detoxify, decontaminate, contain or otherwise remediate any Hazardous Substance; any actions to prevent, cure or mitigate any Release of any Hazardous Substance; any action to comply with any Environmental Laws or with any permits issued pursuant thereto; any inspection, investigation, study, monitoring, assessment, audit, sampling and testing, laboratory or other analysis, or evaluation relating to any Hazardous Substances or to anything referred to herein.

5.    Distributions.  The Pledgor agrees that: (i) any distribution in kind received by the Pledgor from any party for or on account of the Pledged Collateral, including distributions of stock as a dividend or split of any of the Pledged Collateral, shall be immediately delivered to the Lender in the form received with any required endorsement; and (ii) any note or other instrument executed and delivered to the Pledgor by any party to evidence any obligation of such party with respect to the Pledged Collateral shall be immediately delivered with any required endorsement to the Lender.  All such items shall be held by the Lender in accordance with the terms of this Agreement. Until the Obligations are repaid in full, the Pledgor shall not have the right to receive any distributions for or on account of the Pledged Collateral.  Notwithstanding the foregoing to the contrary, to the extent the Pledgor receives any distributions, it shall hold same in trust for the benefit of the Lender and shall immediately deliver all distributions for or on account of the Pledged Collateral to the Lender in the form received.

6.    Certain Rights and Duties of Lender.  The Pledgor acknowledges that:

- 6 -

(a)     the Lender has no duty of any type with respect to the Pledged Collateral except for the use of due care in safekeeping any of the Pledged Collateral actually in the physical custody of the Lender;

(b)     prior to the occurrence of any Event of Default, the Lender's rights with respect to the Pledged Collateral shall be limited to the Lender's rights as a secured party and pledgee and the right to perfect its security interest, preserve, enforce and protect the Lien granted hereunder and its interest in the Pledged Collateral; and

(c)     the Lender may sell, assign or grant participations in any of the Obligations and any of the Pledged Collateral and that the Lender's purchaser, assignee or participant shall have the same rights and privileges with respect to such Obligations and Pledged Collateral as the Pledgor grants to the Lender under this Agreement.

7.     <u>Events of Default; Remedies</u>.

(a)     Solely upon the occurrence of any Event of Default, the Lender, with or without notice to the Pledgor and without demand for additional collateral, may (i) transfer the Pledged Collateral into the name of the Lender or its nominee and vote any Pledged Collateral constituting securities or closely held capital stock; (ii) sell at public or private sale any or all of the Pledged Collateral, which the Lender may purchase free from any right of redemption; (iii) exercise any rights that may be available to the owner of the Pledged Collateral under any governing documents of the issuer of any such Pledged Collateral, including exercising any rights of redemption or withdrawal; or (iv) at its discretion in its own name or in the name of the Pledgor take any action for the collection of the Pledged Collateral, including the filing of a proof of claim in insolvency proceedings, and may receive the proceeds thereof and execute releases therefor.

(b)     Notwithstanding anything else to the contrary herein, after deducting its reasonable expenses, including reasonable attorney's fees, incurred in the sale or collection of the Pledged Collateral, the Lender shall apply the proceeds to the Obligations and shall account to the Pledgor for any surplus.

(c)     The Pledgor agrees that (i) the Lender has no obligation to sell or otherwise liquidate the Pledged Collateral in any particular order or to apply the proceeds thereof to any particular portion of the Obligations, and (ii) in connection with any secured party's sale, the Lender is authorized, if it deems it advisable to do so, in order to comply with any applicable securities laws, to restrict the prospective bidders or purchasers to persons who will represent and agree that they are purchasing the Pledged Collateral for their own account for investment, and not with a view to the distribution or re-sale thereof.  Sales made subject to such restriction shall be deemed to have been made in a commercially reasonable manner.

8.     <u>Rights of the Pledgor; Voting</u>.  So long as no Event of Default has occurred and is continuing, the Pledgor shall have the right to vote and any other consensual rights with respect to any of the Pledged Collateral except (unless the Lender consents thereto) those which, in the Lender's reasonable discretion, would contravene the Note, this Agreement or any other Loan Document, or any other agreement between the Pledgor and the Lender or which might materially reduce the value of the Pledged Collateral.  The Pledgor shall not take any such action without the

**EXECUTION COPY**

prior written approval of the Lender (which approval the Lender may withhold in its sole discretion). Upon the occurrence and during the continuance of an Event of Default, the Lender shall have the exclusive right to exercise such rights, and the Pledgor shall take all such steps as may be necessary to effectuate such rights until the Lender notifies the Pledgor of the release of such rights, including without limitation, the right to provide a loan directly to the Subsidiary or any of its subsidiaries for the purposes of covering any shortfall in necessary capital, provided, Pledgor fails to do so within the time required under the Subsidiary LLCA. Without the prior written consent of the Lender, which shall not be unreasonably withheld or delayed, the Pledgor shall not, directly or indirectly (i) vote to enable, or take any other action to permit the Subsidiary to issue any additional limited liability company interests, or to issue any other securities convertible into or granting the right to purchase or exchange for any limited liability company interests in the Subsidiary, (ii) except as permitted by the Loan Documents, sell, assign, transfer, exchange or otherwise dispose of, or grant any option with respect to, the Pledged Collateral, or (iii) create, incur, authorize or permit to exist any Lien or option in favor of, or any claim of any person or entity  with respect to, any of the Pledged Collateral, or any interest therein, except for the Lien provided for by this Agreement and otherwise permitted under the Note. The Pledgor shall defend the right, title and interest of the Lender in and to the Pledged Collateral against the claims and demands of all persons or entities whomsoever. Any violation of the preceding sentence shall also constitute an Event of Default. The Pledgor will not, unless all actions necessary, in the Lender's reasonable opinion, to protect and perfect the Liens and security interests intended to be created hereunder with respect to the Pledged Interests shall have been taken, (A) change its name, identity, chief executive office, or structure, or (B) reorganize or reform under the laws of another jurisdiction.

9.     <u>Transfer or Liens</u>. The Pledgor agrees that Pledgor will not sell, transfer or convey any interest in, grant any option with respect to, or suffer or permit any Lien, security interest or other encumbrance to be created upon or with respect to, any of the Pledged Collateral during the term of this Agreement, except to or in favor of the Lender.

10.     <u>Power of Attorney, Etc</u>. The Pledgor hereby irrevocably constitutes and appoints the Lender the true and lawful attorney-in-fact for and on behalf of the Pledgor with full power of substitution and revocation in its own name or in the name of the Pledgor to make, execute, deliver and record any and all financing statements, continuation statements, assignments, proofs of claim, powers of attorney, leases, discharges or other instruments or agreements which the Lender in its sole but reasonable discretion may deem necessary or advisable to perfect, preserve, enforce or protect the Lien granted hereunder and its interest in the Pledged Collateral and to carry out the purposes of this Agreement, including but without limiting the generality of the foregoing, any and all proofs of claim in bankruptcy or other insolvency proceedings of the Pledgor, with the right to collect and apply to the Obligations all distributions and dividends made on account of the Pledged Collateral. The rights and powers conferred on the Lender by the Pledgor are expressly declared to be coupled with an interest and shall be irrevocable until all the Obligations are paid and performed in full. A carbon, photographic, or other reproduction of a security agreement (including this Agreement) or a financing statement is sufficient as a financing statement.

11.     <u>Indemnity and Expenses</u>.

HF 12673748v.5

(a)    The Pledgor agrees to and hereby indemnifies the Indemnified Parties from and against any and all claims, damages, losses, liabilities and expenses arising out of, or in connection with, or resulting from, this Agreement (including, without limitation, enforcement of this Agreement) other than such as arise from the gross negligence or willful misconduct of the Indemnified Parties, its agents and/or employees.

(b)    Pledgor covenants and agrees, at its sole cost and expense, to protect, defend, indemnify, release and hold Indemnified Parties harmless from and against any and all Environmental Losses (as defined below) imposed upon or incurred by or asserted against any Indemnified Parties (as defined below) and directly or indirectly arising out of or in any way relating to any one or more of the following: (a) any presence of any Hazardous Substances in, on, above, or under the Property; (b) any past, present or threatened Release of Hazardous Substances in, on, above, under or from the Property; (c) any activity by Pledgor, any Person affiliated with Pledgor, and any tenant or other user of the Property in connection with any actual, proposed or threatened use, treatment, storage, holding, existence, disposition or other Release, generation, production, manufacturing, processing, refining, control, management, abatement, removal, handling, transfer or transportation to or from the Property of any Hazardous Substances at any time located in, under, on or above the Property; (d) any activity by Pledgor, any Person affiliated with Pledgor, and any tenant or other user of the Property in connection with any actual or proposed Remediation of any Hazardous Substances at any time located in, under, on or above the Property, whether or not such Remediation is voluntary or pursuant to court or administrative order, including but not limited to any removal, remedial or corrective action; (e) any past, present or threatened non-compliance or violations of any Environmental Laws (or permits issued pursuant to any Environmental Law) in connection with the Property or operations thereon, including but not limited to any failure by Pledgor, any Person affiliated with Pledgor, and any tenant or other user of the Property to comply with any order of any governmental authority in connection with any Environmental Laws; (f) the imposition, recording or filing or the threatened imposition, recording or filing of any Environmental Lien encumbering the Property; (g) any administrative processes or proceedings or judicial proceedings in any way connected with any matter addressed in this Agreement; (h) any past, present or threatened injury to, destruction of or loss of natural resources in any way connected with the Property, including but not limited to costs to investigate and assess such injury, destruction or loss; (i) any acts of Pledgor, any Person affiliated with Pledgor, and any tenant or other user of the Property in arranging for disposal or treatment, or arranging with a transporter for transport for disposal or treatment, of Hazardous Substances at any facility or incineration vessel containing such or similar Hazardous Substances; (j) any acts of Pledgor, any Person affiliated with any Pledgor, and any tenant or other user of the Property in accepting any Hazardous Substances for transport to disposal or treatment facilities, incineration vessels or sites from which there is a Release, or a threatened Release of any Hazardous Substance which causes the incurrence of costs for Remediation; (k) any personal injury, wrongful death, or property or other damage arising under any statutory or common law or tort law theory, including but not limited to damages assessed for private or public nuisance or for the conducting of an abnormally dangerous activity on or near the Property; and (l) any misrepresentation or inaccuracy in any representation or warranty or material breach or failure to perform any covenants or other obligations pursuant to this Agreement or the other Loan Documents. The term "Indemnified Parties" includes Lender, any Person who is or will have been involved in the origination of the Loan, any Person who is or will have been involved with the servicing of the Loan, any Person in whose name the liens created by this Agreement is or will have been recorded, Persons who may

- 9 -

hold or acquire or will have held a full or partial interest in the Loan, as well as custodians, trustees and other fiduciaries who hold or have held a full or partial interest in the Loan for the benefit of third parties) as well as the respective directors, officers, shareholders, partners, employees, agents, servants, representatives, contractors, subcontractors, affiliates, subsidiaries, participants, successors and assigns of any and all of the foregoing (including but not limited to any other Person who holds or acquires or will have held a participation or other full or partial interest in the Loan or the Property, whether during the term of the Loan or as a part of or following a foreclosure of the Loan and including, but not limited to, any successors by merger, consolidation or acquisition of all or a substantial portion of Lender's assets and business).  The term "Environmental Losses" includes any actual losses, damages, costs, fees, expenses, claims, suits, judgments, awards, liabilities (including but not limited to strict liabilities), obligations, debts, diminutions in value, fines, penalties, charges, costs of Remediation (whether or not performed voluntarily), amounts paid in settlement, foreseeable and unforeseeable consequential damages, litigation costs, reasonable attorneys' fees, engineers' fees, environmental consultants' fees, and investigation costs (including but not limited to costs for sampling, testing and analysis of soil, water, air, building materials, and other materials and substances whether solid, liquid or gas), of whatever kind or nature, and whether or not incurred in connection with any judicial or administrative proceedings, actions, claims, suits, judgments or awards.

(c)     The Pledgor will upon demand pay to the Lender the amount of any and all out-of-pocket reasonable expenses, including the reasonable fees and expenses of its counsel and of any experts and agents, that the Lender may incur in connection with (i) the sale of, collection from, or other realization upon, any of the Pledged Collateral, (ii) the exercise or enforcement of any of the rights of the Lender hereunder, or (iii) any action taken by the Lender pursuant to this Agreement and the other Loan Documents.

(d)     By execution of this Agreement, Dov Leshes agrees to guaranty Pledgor's obligations and liabilities under this Section 11.

(e)     For purposes of this Section 11 only, Pledgor shall mean **EMPIRE EQ WGI LLC** and Dov Leshes, jointly and severally. This indemnity shall survive the repayment and the performance of the Obligations by Pledgor.

12.     Amendments.  No amendment of any provision of this Agreement shall in any event be effective unless the same shall be in writing and signed by the Pledgor and the Lender.  No waiver of any provision of this Agreement, nor consent to any departure by the Pledgor herefrom, shall in any event be effective unless the same shall be in writing and signed by the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  No failure to exercise or any delay in exercising on the part of the Lender any right, power or privilege under this Agreement shall operate as a waiver thereof.  No single or partial exercise of any right, power or privilege under this Agreement shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

13.     Security Interest Absolute.   All rights of the Lender and security interests hereunder, and all obligations of the Pledgor hereunder, shall be absolute and unconditional irrespective of:

**EXECUTION COPY**

(a)    any lack of validity or enforceability of the Note or any other Loan Document;

(b)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to departure from any of the Loan Documents;

(c)    any taking and holding of collateral or guarantees for all or any of the Obligations, or any amendment, alteration, exchange, substitution, transfer, enforcement, waiver, subordination, termination or release of any collateral or such guarantees, or any non-perfection of any collateral, or any consent to departure from any such guaranty;

(d)    any manner of application of collateral, or proceeds thereof, to all or any of the Obligations, or the manner of sale of any collateral;

(e)    any consent by the Lender to the restructuring of the Obligations, or any other restructuring or refinancing of the Obligations or any portion thereof.

(f)    any modification, compromise, settlement or release by the Lender, by operation of law or otherwise, collection or other liquidation of the Obligations or the liability of any guarantor, or of any collateral, in whole or in part, and any refusal of payment by the Lender, in whole or in part, from any obligor or guarantor in connection with any of the Obligations, whether or not with notice to, or further assent by, or any reservation of rights against, the Pledgor; or

(g)    any other circumstance (including, without limitation, any statute of limitations) which might otherwise constitute a defense available to, or a discharge of, any third party pledgor.

14.    <u>Certain Understandings of Parties</u>. The parties hereto acknowledge and agree that the Pledged Interests and the Certificate of Limited Liability Company Interest in the Subsidiary which has been delivered to Lender on the date hereof constitute and will constitute "certificated securities" (as defined in the UCC). Pledgor therefore covenants and agrees that Pledgor shall not, directly or indirectly, without the prior written consent of Lender, alter, amend modify, supplement or change in any way, Section 3.4 of the Subsidiary LLCA as in effect on the date hereof.

15.    <u>Irrevocable Proxy</u>.    Solely with respect to Article 8 Matters (defined below), Pledgor hereby unconditionally and Irrevocably grants and appoints Lender, from the date of this Agreement until the termination of this Agreement in accordance with its terms, as Pledgor's true and lawful proxy, for and in Pledgor's name, place and stead to vote the Pledged Collateral in the Subsidiary by Pledgor, whether directly or indirectly, beneficially or of record, now owned or hereafter acquired, with respect to such Article 8 Matters.    The proxy and powers granted to Lender by Pledgor pursuant to this Agreement are coupled with an interest and are given to secure the performance of Pledgor's obligations under this Agreement. The proxy granted and appointed in this Section 15 shall include the right to sign Pledgor's name (as a member of the Subsidiary) to any consent, certificate or other document relating to an Article 8 Matter and the Pledged Collateral that applicable law may permit or require, to cause the Pledged Collateral to be voted in accordance with the preceding sentence.  Pledgor hereby represents and warrants that there are no other proxies

- 11 -

HF 12673748v.5

**EXECUTION COPY**

and/or powers of attorney with respect to any Article 8 Matter and the Pledged Collateral that Pledgor may have granted or appointed.  Pledgor will not give a subsequent proxy or power of attorney or enter into any other voting agreement with respect to the Pledged Collateral with respect to any Article 8 Matter and any attempt to do so with respect to an Article 8 Matter shall be void and of no effect.  As used herein, an "Article 8 Matter" means any action, decision, determination or election by the Subsidiary or its members that its limited liability company interests or other equity interests be, or cease to be, a "security" within the meaning of Article 8 of the Uniform Commercial Code (including Section 8-102(a)(15) thereof), and all other matters related to any such action, decision, determination or election.

16.    Termination.  This Agreement shall automatically terminate upon the satisfaction of the Note and all Obligations under the Loan Documents, except that any provisions that are expressly stated to survive the satisfaction or termination of this Agreement shall survive such satisfaction or termination.

17.    Notices.  Except as otherwise specifically provided for herein, any notice, demand, authorization, approval, consent or communication hereunder shall be given in accordance with Section 17 of the Note.

18.    Construction.  The term "Pledgor" and all pronouns referring thereto as used herein shall be construed in the masculine, feminine, neuter or singular or plural as the context may require.

19.    Successors and Assigns; Binding Effect.  This Agreement shall inure to the benefit of the Lender and its successors and assigns and shall bind the Pledgor and the successors, representatives, legal representatives and/or heirs and assigns of the Pledgor.

20.    Choice of Law; Waiver Of Jury Trial; Jurisdiction.

(i)    THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, AND MADE BY PLEDGOR AND ACCEPTED BY LENDER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE  NOTE SECURED HEREBY WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT TO THE EXTENT THAT THE UNIFORM COMMERCIAL CODE REQUIRES THE APPLICATION OF THE LAW OF ANOTHER JURISDICTION WITH RESPECT TO THE PERFECTION, PRIORITY OR ENFORCEMENT OF THE SECURITY INTERESTS CREATED HEREBY.  TO THE FULLEST EXTENT PERMITTED BY LAW, PLEDGOR HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT (OTHER THAN ANY ACTION IN

HF 12673748v.5

RESPECT OF THE CREATION, PERFECTION OR ENFORCEMENT OF A LIEN OR SECURITY INTEREST CREATED PURSUANT TO ANY LOAN DOCUMENTS NOT GOVERNED BY THE LAWS OF THE STATE OF NEW YORK), AND THE NOTE, AND THIS AGREEMENT AND THE NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK INCLUDING SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(ii)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR PLEDGOR ARISING OUT OF OR RELATING TO THIS AGREEMENT (OTHER THAN ANY ACTION IN RESPECT OF THE CREATION, PERFECTION OR ENFORCEMENT OF A LIEN OR SECURITY INTEREST CREATED PURSUANT TO ANY LOAN DOCUMENTS NOT GOVERNED BY THE LAWS OF THE STATE OF NEW YORK) SHALL BE INSTITUTED SOLELY IN THE FEDERAL OR STATE COURTS LOCATED IN THE COUNTY OF NEW YORK, STATE OF NEW YORK ONLY PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND PLEDGOR WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND PLEDGOR HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.

(iii)    PLEDGOR, DOV LESHES AND LENDER EACH HEREBY AGREES TO WAIVE ITS RIGHTS TO A JURY TRIAL ON ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, OR ANY DEALINGS BETWEEN PLEDGOR, DOV LESHES AND LENDER. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. PLEDGOR, DOV LESHES AND LENDER EACH ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO LENDER TO ENTER INTO A BUSINESS RELATIONSHIP WITH PLEDGOR. PLEDGOR AND DOV LESHES EACH REPRESENTS AND WARRANTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH WAIVER IS KNOWINGLY AND VOLUNTARILY GIVEN FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED, EITHER ORALLY OR IN WRITING, AND THE WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, REPLACEMENTS, REAFFIRMATIONS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT, OR ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(iv)    <u>Counterpart Signatures</u>.  This Agreement, and any notices to be given pursuant to this Agreement, may be executed in any number of counterparts and by the parties hereto or thereto, as applicable, in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same

- 13 -

**EXECUTION COPY**

instrument. Any counterpart delivered electronically (including as a .pdf attachment to an e-mail) shall constitute an original for all purposes hereunder.

21.    <u>Acknowledgments and Agreement of Pledgor</u>.  Pledgor hereby acknowledges and agrees as follows:

(a)    Pledgor recognizes, acknowledges and agrees that the relationship created between the Lender and Pledgor by the Lender making the Loan and Lender's execution, delivery and performance of the Loan Documents is solely and exclusively that of debtor/borrower and creditor/lender.  Nothing in the Loan Documents shall be construed to create or give rise to (i) any joint venture, partnership, tenancy in common, or joint tenancy relationship, or any other relationship other than debtor/borrower and creditor/lender, between Lender and Pledgor or any Subsidiary Company, or (ii) any rights, duties or obligations of the Lender to any of Pledgor or the Subsidiary of any kind or nature except as expressly set forth in the Loan Documents.  Pledgor agrees never to institute or cause to be instituted or continue prosecution of, directly or indirectly, derivatively or otherwise, any suit or cause of action or proceeding against the Lender in its capacity as lender or otherwise in contravention of the foregoing.

(b)    Pledgor, on behalf of itself and the other Subsidiary Companies hereby agrees not to directly or indirectly assert against the Lender any claim, argument or defense, whether grounded on equitable subordination principles under Section 510 of the United States Bankruptcy Code or under any other section contained in Chapter 5 of the United States Bankruptcy Code, or otherwise, that the relationship of the Lender and the Pledgor as evidenced by the Loan Documents is not solely and exclusively that of debtor/borrower and creditor/lender or that the liens and security interests granted to the Lender in the Pledged Collateral as security for the Loan is not fully perfected and enforceable first priority liens and security interests.

**[Remainder of Page Intentionally Left Blank]**

- 14 -

**IN WITNESS HEREOF**, this Agreement has been executed by the Pledgor and the Lender.

<div style="margin-left:auto">

**PLEDGOR:**

**EMPIRE EQ WGI LLC**, a Delaware limited
liability company

By: _____

Name:  Dov Lesches
Title:   Manager

**LENDER:**

**ORLANDO LENDER LLC**, a New York
limited liability company

By: _____

Name:  Jeffrey Simpson
Title:    Authorized Signatory

</div>

The undersigned hereby agrees to be
bound by the obligations under **Section 11**

_____

**DOV LESCHES**, an individual

STATE OF NEW YORK          )
                                              ) ss:
COUNTY OF NEW YORK    )

On the ⟨⟩ day of March in the year 2019, before me, the undersigned, personally appeared **DOV LESCHES**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____

NOTARY PUBLIC

BARBARA JEAN QUEVEDO
**NOTARY PUBLIC, STATE OF NEW YORK**
Registration No. 01QU4964968
Qualified in Richmond County
Commission Expires April 16, 2022

[Signature Page – Pledge Agreement]

**IN WITNESS HEREOF**, this Agreement has been executed by the Pledgor and the Lender.

<u>**PLEDGOR**</u>:

**EMPIRE EQ WGI LLC**, a Delaware limited liability company

By: _____
Name:  Dov Lesches
Title:    Manager

<u>**LENDER**</u>:

**ORLANDO LENDER LLC**, a New York limited liability company

By: _____
Name:  Jeffrey Simpson
Title:    Authorized Signatory

**The undersigned hereby agrees to be bound by the obligations under <u>Section 11</u>**

_____
**DOV LESCHES**, an individual

STATE OF NEW YORK              )
                                                     ) ss:
COUNTY OF NEW YORK         )

     On the ___ day of March in the year 2019, before me, the undersigned, personally appeared **DOV LESCHES**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
NOTARY PUBLIC

**<u>Exhibit 1 to Pledge Agreement</u>**

**Subsidiary LLCA**

[See attached]

**SECOND AMENDED AND REINSTATED OPERATING**

**AGREEMENT OF**

**EMPIRE EQ HOTEL LLC**

THE MEMBERSHIP INTERESTS HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION (THE "COMMISSION") UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER THE SECURITIES LAWS OF ANY JURISDICTION, AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH STATE LAWS. THE MEMBERSHIP INTERESTS HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE COMMISSION, ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF AN INVESTMENT IN THE LIMITED LIABILITY COMPANY. A MEMBERSHIP INTEREST ALSO MAY NOT BE TRANSFERRED OR ENCUMBERED UNLESS THE PROVISIONS OF THIS AGREEMENT ARE SATISFIED.

## SECOND AMENDED AND REINSTATED OPERATING

## AGREEMENT OF EMPIRE EQ HOTEL LLC

**THIS SECOND AMENDED AND REINSTATED OPERATING AGREEMENT** is made effective as of the 1ST day of February, 2019 (as amended from time to time, this "Agreement"), by and among EMPIRE EQ HOTEL LLC, a Delaware limited liability company (the "Company") and the member executing this Agreement as member (the "Member"), in consideration of the mutual covenants expressed herein.

**1.    Definitions.**

1.1    *Definitions*. Unless the context otherwise requires, capitalized terms used in this Agreement and not otherwise defined herein shall have the following meanings:

"Act" shall mean the Delaware Limited Liability Company Act, as amended from time to time.

"Affiliate" shall mean (a) any Person directly or indirectly owning, controlling or holding the power to vote 10% or more of the outstanding voting securities of an identified other Person; (b) any Person 10% or more of whose voting securities are directly or indirectly owned, controlled or held with power to vote, by such other Person; (c) any Person directly or indirectly controlling, controlled by, or under common control with such other Person; (d) any officer, director, member, manager or partner of such other Person; (e) if such other Person is an officer, director, member, manager or partner, any entity for which such Person acts in any such capacity; and (f) any spouse, lineal ancestor or descendant of such other Person.

"Approved Budget" means the then effective approved annual budget of the Company.

"Capital Contribution" means contributions of cash or other property made by the Member to the Company, from time to time, pursuant to Section 5.

"Certificate" shall mean the Certificate of Formation of the Company, as amended from time to time.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, or corresponding provisions of future laws.

"Initial Capital Contribution" shall mean the Capital Contribution set forth opposite the name of each Member in Exhibit A to this Agreement.

"Internal Rate of Return" means an annualized effective compounded rate of return on capital.

"Manager" shall have the meaning set forth in Section 12.1.

"Member" shall mean the Person executing this Agreement as member and each Person who may become a substituted or additional Member pursuant to the provisions hereof and applicable law, each in its capacity as a member of the Company.

"Net Cash Flow" shall mean, for each year, the Company's gross operating receipts during such year (not including Capital Contributions, loans from the Member to the Company, proceeds from the sale or refinancing within a twelve-month period of all or substantially all of the assets of the Company, insurance proceeds, or similar capital events) and any cash reserves to be distributed to the Member, less the sum of (a) operating expenses paid in cash during such year to the extent such expenses have not been reserved against in a prior fiscal year; (b) the aggregate of all other cash amounts expended by the Company during such year (except distributions made pursuant to Sections 7.1, 7.2 and 7.3 hereof); and (c) any increases in reasonable amounts set aside for contingencies, taxes, insurance and similar items.

"Owner" shall mean EMPIRE EQ HOTEL LLC, a Delaware limited liability company formed for the purpose of acquiring, owning, developing, holding, selling, assigning, transferring, operating, leasing, mortgaging, and otherwise dealing with the Property.

"Percentage Interests" shall mean, initially, the percentages set forth on Exhibit A to this Agreement, as such percentages may be adjusted from time to time pursuant to Section 5.2 and to reflect the admission of new members pursuant to the terms hereof.

"Person" shall mean a natural person, corporation, limited liability company, trust, partnership, estate, unincorporated association or other entity.

"Property" shall mean that certain approximately 5 acre site located at Westwood Boulevard, Orlando, Florida acquired by Owner, together with all improvements currently on such land and all subsequent or additional improvements on such land. The legal description of the Property is attached hereto as Exhibit C.

"Independent Director" means a Person bound by this Agreement as an Independent Director pursuant to Section 3.3. Such Independent Director shall only have the rights and duties expressly set forth in this Agreement.

"Unrecovered Capital Contribution" shall mean any Capital Contribution that is made by a Member and is not repaid pursuant to Section 7.

## 2.   Organization and Purpose.

2.1   *Organization.* The Company was formed by the filing of the Certificate dated June 3rd, 2015 with the Secretary of the State of Delaware pursuant to the Act. Dov Leshes is hereby designated as an "authorized person" within the meaning of the Act, and has executed, delivered and filed the Certificate with the Delaware Secretary of State. Upon the filing of the Certificate, his powers as an "authorized person" ceased, and Manager thereupon became the designated "authorized person" and shall continue as the designated "authorized person" with the meaning of the Act. The existence of the Company as a separate legal entity shall continue until cancellation of the Certificate as provided in the Act.

2.2   *Company Name.* The name of the Company shall be "Empire Eq Hotel LLC" and all business of the Company shall be conducted under that name.

2.3   *Place of Business.* The mailing and business office address of the Company shall be 3 Columbus Circle 15th Floor, New York, New York 10019. The Company address may be changed from time to time by Manager in its sole discretion.

2.4   *Term.* The term of the Company shall commence on the date of this Agreement and shall continue thereafter until December 31, 2065.

2.5   *Company's Purpose.* The Company has been formed solely for the purpose of being the sole member of Owner, the fee owner of the Property.

2.6   *Single Purpose Entity.* The Company is a single purpose entity and until such time as the loan from Orlando Lender LLC to Empire EQ WGI, LLC (the Company's Member) in the amount of One Million Give Hundred Thousand and 00/100 Dollars ($1,500,000) as secured by the Promissory Note of even date herewith (the "Mezzanine Loan") is repaid, the Company shall continue to be, organized solely for the purpose of (i) acquiring, developing, owning, managing or operating the Property, (ii) entering into this Agreement and the documents related hereto, and (iii) engaging in any activity that is incidental, necessary or appropriate to accomplish the foregoing. So long as any part of the Mezzanine Loan remain unpaid and undischarged, the Company shall not (a) engage in any business or activity other than the ownership, operation and maintenance of the Property, and activities incidental thereto; (b) acquire or own any material assets other than the Property; (c) merge into or consolidate with any Person or dissolve, terminate or liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure; (d) fail to maintain separate financial statements and accounting records, showing its assets and liabilities separate and apart from those of any other Person; (e) have its assets listed on the financial statement of any other entity; and (f) fail to maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person.

3.   **Membership.**

3.1   *Member.* The name, Capital Contribution and Percentage Interest of the Member is set forth on Exhibit A to this Agreement, as such Exhibit may be amended from time to time by the Manager.

3.2   *Admission of Additional Members.* Additional Members may be admitted to the Company only upon and subject to the terms and conditions set forth in this Agreement.

3.3   *Independent Director.* The Member hereby appoints Colonial Charter Company, a Delaware corporation, as the Independent Director. The Independent Director shall be required to consent to the following actions of the Company:

3.3.1 filing a voluntary bankruptcy petition;

3.3.2 instituting proceedings to have the Company adjudicated bankrupt or

insolvent;

3.3.3 consenting to the institution of bankruptcy or insolvency proceedings against the Company;

3.3.4 filing a petition seeking, or consenting to, reorganization or relief as to the Company under any applicable federal or state law relating to or similar to bankruptcy;

3.3.5 consenting to the appointment of a receiver or liquidator over the Company;

3.3.6 dissolving the Company;

3.3.7 making any assignment for the benefit of creditors; and

3.3.8 admitting in writing that the Company is unable to pay its debts as they become due, or take action in furtherance of any such action.

To the fullest extent permitted by applicable law, including Section 18-1101(e) of the Act, the Independent Director shall not be liable to the Company, its Members or any other Person for breach of contract or breach of duties (including fiduciary duties), unless the Independent Director acted in bad faith or engaged in willful misconduct.

3.4 *Article 8 Opt-in.* The Company and its Member hereby irrevocably elects that the limited liability company interests in the Company shall constitute securities governed by Article 8 of the UCC in effect in the Law of Delaware in effect as of the effective date and as further amended. Each membership certificate of the Company shall bear a legend evidencing such opt-in as set forth in the form attached hereto as **Exhibit B**. This provisions shall not be amended until such time as the Mezzanine Loan is repaid in full.

## 4.   Title to Company Property.

All property owned by the Company shall be owned by the Company as an entity and, insofar as permitted by applicable law, no Member shall have any ownership interest in any Company property in its individual name or right, and each Member's interest in the Company shall be personal property for all purposes. The foregoing provisions shall govern over any contrary or inconsistent provision in this Agreement or any other document or instrument governing the affairs of the Company.

## 5.   Capital Contributions.

5.1 *Initial Capital Contributions.* The Initial Capital Contribution of each Member as of the date hereof is set forth on Exhibit A.

5.2 *Additional Capital Contributions.*

(a)   The Member acknowledges and agrees that the Manager may, from time to time, at his discretion, determine that an amount of additional cash capital is required by the Company or Owner for the development, improvement, maintenance and/or operation of the Property or other assets of the Company or Owner or for the payment of the Company's or Owner's obligations (such amount hereinafter referred to as a "Capital Shortfall"), and that, in such instance, the Capital Shortfall shall be resolved as provided in this Section 5.2.

(b)   In the event of a Capital Shortfall, Manager may arrange to obtain

that capital by one or a combination of (i) borrowing from the Member and/or third parties, or (ii) additional Capital Contributions from the Member (an "Additional Capital Contribution"). If Manager determines that Additional Capital Contributions are required, Manager shall send a notice (the "Call Notice") to the Member stating the aggregate amount of the additional capital required (the "Capital Call"). The Member shall, within twenty (20) days after the date of the Call Notice (the "Call Period"), contribute to the Company. Any such Additional Capital Contributions shall be made in cash or by wire transfer of immediately available funds into the Company's bank account, or intra-bank transfer and such contribution, when made, shall be credited to such Member's capital account.

       5.3    *No Withdrawals.* No Member shall be entitled to resign as a Member or withdraw any part of such Member's Capital Contribution from the Company and no Member shall be entitled to receive any distributions from the Company except as expressly provided in this Agreement.

       5.4    *No Liability for Capital Contributions.* No Member shall be personally liable for the return of any portion of the Capital Contributions of the Member; rather, the return of the Member's respective Capital Contributions shall be made solely from the Company's assets. No Member shall have the right to demand or receive property other than cash for its interest in the Company.

       5.5    *No Interest.* No Member shall receive any interest on its Unrecovered Capital Contributions.

    **6.**    **Company Shares.**

       6.1    *Description.* The Member and the number of shares held by each such Member ("Company Shares") are set forth on Exhibit A. The voting powers and rights of the Company Shares, and the qualifications, limitations or restrictions thereon, are as follows:

       (a)    General. The Company Shares shall not have a stated value and shall not have any rights to distributions unless Manager shall have declared such a distribution to be made pursuant to Section 7 out of funds lawfully available therefor.

       (b)    Voting. The holders of Company Shares shall be entitled to one vote per Company Share.

       6.2    *Compliance with Securities Laws and Other Laws and Obligations.* Each Member hereby represents and warrants to the Company and to each other Member and acknowledges that (a) it has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of an investment in the Company and making an informed decision with respect thereto, (b) it is able to bear the economic and financial risk of investment in the Company for an indefinite period of time and understands that it has no right to withdraw and have its interest repurchased by the Company, (c) it is acquiring an interest in the Company for investment only and not with a view to, or for resale in connection with, any distribution to the public or public offering thereof, (d) it understands that the equity interests in the Company have not been registered under the securities laws of any jurisdiction and cannot be disposed of unless they are subsequently registered and/or qualified under applicable securities

laws and the provisions of this Agreement have been complied with.

### 7.   Distributions.

7.1   *Distribution of Net Cash Flow.* Manager, in its sole discretion, may cause the Company to distribute to the Member in accordance with this subparagraph, from time to time prior to dissolution of the Company, cash or other assets or property, in such aggregate amounts as Manager shall deem appropriate; provided that any such distribution shall be made in the order of priority set forth below.

The Net Cash Flow of the Company shall be distributed to the Member after maintain sufficient reserves to satisfy the Company's obligations.

### 8.   Capital Accounts.

8.1   *Maintenance of Capital Accounts.* A capital account shall be maintained for the Member on the Company's books of account in accordance with Section 1.704-1(b)(2)(iv) of the Treasury Regulations, and this <u>Section 8</u> shall be interpreted and applied in a manner consistent with such Section of the Treasury Regulations. In the event that Manager determines it is prudent to modify the manner in which Capital Accounts are adjusted and/or maintained in order to comply with the requirements of such Regulation, Manager may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any member upon dissolution of the Company.

8.2. *Basic Rules for Capital Account Entries.* The amount of the Member's capital account shall equal the aggregate amount of cash and the fair market value of any property contributed by that Member to the Company (less any liabilities assumed by the Company with respect to such contribution), and shall be increased by the aggregate amount of income allocated to that Member (or a predecessor) pursuant to <u>Sections 9.2</u> and <u>9.3</u>, and decreased by (a) the aggregate amount of losses allocated to that Member (or a predecessor) pursuant to <u>Section 9.4</u>, and (b) the aggregate amount of cash and the fair market value of any property distributed to that Member (or a predecessor) (less any liabilities assumed by the Member with respect to such distribution).

### 9.   Income, Gains and Losses.

9.1   *Computation of Net Income, Gains and Losses.* Net income, gains and losses as set forth on the books of account of the Company shall be computed in the same manner as net income, gains and losses are computed for federal income tax purposes, except that (i) items of income, gain, loss and deduction relating to the assets contributed to the Company by the Member shall be based on the fair market values of those assets (rather than their basis for federal income tax purposes) at the time of contribution, and (ii) items of tax exempt income and non- deductible expense shall be taken into account.

9.2   *Gross Income and Gain.* For any fiscal year of the Company, prior to any allocation of net income or net loss, pursuant to <u>Sections 9.3</u> and <u>9.4</u>, as the case may be, gross income and gain of the Company shall be allocated to the Member in an amount equal to the

aggregate amount distributed to the Member during such fiscal year and all prior fiscal years pursuant to Sections 7.1, 7.2 and 7.3, reduced by all amounts of gross income and gain previously allocated to the Member in all prior fiscal years pursuant to this Section 9.2 (the "Allocation Shortfall"). In the event that the aggregate Allocation Shortfalls of the Member exceeds the Company's gross income and gain for the fiscal year, there shall be allocated to each Member an amount of gross income and gain equal to the product of (i) the amount of the Company's gross income and gain and (ii) a fraction, the numerator of which is the amount of such Member's Allocation Shortfall and the denominator of which is the aggregate amount of Allocation Shortfalls for the Member. In the event that the Company's gross income and gain for the fiscal year exceeds the aggregate Allocation Shortfall of all holders of Company Shares, prior to any allocation of capital gain, there shall first be allocated items of ordinary gross income.

9.3    *Net Income.* Net income of the Company for any fiscal year, calculated after any allocation of gross income pursuant to Section 9.2, shall be allocated in full to the Member.

9.4    *Net Loss.*

Net loss of the Company for any fiscal year, calculated after allocation of gross income and gain pursuant to Section 9.2, shall be allocated in full to the Member.

9.5    *Special Allocations.*

The following special allocations shall be made in the following order:

(a)    Gain Chargeback. Notwithstanding any other provision of this Section 9, if there is a net decrease in the Company's minimum gain (as calculated in accordance with the principles of Treasury Regulation Section 1.704-2(d)(1)) during any fiscal year, the Member, but only to the extent required by Treasury Regulation Section 1.704-2(f), shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to the portion of such Member's share of the net decrease in Company minimum gain, determined in accordance with Treasury Regulation Section 1.704(g)(2). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j) of the Treasury Regulations. This Section 9.5(a) is intended to comply with the minimum gain chargeback requirement in such Sections of the Treasury Regulations and shall be interpreted consistently therewith.

(b)    Member Nonrecourse Debt Minimum Gain Chargeback. Notwithstanding any other provision of this Section 9 except Section 9.5(a), if there is a net decrease in Member nonrecourse debt minimum gain (calculated in accordance with the principles of Treasury Regulation Section 1.704(2)(i)(3)) during any Company fiscal year, each Member who has a share of that Member nonrecourse debt minimum gain, determined in accordance with the principles of Treasury Regulation Section 1.704-2(i)(5), as of the beginning of such fiscal year, but only to the extent required by Treasury Regulation Section 1.704-2(i) and not subject to the exceptions set forth in Treasury Regulation Section 1.704-2(i)(4), shall be specially allocated items of Company income and gain for such year (and, if necessary,

subsequent years) in an amount equal to such Member's share of the net decrease in Member nonrecourse debt minimum gain, determined in accordance with Treasury Regulation Sections 1.704-2(i)(4) and 1.704-2(g)(2). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with, and only to the extent required by, Sections 1.704-2(i) and 1.704-2(j) of the Regulations. This Section 9.5(b) is intended to comply with the minimum gain chargeback requirements in such Sections of the Treasury Regulations and shall be interpreted consistently therewith.

(c)   Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulation Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) or 1.704-1(b)(2)(ii)(d)(6), items of Member income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the capital account deficit of such Member adjusted in the manner set forth in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6) ("Adjusted Capital Account Deficit") as quickly as possible, provided that an allocation pursuant to this Section 9.5(c) shall be made if and only to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 9 have been tentatively made as if this Section 10.5(c) were not in the Agreement. This Section 9.5(c) is intended to be a qualified income offset in compliance with Treasury Regulation Sections 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

**10.   Fiscal Year Reports.**

10.1   *Fiscal Year*. The Company's fiscal year shall be the calendar year unless changed by Manager.

10.2   *Books of Account*. Complete and accurate books of account shall be kept by the Company at the principal office of the Company (or at such other office as Manager may designate). The determinations of Manager with respect to the treatment of any item or its allocation for federal, state or local income tax purposes shall be binding upon the Member so long as that determination is not inconsistent with any express provision of this Agreement or applicable law.

10.3   *Reports*. No later than January 31st, after the close of each fiscal year, Manager shall furnish to each Member financial statements (which need not be audited) for that fiscal year. The financial statements shall include a balance sheet of the Company as of the end of the year and a statement of income and a statement of changes in financial position of the Company for the year, setting forth in each case in comparative form the figures as of the end of and for the previous fiscal year.

10.4   *K-1 Reports*. Within 105 days after the end of each calendar year, Manager shall furnish to each Member a copy of Schedule K-1 to the Company's federal income tax return for that year.

**11.   Tax Matters.**

11.1    *Allocations.* For federal, state and local income tax purposes, all items of income, deduction and loss shall be allocated to the Member on the same basis as profits are allocated and losses are charged as provided in Section 9 and all items of credit and other items not so allocated shall be allocated to the Member in the manner provided for in the Code and the applicable Treasury Regulations issued thereunder. Notwithstanding the foregoing, tax items relating to property subject to Section 704(c) of the Code and the applicable Treasury Regulations issued thereunder shall be allocated in accordance therewith.

11.2    *Consistency.* No Member shall treat a Company item on its federal, state or local income tax returns in a manner inconsistent with the treatment of the Company item on the Company's federal, state or local income tax return.

11.3    *Elections.* Upon a transfer of Company Shares described in Code Section 743(b) or upon a distribution of Company assets, Manager, in its sole discretion, may file an election pursuant to Code Section 754 to adjust the basis of Company property.

11.4    *Tax Matters Partner.* Manager shall be the tax matters partner as that term is defined in Section 6231 of the Code for the Company.

11.5    *Tax Classification.* It is the intention of the Member that the Company be treated, for all federal, state and local tax proposes, as a partnership and not as an association taxable as a corporation, and the Member, and Manager on behalf of the Company, shall take all actions consistent with the foregoing.

**12.    Operation of Business.**

12.1    *Management of Business.* Except for (i) duties specifically delegated to a Member pursuant to the terms of this Agreement, and/or (ii) as specifically provided elsewhere in this Agreement, the full right, power, authority and discretion to conduct the business and affairs of the Company, and to do all things necessary to carry on the business of the Company, shall be vested in a manager (the "Manager"), acting alone and without the consent of the Member. The Member hereby designates Dov Lesches as the Manager with the authority to bind the Company as set forth herein.

12.2    In the event of a willing withdrawal of Manager, Manager shall notify its Member in writing thirty days (30) prior to the intended withdrawal date. If the Manager withdraws due to death, sickness or if the Manager is no longer able to fulfill its duties, a successor Manager shall be elected by the majority in interest of the Persons holding membership interests. The newly elected Manager shall be entitled to one third (1/3) of net proceeds.

12.3    *Day-to-Day Management.* In addition to, and not in limitation of Section 12.1 above, but subject to Section 12.3 below, Manager is hereby authorized on behalf of the Company in its individual capacity and in its capacity as a manager of Owner to follow the Approved Budget and to:

(a)    Incur all expenditures and pay all obligations of the Company and Owner;

(b)    Execute any and all documents or instruments of any kind which Manager may deem necessary or appropriate for carrying out the daily purposes of the Company or Owner;

(c)    Purchase or lease equipment for the Company's or Owner's purposes;

(d)    Cause the Company to borrow funds, and, in connection with such borrowing, mortgage real property, grant security interests in real property and/or any other property owned by the Company and execute documents as necessary to accomplish such borrowing;

(e)    Procure and maintain, at the expense of the Company or Owner, as applicable, with responsible companies, such insurance in such amounts and covering such risks as are appropriate in the judgment of Manager;

(f)    Receive and disburse any Net Cash Flow in accordance with Section 7;

(g)    Supervise the preparation and filing of all Company and Owner tax returns;

(h)    Make any tax elections on behalf of the Company and Owner;

(i)    Engage and terminate any attorneys, accountants, brokers or sales, agents, and determine the terms of such engagements, except for sale of the Property;

(j)    Supervise the preparation and filing of all Company and Owner tax returns;

(k)    Make any tax elections on behalf of the Company and Owner;

(l)    Engage and terminate any attorneys, accountants, brokers or sales;

(m)    agents, and determine the terms of such engagements, except for sale of the Property; and

(n)    Perform any and all other acts or activities customary or incidental to the purpose of the Company's daily operations.

1.24   *Services of Manager; Other Activities.* Manager shall devote such time to the affairs of the Company as it may determine necessary to conduct them properly. Notwithstanding any other duty at law or in equity, Manager may engage or have an interest in other business ventures of any kind, independently or with others (which ventures may compete with the business of the Company or the Owner) and neither the Company nor any other Member

shall have any rights in or to those independent ventures. In addition, the Member and its direct or indirect owners or any other Affiliate of any Member may have other business interests and may engage in other activities in addition to those relating to the Company, whether or not such business interests or activities may be competitive with those of the Company. None of the Company, any Member or Manager shall have any right pursuant to this Agreement to share or participate in such other business interests or activities or to the income or proceeds derived therefrom.

12.5    *Officers.* Manager may appoint such officers of the Company as it deems desirable, including, but not limited to, a president, one or more vice-presidents, a secretary, a treasurer, and one or more assistant secretaries and assistant treasurers. Except as Manager shall otherwise determine, each of the officers of the Company shall have the powers and duties that a person holding that office in a corporation customarily has.

12.6    *No Partition, Sale or Partition.* No Member shall have the right to require partition of any of the Company's property or to compel any sale or appraisal of the Company's assets.

12.7    *Reliance by Third Parties.* Any person dealing with the Company, Manager or any Member or any officer of the Company may rely upon a certificate signed by Manager as to (a) the identity of Manager, any Member or officer of the Company, (b) any factual matters relevant to the affairs of the Company, (c) the persons who are authorized to execute and deliver any document on behalf of the Company or (d) any action taken or omitted by the Company, Manager or any Member.

12.8    *Discretion.* Whenever in this Agreement Manager is permitted or required to make a decision in its "discretion" or "sole discretion" or under a grant of similar authority or latitude, Manager shall have no duty or obligation to consider any interest of or factors affecting some or the Member so long as such Manager acts in good faith and in a manner which it reasonably believes is in or not opposed to the best interest of the Company. Each Member hereby agrees that any standard of care or duty imposed under the Act or any other applicable law shall be modified, waived or limited in each case as required to permit Manager to act under this Agreement and to make any decision pursuant to the authority prescribed in this <u>Section 12.9</u> so long as such action or decision does not constitute willful or wanton misconduct, gross negligence or a material breach of the terms of this Agreement and is reasonably believed by Manager to be consistent with the overall purposes and objectives of the Company.

## 13.    Meetings.

13.1    *Quorum; Majority Vote.* A majority of Persons holding membership interests entitled to vote shall constitute a quorum at the member meeting. If a quorum is present, the affirmative vote of the majority in interest represented at the meeting and entitled to vote on the subject matter shall constitute the act of the Member.

## 14.    Mezzanine Provisions.

14.1    Notwithstanding anything contained herein to the contrary, the Member and the Company each hereby irrevocably acknowledge and agree that upon the foreclosure, sale and/or other

transfer of Member's limited liability company interest(s) in the Company pursuant to that certain Pledge and Security Agreement in favor of Orlando Lender, LLC, as lender, dated March __, 2019, (the "Pledge Agreement"), the foreclosing party, assignee and/or the purchaser of the Member's limited liability company interest(s) in the Company shall, upon execution of a counterpart signature page of this Agreement, be automatically admitted and substituted as the sole member of the Company. Upon such a foreclosure, sale and/or other transfer, such foreclosing party, assignee and/or purchaser shall have all of the rights, title, interest and powers of the Member, including, without limitation, the Member's voting, managerial and control rights with respect to the affairs of the Company and the Member's right to receive profits and a return on the Member's capital account, if any. Such foreclosing party, assignee and/or purchaser shall also have the right to replace any or all independent managers, special members, officers and independent directors of Company. The Company acknowledges that the pledge of the limited liability company interest(s) in the Company made by the Member under the Pledge Agreement shall be a pledge not only of the profits and losses of the Company, but also a pledge of all rights and powers of the Member, including, without limitation, all voting, managerial and other rights.

14.2   <u>Pledge of LLC Interests</u>. The Member is hereby authorized to pledge and grant a security interest in its limited liability company interests in the Membership Interests to or in favor of Mezzanine Lender as collateral for the Mezzanine Loan. The Company acknowledges that the pledge of the Member's membership interests in the Company in connection with the Pledge Agreement shall be a pledge not only of profits and losses of the Company, but also a pledge of all rights and obligations of the Member, including all voting rights and the right to manage and control the affairs of the Company. Upon foreclosure, sale or transfer of the Member's limited liability company interests in the Company, pursuant to that Pledge Agreement, the holder of such membership interests shall be automatically admitted as a member of the Company, effective as of such foreclosure, sale or transfer, with all of the rights and obligations of the Member hereunder. For the avoidance of doubt, such rights, powers and benefits shall include all voting and other rights and not merely the rights of an economic interest holder. Upon a foreclosure, sale or other transfer of the limited liability company interests of the Company pursuant to the Pledge Agreement, the successor Member may transfer its interests in the Company, subject to this Agreement. Notwithstanding any provision in the Act or any other provision contained herein to the contrary, the Member shall be permitted to pledge and upon any foreclosure of such pledge in connection with the admission of the Mezzanine Lender or its designee as a member, transfer to the Mezzanine Lender or its designee its rights and powers to manage and control the affairs of the Company pursuant to the terms of the Pledge Agreement. Upon the exercise of its rights under the Pledge Agreement following a foreclosure, sale or other transfer of the limited liability company interests of the Company pursuant to the Pledge Agreement, the Mezzanine Lender or its designee shall have, among its other powers, the right to appoint and remove directors and officers pursuant to the terms of this Agreement.

14.3   Notwithstanding anything to the contrary contained herein, the Member shall not, without the prior written consent of the Mezzanine Lender, issue and shall not permit the issuance of any additional limited liability company interests of the Company other than its initial issuance of limited liability company interests issued on or prior to the date of this Agreement.

## 15.   Assignment of Interest.

15.1   *General Rules*. A Member may not sell, transfer, assign, pledge, hypothecate or otherwise dispose (the foregoing collectively referred to as a "<u>Transfer</u>") of all or any portion of its interest in the Company without the consent of Manager. Upon the grant of such consent a transferee may become a substitute Member upon its execution of a counterpart to this Agreement. Such admission shall be deemed immediately prior to the Transfer and, immediately

following such admission, the transferor Member shall cease to be a member of the Company. Any Transfer or purported Transfer that does not conform to the requirements of this Section 15 shall be void and ineffective, and shall not be recognized by the Company for any purpose, subject to Section 15.2. Notwithstanding the foregoing, a Transfer within the meaning of this Section 15 shall, to the fullest extent permitted by law, be deemed not to occur upon (a) a Transfer by devise or descent or by operation of law upon the death of partner, stockholder or member of any entity owning, directly or indirectly, an interest in the Company, (b) any transfer between partners, stockholders or members of an entity which owns, directly or indirectly, an interest in the Company, (c) any transfer by an indirect beneficial owner of interest in the Company to (i) his spouse, partners or siblings, (ii) his children or grandchildren, or (iii) to a trust for the primary benefit of any of the foregoing, or (d) any Transfer by a trust to its beneficiaries (each an "Exempted Transfer").

15.2   *Transfers Resulting in Default Under the Terms of a Mortgage Agreement.* Not in limitation of the foregoing, any Transfer of an interest in the Company, or in any entity holding a direct or indirect interest in the Company, which would result in a default pursuant to any mortgage agreement with respect to the Property or any other Company asset is hereby declared, to the fullest extent permitted by law, null and void ab initio.

15.3   *Transferee Not a Member.* Without limiting the generality of Section 15.1 hereof, and notwithstanding any other provision of this Agreement, no Person acquiring a Member interest, other than a Person who is a Member prior to the applicable Transfer, shall become substituted or admitted as a Member (a) unless such Person (i) executes a counterpart signature page to this Agreement agreeing to be bound by the terms thereof and (ii) pays all costs reasonably incurred by the Company incidental to the Transfer including, without limitation, attorneys' fees, and (b) if such substitution or admission would constitute a violation of the Securities Act or of any other applicable state or federal securities laws. In addition, in the event of an Exempted Transfer, the transferee shall not become a Member hereunder without Manager's consent. If Manager does not (or is not requested to) grant its consent to the admission of any such transferee as a Member, then such transferee shall be entitled to receive any distributions to which it would be entitled if it were a Member and shall be treated as a Member for tax purposes, but shall not have any other rights or privileges of a Member.

154   *Effective Date.* Any authorized Transfer of a Member interest or admission or substitution of a Member pursuant to this Section 15 shall be deemed effective as of the last day of the calendar month in which such Transfer or admission occurs.

155   *Survival of Obligations.* No Transfer by any Member of all or any portion of its Member interest shall relieve such Member from any of the liabilities or obligations, including any indemnification obligations under Section 17, of such Member to the Company existing or arising out of actions that occurred on or prior to the date of such Transfer.

## 16.   Dissolution; Liquidation.

16.1   *Dissolution.* The following provisions shall govern over this Agreement or any other document or instrument governing the affairs of the Company:

(a)     The Company shall be dissolved, and its affairs shall be wound up upon the first to occur of the following: (i) the termination of the legal existence of the last remaining member of the Company or the occurrence of any other event which terminates the continued membership of the last remaining member of the Company in the Company unless the Company is continued without dissolution in a manner permitted by this Agreement or the Act or (ii) the entry of a decree of judicial dissolution under Delaware Law. Upon the occurrence of any event that causes the last remaining member of the Company to cease to be a member of the Company, to the fullest extent permitted by law, the personal representative of such member is hereby authorized to, and shall, within 90 days after the occurrence of the event that terminated the continued membership of such member in the Company, agree in writing (i) to continue the Company and (ii) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of the Company, effective as of the occurrence of the event that terminated the continued membership of the last remaining member of the Company in the Company.

(b)     Notwithstanding any other provision of this Agreement, the Bankruptcy of the Member shall not cause the Member to cease to be a member of the Company and upon the occurrence of such an event, the Company shall continue without dissolution. Bankruptcy means, with respect to any Person, if such Person (i) makes an assignment for the benefit of creditors, (ii) files a voluntary petition in bankruptcy, (iii) is adjudged a bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (iv) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (vi) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (vii) if 120 days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, if the proceeding has not been dismissed, or if within 90 days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all of any substantial part of its properties, the appointment is not vacated or stayed, or within 90 days after the expiration of any such stay, the appointment is not vacated. The foregoing definition of "Bankruptcy" is intended to replace and shall supersede and replace the definition of "Bankruptcy."

16.2     *Liquidation and Distribution of Assets.* Upon dissolution of the Company, Manager shall proceed to sell or liquidate the Company's assets within a reasonable time and, shall distribute the Company's cash and other assets to the Member in accordance with the provisions of Section 7.3 of this Agreement.

16.3     *Termination.* The Company shall terminate when all property owned by the Company has been disposed of and the assets, after payment of or provisions for liabilities to the Company's creditors, have been distributed to the Member as provided in Section 16.2 and the Certificate shall not have been cancelled in the manner required under the Act.

16.4     *Internal Revenue Code Section 1031 Tax Deferred Exchange.* At the request of either Member, the Member agrees to reasonably cooperate in structuring and documenting the

sale of all or any portion of a Member's interest in the Company to effect a tax deferred exchange in accordance with the provisions of Section 1031 of the Internal Revenue Code and its corresponding regulations. Such cooperation shall be at no cost to the other Member (i.e., the cooperating Member).

## 17. Exculpation, Indemnification, Limitation of Liability of the Member.

17.1  *Liability of Member and Manager*. The Member and Manager shall no liability for the obligations or liabilities of the Company except to the extent provided in the Act and other applicable law. A Member and/or Manager shall not be personally liable for any indebtedness, liability or obligation of the Company, except as otherwise set forth under the Act and any other applicable law. Without limiting the generality of the preceding sentence, a Member or Manager does not in any way guaranty the return of any Capital Contribution to any other Member or a profit for the Member from the operations of the Company. No Member shall be obligated to restore by way of Capital Contribution or otherwise any deficit in its Capital Account or the Capital Account of any Member (if such deficits occur). Except as may otherwise be specifically provided in this Agreement, each Member's and Manager's personal liability shall be limited to the fullest extent under the Act and other applicable law.

17.2  *No Binding Authority of Member*. The Member is not an agent of the Company solely by virtue of being the Member, and the Member has authority to act for the Company solely by virtue of being a Member. Any Member that takes any action or binds the Company in violation of this Agreement shall be solely responsible for, and indemnify the Company and each other Member against, any losses that the Company, or such other Member, as the case may be, may at any time become subject to or liable for by reason of the actions specified above.

17.3  *Indemnification by the Company*. Subject to the standards and restrictions, if any, set forth in this Agreement, the Company shall, to the fullest extent permitted by law, indemnify and hold harmless each Member of the Company, or any executor or administrator of the estate of such Member, made, or threatened to be made, party to an action or proceeding, whether civil or criminal, by reason of the fact that such Person is or was a Member of the Company, against amounts paid in settlement and reasonable expenses, including attorneys' fees, actually or necessarily incurred by it in connection with the defense or settlement of such action, or in connection with an appeal therein; *provided, however*, that no indemnification shall be made to or on behalf of any Member (a) if a judgment or other final adjudication adverse to such Person establishes (i) that its acts were committed in bad faith or were the result of active and deliberate dishonesty and were material to the cause of action so adjudicated or (ii) that it personally gained in fact a financial profit or other advantage to which such person was not legally entitled or (b) in connection with any dispute regarding the Member.

17.4  *Indemnification by Member*. Subject to the terms of this Agreement and the Act, each Member hereby indemnifies each and every other Member from and against all losses resulting from the breach by any such first Member of any of terms or conditions of this Agreement.

17.5  *Indemnification of Manager*. The Company shall indemnify, defend, and hold harmless Manager and its respective employees, agents, shareholders, directors, officers,

representatives, and attorneys and any officers or agents of the Company (each, an "Indemnified Person"), on demand of and to the reasonable satisfaction of the Indemnified Person, from and against any and all liabilities, obligations, losses, damages, penalties, actions, suits, proceedings, judgments, costs, expenses, and disbursements of any kind or nature whatsoever including, without limitation, all costs and expenses of investigation, defense, appeal and settlement ("Indemnity Damages"), which may be incurred by or asserted against the Indemnified Person in any way relating to or arising out of, or alleged to relate or arise out of any action or inaction on the party of the Indemnified Person other than the portion of the Indemnity Damages resulting from the Indemnified Person's own willful or wanton misconduct, gross negligence or breach of fiduciary duty.

### 18.   Other Action.

Each Member shall execute and deliver such additional documents and instruments, and shall perform such additional acts, as may be necessary or appropriate to carry out the terms of this Agreement.

### 19.   Admission of Additional Members.

19.1   *Consent required.* No Person may be admitted to the Company as a Member without the prior written consent of Manager.

19.2   *Manager to set Criteria.* Manager shall determine the financial and other criteria for entry of new Members into the Company and shall accept all new subscriptions on behalf of the Company.

### 20.   Miscellaneous.

20.1   *Entire Agreement; Amendment.* This Agreement contains a complete statement of the arrangements among the Member with respect to the Company, and supersedes all prior agreements and understandings among them with respect to the Company. This Agreement may be amended only by a written agreement of the Member or as otherwise provided in the Act.

20.2   *Notices.* Any notice or other communications under this Agreement shall be in writing and shall be considered given when delivered in person or mailed by registered mail, postage prepaid and return receipt requested, addressed to the party intended as the recipient at the address listed on the Company's records or at such other address as a Member may designate by written notice to the other Member.

20.3   *Governing Law.* This Agreement shall be governed by, and construed in accordance with, the law of the State of Delaware applicable to agreements made and to be performed in the State of Delaware.

20.4   *Counterparts; Facsimile and PDF Signatures.* This Agreement may be executed in multiple counterparts with separate signature pages, each such counterpart shall be

considered an original, but all of which together shall constitute one and the same instrument. For purposes of execution of this Agreement, signatures transmitted via facsimile or Portable Document Format (or "PDF") shall be deemed original ink signatures.

     20.5   *Attorneys' Fees.* If any action or proceeding is instituted regarding the Member arising from or related to or with this Agreement, the Member prevailing in such action or arbitration shall be entitled to recover from the non-prevailing party for its or their costs of action or arbitration, including, without limitation, reasonable attorneys' fees and costs as fixed by the court or arbitrator therein.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

**COMPANY:**

EMPIRE EQ HOTEL LLC

By: _____
Name: Dov Leshes
Title:   Manager

**MEMBER:**

EMPIRE EQ WGI LLC

By: _____
Name: Dov Leshes
Title: Manager

**INDEPENDENT DIRECTOR:**

COLONIAL CHARTER COMPANY, a
Delaware Corporation

By: _____
Name: Karen Elliott
Title:   Authorized Representative

## EXHIBIT A

### EMPIRE EQ HOTEL LLC

| Members | Percentage Interest/Voting |
|---|---|
| Empire EQ WGI, LLC | 100% |
| **TOTAL** | 100% |

**Exhibit 2 to Pledge Agreement**

**FORM OF ACKNOWLEDGMENT AND CONSENT**

**[attached]**

## ACKNOWLEDGMENT AND CONSENT

Reference is made to that certain Pledge Agreement, dated as of April __, 2019 (as amended, supplemented or otherwise modified from time to time, the "Pledge Agreement"), by **EMPIRE EQ WGI LLC**, a Delaware limited liability company ("Pledgor"), in favor of **ORLANDO LENDER LLC**, a New York limited liability company (together with its successors and assigns, "Lender"). For the purposes of this Acknowledgement and Consent, all initially capitalized terms not herein defined shall have the respective meanings ascribed thereto in the Pledge Agreement or in the Note referred to therein.

The Subsidiary hereby (a) acknowledges receipt of a copy of the executed Pledge Agreement and the other Loan Documents, (b) consents to the Pledge Agreement and the other Loan Documents, (c) agrees to comply with the terms and provisions of the Pledge Agreement and the other Loan Documents, (d) agrees not to do anything or cause, permit or suffer anything to be done which is prohibited by, or contrary to, the terms of the Pledge Agreement or the other Loan Documents, and (e) agrees to notify Lender promptly in writing of the occurrence of any Event of Default. Subsidiary agrees to register on its books and records Lender's security interest in the Pledged Interests as provided in the Pledge Agreement.

[SIGNATURES FOLLOW]

Date: April __, 2019

**SUBSIDIARY:**

**EMPIRE EQ HOTEL LLC**, a Delaware limited liability company

By: _____

Name: Dov Lesches
Title:   Manager

STATE OF NEW YORK            )
                             ) ss:
COUNTY OF NEW YORK           )

On the ___ day of March in the year 2019, before me, the undersigned, personally appeared **DOV LESCHES**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
NOTARY PUBLIC

[Signature Page – Acknowledgement and Consent]

**<u>Exhibit 3 to Pledge Agreement</u>**

**Form of Instruction to Register Pledge**

**[attached]**

**Instruction to Register Pledge**

April __, 2019

To:    **EMPIRE EQ HOTEL LLC**, a Delaware limited liability company ("Subsidiary")

In accordance with the requirements of that certain Pledge Agreement, dated as of April __, 2019 (as amended, supplemented or otherwise modified from time to time, the "Pledge Agreement"), by **EMPIRE EQ WGI LLC**, a Delaware limited liability company ("Pledgor"), in favor of **ORLANDO LENDER LLC**, a New York limited liability company (together with its successors and assigns "Lender") (for the purposes of this Instruction to Register Pledge, all initially capitalized terms not herein defined shall have the respective meanings ascribed thereto in the Pledge Agreement), you are hereby instructed to register the pledge of the following interests in the name of Lender as follows:

The 100% limited liability company interests in Subsidiary, including without limitation all of the following property now owned or at any time hereafter acquired by Pledgor or in which Pledgor now has or at any time in the future may acquire any right, title or interest:

(a)    all additional limited liability company interests of, or other equity interests in, the Issuer and options, warrants, and other rights hereafter acquired by Pledgor in respect of such limited liability company or other equity interests (whether in connection with any capital increase, recapitalization, reclassification, or reorganization of the Issuer or otherwise) (all such limited liability company and other equity interests, including the Pledged Interests, and all such options, warrants and other rights being hereinafter collectively referred to as the "Pledged Interests");

(b)    all certificates, instruments, or other writings representing or evidencing the Pledged Interests, and all accounts and general intangibles arising out of, or in connection with, the Pledged Interests;

(c)    any and all moneys or property due and to become due to Pledgor now or in the future in respect of the Pledged Interests, or to which Pledgor may now or in the future be entitled to in its capacity as a partner of the Issuer, whether by way of a dividend, distribution, return of capital, or otherwise;

(d)    all other claims which Pledgor now has or may in the future acquire in its capacity as a partner of the Issuer against the Issuer and its property;

(e)    all rights of Pledgor under the Subsidiary LLCA (and all other agreements, if any, to which Pledgor is a party from time to time which relate to its ownership of the Pledged Interests), including, without limitation, all voting and consent rights of Pledgor arising thereunder or otherwise in connection with Pledgor's ownership of the Pledged Interests; and

(f)    to the extent not otherwise included, all Proceeds of any or all of the foregoing.

You are hereby further authorized and instructed to execute and deliver to Lender the Confirmation Statement and Instruction Agreement in the form of Exhibit 4 to the Pledge Agreement pursuant to which you will confirm that you have registered the pledge effected by the Pledge Agreement on your books and agree to comply with the instructions of Lender in respect of the Pledged Interests without further consent of Pledgor or any other Person.

[SIGNATURE FOLLOWS]

Date: April __, 2019

**PLEDGOR:**

**EMPIRE EQ WGI LLC**, a Delaware limited liability company

By: _____
Name: Dov Lesches
Title:  Manager

STATE OF NEW YORK          )
                                  ) ss:
COUNTY OF NEW YORK       )

On the ___ day of March in the year 2019, before me, the undersigned, personally appeared **DOV LESCHES**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
NOTARY PUBLIC

[Signature Page – Instruction to Register Pledge]

**Exhibit 4 to Pledge Agreement**

**Form of Confirmation Statement and Instruction Agreement**

**[attached]**

## Confirmation Statement and Instruction Agreement

April __, 2019

To:    Orlando Lender LLC
      c/o Arch Companies
      524 Broadway, Suite 405
      New York, NY 10012
      Attn:  Jeffrey Simpson

Pursuant to the requirements of that certain Pledge Agreement, dated as of April __, 2019 (as amended, supplemented or otherwise modified from time to time, the "Pledge Agreement"), by **EMPIRE EQ WGI LLC**, a Delaware limited liability company ("Pledgor") in favor of **ORLANDO LENDER LLC**, a New York limited liability company (together with its successors and assigns "Lender") (for the purpose of this Confirmation Statement and Instruction Agreement, all initially capitalized terms not herein defined shall have the respective meanings ascribed thereto in the Pledge Agreement), this Confirmation Statement and Instruction Agreement relates to the Pledged Interests (as defined in the Pledge Agreement), issued by **EMPIRE EQ HOTEL LLC**, a Delaware limited liability company (the "Issuer").

Issuer hereby (a) acknowledges receipt of a copy of the executed Pledge Agreement and the other Loan Documents, (b) consents to the Pledge Agreement and the other Loan Documents, (c) agrees to comply with the terms and provisions thereof, (d) agrees not to do anything or cause, permit or suffer anything to be done which is prohibited by, or contrary to, the terms of the Pledge Agreement or the other Loan Documents, and (e) agrees to notify Lender promptly in writing of the occurrence of any Event of Default.

On the date hereof, Issuer hereby confirms that the registered owner of 100% of the limited liability company interests in Issuer is: **EMPIRE EQ WGI LLC**, a Delaware limited liability company.  The registered pledgee of the Pledged Interests is:  **ORLANDO LENDER LLC**, a New York limited liability company limited liability company, together with its successors and assigns.

In connection with the pledge of the Pledged Collateral to Lender by the Pledgor, the Issuer hereby represents, warrants and agrees with Lender as follows:

Issuer has registered the Pledged Interests in the name of the registered pledgee on the date hereof. No other pledge or other interest adverse to that of the registered pledgee is currently registered on the books and records of the Issuer.

The Issuer shall deliver directly to Lender at its address set forth above, any and all instruments and/or certificates evidencing any right, option or warrant, and all new, additional or substituted securities issued to, or to be received by, the Pledgor by virtue of its ownership of the Pledged Interest issued by the Issuer or upon exercise by the Pledgor of any option, warrant or right attached to such Pledged Interest;

HF 12673748v.5

The Issuer shall pay directly to Lender any and all cash distributions which might be declared and payable (including any unpaid distributions accrued prior to the date hereof) on any of the Pledged Interests or any of the other Pledged Collateral issued by the Issuer;

At any time upon and during the continuance of an Event of Default, upon Lender's written instructions, the Issuer shall register the transfer of such Pledged Interests to Lender or its nominee, as applicable;

The Pledged Interest has been duly authorized and validly issued and is not subject to, nor will the Issuer at any time permit it to become subject to, any restrictions governing its issuance, transfer, ownership or control other than those currently set forth in the Subsidiary LLCA; and

Until the Obligations are paid in full (exclusive of provisions which shall survive full payment), the Issuer agrees to comply with the instructions of Lender, without any further consent from Pledgor or any other person or entity.

Notwithstanding any other right or remedy to which Lender is entitled under the Pledge Agreement or the Loan Documents, the Issuer agrees that, upon the occurrence and continuance of an Event of Default, Lender shall determine to exercise its right to sell all or any of the Pledged Collateral issued by the Issuer, the Issuer will, upon Lender's request and at the Pledgor's expense: (a) provide Lender with such other information and projections as may be necessary or, in Lender's opinion, advisable to enable Lender to effect the sale of such Pledged Collateral; (b) do or cause to be done all such other acts and things as may be necessary to make the sale of such Pledged Collateral or any part thereof valid and binding and in compliance with applicable law; and (c) do or cause to be done all such other acts and things as may be necessary to constitute Lender or Lender's designees or transferees a member of the Issuer.

Lender is hereby authorized, upon the occurrence and continuance of an Event of Default, and in connection with any sale of the Pledged Collateral issued by the Issuer, to deliver or otherwise disclose to any prospective purchaser of such Pledged Collateral (i) any information and projections provided to Lender by Issuer and/or Pledgor and (ii) any other information in Lender's possession relating to the Issuer, Pledgor or such Pledged Collateral.

**[Signature page follows]**

HF 12673748v.5

Date: April __, 2019

**Very truly yours:**

**EMPIRE EQ HOTEL LLC**, a Delaware
limited liability company

By: _____

       Name: Dov Lesches
       Title:  Manager

**ACKNOWLEDGED AND AGREED:**

**PLEDGOR:**

**EMPIRE EQ WGI LLC**, a
Delaware limited liability company

By: _____

       Name: Dov Lesches
       Title:  Manager

**LENDER:**

**ORLANDO LENDER LLC,**
a New York limited liability company

By: _____

       Name: Jeffrey Simpson
       Title:  Authorized Signatory

STATE OF NEW YORK      )
                         ) ss:
COUNTY OF NEW YORK   )

On the ___ day of March in the year 2019, before me, the undersigned, personally appeared **DOV LESCHES**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
**NOTARY PUBLIC**

[Signature Page – Confirmation Statement and Instruction Agreement]

**Exhibit 5 to Pledge Agreement**

**FORM OF ASSIGNMENT OF LIMITED LIABILITY COMPANY INTEREST**

**[attached]**

## ASSIGNMENT OF LIMITED LIABILITY COMPANY INTEREST

THIS **ASSIGNMENT OF LIMITED LIABILITY COMPANY INTEREST** (this "Assignment of Limited Liability Company Interest"), dated as of _____ __, 20__ (the "Effective Date"), is made by **EMPIRE EQ WGI LLC**, a Delaware limited liability company (together with its successors and assigns, the "Assignor") to _____ (the "Assignee").

## RECITALS

Assignor has entered into a certain Pledge Agreement dated as of April __, 2019 (as amended, supplemented or otherwise modified from time to time, the "Pledge Agreement"), with **ORLANDO LENDER LLC**, a New York limited liability company (together with its successors and assigns, "Lender"). Unless otherwise noted, terms defined in the Pledge Agreement are used herein as defined therein.

The Assignor is the registered owner of 100% of the limited liability company interests in EMPIRE EQ HOTEL LLC, a Delaware limited liability company ("Subsidiary"), existing under and evidenced by the Subsidiary LLCA. Under the Subsidiary LLCA, the Assignor has certain rights, title and interest in and to Subsidiary and its assets and distributions (collectively, the "Interest").

Lender has required that the Assignor shall have executed and delivered this Assignment of Limited Liability Company Interest.

NOW THEREFORE, in consideration of the premises and of the mutual covenants and agreements contained herein, the parties hereto agree as follows:

Section 1.   Assignment and Acceptance of Assigned Interest.   As of the Effective Date, the Assignor hereby sells, transfers, conveys and assigns (without recourse and, except as set forth herein, representation or warranty) to the Assignee all of the Assignor's right, title and interest in and to the Interest and of its rights under the Subsidiary LLCA, including, without limitation, all its (a) rights to receive moneys due and to become due under or pursuant to the Subsidiary LLCA, (b) rights to receive proceeds of any insurance, indemnity, warranty or guaranty with respect to the Jo Subsidiary LLCA, (c) claims for damages arising out of or for breach of or default under the Subsidiary LLCA, and (d) rights to perform thereunder and to compel performance, and otherwise exercise all rights and remedies thereunder. The Assignor's right, title and interest in the Interest and of the Assignor's rights under the Subsidiary LLCA that are being assigned to the Assignee pursuant to the Pledge Agreement are hereinafter referred to as the "Assigned Interest". The Assignee, upon the execution of this Assignment of Limited Liability Company Interest, hereby accepts from the Assignor the Assigned Interest and agrees to become a successor member of Subsidiary in the place and stead of the Assignor to the extent of the Assigned Interest and to be bound by the terms and provisions of the Subsidiary LLCA.

Section 2.   Capital Account.   On or prior to the Effective Date, the Assignee shall notify each of the other members in Subsidiary, if any, required to be so notified under the terms of the Subsidiary LLCA and thereafter, the portion of all profits and losses, and all other items of income, gain, loss, deduction or credit, allocable to the Assigned Interest shall be credited or charged, as the case may be, to the Assignee and the Assignee shall be entitled to the portion of all distributions, payments or other allocations payable in respect of the Assigned Interest, regardless of the source of such distributions, payments or other allocations or the date on which they were earned.

- 1 -

Section 3.    Representations and Warranties of the Assignor.  The Assignor represents to Assignee, as of the Effective Date of this Assignment of Limited Liability Company Interest, and to Lender as of the Effective Date of the Pledge Agreement, that:

(a)  This Assignment of Limited Liability Company Interest has been duly executed and delivered by the Assignor and is a valid and binding obligation of the Assignor, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and general principles of equity; and

(b)  The Assignor is the sole owner of the Assigned Interest free and clear of any liens, except for the liens created by the Pledge Agreement.

Section 4.    Filings.  On or as soon as practicable after the Effective Date, the Assignee shall file and record or cause to be filed and recorded with all proper offices or agencies all documents and instruments required to effect the terms herein, if any, including, without limitation, (a) this Assignment of Limited Liability Company Interest and (b) any limited liability company and assumed or fictitious name certificate or certificates and any amendments thereto.

Section 5.    Future Assurances.  Each of the Assignor and the Assignee mutually agrees to cooperate at all times from and after the date hereof with respect to any of the matters described herein, and to execute such further deeds, bills of sale, assignments, releases, assumptions, notifications or other documents as may be reasonably requested for the purpose of giving effect to, evidencing or giving notice of the assignment evidenced hereby.

Section 6.    Successors and Assigns.  This Assignment of Limited Liability Company Interest shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns.

Section 7.    Modification and Waiver.  No supplement, modification, waiver or termination of this Assignment of Limited Liability Company Interest or any provisions hereof shall be binding unless executed in writing by all parties hereto and the original or a copy of such writing has been delivered to Assignee.

Section 8.    Counterparts.  Any number of counterparts of this Assignment of Limited Liability Company Interest may be executed (including via .pdf).  Each counterpart will be deemed to be an original instrument and all counterparts taken together will constitute one agreement.  Delivery of an executed counterpart of a signature page to this Assignment of Limited Liability Company Interest by facsimile, telecopier or other electronic means shall be as effective as delivery of a manually executed counterpart of this Assignment of Limited Liability Company Interest.

Section 9.    Execution; Effective Date.  This Assignment of Limited Liability Company Interest will be binding and effective and will result in the assignment of the Assigned Interest on the Effective Date.

Section 10.  Governing Law.  This Assignment of Limited Liability Company Interest will be governed by the laws of the State of New York.

[SIGNATURE PAGE FOLLOWS]

HF 12673748v.5

IN WITNESS WHEREOF, the Assignor has caused this Assignment of Limited Liability Company Interest to be executed and delivered as of the Effective Date.

**ASSIGNOR:**

**EMPIRE EQ WGI LLC**, a Delaware limited liability company

By: _____

Name: Dov Lesches
Title:   Manager

STATE OF NEW YORK            )
                             ) ss:
COUNTY OF NEW YORK           )

On the ___ day of March in the year 2019, before me, the undersigned, personally appeared **DOV LESCHES**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
NOTARY PUBLIC

[Signature Page – Assignment of Limited Liability Company Interest]

**Exhibit 6 to Pledge Agreement**

**Organizational chart of the Pledgor, the Subsidiary and the Property**

(see attached)



# Exhibit C

## MANAGER'S CERTIFICATE

### Dated as of April 5, 2019

I, **DOV LESCHES**, hereby certify to **ORLANDO LENDER LLC**, a Delaware limited liability company, together with its successor and assigns (*"Lender"*), and **FIRST AMERICAN TITLE INSURANCE COMPANY**, together with its successor and assigns (*"Insurer"*), that I am the duly appointed, qualified and acting Manager of each of **EMPIRE EQ WGI LLC**, a Delaware limited liability company (*"Mezz"*), and **EMPIRE EQ HOTEL LLC**, a Delaware limited liability company (*"Owner"*), which is a wholly owned subsidiary of Mezz. I further certify to Lender and Insurer, on behalf of each of Mezz and Owner as follows as of the date and year first above written:

1.     Attached as **Exhibit A-1** attached hereto is a true, correct and complete copy of the Articles of Organization of Owner as certified by the Secretary of State of the State of Florida. There are no amendments, modifications or alterations to such Articles of Organization pending or contemplated as of the date hereof, and the same has not been rescinded or revoked and is in full force and effect on the date hereof, except as otherwise set forth in this Certificate.

2.     Attached as **Exhibit A-2** attached hereto is a true and complete copy of the Good Standing Certificate for Owner as certified by the Secretary of State of the State of Florida.

3.     Attached as **Exhibit A-3** attached hereto is a true, correct and complete copy of the limited liability company operating agreement of Owner. There are no amendments, modifications or alterations to such limited liability company operating agreement pending or contemplated as of the date hereof, and the same has not been rescinded or revoked and is in full force and effect on the date hereof, except as otherwise set forth in this Certificate.

4.     Attached as **Exhibit A-4** attached hereto is a true, correct and complete copy of the amended and restated limited liability company operating agreement of Owner. There are no amendments, modifications or alterations to such limited liability company operating agreement pending or contemplated as of the date hereof, and the same has not been rescinded or revoked and is in full force and effect on the date hereof, except as otherwise set forth in this Certificate.

5.     Attached as **Exhibit A-5** attached hereto is a true, correct and complete copy of the second amended and restated limited liability company operating agreement of Owner. There are no amendments, modifications or alterations to such limited liability company operating agreement pending or contemplated as of the date hereof, and the same has not been rescinded or revoked and is in full force and effect on the date hereof, except as otherwise set forth in this Certificate.

6.     Attached as **Exhibit A-6** hereto is a true and complete copy of the resolutions duly adopted by written consent of the members and manager of Owner with respect to the authorization and approval of the transactions outlined therein. There are no amendments, modifications or alterations to such resolutions pending or contemplated as of the date hereof, and the same has not been rescinded or revoked and is in full force and effect on the date hereof.

7.    Attached as **Exhibit A-7** hereto is a true and complete copy of the plan of conversion of Owner. There are no amendments, modifications or alterations to such resolutions pending or contemplated as of the date hereof, and the same has not been rescinded or revoked and is in full force and effect on the date hereof.

8.    Attached as **Exhibit A-8** hereto is a true and complete copy of the certificate of conversion of Owner. There are no amendments, modifications or alterations to such resolutions pending or contemplated as of the date hereof, and the same has not been rescinded or revoked and is in full force and effect on the date hereof.

9.    Attached as **Exhibit B-1** attached hereto is a true, correct and complete copy of the Certificate of Formation of Owner as certified by the Secretary of State of the State of Delaware. There are no amendments, modifications or alterations to such Certificate of Formation pending or contemplated as of the date hereof, and the same has not been rescinded or revoked and is in full force and effect on the date hereof.

10.    Attached as **Exhibit B-2** attached hereto is a true and complete copy of the Good Standing Certificate for Owner as certified by the Secretary of State of the State of Delaware.

11.    Attached as **Exhibit B-3** attached hereto is a true, correct and complete copy of the limited liability company operating agreement of Owner. There are no amendments, modifications or alterations to such limited liability company operating agreement pending or contemplated as of the date hereof, and the same has not been rescinded or revoked and is in full force and effect on the date hereof, except as otherwise set forth in this Certificate.

12.    Attached as **Exhibit B-4** hereto is a true and complete copy of the resolutions duly adopted by written consent of the members and manager of Owner with respect to the authorization and approval of the transactions outlined therein. There are no amendments, modifications or alterations to such resolutions pending or contemplated as of the date hereof, and the same has not been rescinded or revoked and is in full force and effect on the date hereof.

13.    Attached as **Exhibit B-5** attached hereto is a true, correct and complete copy of the Assignments of Membership Interests of the Members of Owner. There are no amendments, modifications or alterations to such assignments pending or contemplated as of the date hereof, and the same has not been rescinded or revoked and is in full force and effect on the date hereof, except as otherwise set forth in this Certificate.

14.    Attached as **Exhibit B-6** attached hereto is a true, correct and complete copy of the Scrivener's Affidavit and attached assignments of Membership Interests to address the Scrivener's error as described therein. There are no amendments, modifications or alterations to such assignments pending or contemplated as of the date hereof, and the same has not been rescinded or revoked and is in full force and effect on the date hereof, except as otherwise set forth in this Certificate.

15.    Attached as **Exhibit B-7** attached hereto is a true and complete copy of the Written Consent of Manager to the Assignments of Membership Interests of the Members of Owner. There are no amendments, modifications or alterations to such written consent pending

-2-

or contemplated as of the date hereof, and the same has not been rescinded or revoked and is in full force and effect on the date hereof, except as otherwise set forth in this Certificate.

16.    Attached as **Exhibit C-1** attached hereto is a true, correct and complete copy of the Certificate of Formation of Mezz as certified by the Secretary of State of the State of Delaware. There are no amendments, modifications or alterations to such Certificate of Formation pending or contemplated as of the date hereof, and the same has not been rescinded or revoked and is in full force and effect on the date hereof.

17.    Attached as **Exhibit C-2** attached hereto is a true and complete copy of the Good Standing Certificate for Mezz as certified by the Secretary of State of the State of Delaware.

18.    Attached as **Exhibit C-3** attached hereto is a true, correct and complete copy of the limited liability company operating agreement of Mezz. There are no amendments, modifications or alterations to such limited liability company operating agreement pending or contemplated as of the date hereof, and the same has not been rescinded or revoked and is in full force and effect on the date hereof, except as otherwise set forth in this Certificate.

19.    Attached as **Exhibit C-4** hereto is a true and complete copy of the resolutions duly adopted by written consent of the members and manager of Mezz with respect to the authorization and approval of the transactions outlined therein. There are no amendments, modifications or alterations to such resolutions pending or contemplated as of the date hereof, and the same has not been rescinded or revoked and is in full force and effect on the date hereof.

20.    Attached as **Exhibit D** attached hereto is a true, correct and complete copy of the ownership structure of each of Owner and Mezz.

21.    Neither Mezz nor Owner has ever issued a membership certificate evidencing its membership interests or previously opted into Article 8 of the Uniform Commercial Code of the State of Delaware or any other State.

[Remainder of page intentionally left blank; signature on following page]

-3-

IN WITNESS WHEREOF, I have hereunto signed my name as the date and year first above written.

_____
Dov Lesches, Manager

# EXHIBIT

# A-1

# Electronic Articles of Organization
## For
## Florida Limited Liability Company

L15000097817
FILED 8:00 AM
June 03, 2015
Sec. Of State
jahickman

## Article I

The name of the Limited Liability Company is:

EMPIRE EQ HOTEL LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

C/O EMPIRE EQUITIES
3 COLUMBUS CIRCLE 15TH FLOOR
NEW YORK, NY. US  10019

The mailing address of the Limited Liability Company is:

C/O EMPIRE EQUITIES
3 COLUMBUS CIRCLE 15TH FLOOR
NEW YORK, NY. US  10019

## Article III

The name and Florida street address of the registered agent is:

INTERSTATE AGENT SERVICES LLC
1540 GLENWAY DR.
TALLAHASSEE, FL.  32301

Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this certificate, I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.

Registered Agent Signature:  ALEX ENGLARD

## Article IV

The name and address of person(s) authorized to manage LLC:

L15000097817
FILED 8:00 AM
June 03, 2015
Sec. Of State
jahickman

    Title: MGRM
    DOV LESCHES
    329A CROWN ST.
    BROOKLYN, NY. 11225 US

Signature of member or an authorized representative

Electronic Signature: DOV LESCHES

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true. I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

# EXHIBIT

# A-2

# *State of Florida*
# *Department of State*

I certify from the records of this office that EMPIRE EQ HOTEL LLC is a limited liability company organized under the laws of the State of Florida, filed on June 3, 2015.

The document number of this limited liability company is L15000097817.

I further certify that said limited liability company has paid all fees due this office through December 31, 2017, that its most recent annual report was filed on April 16, 2017, and that its status is active.

*Given under my hand and the*
*Great Seal of the State of Florida*
*at Tallahassee, the Capital, this*
*the Second day of April, 2018*



*Ken Detzner*

*Secretary of State*

Tracking Number: CU3666155580

To authenticate this certificate,visit the following site,enter this number, and then follow the instructions displayed.

https://services.sunbiz.org/Filings/CertificateOfStatus/CertificateAuthentication

# EXHIBIT

# A-3

THE MEMBERSHIP INTERESTS REPRESENTED BY THIS INSTRUMENT HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS PURSUANT TO APPLICABLE EXEMPTIONS. WITHOUT SUCH REGISTRATION, INTERESTS MAY NOT BE SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED IN THE UNITED STATES AT ANY TIME WHATSOEVER, EXCEPT UPON DELIVERY TO THE LIMITED LIABILITY COMPANY OF AN OPINION OF COUNSEL SATISFACTORY TO THE MEMBER OF THE LIMITED LIABILITY COMPANY THAT REGISTRATION IS NOT REQUIRED FOR SUCH TRANSFER OR THE SUBMISSION TO THE MEMBER OF THE LIMITED LIABILITY COMPANY OF SUCH OTHER EVIDENCE AS MAY BE SATISFACTORY TO THE MEMBER TO THE EFFECT THAT ANY SUCH TRANSFER WILL NOT BE IN VIOLATION OF THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS OR ANY RULE OR REGULATION PROMULGATED THEREUNDER. ADDITIONALLY, ANY SALE OR OTHER TRANSFER OF THE INTERESTS IS SUBJECT TO CERTAIN RESTRICTIONS THAT ARE SET FORTH IN THIS OPERATING AGREEMENT.

<div align="center">

**OPERATING AGREEMENT**

**OF**

**EMPIRE EQ HOTEL LLC**

A FLORIDA LIMITED LIABILITY COMPANY

</div>

**THIS OPERATING AGREEMENT** ("Agreement") is made and entered into effective the 3rd day of June, 2015, by and between **EMPIRE EQ HOTEL LLC**, a Florida limited liability company (the "Company"), which has a mailing address at C/O Empire Equities, 3 Columbus Circle, 15th Floor, New York, NY 10019.

<div align="center">

**W I T N E S S E T H :**

</div>

**WHEREAS,** the Company is a Florida limited liability company that was formed by filing Articles of Organization pursuant to the Florida Revised Limited Liability Company Act, Chapter 605, Florida Statutes (the "Act") with the Florida Secretary of State, Division of Corporations, on June 3, 2015; and

**WHEREAS,** the name and address of the Member of the Company are as set forth on the attached Membership Roll; and

**WHEREAS,** the Member and the Company desire to enter into this Agreement for the purpose of regulating the rights and obligations of the Members, providing for certain limitations upon the sale or transfer of Membership Interests in the Company, and providing for the continued orderly management of the Company.

**NOW, THEREFORE,** in consideration of the mutual promises and covenants contained herein, and other good and valuable consideration, the parties do hereby agree as follows:

<div align="center">

**SECTION I**
**Recitals**

</div>

1.1     The foregoing recitals are true and correct and incorporated herein by reference.

## SECTION II
### Parties

2.1 The parties to this Agreement are the Company and the Member set forth on the Membership Roll attached hereto and made a part hereof by reference, as it may be amended from time to time by the parties. Any other persons or entities that become Members of the Company shall automatically become parties to this Agreement and obligated hereby, upon acceptance of the Membership Interest, and shall acknowledge their joinder to this Agreement if requested by the Members or the Company.

## SECTION III
### Term

3.1 This Agreement shall remain in full force and effect until terminated as provided for in this Agreement. The Company shall be dissolved only upon the written election by the Members that the Company should be dissolved or unless required by law.

## SECTION IV
### Office

4.1 The Company shall maintain its principal office at c/o Empire Equities, 3 Columbus Circle, 15th Floor, New York, NY 10019 or at such other address as may be determined by the Members from time to time.

## SECTION V
### Principal Business

5.1 The Company's principal business is to own and manage the real property located on Westwood Blvd in Orlando FL set forth and described on Exhibit "A" hereto (the "Property") and such other activities as a limited liability company may be permitted to undertake pursuant to the laws of the State of Florida.

## SECTION VI
### Management of the Company

6.1   Management. The Company shall be a member managed limited liability company. The overall management and operation of the Company shall be under the control and direction of Dov Lesches.

6.2   General Powers. Dov Lesches shall have full, exclusive, and complete discretion, power, and authority, subject in all cases to the other provisions of this Agreement and the requirements of applicable law, to manage, control, administer, and operate the business and affairs of the Company for the purposes herein stated, and to make all decisions affecting such business and affairs, including, without limitation, for Company purposes, the power to:

A.   Buy, sell, lease, mortgage, convey, own and manage in all respects any and all property, real and personal, tangible and intangible, including but not limited to the purchase, sale, mortgage and leasing of the Property or any part thereof;

B.   Construct on, operate, maintain, improve, and lease the Property and any other real or personal property relating to the Company or the Property;

C.   Sign agreements, contracts, deeds, and to give receipts, releases and discharges;

[5875-8/4961537/1]

D.    Purchase liability and other insurance to protect the Company's properties, including the Property and protect the Members from any liability associated with the operations of the Company the Property or any business related thereto;

E.    Execute or modify leases with respect to any part or all of the assets of the Company;

F.    Execute any and all other instruments and documents which may be necessary or in the opinion of the Members desirable to carry out the intent and purpose of this Agreement;

G.    Make any and all expenditures which the Members, in their sole discretion, deem necessary or appropriate in connection with the management of the affairs of the Company and the carrying out of its obligations and responsibilities hereunder;

H.    Borrow money for and on behalf of the Company, and in connection therewith, execute and deliver any notes, mortgages, security instruments or other documents required in connection with any such loan;

I.    Enter into any capital transaction including, but not limited to, any sale of all or substantially all of the assets of the Company; and

J.    Exercise all other powers permitted by law.

No further documentation is required to evidence the authority of the Members to perform any of the foregoing. All instruments to be executed by the Company shall require the signature of one Member.

## SECTION VII
### Interests in Company/Borrowing

7.1    _Percentage Interests_. The percentage interests of the Members shall be as set forth under the title "Membership Interest" on the attached Membership Roll and may be evidenced by Membership Certificates if determined by the Members.

7.2    _Capital Funding_. In order to finance initial operations of the Company, the Company may obtain its additional capitalization from loans to the Company or equity contributions from the Members as determined by the Members. The Members shall determine how any such financing is treated as between the Members and for tax purposes. **Dov Lesches** shall be considered the "tax matters partner" for purposes of dealing with the Internal Revenue Service.

## SECTION VIII
### Capital Contributions; Allocation of Income, Gain, Loss,
### Net Cash Flow and Other Distributions

8.1    _Initial Capital Contributions_. Upon the execution of this Agreement, the Members shall contribute and/or have contributed cash or value to the Company ("Capital Contribution") in the amounts set forth on the attached Membership Roll.

8.2    _Capital Accounts_. A separate capital account ("Capital Account") shall be maintained for each Member in accordance with the following provisions:

A.    Each Member's Capital Account shall be credited with the amounts of such Member's Capital Contributions, such Member's distributive share of profits and any items in the nature of income or gain which are specially allocated to the Member by the Members.

B.    Each Member's Capital Account shall be charged with the amounts of cash and the carrying value of any property distributed by the Company to such Member pursuant to any provision of this Agreement, such Member's distributive share of losses and any items in the nature of expenses or losses which are specially allocated to the Member by the Members.

C.    If all or a portion of a Member's Membership Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Membership Interest.

8.3    Capital Account Deficit. Except as otherwise provided in this Agreement or the Act, no Member shall have any liability or obligation to restore a negative or deficit balance in such Member's Capital Account.

8.4    Return of Capital Contributions. No Member shall be entitled to withdraw any part of its Capital Contributions or Capital Account or to receive any distribution from the Company except as specifically provided in this Agreement.

8.5    No Interest on Contributions. No Member shall be entitled to interest on its Capital Contributions.

8.6    Loans. As set forth in this Agreement, any Member may, at any time, make or cause a loan to be made to the Company in any amount and on those terms upon which the Members agrees. Unless otherwise specifically so designated by the Members, Loans by a Member to the Company (including those arising by virtue of payment under a guaranty or indemnity of the Company obligations) shall not be considered contributions to the capital or Capital Contributions of the Company and shall not increase the Capital Account of the lending Member but instead shall be treated as a loan to the Company to be repaid in accordance with the reasonable and customary business terms negotiated for such loan and may, at the discretion of the Members, be repaid prior to any distributions to any other Members.

8.7    Limited Liability. Except as provided in this Agreement, no Member shall be required under any circumstances to contribute or lend any money or property to the Company.

8.8    Not for Benefit of Creditors. The provisions of this Section are not intended to be for the benefit of any creditor or other person (other than a Member in its capacity as Member) to whom any debts, liabilities, or obligations are owed by (or who otherwise has any claim against) the Company or any of the Members, and no such creditor or other person shall obtain any right under any such provisions or shall by reason of any such provisions make any claim in respect of any debt, liability, obligation, or claim against the Company or any of the Members.

8.9    Allocation of Net Income, Gain, Loss and Credits. The interest of each Member in net income, gain or loss of the Company (and each item of income, gain, loss, deduction or credit) shall be allocated to Members in accordance with their respective percentage interests in the Company.

8.10    Distribution of Net Cash Flow. The net cash flow of the Company shall be distributed at such times as the Members may determine during each fiscal year of the Company, after payment of all expenses, including debt service (whether institutional or to a Member), and provision for reserves deemed necessary by the Members. The balance of the Company's net cash flow, if any, shall be distributed to Members in accordance with their respective percentage interests in the Company. Members shall distribute the balance of the net cash flow, if any, to the Members not later than thirty (30) days after the end of each calendar year.

## SECTION IX
### Transfers of Membership Interest

9.1 No Member shall have the right to transfer all, or any portion of, or rights in, the Member's Membership Interest without the express written consent of the other Members which may be granted or withheld in the sole discretion of the other Members. Any purported Transfer of a Member's Membership Interest in violation of the provisions of this Agreement shall be void *ab initio*. In the event the Members permit the transfer of a Member's Membership Interest, the transferee shall automatically be admitted to the Company as a Member, provided that the transferee executes and delivers to the Company a counterpart of this Agreement. As to any assignee or transferee of a Membership Interest not approved as required above, such assignee or transferee shall have (i) no voting rights of any nature or kind, and (ii) no rights to require any information or accounting of the Company's transactions or finances or to inspect Company books. If, however, such assignee is admitted to the Company as permitted above and otherwise herein, such admission shall vest in such assignee an assignment of all rights, powers, authorities and responsibilities inuring to and imposed upon Members hereunder.

## SECTION X
### Miscellaneous

10.1    Attorneys' Fees. If any action at law or in equity, including an action for declaratory judgment, is brought to enforce or interpret the provisions of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and costs from the other parties, which fees and costs may be set by the Court in the trial or appeal of such action, or may be enforced in a separate action brought for that purpose, and which fee shall be in addition to any other relief which may be awarded.

10.2    Final Agreement. This Agreement supersedes any and all other agreements, either oral or in writing, between the parties hereto with respect to the subject matter hereof, and contains all of the covenants and agreements between the parties with respect to said matter. Each party to this Agreement acknowledges that no representations, inducements, promises, or agreements orally or otherwise, have been made by any party, or anyone acting on behalf of any party, which is not embodied herein, and that no other agreement, statement, or promise not contained in this Agreement shall be valid or binding.

10.3    Time of Essence. Time is of the essence as to this Agreement.

10.4    Choice of Law. The validity of this Agreement and of any of its terms or provisions, as well as the rights and duties of the parties hereunder, shall be interpreted and construed pursuant to and in accordance with the laws of the State of Florida.

10.5    Notice. Any notice to be given hereunder by any party to the others shall be in writing and may be made by personal delivery, by registered or certified mail, return receipt requested, by any nationally recognized overnight delivery service, or by facsimile transmission to the addresses set forth on the attached Membership Roll. Notice to any party shall be sufficient if made or addressed to said party, at the address for said party set forth on the Membership Roll. Any party may change the address for notice by giving notice of such change in accordance with the provisions of this paragraph. As applicable, notice shall be deemed given when personally delivered, on the date shown on the written confirmation of receipt (which shall include a successful facsimile transmission report), or within five (5) days of being deposited in the United States Mail with adequate postage thereon.

10.6    Amendments. This Agreement may be altered, amended, repealed or otherwise modified, only with the express, written consent of all Members who are parties hereto. All modifications hereof shall be in writing, signed by all Members of record and annexed hereto.

10.7    Venue. In the event of any litigation between the Members, or between the Company and any Members, arising under this Agreement, it is agreed the proper jurisdiction and venue shall be Palm Beach County, Florida.

10.8    Counterparts; Facsimiles. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. Facsimiles and scanned (PDF) signatures shall be treated as originals for all purposes relating to this Agreement.

**[SIGNATURES APPEAR ON FOLLOWING PAGE]**

**IN WITNESS WHEREOF**, the individuals and entities signing this Agreement below conclusively evidence their agreement to the terms and conditions of this Agreement by so signing this Agreement.

THE COMPANY:

**EMPIRE EQ HOTEL LLC,**
a Florida limited liability company

By: _____
Name: Dov Lesches
Title: President

**MEMBERSHIP ROLL**

**OF**

**EMPIRE EQ HOTEL LLC**

| Member Names | Address | Capital Contribution | Membership Interest |
|---|---|---|---|
| Dov Lesches | 3 Columbus Circle, 15th Floor New York, NY 10019 | $ | 100% |
| | | | |
| | | | |
| | | | |
| | | | |

EXHIBIT "A"

DESCRIPTION OF REAL PROPERTY

# EXHIBIT

# A-4

# FIRST AMENDED AND REINSTATED OPERATING AGREEMENT

## OF

## EMPIRE EQ HOTEL LLC

THE MEMBERSHIP INTERESTS HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION (THE "COMMISSION") UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER THE SECURITIES LAWS OF ANY JURISDICTION, AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH STATE LAWS. THE MEMBERSHIP INTERESTS HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE COMMISSION, ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF AN INVESTMENT IN THE LIMITED LIABILITY COMPANY. A MEMBERSHIP INTEREST ALSO MAY NOT BE TRANSFERRED OR ENCUMBERED UNLESS THE PROVISIONS OF THIS AGREEMENT ARE SATISFIED.

# FIRST AMENDED AND REINSTATED OPERATING AGREEMENT

## OF

## EMPIRE EQ HOTELLLC

**THIS OPERATING AGREEMENT** is made effective as of the 7th day of January, 2019 (as amended from time to time, this "Agreement"), by and among EMPIRE EQ HOTEL LLC, as amended from that certain Operating Agreement dated June 3rd, 2015;a Florida limited liability company (the "Company") and the Persons executing this Agreement as members (collectively, the "Members"), in consideration of the mutual covenants expressed herein.

1.    **Definitions.**

    1.1    *Definitions.* Unless the context otherwise requires, capitalized terms used in this Agreement and not otherwise defined herein shall have the following meanings:

    "Act" shall mean the Florida Limited Liability Company Act, as amended from time to time.

    "Affiliate" shall mean (a) any Person directly or indirectly owning, controlling or holding the power to vote 10% or more of the outstanding voting securities of an identified other Person; (b) any Person 10% or more of whose voting securities are directly or indirectly owned, controlled or held with power to vote, by such other Person; (c) any Person directly or indirectly controlling, controlled by, or under common control with such other Person; (d) any officer, director, member, manager or partner of such other Person; (e) if such other Person is an officer, director, member, manager or partner, any entity for which such Person acts in any such capacity; and (f) any spouse, lineal ancestor or descendant of such other Person.

    "Approved Budget" means the then effective approved annual budget of the Company.

    "Capital Contribution" means contributions of cash or other property made by the Members to the Company, from time to time, pursuant to Section 5.

    "Certificate" shall mean the Certificate of Formation of the Company, as amended from time to time.

    "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, or corresponding provisions of future laws.

    "Hotel" shall have the meaning given such term in the HMA.

    "Hotel Agreements" shall mean, certain Operating Agreement by and between Owner and a Starwood Company.

    "Initial Capital Contribution" shall mean the Capital Contribution set forth opposite the name of each Member in Exhibit A to this Agreement.

"Internal Rate of Return" means an annualized effective compounded rate of return on capital.

"Manager" shall have the meaning set forth in Section 12.1.

"Member(s)" shall mean the Persons executing this Agreement as members and each Person who may become a substituted or additional Member pursuant to the provisions hereof and applicable law, each in its capacity as a member of the Company.

"Net Cash Flow" shall mean, for each year, the Company's gross operating receipts during such year (not including Capital Contributions, loans from Members to the Company, proceeds from the sale or refinancing within a twelve-month period of all or substantially all of the assets of the Company, insurance proceeds, or similar capital events) and any cash reserves to be distributed to the Members, less the sum of (a) operating expenses paid in cash during such year to the extent such expenses have not been reserved against in a prior fiscal year; (b) the aggregate of all other cash amounts expended by the Company during such year (except distributions made pursuant to Sections 7.1, 7.2 and 7.3 hereof); and (c) any increases in reasonable amounts set aside for contingencies, taxes, insurance and similar items.

"Owner" shall mean EMPIRE EQ HOTEL LLC, a Florida limited liability company formed for the purpose of acquiring, owning, developing, holding, selling, assigning, transferring, operating, leasing, mortgaging, and otherwise dealing with the Property.

"Percentage Interests" shall mean, initially, the percentages set forth on Exhibit A to this Agreement, as such percentages may be adjusted from time to time pursuant to Section 5.2 and to reflect the admission of new members pursuant to the terms hereof.

"Person" shall mean a natural person, corporation, limited liability company, trust, partnership, estate, unincorporated association or other entity.

"Property" shall mean that certain approximately 5 acre site located at Westwood Boulevard, Orlando, Florida acquired by Owner, together with all improvements currently on such land and all subsequent or additional improvements on such land.  The legal description of the Property is attached hereto as Exhibit C.

"Starwood" shall mean Starwood (M) International, Inc., a Delaware corporation.

"Starwood Companies" shall mean Starwood and/or its Affiliates.

"TOG" shall mean either The One Group or TOG Orlando F&B Manager LLC, a Florida limited liability company.

"Unrecovered Capital Contribution" shall mean any Capital Contribution that is made by a Member and is not repaid pursuant to Section 7.

2. **Organization and Purpose.**

2.1    *Organization.* The Company was formed by the filing of the Certificate dated June 3rd, 2015 with the Secretary of the State of Florida pursuant to the Act. Dovi Leshes is hereby designated as an "authorized person" within the meaning of the Act, and has executed, delivered and filed the Certificate with the Florida Secretary of State. Upon the filing of the Certificate, his powers as an "authorized person" ceased, and Manager thereupon became the designated "authorized person" and shall continue as the designated "authorized person" with the meaning of the Act. The existence of the Company as a separate legal entity shall continue until cancellation of the Certificate as provided in the Act.

2.2    *Company Name.* The name of the Company shall be "Empire Eq Hotel LLC" and all business of the Company shall be conducted under that name.

2.3    *Place of Business.* The mailing and business office address of the Company shall be 3 Columbus Circle 15th Floor, New York, New York 10019. The Company address may be changed from time to time by Manager in its sole discretion.

2.4    *Term.* The term of the Company shall commence on the date of this Agreement and shall continue thereafter until December 31, 2065.

2.5    *Company's Purpose.* The Company has been formed solely for the purpose of developing a 350 +/- hotel on the Orange County Convention center.

3. **Membership.**

3.1    *Members.* The name, Capital Contribution and Percentage Interest of each of the Members is set forth on Exhibit A to this Agreement, as such Exhibit may be amended from time to time by the Manager.

3.2    *Admission of Additional Members.* Additional Members may be admitted to the Company only upon and subject to the terms and conditions set forth in this Agreement.

4. **Title to Company Property.**

All property owned by the Company shall be owned by the Company as an entity and, insofar as permitted by applicable law, no Member shall have any ownership interest in any Company property in its individual name or right, and each Member's interest in the Company shall be personal property for all purposes. The foregoing provisions shall govern over any contrary or inconsistent provision in this Agreement or any other document or instrument governing the affairs of the Company.

5. **Capital Contributions.**

5.1    *Initial Capital Contributions.* The Initial Capital Contribution of each Member as of the date hereof is set forth on Exhibit A. The Members acknowledge, however, that the Initial Capital Contribution of Dovi Leshes as reflected on Exhibit A.

[5875-006/4862525/2]                                          4

5.2    *Additional Capital Contributions.*

(a)    The Members acknowledge and agree that Manager may, from time to time, at his discretion, determine that an amount of additional cash capital is required by the Company or Owner for the development, improvement, maintenance and/or operation of the Property or other assets of the Company or Owner or for the payment of the Company's or Owner's obligations (such amount hereinafter referred to as a "Capital Shortfall"), and that, in such instance, the Capital Shortfall shall be resolved as provided in this Section 5.2.

(b)    In the event of a Capital Shortfall, Manager may arrange to obtain that capital by one or a combination of (i) borrowing from Members and/or third parties, or (ii) additional Capital Contributions from the Members (each, an "Additional Capital Contribution"). If Manager determines that Additional Capital Contributions are required, Manager shall send a notice (the "Call Notice") to each Member stating the aggregate amount of the additional capital required (the "Capital Call"). Each Member shall, within twenty (20) days after the date of the Call Notice (the "Call Period"), contribute to the Company, it's Ratable Share (as hereinafter defined) of the Capital Call. Any such Additional Capital Contributions shall be made in cash or by wire transfer of immediately available funds into the Company's bank account, or intra-bank transfer and such contribution, when made, shall be credited to such Member's capital account. Each such Member's "Ratable Share" of the Capital Call shall be determined by multiplying (i) a fraction, the numerator of which is the Unrecovered Capital Contribution of the Member at the time of the Call Notice and the denominator of which is the Unrecovered Capital Contributions of all Members at such time, by (ii) the aggregate amount of the Capital Call.

(c)    If any Member shall fail to contribute an amount (the "Default Amount") equal to its Ratable Share of the Capital Call within the time period prescribed by Section 5.2(b) above (the "Defaulting Member"), Manager shall give written notice (the "Second Call Notice") to the other Members (the "Non-Defaulting Members") stating the amount of the Default Amount and giving the Non-Defaulting Members the option to make further Additional Capital Contributions (each, a "Default Capital Contribution"). Within ten (10) days after the date of the Second Call Notice, each of the Non-Defaulting Members shall elect to make a Default Capital Contribution in an amount equal to all or a portion of the Default Amount, which election shall be made by written notice to Manager (the "Response Notice") given prior to the expiration of the aforesaid ten (10) day period.

(d)    Each Member who exercises the option to make a Default Capital Contribution shall be deemed to have offered to make a Default Capital Contribution in the amount of the lesser of (i) the amount of Default Capital Contributions such member elects to make in the Response Notice, and (ii) the product of (A) a fraction, the numerator of which is the amount of Default Capital Contributions that such Member elects to make in the Response Notice and the denominator of which is the aggregate amount of the Default Capital Contributions that all Members elected to make in their respective Response Notices, multiplied by (B) the Default Amount.  Such offers shall be accepted or rejected (in whole or in part, proportionately, or disproportionately) by Manager by giving written notice to the responding Members within thirty (30) days after the date of the Second Call Notice, in which case those Members shall be obligated to make their Default Capital Contributions immediately.  If and to the extent that Manager does

[5875-006/4862525/2]

not accept any offers within the time period stated in the preceding sentence, such offers shall be deemed rejected.

(e) If any Defaulting Member fails to timely make its required Additional Capital Contribution and one or more Non-Defaulting Members make Default Capital Contributions, then the Defaulting Member's Percentage Interest immediately following the making of the Default Capital Contributions by Non-Defaulting Members shall be reduced by subtracting from such Defaulting Member's Percentage Interest the product of (i) the excess of (A) over (B), where (A) is such Defaulting Member's then Percentage Interest and (B) is the percentage determined by reference to a fraction, the numerator of which is the aggregate Capital Contributions of such Defaulting Member through the date of such determination, and the denominator of which is the aggregate Default Capital Contributions (including the Default Capital Contribution made by the Non-Defaulting Members) made by all Members (including the Defaulting Member) through the date of such determination. The Percentage Interests of each of the Members making Default Capital Contributions shall be increased by each such Member's proportionate share (based on the ratio of such Member's Default Capital Contribution to the total Default Capital Contributions) of the number of percentage points by which the Defaulting Member(s) Percentage Interest were decreased pursuant to this Section 5.2(f). If a Defaulting Member fails to timely make his required Additional Capital Contribution and other Members do not make Default Capital Contributions in the full Default Amount, then the Defaulting Member's Percentage Interest shall be reduced by the product of (i) the excess of (A) over (B), where (A) is such Defaulting Member's then Percentage Interest and (B) is the percentage determined by reference to a fraction, the numerator of which is the aggregate Capital Contributions of such Defaulting Member through the date of such determination, and the denominator of which is the aggregate Capital Contributions made by all Members (including the Defaulting Member) through the date of such determination. The Percentage Interests of each of the Non-Defaulting Members shall be increased by each such Member's proportionate share (based on the ratio of such Member's Capital Contributions to the Capital Contributions of all Members) of the number of percentage points by which the Defaulting Member's Percentage Interest were decreased pursuant to this Section 5.2(f).

5.3    *No Withdrawals.* No Member shall be entitled to resign as a Member or withdraw any part of such Member's Capital Contribution from the Company and no Member shall be entitled to receive any distributions from the Company except as expressly provided in this Agreement.

5.4    *No Liability for Capital Contributions.* No Member shall be personally liable for the return of any portion of the Capital Contributions of the Members; rather, the return of the Members' respective Capital Contributions shall be made solely from the Company's assets. No Member shall have the right to demand or receive property other than cash for its interest in the Company.

5.5    *No Interest.* No Member shall receive any interest on its Unrecovered Capital Contributions.

6.    **Company Shares.**

6.1    *Description.* The Members and the number of shares held by each such Member ("Company Shares") are set forth on Exhibit A. The voting powers and rights of the Company Shares, and the qualifications, limitations or restrictions thereon, are as follows:

(a)    General. The Company Shares shall not have a stated value and shall not have any rights to distributions unless Manager shall have declared such a distribution to be made pursuant to Section 7 out of funds lawfully available therefor.

(b)    Voting. The holders of Company Shares shall not be entitled to a vote.

6.2    *Compliance with Securities Laws and Other Laws and Obligations.* Each Member hereby represents and warrants to the Company and to each other Member and acknowledges that (a) it has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of an investment in the Company and making an informed decision with respect thereto, (b) it is able to bear the economic and financial risk of investment in the Company for an indefinite period of time and understands that it has no right to withdraw and have its interest repurchased by the Company, (c) it is acquiring an interest in the Company for investment only and not with a view to, or for resale in connection with, any distribution to the public or public offering thereof, (d) it understands that the equity interests in the Company have not been registered under the securities laws of any jurisdiction and cannot be disposed of unless they are subsequently registered and/or qualified under applicable securities laws and the provisions of this Agreement have been complied with.

7.    **Distributions.**

7.1    *Distribution of Net Cash Flow.* Manager, in its sole discretion, may cause the Company to distribute to the Members in accordance with this subparagraph, from time to time prior to dissolution of the Company, cash or other assets or property, in such aggregate amounts as Manager shall deem appropriate; provided that any such distribution shall be made in the order of priority set forth below.

The Net Cash Flow of the Company shall be distributed to the Members in the following order of priority:

(a)    First, to all the Members, pro rata in accordance with their Percentage Interests until they have received aggregate distributions of Net Cash Flow in an amount equal to their Capital Contributions from the date of each contribution through the date of the distribution;

(b)    Second, the balance of Net Cash Flow shall be distributed eighty percent (80.0%) to the Members, pro rata in accordance with their Percentage Interests and twenty percent (20.0%) to the Manager, pro rata.

[5875-006/4862525/2]

(c)    Third, once 10% (ten percent) is returned above principal, the balance of Net Cash Flow shall be distributed seventy percent (70.0%) to the Members, pro rata in accordance with their Percentage Interests and thirty percent (30.0%) to the Manager, pro rata.

(d)    Fourth, once 15% (fifteen percent) is returned above principal, the balance of Net Cash Flow shall be distributed sixty percent (60.0%) to the Members, pro rata in accordance with their Percentage Interests and forty percent (40.0%) to the Manager, pro rata.

(e)    Last, once 25% (twenty five percent) is returned above principal, the balance of Net Cash Flow shall be distributed fifty percent (50.0%) to the Members, pro rata in accordance with their Percentage Interests and fifty percent (50.0%) to the Manager, pro rata and remains there.

7.2    *Distribution of Proceeds of Refinancing.*  Proceeds from any refinancing of the Property or other Company assets, reduced by the expenses attributable thereto, in such aggregate amounts as Manager shall deem appropriate, shall be distributed in the following order of priority:

(a)    First, to all the Members, pro rata in accordance with their Percentage Interests until they have received aggregate distributions of Net Cash Flow in an amount equal to their Capital Contributions from the date of each contribution through the date of the distribution;

(b)    Second, the balance of Net Cash Flow shall be distributed eighty percent (80.0%) to the Members, pro rata in accordance with their Percentage Interests and twenty percent (20.0%) to the Manager, pro rata.

(c)    Third, once 10% (ten percent) is returned above principal, the balance of Net Cash Flow shall be distributed seventy percent (70.0%) to the Members, pro rata in accordance with their Percentage Interests and thirty percent (30.0%) to the Manager, pro rata.

(d)    Fourth, once 15% (fifteen percent) is returned above principal, the balance of Net Cash Flow shall be distributed sixty percent (60.0%) to the Members, pro rata in accordance with their Percentage Interests and forty percent (40.0%) to the Manager, pro rata.

(e)    Thereafter, the balance of the proceeds shall be distributed fifty percent (50.0%) to the Class A Members, pro rata in accordance with their Class A Percentage Interests and fifty percent (50.0%) to the Class B Members, pro rata in accordance with their Class B Percentage Interests.

7.3    *Distribution of Proceeds from Sale or Disposition of Company Assets and Upon Dissolution.*  Proceeds from the sale or other disposition of the assets of the Company (including the proceeds of any taking of the Property by eminent domain or condemnation and the proceeds of insurance received upon a partial or a complete destruction of the Property, to the extent that such proceeds have not been applied to the repair or reconstruction of the Property) and upon the dissolution of the Company shall be distributed in the following order of priority:

(a)    First, to all the Members, pro rata in accordance with their Percentage Interests until they have received aggregate distributions of Net Cash Flow in an

8

amount equal to their Capital Contributions from the date of each contribution through the date of the distribution;

(b)    Second, the balance of Net Cash Flow shall be distributed eighty percent (80.0%) to the Members, pro rata in accordance with their Percentage Interests and twenty percent (20.0%) to the Manager, pro rata.

(c)    Third, once 10% (ten percent) is returned above principal, the balance of Net Cash Flow shall be distributed seventy percent (70.0%) to the Members, pro rata in accordance with their Percentage Interests and thirty percent (30.0%) to the Manager, pro rata.

(d)    Fourth, once 15% (fifteen percent) is returned above principal, the balance of Net Cash Flow shall be distributed sixty percent (60.0%) to the Members, pro rata in accordance with their Percentage Interests and forty percent (40.0%) to the Manager, pro rata.

(e)    Thereafter, the balance of the proceeds shall be distributed fifty percent (50.0%) to the Class A Members, pro rata in accordance with their Class A Percentage Interests and fifty percent (50.0%) to the Class B Members, pro rata in accordance with their Class B Percentage Interests.

**8.    Capital Accounts.**

8.1    *Maintenance of Capital Accounts.*  A capital account shall be maintained for each Member on the Company's books of account in accordance with Section 1.704-1(b)(2)(iv) of the Treasury Regulations, and this Section 8 shall be interpreted and applied in a manner consistent with such Section of the Treasury Regulations. In the event that Manager determines it is prudent to modify the manner in which Capital Accounts are adjusted and/or maintained in order to comply with the requirements of such Regulation, Manager may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any member upon dissolution of the Company.

8.2.    *Basic Rules for Capital Account Entries.*  The amount of each Member's capital account shall equal the aggregate amount of cash and the fair market value of any property contributed by that Member to the Company (less any liabilities assumed by the Company with respect to such contribution), and shall be increased by the aggregate amount of income allocated to that Member (or a predecessor) pursuant to Sections 9.2 and 9.3, and decreased by (a) the aggregate amount of losses allocated to that Member (or a predecessor) pursuant to Section 9.4, and (b) the aggregate amount of cash and the fair market value of any property distributed to that Member (or a predecessor) (less any liabilities assumed by the Member with respect to such distribution).

**9.    Income, Gains and Losses.**

9.1    *Computation of Net Income, Gains and Losses.*  Net income, gains and losses as set forth on the books of account of the Company shall be computed in the same manner as net income, gains and losses are computed for federal income tax purposes, except that (i) items of income, gain, loss and deduction relating to the assets contributed to the Company by the Members shall be based on the fair market values of those assets (rather than their basis for federal

[5875-006/4862525/2]

9

income tax purposes) at the time of contribution, and (ii) items of tax exempt income and non-deductible expense shall be taken into account.

9.2    *Gross Income and Gain.* For any fiscal year of the Company, prior to any allocation of net income or net loss, pursuant to Sections 9.3 and 9.4, as the case may be, gross income and gain of the Company shall be allocated to the Members in an amount equal to the aggregate amount distributed to such Members during such fiscal year and all prior fiscal years pursuant to Sections 7.1, 7.2 and 7.3, reduced by all amounts of gross income and gain previously allocated to such Members in all prior fiscal years pursuant to this Section 9.2 (the "Allocation Shortfall"). In the event that the aggregate Allocation Shortfalls of all Members exceeds the Company's gross income and gain for the fiscal year, there shall be allocated to each Member an amount of gross income and gain equal to the product of (i) the amount of the Company's gross income and gain and (ii) a fraction, the numerator of which is the amount of such Member's Allocation Shortfall and the denominator of which is the aggregate amount of Allocation Shortfalls for all Members. In the event that the Company's gross income and gain for the fiscal year exceeds the aggregate Allocation Shortfall of all holders of Company Shares, prior to any allocation of capital gain, there shall first be allocated items of ordinary gross income.

9.3    *Net Income.* Net income of the Company for any fiscal year, calculated after any allocation of gross income pursuant to Section 9.2, shall be allocated as follows:

(a)    To all Members with a deficit in their capital accounts, pro rata to the amount of such deficits; then

(b)    To the Members, in each case, in an amount equal to the excess of (i)(A) such Member's capital contributions, reduced by (B) amounts distributed to such Member pursuant to Sections 7.2 and 7.3 (the "Entitlement Amount") over (ii) the capital account of such Member ("Entitlement Shortfall"). In the event that the aggregate Entitlement Shortfalls of all Members exceeds the amount of net income to be allocated under this Section 9.3(b), there shall be allocated to each Member an amount equal to the product of (i) the Company's net income allocable under this Section 9.3(b) and (ii) a fraction, the numerator of which is the amount of such Member's Entitlement Shortfall and the denominator of which is the aggregate Entitlement Shortfalls of all Members; then

(c)    To the Members in such amounts and proportions as will cause the excess of the capital account balance of each Member over that Member's Entitlement Amount ("Excess Entitlement") to be in proportion to the percentage of Company Shares owned by that Member; and

(d)    The balance to the Members pro rata in accordance with their respective Percentage Interests.

9.4    *Net Loss.*

Net loss of the Company for any fiscal year, calculated after allocation of gross income and gain pursuant to Section 9.2, shall be allocated in the following order:

(a)     To the Members in such amounts and proportions as will cause the Excess Entitlement amount of each Member to be in proportion to the percentage of Company Shares owned by the Member; then

(b)     To the Members in an amount equal to such Member's Excess Entitlement. In the event that the aggregate Excess Entitlements of all Members exceeds the amount of net loss of the Company, there shall be allocated to each Member an amount equal to the product of (i) the Company's net loss and (ii) a fraction, the numerator of which is the amount of the Member's Excess Entitlement and the denominator of which is the aggregate Excess Entitlements of all Members; then

(c)     To all Members in an amount equal to the aggregate positive capital account balances of all of them. In the event that such aggregate capital account balances exceed the amount of net loss allocable under this Section 9.4, there shall be allocated to each Member an amount of net loss equal to the product of (i) the net loss and (ii) a fraction, the numerator of which is such Member's positive capital account balance and the denominator of which is the positive capital account balances of all of them; and

(d)     The balance to the Members pro rata in accordance with their respective Percentage Interests.

9.5     *Special Allocations.*

The following special allocations shall be made in the following order:

(a)     Gain Chargeback. Notwithstanding any other provision of this Section 9, if there is a net decrease in the Company's minimum gain (as calculated in accordance with the principles of Treasury Regulation Section 1.704-2(d)(1)) during any fiscal year, each Member, but only to the extent required by Treasury Regulation Section 1.704-2(f), shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to the portion of such Member's share of the net decrease in Company minimum gain, determined in accordance with Treasury Regulation Section 1.704(g)(2). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j) of the Treasury Regulations. This Section 9.5(a) is intended to comply with the minimum gain chargeback requirement in such Sections of the Treasury Regulations and shall be interpreted consistently therewith.

(b)     Member Nonrecourse Debt Minimum Gain Chargeback. Notwithstanding any other provision of this Section 9 except Section 9.5(a), if there is a net decrease in Member nonrecourse debt minimum gain (calculated in accordance with the principles of Treasury Regulation Section 1.704(2)(i)(3)) during any Company fiscal year, each Member who has a share of that Member nonrecourse debt minimum gain, determined in accordance with the principles of Treasury Regulation Section 1.704-2(i)(5), as of the beginning of such fiscal year, but only to the extent required by Treasury Regulation Section 1.704-2(i) and not subject to the exceptions set forth in Treasury Regulation Section 1.704-2(i)(4), shall be

specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Member nonrecourse debt minimum gain, determined in accordance with Treasury Regulation Sections 1.704-2(i)(4) and 1.704-2(g)(2). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with, and only to the extent required by, Sections 1.704-2(i) and 1.704-2(j) of the Regulations. This Section 9.5(b) is intended to comply with the minimum gain chargeback requirements in such Sections of the Treasury Regulations and shall be interpreted consistently therewith.

(c) Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulation Sections 1.704-1(b)(2)(ii)(*d*)(4), 1.704-1(b)(2)(ii)(*d*)(5) or 1.704-1(b)(2)(ii)(*d*)(6), items of Member income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the capital account deficit of such Member adjusted in the manner set forth in Treasury Regulation Section 1.704-1(b)(2)(ii)(*d*)(4), (5) and (6) ("Adjusted Capital Account Deficit") as quickly as possible, provided that an allocation pursuant to this Section 9.5(c) shall be made if and only to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 9 have been tentatively made as if this Section 10.5(c) were not in the Agreement. This Section 9.5(c) is intended to be a qualified income offset in compliance with Treasury Regulation Sections 1.704-1(b)(2)(ii)(*d*) and shall be interpreted consistently therewith.

**10.   Fiscal Year Reports.**

10.1   *Fiscal Year.* The Company's fiscal year shall be the calendar year unless changed by Manager.

10.2   *Books of Account.* Complete and accurate books of account shall be kept by the Company at the principal office of the Company (or at such other office as Manager may designate). The determinations of Manager with respect to the treatment of any item or its allocation for federal, state or local income tax purposes shall be binding upon the Members so long as that determination is not inconsistent with any express provision of this Agreement or applicable law.

10.3   *Reports.* No later than January 31st, after the close of each fiscal year, Manager shall furnish to each Member financial statements (which need not be audited) for that fiscal year. The financial statements shall include a balance sheet of the Company as of the end of the year and a statement of income and a statement of changes in financial position of the Company for the year, setting forth in each case in comparative form the figures as of the end of and for the previous fiscal year.

10.4   *K-1 Reports.* Within 105 days after the end of each calendar year, Manager shall furnish to each Member a copy of Schedule K-1 to the Company's federal income tax return for that year.

## 11.    Tax Matters.

11.1    *Allocations.*  For federal, state and local income tax purposes, all items of income, deduction and loss shall be allocated among the Members on the same basis as profits are allocated and losses are charged as provided in Section 9 and all items of credit and other items not so allocated shall be allocated among the Members in the manner provided for in the Code and the applicable Treasury Regulations issued thereunder.  Notwithstanding the foregoing, tax items relating to property subject to Section 704(c) of the Code and the applicable Treasury Regulations issued thereunder shall be allocated in accordance therewith.

11.2    *Consistency.*  No Member shall treat a Company item on its federal, state or local income tax returns in a manner inconsistent with the treatment of the Company item on the Company's federal, state or local income tax return.

11.3    *Elections.*  Upon a transfer of Company Shares described in Code Section 743(b) or upon a distribution of Company assets, Manager, in its sole discretion, may file an election pursuant to Code Section 754 to adjust the basis of Company property.

11.4    *Tax Matters Partner.*  Manager shall be the tax matters partner as that term is defined in Section 6231 of the Code for the Company.

11.5    *Tax Classification.*  It is the intention of the Members that the Company be treated, for all federal, state and local tax proposes, as a partnership and not as an association taxable as a corporation, and the Members, and Manager on behalf of the Company, shall take all actions consistent with the foregoing.

## 12.    Operation of Business.

12.1    *Management of Business.*  Except for (i) duties specifically delegated to a Member pursuant to the terms of this Agreement, and/or (ii) as specifically provided elsewhere in this Agreement, the full right, power, authority and discretion to conduct the business and affairs of the Company, and to do all things necessary to carry on the business of the Company, shall be vested in a manager (the "Manager"), acting alone and without the consent of any other Members. The Members hereby designate Dovi Leshes as the Manager.  The Members hereby authorize Manager to execute and deliver, on behalf of the Company and Owner, all documents reasonably required in connection with the acquisition of debt of, or direct and indirect interests in, the Owner, and the acquisition by Owner of the Property.

12.2    In the event of a willing withdrawal of Manager, Manager shall notify its Members in writing thirty days (30) prior to the intended withdrawal date. If the Manager withdraws due to death, sickness or if the Manager is no longer able to fulfill its duties, Joshua David Orbach shall be elected. The newly elected Manager shall be entitled to one third (1/3) of net proceeds.

12.3    *Day-to-Day Management.*  In addition to, and not in limitation of Section 12.1 above, but subject to Section 12.3 below, Manager is hereby authorized on behalf of the Company in its individual capacity and in its capacity as a manager of Owner to follow the Approved Budget and to:

[5875-006/4862525/2]

13

(a)    Incur all expenditures and pay all obligations of the Company and Owner;

(b)    Enter in to necessary relationships and agreements Manager may deem necessary or appropriate for carrying out the daily purposes of the Company or Owner;

(c)    Execute any and all documents or instruments of any kind which Manager may deem necessary or appropriate for carrying out the daily purposes of the Company or Owner;

(d)    Purchase or lease equipment for the Company's or Owner's purposes;

(e)    Procure and maintain, at the expense of the Company or Owner, as applicable, with responsible companies, such insurance in such amounts and covering such risks as are appropriate in the judgment of Manager;

(f)    Receive and disburse any Net Cash Flow in accordance with Section 7;

(g)    Supervise the preparation and filing of all Company and Owner tax returns;

(h)    Make any tax elections on behalf of the Company and Owner;

(i)    Engage and terminate any attorneys, accountants, brokers or sales agents, and determine the terms of such engagements, except for sale of the Property; and

(j)    Perform any and all other acts or activities customary or incidental to the purpose of the Company's daily operations.

12.4    *Services of Manager; Other Activities.*  Manager shall devote such time to the affairs of the Company as it may determine necessary to conduct them properly. Notwithstanding any other duty at law or in equity, Manager may engage or have an interest in other business ventures of any kind, independently or with others (which ventures may compete with the business of the Company or the Owner) and neither the Company nor any other Member shall have any rights in or to those independent ventures.  In addition, each of the Members and their direct or indirect owners or any other Affiliate of any Member may have other business interests and may engage in other activities in addition to those relating to the Company, whether or not such business interests or activities may be competitive with those of the Company.  None of the Company, any Member or Manager shall have any right pursuant to this Agreement to share or participate in such other business interests or activities or to the income or proceeds derived therefrom.

12.5    *Officers.*  Manager may appoint such officers of the Company as it deems desirable, including, but not limited to, a president, one or more vice-presidents, a secretary, a treasurer, and one or more assistant secretaries and assistant treasurers.  Except as Manager shall

[5875-006/4862525/2]

otherwise determine, each of the officers of the Company shall have the powers and duties that a person holding that office in a corporation customarily has.

12.6   *No Partition, Sale or Partition.*  No Member shall have the right to require partition of any of the Company's property or to compel any sale or appraisal of the Company's assets.

12.7   *Reliance by Third Parties.*  Any person dealing with the Company, Manager or any Member or any officer of the Company may rely upon a certificate signed by Manager as to (a) the identity of Manager, any Member or officer of the Company, (b) any factual matters relevant to the affairs of the Company, (c) the persons who are authorized to execute and deliver any document on behalf of the Company or (d) any action taken or omitted by the Company, Manager or any Member.

12.8   *Discretion.*  Whenever in this Agreement Manager is permitted or required to make a decision in its "discretion" or "sole discretion" or under a grant of similar authority or latitude, Manager shall have no duty or obligation to consider any interest of or factors affecting some or all the Members so long as such Manager acts in good faith and in a manner which it reasonably believes is in or not opposed to the best interest of the Company. Each Member hereby agrees that any standard of care or duty imposed under the Act or any other applicable law shall be modified, waived or limited in each case as required to permit Manager to act under this Agreement and to make any decision pursuant to the authority prescribed in this Section 12.9 so long as such action or decision does not constitute willful or wanton misconduct, gross negligence or a material breach of the terms of this Agreement and is reasonably believed by Manager to be consistent with the overall purposes and objectives of the Company.

13.   **Meetings.**

13.1   *Quorum; Majority Vote.*  A majority of Members in interest entitled to vote shall constitute a quorum at the meeting of Members. If a quorum is present, the affirmative vote of the majority in interest of Members represented at the meeting and entitled to vote on the subject matter shall constitute the act of the Members. In casting their votes, the Members shall, to the fullest extent permitted by law, take into account the interests of the Company's creditors, as well as those of the Members. For the avoidance of doubt, class of Company Shares will not affect voting rights.

14.   **Assignment of Interest.**

14.1   *General Rules.*  A Member may not sell, transfer, assign, pledge, hypothecate or otherwise dispose (the foregoing collectively referred to as a "Transfer") of all or any portion of its interest in the Company without the consent of Manager. Upon the grant of such consent a transferee may become a substitute Member upon its execution of a counterpart to this Agreement. Such admission shall be deemed immediately prior to the Transfer and, immediately following such admission, the transferor Member shall cease to be a member of the Company. Any Transfer or purported Transfer that does not conform to the requirements of this Section 15 shall be void and ineffective, and shall not be recognized by the Company for any purpose, subject to Section 15.2. Notwithstanding the foregoing, a Transfer within the meaning of this Section 15

15

shall, to the fullest extent permitted by law, be deemed not to occur upon (a) a Transfer by devise or descent or by operation of law upon the death of partner, stockholder or member of any entity owning, directly or indirectly, an interest in the Company, (b) any transfer between partners, stockholders or members of an entity which owns, directly or indirectly, an interest in the Company, (c) any transfer by an indirect beneficial owner of interest in the Company to (i) his spouse, partners or siblings, (ii) his children or grandchildren, or (iii) to a trust for the primary benefit of any of the foregoing, or (d) any Transfer by a trust to its beneficiaries (each an "Exempted Transfer").

    14.2    *Transfers Resulting in Default Under the Terms of a Mortgage Agreement.* Not in limitation of the foregoing, any Transfer of an interest in the Company, or in any entity holding a direct or indirect interest in the Company, which would result in a default pursuant to any mortgage agreement with respect to the Property or any other Company asset is hereby declared, to the fullest extent permitted by law, null and void ab initio.

    14.3    *Transferee Not a Member.*    Without limiting the generality of Section 15.1 hereof, and notwithstanding any other provision of this Agreement, no Person acquiring a Member interest, other than a Person who is a Member prior to the applicable Transfer, shall become substituted or admitted as a Member (a) unless such Person (i) executes a counterpart signature page to this Agreement agreeing to be bound by the terms thereof and (ii) pays all costs reasonably incurred by the Company incidental to the Transfer including, without limitation, attorneys' fees, and (b) if such substitution or admission would constitute a violation of the Securities Act or of any other applicable state or federal securities laws. In addition, in the event of an Exempted Transfer, the transferee shall not become a Member hereunder without Manager's consent. If Manager does not (or is not requested to) grant its consent to the admission of any such transferee as a Member, then such transferee shall be entitled to receive any distributions to which it would be entitled if it were a Member and shall be treated as a Member for tax purposes, but shall not have any other rights or privileges of a Member.

    15.4    *Buy-Sell Procedure.*    Prior to a Member selling any portion of its Member interest in the Company, the Selling Member shall first make a written offer ("Offer") to sell its Interest to the other Members at a price equal to (a) the Fair Market Value (as defined below) of Seller's Member interest minus (b) Seller's proportionate share of any selling, prepayment or other costs that would apply in the event the Property was sold on the date of the offer. The other Members shall be entitled to purchase the Selling Member's Member interest in the Company. "Fair Market Value", which shall not be discounted based on amount of ownership, shall mean the fair market value of Seller's Member interest in the Company (reduced by liabilities secured by the Property or liabilities taken subject to) on the date the Offer is made as determined in accordance with the procedures set forth below. The other Members shall have sixty (60) days after delivery of the Offer to accept the Offer. If the other Members or any of them (the "Purchaser") accepts the Offer, Selling Member and Purchaser shall commence negotiation of the Fair Market Value within fifteen (15) days after the Offer is accepted. If the parties do not agree, after good faith negotiations, within ten (10) days, then each party shall submit to the other a proposal containing the Fair Market Value the submitting party believes to be correct (each a "Proposal"). If either Purchaser or Seller fails to timely submit a Proposal, the other party's "Proposal" shall determine the Fair Market Value. If both Purchaser and Seller timely submit Proposals, then the Fair Market Value shall be determined by final and binding arbitration

16

[5875-006/4862525/2]

in accordance with the procedures set forth below. Purchaser and Seller shall meet, telephonically or at a mutually agreeable location, within seven (7) days after delivery of the last Proposal and make a good faith attempt to mutually appoint a certified MAI real estate appraiser who shall have been active full-time over the previous five (5) years in the appraisal of comparable properties located in Orlando, Florida to act as the arbitrator. If Purchaser and Seller are unable to agree upon a single arbitrator, then Purchaser and Seller each, within five (5) days after the meeting, shall select an arbitrator that meets the foregoing qualifications. The two (2) arbitrators so appointed, within fifteen (15) days after their appointment, shall appoint a third arbitrator meeting the foregoing qualifications; provided, however, if one party fails to appoint an arbitrator in such period, then the one appointed arbitrator shall make such determination itself without the need for an additional, or third, arbitrator to be appointed or chosen. The determination of the arbitrator(s) shall be limited solely to the issue of whether Seller's or Purchaser's Proposal most closely approximates the Fair Market Value. The decision of the single arbitrator or of the arbitrator(s) shall be made within thirty (30) days after the appointment of a single arbitrator or the third arbitrator, as applicable. The arbitrator(s) shall have no authority to create an independent structure of fair market value or prescribe or change any or several of the components or the structure thereof; the sole decision to be made shall be which of the parties' Proposals most closely corresponds to the Fair Market Value. The decision of the single arbitrator or majority of the three (3) arbitrators shall be binding upon Purchaser and Seller. If Purchaser or Seller fails to appoint an arbitrator within the time period specified above, the arbitrator appointed by one of them shall reach a decision that shall be binding upon the parties. The cost of the arbitrators shall be paid equally by Seller and Purchaser. The arbitration shall be conducted in Orlando, Florida, in accordance with applicable Florida law, as modified by this Agreement. The parties agree that Federal Arbitration Act, Title 9 of the United States Code, shall not apply to any arbitration hereunder. The parties shall have no discovery rights in connection with the arbitration. The decision of the arbitrator(s) may be submitted to any court of competent jurisdiction by the party designated in the decision. Such party shall submit to the applicable court having subject matter jurisdiction a form of judgment incorporating the decision of the arbitrator(s), and such judgment, when signed by a judge of such court, shall become final for all purposes and shall be entered by the clerk of the court on the judgment roll of the court. If either Purchaser or Seller refuses to arbitrate an arbitrable dispute and the party demanding arbitration obtains a court order directing the other to arbitrate, the party demanding arbitration shall be entitled to all of its reasonable attorneys' fees and costs in obtaining such order, regardless of which party ultimately prevails in the matter. BY EXECUTING THIS AGREEMENT, EACH MEMEBER AGREES TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE ARBITRATION OF DISPUTES PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY FLORIDA LAW AND EACH TENANT IN COMMON KNOWINGLY GIVES UP ANY RIGHTS IT MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY EXECUTING THIS AGREEMENT EACH TENANT IN COMMON GIVES UP ITS JUDICIAL RIGHTS TO APPEAL. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF FLORIDA LAW. EACH MEMBER'S AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY. Once the Fair Market Value is determined, the Purchaser shall be obligated to acquire the Seller's Member interest. The closing of the purchase shall occur and be administered

[5875-006/4862525/2]

by the Manager within ninety (90) days from the date a Fair Market Value is determined, whether by agreement or arbitration.

15.5    *Effective Date.* Any authorized Transfer of a Member interest or admission or substitution of a Member pursuant to this Section 15 shall be deemed effective as of the last day of the calendar month in which such Transfer or admission occurs.

15.6    *Survival of Obligations.* No Transfer by any Member of all or any portion of its Member interest shall relieve such Member from any of the liabilities or obligations, including any indemnification obligations under Section 17, of such Member to the Company existing or arising out of actions that occurred on or prior to the date of such Transfer.

15.    **Dissolution; Liquidation.**

15.1    *Dissolution.* The following provisions shall govern over this Agreement or any other document or instrument governing the affairs of the Company:

(a)    The Company shall be dissolved, and its affairs shall be wound up upon the first to occur of the following: (i) the termination of the legal existence of the last remaining member of the Company or the occurrence of any other event which terminates the continued membership of the last remaining member of the Company in the Company unless the Company is continued without dissolution in a manner permitted by this Agreement or the Act or (ii) the entry of a decree of judicial dissolution under Florida Law. Upon the occurrence of any event that causes the last remaining member of the Company to cease to be a member of the Company, to the fullest extent permitted by law, the personal representative of such member is hereby authorized to, and shall, within 90 days after the occurrence of the event that terminated the continued membership of such member in the Company, agree in writing (i) to continue the Company and (ii) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of the Company, effective as of the occurrence of the event that terminated the continued membership of the last remaining member of the Company in the Company.

(b)    Notwithstanding any other provision of this Agreement, the Bankruptcy of the Member shall not cause the Member to cease to be a member of the Company and upon the occurrence of such an event, the Company shall continue without dissolution. Bankruptcy means, with respect to any Person, if such Person (i) makes an assignment for the benefit of creditors, (ii) files a voluntary petition in bankruptcy, (iii) is adjudged a bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (iv) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (vi) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (vii) if 120 days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, if the proceeding has not been dismissed, or if within 90 days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of

such Person or of all of any substantial part of its properties, the appointment is not vacated or stayed, or within 90 days after the expiration of any such stay, the appointment is not vacated. The foregoing definition of "Bankruptcy" is intended to replace and shall supersede and replace the definition of "Bankruptcy" set forth in the Florida State Act.

15.2    *Liquidation and Distribution of Assets.* Upon dissolution of the Company, shall Manager shall proceed to sell or liquidate the Company's assets within a reasonable time and, shall distribute the Company's cash and other assets among the Members in accordance with the provisions of Section 7.3 of this Agreement.

15.3    *Termination.* The Company shall terminate when all property owned by the Company has been disposed of and the assets, after payment of or provisions for liabilities to the Company's creditors, have been distributed among the Members as provided in Section 16.2, and the Certificate shall not have been cancelled in the manner required under the Act.

15.4    *Internal Revenue Code Section 1031 Tax Deferred Exchange.* At the request of either Member, the Members agree to reasonably cooperate with the other in structuring and documenting the sale of all or any portion of a Member's interest in the Company to effect a tax deferred exchange in accordance with the provisions of Section 1031 of the Internal Revenue Code and its corresponding regulations. Such cooperation shall be at no cost to the other Member (i.e., the cooperating Member).

16.    **Exculpation, Indemnification, Limitation of Liability of Members.**

16.1    *Liability of Members and Manager.* No Member or Manager shall have any liability for the obligations or liabilities of the Company except to the extent provided in the Act and other applicable law. A Member and/or Manager shall not be personally liable for any indebtedness, liability or obligation of the Company, except as otherwise set forth under the Act and any other applicable law. Without limiting the generality of the preceding sentence, a Member or Manager does not in any way guaranty the return of any Capital Contribution to any other Member or a profit for the Members from the operations of the Company. No Member shall be obligated to restore by way of Capital Contribution or otherwise any deficit in its Capital Account or the Capital Account of any Member (if such deficits occur). Except as may otherwise be specifically provided in this Agreement, each Member's and Manager's personal liability shall be limited to the fullest extent under the Act and other applicable law.

16.2    *No Binding Authority of Members.* No Member is an agent of the Company solely by virtue of being a Member, and no Member has authority to act for the Company solely by virtue of being a Member. Any Member that takes any action or binds the Company in violation of this Agreement shall be solely responsible for, and indemnify the Company and each other Member against, any losses that the Company, or such other Member, as the case may be, may at any time become subject to or liable for by reason of the actions specified above.

16.3    *Indemnification by the Company.* Subject to the standards and restrictions, if any, set forth in this Agreement, the Company shall, to the fullest extent permitted by law, indemnify and hold harmless each Member of the Company, or any executor or administrator of the estate of such Member, made, or threatened to be made, party to an action or

19

proceeding, whether civil or criminal, by reason of the fact that such Person is or was a Member of the Company, against amounts paid in settlement and reasonable expenses, including attorneys' fees, actually or necessarily incurred by it in connection with the defense or settlement of such action, or in connection with an appeal therein; *provided, however,* that no indemnification shall be made to or on behalf of any Member (a) if a judgment or other final adjudication adverse to such Person establishes (i) that its acts were committed in bad faith or were the result of active and deliberate dishonesty and were material to the cause of action so adjudicated or (ii) that it personally gained in fact a financial profit or other advantage to which such person was not legally entitled or (b) in connection with any dispute between or among the Members.

16.4    *Indemnification by Members.*  Subject to the terms of this Agreement and the Act, each Member hereby indemnifies each and every other Member from and against all losses resulting from the breach by any such first Member of any of terms or conditions of this Agreement. Without limiting the generality of the foregoing, any Member who or which engages in a Transfer of any Member interest or any interest therein or associated rights relating thereto, or who or which permits any Person owning an equity interest in such Member to engage in a Transfer of such equity interest or part thereof, agrees to indemnify and hold harmless the Company and the other Members from any federal, state or local income taxes, or transfer taxes arising from any such Transfer.

17.5    *Indemnification of Manager.*  The Company shall indemnify, defend, and hold harmless Manager and its respective employees, agents, shareholders, directors, officers, representatives, and attorneys and any officers or agents of the Company (each, an "Indemnified Person"), on demand of and to the reasonable satisfaction of the Indemnified Person, from and against any and all liabilities, obligations, losses, damages, penalties, actions, suits, proceedings, judgments, costs, expenses, and disbursements of any kind or nature whatsoever including, without limitation, all costs and expenses of investigation, defense, appeal and settlement ("Indemnity Damages"), which may be incurred by or asserted against the Indemnified Person in any way relating to or arising out of, or alleged to relate or arise out of any action or inaction on the party of the Indemnified Person other than the portion of the Indemnity Damages resulting from the Indemnified Person's own willful or wanton misconduct, gross negligence or breach of fiduciary duty.

17.    **Other Action.**

Each Member shall execute and deliver such additional documents and instruments, and shall perform such additional acts, as may be necessary or appropriate to carry out the terms of this Agreement.

18.    **Admission of Additional Members.**

18.1    *Consent required.*  No Person may be admitted to the Company as a Member without the prior written consent of Manager.

18.2    *Manager to set Criteria.*  Manager shall determine the financial and other criteria for entry of new Members into the Company and shall accept all new subscriptions on behalf of the Company.

20

[5875-006/4862525/2]

**19.   Miscellaneous.**

19.1   *Entire Agreement; Amendment.*  This Agreement contains a complete statement of the arrangements among the Members with respect to the Company, and supersedes all prior agreements and understandings among them with respect to the Company.  This Agreement may be amended only by a written agreement of the Members or as otherwise provided in the Act.

19.2   *Notices.*  Any notice or other communications under this Agreement shall be in writing and shall be considered given when delivered in person or mailed by registered mail, postage prepaid and return receipt requested, addressed to the party intended as the recipient at the address listed on the Company's records or at such other address as a Member may designate by written notice to the other Members.

19.3   *Governing Law.*  This Agreement shall be governed by, and construed in accordance with, the law of the State of New York applicable to agreements made and to be performed in the State of Florida.

19.4   *Counterparts; Facsimile and PDF Signatures.*  This Agreement may be executed in multiple counterparts with separate signature pages, each such counterpart shall be considered an original, but all of which together shall constitute one and the same instrument. For purposes of execution of this Agreement, signatures transmitted via facsimile or Portable Document Format (or "PDF") shall be deemed original ink signatures.

19.5   *Attorneys' Fees.*  If any action or proceeding is instituted between all or any of the Members arising from or related to or with this Agreement, the Member or Members prevailing in such action or arbitration shall be entitled to recover from the other Member or Members all of its or their costs of action or arbitration, including, without limitation, reasonable attorneys' fees and costs as fixed by the court or arbitrator therein.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

21

[5875-006/4862525/2]

COMPANY:

EMPIRE EQ HOTEL LLC

By: _____
Name: Devi Leshes
Title: Managing Member

MEMBERS:

By: _____
Name: Avi Leshes
Title:

**COMPANY:**

EMPIRE EQ HOTEL LLC

By: _____
Name:  Dovi Leshes
Title:  Managing Member

**MEMBERS:**

By: _____
Name:  Dovi Leshes S Trust
Title:  Dovi Leshes

**COMPANY:**

EMPIRE EQ HOTEL LLC

By: _____
Name: Dovi Leshes
Title: Managing Member

**MEMBERS:**

By: _____
Name: FDJF Holdings LTD
Title: Moshe Oppenhaim

22

**COMPANY**:

EMPIRE EQ HOTEL LLC

By:
Name: Dovi Leshes
Title:  Managing Member

**MEMBERS**:

By:
Name: Abes Corner LLC
Title:  Abe Scheinfeld

22

[5875-006/4862525/2]

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

**COMPANY:**

EMPIRE EQ HOTEL LLC

By: _____
Name: Dovi Leshes
Title:   Managing Member

**MEMBERS:**

By: _____
Name: Joseph Harris
Title:

[5875-006/4862525/2]

COMPANY:

EMPIRE EQ HOTEL LLC

By:
Name: Davi Leshes
Title:  Managing Member


MEMBERS:

By:
Name: David Eyzenberg
Title:

[5875-006/4862525/2]

## EXHIBIT A

### EMPIRE EQ HOTEL LLC

| Members | Initial Capital Contributions |
|---|---|
| | 150,000 |
| Avi Leshes | 50,000 |
| Joseph Harris | 250,000 |
| EDJF Holdings LTD | 345,000 |
| David Eyzenberg | 11,211,873 |
| Dovi Leshes S Trust | 50,000 |
| Abes Corner LLC | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | $12,056,873 |
| TOTAL | |
| | |

23

# EXHIBIT

# A-5

# SECOND AMENDED AND REINSTATED OPERATING

## AGREEMENT OF

## EMPIRE EQ HOTEL LLC

THE MEMBERSHIP INTERESTS HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION (THE "COMMISSION") UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER THE SECURITIES LAWS OF ANY JURISDICTION, AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH STATE LAWS. THE MEMBERSHIP INTERESTS HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE COMMISSION, ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF AN INVESTMENT IN THE LIMITED LIABILITY COMPANY. A MEMBERSHIP INTEREST ALSO MAY NOT BE TRANSFERRED OR ENCUMBERED UNLESS THE PROVISIONS OF THIS AGREEMENT ARE SATISFIED.

## SECOND AMENDED AND REINSTATED OPERATING

## AGREEMENT OF EMPIRE EQ HOTEL LLC

**THIS SECOND AMENDED AND REINSTATED OPERATING AGREEMENT** is made effective as of the 1ST day of February, 2019 (as amended from time to time, this "Agreement"), by and among EMPIRE EQ HOTEL LLC, a Delaware limited liability company (the "Company") and the member executing this Agreement as member (the "Member"), in consideration of the mutual covenants expressed herein.

1.    **Definitions.**

    1.1    *Definitions.* Unless the context otherwise requires, capitalized terms used in this Agreement and not otherwise defined herein shall have the following meanings:

    "Act" shall mean the Delaware Limited Liability Company Act, as amended from time to time.

    "Affiliate" shall mean (a) any Person directly or indirectly owning, controlling or holding the power to vote 10% or more of the outstanding voting securities of an identified other Person; (b) any Person 10% or more of whose voting securities are directly or indirectly owned, controlled or held with power to vote, by such other Person; (c) any Person directly or indirectly controlling, controlled by, or under common control with such other Person; (d) any officer, director, member, manager or partner of such other Person; (e) if such other Person is an officer, director, member, manager or partner, any entity for which such Person acts in any such capacity; and (f) any spouse, lineal ancestor or descendant of such other Person.

    "Approved Budget" means the then effective approved annual budget of the Company.

    "Capital Contribution" means contributions of cash or other property made by the Member to the Company, from time to time, pursuant to Section 5.

    "Certificate" shall mean the Certificate of Formation of the Company, as amended from time to time.

    "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, or corresponding provisions of future laws.

    "Initial Capital Contribution" shall mean the Capital Contribution set forth opposite the name of each Member in Exhibit A to this Agreement.

    "Internal Rate of Return" means an annualized effective compounded rate of return on capital.

    "Manager" shall have the meaning set forth in Section 12.1.

"Member" shall mean the Person executing this Agreement as member and each Person who may become a substituted or additional Member pursuant to the provisions hereof and applicable law, each in its capacity as a member of the Company.

"Net Cash Flow" shall mean, for each year, the Company's gross operating receipts during such year (not including Capital Contributions, loans from the Member to the Company, proceeds from the sale or refinancing within a twelve-month period of all or substantially all of the assets of the Company, insurance proceeds, or similar capital events) and any cash reserves to be distributed to the Member, less the sum of (a) operating expenses paid in cash during such year to the extent such expenses have not been reserved against in a prior fiscal year; (b) the aggregate of all other cash amounts expended by the Company during such year (except distributions made pursuant to Sections 7.1, 7.2 and 7.3 hereof); and (c) any increases in reasonable amounts set aside for contingencies, taxes, insurance and similar items.

"Owner" shall mean EMPIRE EQ HOTEL LLC, a Delaware limited liability company formed for the purpose of acquiring, owning, developing, holding, selling, assigning, transferring, operating, leasing, mortgaging, and otherwise dealing with the Property.

"Percentage Interests" shall mean, initially, the percentages set forth on Exhibit A to this Agreement, as such percentages may be adjusted from time to time pursuant to Section 5.2 and to reflect the admission of new members pursuant to the terms hereof.

"Person" shall mean a natural person, corporation, limited liability company, trust, partnership, estate, unincorporated association or other entity.

"Property" shall mean that certain approximately 5 acre site located at Westwood Boulevard, Orlando, Florida acquired by Owner, together with all improvements currently on such land and all subsequent or additional improvements on such land. The legal description of the Property is attached hereto as Exhibit C.

"Independent Director" means a Person bound by this Agreement as an Independent Director pursuant to Section 3.3. Such Independent Director shall only have the rights and duties expressly set forth in this Agreement.

"Unrecovered Capital Contribution" shall mean any Capital Contribution that is made by a Member and is not repaid pursuant to Section 7.

2.   **Organization and Purpose.**

2.1   *Organization.* The Company was formed by the filing of the Certificate dated June 3rd, 2015 with the Secretary of the State of Delaware pursuant to the Act. Dov Leshes is hereby designated as an "authorized person" within the meaning of the Act, and has executed, delivered and filed the Certificate with the Delaware Secretary of State. Upon the filing of the Certificate, his powers as an "authorized person" ceased, and Manager thereupon became the designated "authorized person" and shall continue as the designated "authorized person" with the meaning of the Act. The existence of the Company as a separate legal entity shall continue until cancellation of the Certificate as provided in the Act.

2.2     *Company Name.* The name of the Company shall be "Empire Eq Hotel LLC" and all business of the Company shall be conducted under that name.

2.3     *Place of Business.* The mailing and business office address of the Company shall be 3 Columbus Circle 15th Floor, New York, New York 10019. The Company address may be changed from time to time by Manager in its sole discretion.

2.4     *Term.* The term of the Company shall commence on the date of this Agreement and shall continue thereafter until December 31, 2065.

2.5     *Company's Purpose.* The Company has been formed solely for the purpose of being the sole member of Owner, the fee owner of the Property.

2.6     *Single Purpose Entity.* The Company is a single purpose entity and until such time as the loan from Orlando Lender LLC to Empire EQ WGI, LLC (the Company's Member) in the amount of One Million Give Hundred Thousand and 00/100 Dollars ($1,500,000) as secured by the Promissory Note of even date herewith (the "Mezzanine Loan") is repaid, the Company shall continue to be, organized solely for the purpose of (i) acquiring, developing, owning, managing or operating the Property, (ii) entering into this Agreement and the documents related hereto, and (iii) engaging in any activity that is incidental, necessary or appropriate to accomplish the foregoing. So long as any part of the Mezzanine Loan remain unpaid and undischarged, the Company shall not (a) engage in any business or activity other than the ownership, operation and maintenance of the Property, and activities incidental thereto; (b) acquire or own any material assets other than the Property; (c) merge into or consolidate with any Person or dissolve, terminate or liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure; (d) fail to maintain separate financial statements and accounting records, showing its assets and liabilities separate and apart from those of any other Person; (e) have its assets listed on the financial statement of any other entity; and (f) fail to maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person.

3.     **Membership.**

3.1     *Member.* The name, Capital Contribution and Percentage Interest of the Member is set forth on Exhibit A to this Agreement, as such Exhibit may be amended from time to time by the Manager.

3.2     *Admission of Additional Members.* Additional Members may be admitted to the Company only upon and subject to the terms and conditions set forth in this Agreement.

3.3     *Independent Director.* The Member hereby appoints Colonial Charter Company, a Delaware corporation, as the Independent Director. The Independent Director shall be required to consent to the following actions of the Company:

3.3.1 filing a voluntary bankruptcy petition;
3.3.2 instituting proceedings to have the Company adjudicated bankrupt or

insolvent;                    3.3.3 consenting to the institution of bankruptcy or insolvency proceedings against the Company;

3.3.4 filing a petition seeking, or consenting to, reorganization or relief as to the Company under any applicable federal or state law relating to or similar to bankruptcy;

3.3.5 consenting to the appointment of a receiver or liquidator over the Company;

3.3.6 dissolving the Company;

3.3.7 making any assignment for the benefit of creditors; and

3.3.8 admitting in writing that the Company is unable to pay its debts as they become due, or take action in furtherance of any such action.

To the fullest extent permitted by applicable law, including Section 18-1101(e) of the Act, the Independent Director shall not be liable to the Company, its Members or any other Person for breach of contract or breach of duties (including fiduciary duties), unless the Independent Director acted in bad faith or engaged in willful misconduct.

3.4    *Article 8 Opt-in.*  The Company and its Member hereby irrevocably elects that the limited liability company interests in the Company shall constitute securities governed by Article 8 of the UCC in effect in the Law of Delaware in effect as of the effective date and as further amended. Each membership certificate of the Company shall bear a legend evidencing such opt-in as set forth in the form attached hereto as **Exhibit B**. This provisions shall not be amended until such time as the Mezzanine Loan is repaid in full.

4.    **Title to Company Property.**

All property owned by the Company shall be owned by the Company as an entity and, insofar as permitted by applicable law, no Member shall have any ownership interest in any Company property in its individual name or right, and each Member's interest in the Company shall be personal property for all purposes. The foregoing provisions shall govern over any contrary or inconsistent provision in this Agreement or any other document or instrument governing the affairs of the Company.

5.    **Capital Contributions.**

5.1    *Initial Capital Contributions.* The Initial Capital Contribution of each Member as of the date hereof is set forth on Exhibit A.

5.2    *Additional Capital Contributions.*

(a)    The Member acknowledges and agrees that the Manager may, from time to time, at his discretion, determine that an amount of additional cash capital is required by the Company or Owner for the development, improvement, maintenance and/or operation of the Property or other assets of the Company or Owner or for the payment of the Company's or Owner's obligations (such amount hereinafter referred to as a "Capital Shortfall"), and that, in such instance, the Capital Shortfall shall be resolved as provided in this Section 5.2.

(b)    In the event of a Capital Shortfall, Manager may arrange to obtain

that capital by one or a combination of (i) borrowing from the Member and/or third parties, or (ii) additional Capital Contributions from the Member (an "Additional Capital Contribution"). If Manager determines that Additional Capital Contributions are required, Manager shall send a notice (the "Call Notice") to the Member stating the aggregate amount of the additional capital required (the "Capital Call"). The Member shall, within twenty (20) days after the date of the Call Notice (the "Call Period"), contribute to the Company. Any such Additional Capital Contributions shall be made in cash or by wire transfer of immediately available funds into the Company's bank account, or intra-bank transfer and such contribution, when made, shall be credited to such Member's capital account.

5.3    *No Withdrawals.* No Member shall be entitled to resign as a Member or withdraw any part of such Member's Capital Contribution from the Company and no Member shall be entitled to receive any distributions from the Company except as expressly provided in this Agreement.

5.4    *No Liability for Capital Contributions.* No Member shall be personally liable for the return of any portion of the Capital Contributions of the Member; rather, the return of the Member's respective Capital Contributions shall be made solely from the Company's assets. No Member shall have the right to demand or receive property other than cash for its interest in the Company.

5.5    *No Interest.* No Member shall receive any interest on its Unrecovered Capital Contributions.

6.    **Company Shares.**

6.1    *Description.* The Member and the number of shares held by each such Member ("Company Shares") are set forth on Exhibit A. The voting powers and rights of the Company Shares, and the qualifications, limitations or restrictions thereon, are as follows:

(a)    General. The Company Shares shall not have a stated value and shall not have any rights to distributions unless Manager shall have declared such a distribution to be made pursuant to Section 7 out of funds lawfully available therefor.

(b)    Voting. The holders of Company Shares shall be entitled to one vote per Company Share.

6.2    *Compliance with Securities Laws and Other Laws and Obligations.* Each Member hereby represents and warrants to the Company and to each other Member and acknowledges that (a) it has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of an investment in the Company and making an informed decision with respect thereto, (b) it is able to bear the economic and financial risk of investment in the Company for an indefinite period of time and understands that it has no right to withdraw and have its interest repurchased by the Company, (c) it is acquiring an interest in the Company for investment only and not with a view to, or for resale in connection with, any distribution to the public or public offering thereof, (d) it understands that the equity interests in the Company have not been registered under the securities laws of any jurisdiction and cannot be disposed of unless they are subsequently registered and/or qualified under applicable securities

laws and the provisions of this Agreement have been complied with.

7. **Distributions.**

7.1    *Distribution of Net Cash Flow.* Manager, in its sole discretion, may cause the Company to distribute to the Member in accordance with this subparagraph, from time to time prior to dissolution of the Company, cash or other assets or property, in such aggregate amounts as Manager shall deem appropriate; provided that any such distribution shall be made in the order of priority set forth below.

The Net Cash Flow of the Company shall be distributed to the Member after maintain sufficient reserves to satisfy the Company's obligations.

8. **Capital Accounts.**

8.1    *Maintenance of Capital Accounts.* A capital account shall be maintained for the Member on the Company's books of account in accordance with Section 1.704-1(b)(2)(iv) of the Treasury Regulations, and this Section 8 shall be interpreted and applied in a manner consistent with such Section of the Treasury Regulations. In the event that Manager determines it is prudent to modify the manner in which Capital Accounts are adjusted and/or maintained in order to comply with the requirements of such Regulation, Manager may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any member upon dissolution of the Company.

8.2. *Basic Rules for Capital Account Entries.* The amount of the Member's capital account shall equal the aggregate amount of cash and the fair market value of any property contributed by that Member to the Company (less any liabilities assumed by the Company with respect to such contribution), and shall be increased by the aggregate amount of income allocated to that Member (or a predecessor) pursuant to Sections 9.2 and 9.3, and decreased by (a) the aggregate amount of losses allocated to that Member (or a predecessor) pursuant to Section 9.4, and (b) the aggregate amount of cash and the fair market value of any property distributed to that Member (or a predecessor) (less any liabilities assumed by the Member with respect to such distribution).

9. **Income, Gains and Losses.**

9.1    *Computation of Net Income, Gains and Losses.* Net income, gains and losses as set forth on the books of account of the Company shall be computed in the same manner as net income, gains and losses are computed for federal income tax purposes, except that (i) items of income, gain, loss and deduction relating to the assets contributed to the Company by the Member shall be based on the fair market values of those assets (rather than their basis for federal income tax purposes) at the time of contribution, and (ii) items of tax exempt income and non-deductible expense shall be taken into account.

9.2    *Gross Income and Gain.* For any fiscal year of the Company, prior to any allocation of net income or net loss, pursuant to Sections 9.3 and 9.4, as the case may be, gross income and gain of the Company shall be allocated to the Member in an amount equal to the

aggregate amount distributed to the Member during such fiscal year and all prior fiscal years pursuant to Sections 7.1, 7.2 and 7.3, reduced by all amounts of gross income and gain previously allocated to the Member in all prior fiscal years pursuant to this Section 9.2 (the "Allocation Shortfall"). In the event that the aggregate Allocation Shortfalls of the Member exceeds the Company's gross income and gain for the fiscal year, there shall be allocated to each Member an amount of gross income and gain equal to the product of (i) the amount of the Company's gross income and gain and (ii) a fraction, the numerator of which is the amount of such Member's Allocation Shortfall and the denominator of which is the aggregate amount of Allocation Shortfalls for the Member. In the event that the Company's gross income and gain for the fiscal year exceeds the aggregate Allocation Shortfall of all holders of Company Shares, prior to any allocation of capital gain, there shall first be allocated items of ordinary gross income.

9.3    *Net Income.* Net income of the Company for any fiscal year, calculated after any allocation of gross income pursuant to Section 9.2, shall be allocated in full to the Member.

9.4    *Net Loss.*

Net loss of the Company for any fiscal year, calculated after allocation of gross income and gain pursuant to Section 9.2, shall be allocated in full to the Member.

9.5    *Special Allocations.*

The following special allocations shall be made in the following order:

(a)    Gain Chargeback. Notwithstanding any other provision of this Section 9, if there is a net decrease in the Company's minimum gain (as calculated in accordance with the principles of Treasury Regulation Section 1.704-2(d)(1)) during any fiscal year, the Member, but only to the extent required by Treasury Regulation Section 1.704-2(f), shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to the portion of such Member's share of the net decrease in Company minimum gain, determined in accordance with Treasury Regulation Section 1.704(g)(2). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j) of the Treasury Regulations. This Section 9.5(a) is intended to comply with the minimum gain chargeback requirement in such Sections of the Treasury Regulations and shall be interpreted consistently therewith.

(b)    Member Nonrecourse Debt Minimum Gain Chargeback. Notwithstanding any other provision of this Section 9 except Section 9.5(a), if there is a net decrease in Member nonrecourse debt minimum gain (calculated in accordance with the principles of Treasury Regulation Section 1.704(2)(i)(3)) during any Company fiscal year, each Member who has a share of that Member nonrecourse debt minimum gain, determined in accordance with the principles of Treasury Regulation Section 1.704-2(i)(5), as of the beginning of such fiscal year, but only to the extent required by Treasury Regulation Section 1.704-2(i) and not subject to the exceptions set forth in Treasury Regulation Section 1.704-2(i)(4), shall be specially allocated items of Company income and gain for such year (and, if necessary,

subsequent years) in an amount equal to such Member's share of the net decrease in Member nonrecourse debt minimum gain, determined in accordance with Treasury Regulation Sections 1.704-2(i)(4) and 1.704-2(g)(2). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with, and only to the extent required by, Sections 1.704-2(i) and 1.704-2(j) of the Regulations. This Section 9.5(b) is intended to comply with the minimum gain chargeback requirements in such Sections of the Treasury Regulations and shall be interpreted consistently therewith.

(c)   Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulation Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) or 1.704-1(b)(2)(ii)(d)(6), items of Member income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the capital account deficit of such Member adjusted in the manner set forth in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6) ("Adjusted Capital Account Deficit") as quickly as possible, provided that an allocation pursuant to this Section 9.5(c) shall be made if and only to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 9 have been tentatively made as if this Section 10.5(c) were not in the Agreement. This Section 9.5(c) is intended to be a qualified income offset in compliance with Treasury Regulation Sections 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

## 10.   Fiscal Year Reports.

10.1   *Fiscal Year*. The Company's fiscal year shall be the calendar year unless changed by Manager.

10.2   *Books of Account*. Complete and accurate books of account shall be kept by the Company at the principal office of the Company (or at such other office as Manager may designate). The determinations of Manager with respect to the treatment of any item or its allocation for federal, state or local income tax purposes shall be binding upon the Member so long as that determination is not inconsistent with any express provision of this Agreement or applicable law.

10.3   *Reports*. No later than January 31st, after the close of each fiscal year, Manager shall furnish to each Member financial statements (which need not be audited) for that fiscal year. The financial statements shall include a balance sheet of the Company as of the end of the year and a statement of income and a statement of changes in financial position of the Company for the year, setting forth in each case in comparative form the figures as of the end of and for the previous fiscal year.

10.4   *K-1 Reports*. Within 105 days after the end of each calendar year, Manager shall furnish to each Member a copy of Schedule K-1 to the Company's federal income tax return for that year.

## 11.   Tax Matters.

11.1   *Allocations.* For federal, state and local income tax purposes, all items of income, deduction and loss shall be allocated to the Member on the same basis as profits are allocated and losses are charged as provided in Section 9 and all items of credit and other items not so allocated shall be allocated to the Member in the manner provided for in the Code and the applicable Treasury Regulations issued thereunder. Notwithstanding the foregoing, tax items relating to property subject to Section 704(c) of the Code and the applicable Treasury Regulations issued thereunder shall be allocated in accordance therewith.

11.2   *Consistency.* No Member shall treat a Company item on its federal, state or local income tax returns in a manner inconsistent with the treatment of the Company item on the Company's federal, state or local income tax return.

11.3   *Elections.* Upon a transfer of Company Shares described in Code Section 743(b) or upon a distribution of Company assets, Manager, in its sole discretion, may file an election pursuant to Code Section 754 to adjust the basis of Company property.

11.4   *Tax Matters Partner.* Manager shall be the tax matters partner as that term is defined in Section 6231 of the Code for the Company.

11.5   *Tax Classification.* It is the intention of the Member that the Company be treated, for all federal, state and local tax proposes, as a partnership and not as an association taxable as a corporation, and the Member, and Manager on behalf of the Company, shall take all actions consistent with the foregoing.

**12.   Operation of Business.**

12.1   *Management of Business.* Except for (i) duties specifically delegated to a Member pursuant to the terms of this Agreement, and/or (ii) as specifically provided elsewhere in this Agreement, the full right, power, authority and discretion to conduct the business and affairs of the Company, and to do all things necessary to carry on the business of the Company, shall be vested in a manager (the "Manager"), acting alone and without the consent of the Member. The Member hereby designates Dov Lesches as the Manager with the authority to bind the Company as set forth herein.

12.2   In the event of a willing withdrawal of Manager, Manager shall notify its Member in writing thirty days (30) prior to the intended withdrawal date. If the Manager withdraws due to death, sickness or if the Manager is no longer able to fulfill its duties, a successor Manager shall be elected by the majority in interest of the Persons holding membership interests. The newly elected Manager shall be entitled to one third (1/3) of net proceeds.

12.3   *Day-to-Day Management.* In addition to, and not in limitation of Section 12.1 above, but subject to Section 12.3 below, Manager is hereby authorized on behalf of the Company in its individual capacity and in its capacity as a manager of Owner to follow the Approved Budget and to:

(a)   Incur all expenditures and pay all obligations of the Company and Owner;

(b)  Execute any and all documents or instruments of any kind which Manager may deem necessary or appropriate for carrying out the daily purposes of the Company or Owner;

(c)  Purchase or lease equipment for the Company's or Owner's purposes;

(d)  Cause the Company to borrow funds, and, in connection with such borrowing, mortgage real property, grant security interests in real property and/or any other property owned by the Company and execute documents as necessary to accomplish such borrowing;

(e)  Procure and maintain, at the expense of the Company or Owner, as applicable, with responsible companies, such insurance in such amounts and covering such risks as are appropriate in the judgment of Manager;

(f)  Receive and disburse any Net Cash Flow in accordance with <u>Section 7</u>;

(g)  Supervise the preparation and filing of all Company and Owner tax returns;

(h)  Make any tax elections on behalf of the Company and Owner;

(i)  Engage and terminate any attorneys, accountants, brokers or sales, agents, and determine the terms of such engagements, except for sale of the Property;

(j)  Supervise the preparation and filing of all Company and Owner tax returns;

(k)  Make any tax elections on behalf of the Company and Owner;

(l)  Engage and terminate any attorneys, accountants, brokers or sales;

(m)  agents, and determine the terms of such engagements, except for sale of the Property; and

(n)  Perform any and all other acts or activities customary or incidental to the purpose of the Company's daily operations.

124    *Services of Manager; Other Activities*. Manager shall devote such time to the affairs of the Company as it may determine necessary to conduct them properly. Notwithstanding any other duty at law or in equity, Manager may engage or have an interest in other business ventures of any kind, independently or with others (which ventures may compete with the business of the Company or the Owner) and neither the Company nor any other Member

shall have any rights in or to those independent ventures. In addition, the Member and its direct or indirect owners or any other Affiliate of any Member may have other business interests and may engage in other activities in addition to those relating to the Company, whether or not such business interests or activities may be competitive with those of the Company. None of the Company, any Member or Manager shall have any right pursuant to this Agreement to share or participate in such other business interests or activities or to the income or proceeds derived therefrom.

12.5    *Officers.* Manager may appoint such officers of the Company as it deems desirable, including, but not limited to, a president, one or more vice-presidents, a secretary, a treasurer, and one or more assistant secretaries and assistant treasurers. Except as Manager shall otherwise determine, each of the officers of the Company shall have the powers and duties that a person holding that office in a corporation customarily has.

12.6    *No Partition, Sale or Partition.* No Member shall have the right to require partition of any of the Company's property or to compel any sale or appraisal of the Company's assets.

12.7    *Reliance by Third Parties.* Any person dealing with the Company, Manager or any Member or any officer of the Company may rely upon a certificate signed by Manager as to (a) the identity of Manager, any Member or officer of the Company, (b) any factual matters relevant to the affairs of the Company, (c) the persons who are authorized to execute and deliver any document on behalf of the Company or (d) any action taken or omitted by the Company, Manager or any Member.

12.8    *Discretion.* Whenever in this Agreement Manager is permitted or required to make a decision in its "discretion" or "sole discretion" or under a grant of similar authority or latitude, Manager shall have no duty or obligation to consider any interest of or factors affecting some or the Member so long as such Manager acts in good faith and in a manner which it reasonably believes is in or not opposed to the best interest of the Company. Each Member hereby agrees that any standard of care or duty imposed under the Act or any other applicable law shall be modified, waived or limited in each case as required to permit Manager to act under this Agreement and to make any decision pursuant to the authority prescribed in this <u>Section 12.9</u> so long as such action or decision does not constitute willful or wanton misconduct, gross negligence or a material breach of the terms of this Agreement and is reasonably believed by Manager to be consistent with the overall purposes and objectives of the Company.

**13.    Meetings.**

13.1    *Quorum; Majority Vote.* A majority of Persons holding membership interests entitled to vote shall constitute a quorum at the member meeting. If a quorum is present, the affirmative vote of the majority in interest represented at the meeting and entitled to vote on the subject matter shall constitute the act of the Member.

**14.    Mezzanine Provisions.**

14.1    Notwithstanding anything contained herein to the contrary, the Member and the Company each hereby irrevocably acknowledge and agree that upon the foreclosure, sale and/or other

transfer of Member's limited liability company interest(s) in the Company pursuant to that certain Pledge and Security Agreement in favor of Orlando Lender, LLC, as lender, dated March __, 2019, (the "Pledge Agreement"), the foreclosing party, assignee and/or the purchaser of the Member's limited liability company interest(s) in the Company shall, upon execution of a counterpart signature page of this Agreement, be automatically admitted and substituted as the sole member of the Company. Upon such a foreclosure, sale and/or other transfer, such foreclosing party, assignee and/or purchaser shall have all of the rights, title, interest and powers of the Member, including, without limitation, the Member's voting, managerial and control rights with respect to the affairs of the Company and the Member's right to receive profits and a return on the Member's capital account, if any. Such foreclosing party, assignee and/or purchaser shall also have the right to replace any or all independent managers, special members, officers and independent directors of Company. The Company acknowledges that the pledge of the limited liability company interest(s) in the Company made by the Member under the Pledge Agreement shall be a pledge not only of the profits and losses of the Company, but also a pledge of all rights and powers of the Member, including, without limitation, all voting, managerial and other rights.

14.2    Pledge of LLC Interests. The Member is hereby authorized to pledge and grant a security interest in its limited liability company interests in the Membership Interests to or in favor of Mezzanine Lender as collateral for the Mezzanine Loan. The Company acknowledges that the pledge of the Member's membership interests in the Company in connection with the Pledge Agreement shall be a pledge not only of profits and losses of the Company, but also a pledge of all rights and obligations of the Member, including all voting rights and the right to manage and control the affairs of the Company. Upon foreclosure, sale or transfer of the Member's limited liability company interests in the Company, pursuant to that Pledge Agreement, the holder of such membership interests shall be automatically admitted as a member of the Company, effective as of such foreclosure, sale or transfer, with all of the rights and obligations of the Member hereunder. For the avoidance of doubt, such rights, powers and benefits shall include all voting and other rights and not merely the rights of an economic interest holder. Upon a foreclosure, sale or other transfer of the limited liability company interests of the Company pursuant to the Pledge Agreement, the successor Member may transfer its interests in the Company, subject to this Agreement. Notwithstanding any provision in the Act or any other provision contained herein to the contrary, the Member shall be permitted to pledge and upon any foreclosure of such pledge in connection with the admission of the Mezzanine Lender or its designee as a member, transfer to the Mezzanine Lender or its designee its rights and powers to manage and control the affairs of the Company pursuant to the terms of the Pledge Agreement. Upon the exercise of its rights under the Pledge Agreement following a foreclosure, sale or other transfer of the limited liability company interests of the Company pursuant to the Pledge Agreement, the Mezzanine Lender or its designee shall have, among its other powers, the right to appoint and remove directors and officers pursuant to the terms of this Agreement.

14.3    Notwithstanding anything to the contrary contained herein, the Member shall not, without the prior written consent of the Mezzanine Lender, issue and shall not permit the issuance of any additional limited liability company interests of the Company other than its initial issuance of limited liability company interests issued on or prior to the date of this Agreement.

## 15.    Assignment of Interest.

15.1    *General Rules.* A Member may not sell, transfer, assign, pledge, hypothecate or otherwise dispose (the foregoing collectively referred to as a "Transfer") of all or any portion of its interest in the Company without the consent of Manager. Upon the grant of such consent a transferee may become a substitute Member upon its execution of a counterpart to this Agreement. Such admission shall be deemed immediately prior to the Transfer and, immediately

following such admission, the transferor Member shall cease to be a member of the Company. Any Transfer or purported Transfer that does not conform to the requirements of this Section 15 shall be void and ineffective, and shall not be recognized by the Company for any purpose, subject to Section 15.2. Notwithstanding the foregoing, a Transfer within the meaning of this Section 15 shall, to the fullest extent permitted by law, be deemed not to occur upon (a) a Transfer by devise or descent or by operation of law upon the death of partner, stockholder or member of any entity owning, directly or indirectly, an interest in the Company, (b) any transfer between partners, stockholders or members of an entity which owns, directly or indirectly, an interest in the Company, (c) any transfer by an indirect beneficial owner of interest in the Company to (i) his spouse, partners or siblings, (ii) his children or grandchildren, or (iii) to a trust for the primary benefit of any of the foregoing, or (d) any Transfer by a trust to its beneficiaries (each an "Exempted Transfer").

15.2   *Transfers Resulting in Default Under the Terms of a Mortgage Agreement.* Not in limitation of the foregoing, any Transfer of an interest in the Company, or in any entity holding a direct or indirect interest in the Company, which would result in a default pursuant to any mortgage agreement with respect to the Property or any other Company asset is hereby declared, to the fullest extent permitted by law, null and void ab initio.

15.3   *Transferee Not a Member.* Without limiting the generality of Section 15.1 hereof, and notwithstanding any other provision of this Agreement, no Person acquiring a Member interest, other than a Person who is a Member prior to the applicable Transfer, shall become substituted or admitted as a Member (a) unless such Person (i) executes a counterpart signature page to this Agreement agreeing to be bound by the terms thereof and (ii) pays all costs reasonably incurred by the Company incidental to the Transfer including, without limitation, attorneys' fees, and (b) if such substitution or admission would constitute a violation of the Securities Act or of any other applicable state or federal securities laws. In addition, in the event of an Exempted Transfer, the transferee shall not become a Member hereunder without Manager's consent. If Manager does not (or is not requested to) grant its consent to the admission of any such transferee as a Member, then such transferee shall be entitled to receive any distributions to which it would be entitled if it were a Member and shall be treated as a Member for tax purposes, but shall not have any other rights or privileges of a Member.

15.4   *Effective Date.* Any authorized Transfer of a Member interest or admission or substitution of a Member pursuant to this Section 15 shall be deemed effective as of the last day of the calendar month in which such Transfer or admission occurs.

15.5   *Survival of Obligations.* No Transfer by any Member of all or any portion of its Member interest shall relieve such Member from any of the liabilities or obligations, including any indemnification obligations under Section 17, of such Member to the Company existing or arising out of actions that occurred on or prior to the date of such Transfer.

16.   **Dissolution; Liquidation.**

16.1   *Dissolution.* The following provisions shall govern over this Agreement or any other document or instrument governing the affairs of the Company:

(a)   The Company shall be dissolved, and its affairs shall be wound up upon the first to occur of the following: (i) the termination of the legal existence of the last remaining member of the Company or the occurrence of any other event which terminates the continued membership of the last remaining member of the Company in the Company unless the Company is continued without dissolution in a manner permitted by this Agreement or the Act or (ii) the entry of a decree of judicial dissolution under Delaware Law. Upon the occurrence of any event that causes the last remaining member of the Company to cease to be a member of the Company, to the fullest extent permitted by law, the personal representative of such member is hereby authorized to, and shall, within 90 days after the occurrence of the event that terminated the continued membership of such member in the Company, agree in writing (i) to continue the Company and (ii) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of the Company, effective as of the occurrence of the event that terminated the continued membership of the last remaining member of the Company in the Company.

(b)   Notwithstanding any other provision of this Agreement, the Bankruptcy of the Member shall not cause the Member to cease to be a member of the Company and upon the occurrence of such an event, the Company shall continue without dissolution. Bankruptcy means, with respect to any Person, if such Person (i) makes an assignment for the benefit of creditors, (ii) files a voluntary petition in bankruptcy, (iii) is adjudged a bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (iv) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (vi) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (vii) if 120 days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, if the proceeding has not been dismissed, or if within 90 days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all of any substantial part of its properties, the appointment is not vacated or stayed, or within 90 days after the expiration of any such stay, the appointment is not vacated. The foregoing definition of "Bankruptcy" is intended to replace and shall supersede and replace the definition of "Bankruptcy."

16.2   *Liquidation and Distribution of Assets*. Upon dissolution of the Company, Manager shall proceed to sell or liquidate the Company's assets within a reasonable time and, shall distribute the Company's cash and other assets to the Member in accordance with the provisions of Section 7.3 of this Agreement.

16.3   *Termination*. The Company shall terminate when all property owned by the Company has been disposed of and the assets, after payment of or provisions for liabilities to the Company's creditors, have been distributed to the Member as provided in Section 16.2 and the Certificate shall not have been cancelled in the manner required under the Act.

16.4   *Internal Revenue Code Section 1031 Tax Deferred Exchange*. At the request of either Member, the Member agrees to reasonably cooperate in structuring and documenting the

sale of all or any portion of a Member's interest in the Company to effect a tax deferred exchange in accordance with the provisions of Section 1031 of the Internal Revenue Code and its corresponding regulations. Such cooperation shall be at no cost to the other Member (i.e., the cooperating Member).

## 17.   Exculpation, Indemnification, Limitation of Liability of the Member.

17.1   *Liability of Member and Manager.* The Member and Manager shall no liability for the obligations or liabilities of the Company except to the extent provided in the Act and other applicable law. A Member and/or Manager shall not be personally liable for any indebtedness, liability or obligation of the Company, except as otherwise set forth under the Act and any other applicable law. Without limiting the generality of the preceding sentence, a Member or Manager does not in any way guaranty the return of any Capital Contribution to any other Member or a profit for the Member from the operations of the Company. No Member shall be obligated to restore by way of Capital Contribution or otherwise any deficit in its Capital Account or the Capital Account of any Member (if such deficits occur). Except as may otherwise be specifically provided in this Agreement, each Member's and Manager's personal liability shall be limited to the fullest extent under the Act and other applicable law.

17.2   *No Binding Authority of Member.* The Member is not an agent of the Company solely by virtue of being the Member, and the Member has authority to act for the Company solely by virtue of being a Member. Any Member that takes any action or binds the Company in violation of this Agreement shall be solely responsible for, and indemnify the Company and each other Member against, any losses that the Company, or such other Member, as the case may be, may at any time become subject to or liable for by reason of the actions specified above.

17.3   *Indemnification by the Company.* Subject to the standards and restrictions, if any, set forth in this Agreement, the Company shall, to the fullest extent permitted by law, indemnify and hold harmless each Member of the Company, or any executor or administrator of the estate of such Member, made, or threatened to be made, party to an action or proceeding, whether civil or criminal, by reason of the fact that such Person is or was a Member of the Company, against amounts paid in settlement and reasonable expenses, including attorneys' fees, actually or necessarily incurred by it in connection with the defense or settlement of such action, or in connection with an appeal therein; *provided, however,* that no indemnification shall be made to or on behalf of any Member (a) if a judgment or other final adjudication adverse to such Person establishes (i) that its acts were committed in bad faith or were the result of active and deliberate dishonesty and were material to the cause of action so adjudicated or (ii) that it personally gained in fact a financial profit or other advantage to which such person was not legally entitled or (b) in connection with any dispute regarding the Member.

17.4   *Indemnification by Member.* Subject to the terms of this Agreement and the Act, each Member hereby indemnifies each and every other Member from and against all losses resulting from the breach by any such first Member of any of terms or conditions of this Agreement.

17.5   *Indemnification of Manager.* The Company shall indemnify, defend, and hold harmless Manager and its respective employees, agents, shareholders, directors, officers,

representatives, and attorneys and any officers or agents of the Company (each, an "Indemnified Person"), on demand of and to the reasonable satisfaction of the Indemnified Person, from and against any and all liabilities, obligations, losses, damages, penalties, actions, suits, proceedings, judgments, costs, expenses, and disbursements of any kind or nature whatsoever including, without limitation, all costs and expenses of investigation, defense, appeal and settlement ("Indemnity Damages"), which may be incurred by or asserted against the Indemnified Person in any way relating to or arising out of, or alleged to relate or arise out of any action or inaction on the party of the Indemnified Person other than the portion of the Indemnity Damages resulting from the Indemnified Person's own willful or wanton misconduct, gross negligence or breach of fiduciary duty.

**18.   Other Action.**

Each Member shall execute and deliver such additional documents and instruments, and shall perform such additional acts, as may be necessary or appropriate to carry out the terms of this Agreement.

**19.   Admission of Additional Members.**

19.1   *Consent required.* No Person may be admitted to the Company as a Member without the prior written consent of Manager.

19.2   *Manager to set Criteria.* Manager shall determine the financial and other criteria for entry of new Members into the Company and shall accept all new subscriptions on behalf of the Company.

**20.   Miscellaneous.**

20.1   *Entire Agreement; Amendment.* This Agreement contains a complete statement of the arrangements among the Member with respect to the Company, and supersedes all prior agreements and understandings among them with respect to the Company. This Agreement may be amended only by a written agreement of the Member or as otherwise provided in the Act.

20.2   *Notices.* Any notice or other communications under this Agreement shall be in writing and shall be considered given when delivered in person or mailed by registered mail, postage prepaid and return receipt requested, addressed to the party intended as the recipient at the address listed on the Company's records or at such other address as a Member may designate by written notice to the other Member.

20.3   *Governing Law.* This Agreement shall be governed by, and construed in accordance with, the law of the State of Delaware applicable to agreements made and to be performed in the State of Delaware.

20.4   *Counterparts; Facsimile and PDF Signatures.* This Agreement may be executed in multiple counterparts with separate signature pages, each such counterpart shall be

considered an original, but all of which together shall constitute one and the same instrument. For purposes of execution of this Agreement, signatures transmitted via facsimile or Portable Document Format (or "PDF") shall be deemed original ink signatures.

20.5    *Attorneys' Fees.* If any action or proceeding is instituted regarding the Member arising from or related to or with this Agreement, the Member prevailing in such action or arbitration shall be entitled to recover from the non-prevailing party for its or their costs of action or arbitration, including, without limitation, reasonable attorneys' fees and costs as fixed by the court or arbitrator therein.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

COMPANY:

EMPIRE EQ HOTEL LLC

By: _____
Name: Dov Leshes
Title:   Manager

MEMBER:

EMPIRE EQ WGI LLC

By: _____
Name: Dov Leshes
Title: Manager

INDEPENDENT DIRECTOR:

COLONIAL CHARTER COMPANY, a
Delaware Corporation

By: _____
Name: Karen Elliott
Title: Authorized Representative

## EXHIBIT A

### EMPIRE EQ HOTEL LLC

| Members | Percentage Interest/Voting |
|---|---|
| Empire EQ WGI, LLC | 100% |
| TOTAL | 100% |

## CERTIFICATE FOR LIMITED LIABILITY COMPANY INTERESTS IN
## EMPIRE EQ HOTEL LLC

**THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER THE SECURITIES OR BLUE SKY LAWS OF ANY STATE. THE HOLDER OF THIS CERTIFICATE, BY ITS ACCEPTANCE HEREOF, REPRESENTS THAT IT IS ACQUIRING THIS SECURITY FOR INVESTMENT AND NOT WITH A VIEW TO ANY SALE OR DISTRIBUTION HEREOF. ANY TRANSFER OF THIS CERTIFICATE OR ANY LIMITED LIABILITY COMPANY INTEREST REPRESENTED HEREBY IS SUBJECT TO THE TERMS AND CONDITIONS OF THE LIMITED LIABILITY COMPANY AGREEMENT (AS DEFINED BELOW).**

Certificate Number 1                                          100% Interests

**EMPIRE EQ HOTEL LLC**, a Delaware limited liability company (the "Company"), hereby certifies that Empire EQ WGI LLC, a Delaware limited liability company (the "Holder") is the registered owner of 100% of the limited liability company interests in the Company ("Interests"). The rights, powers, preferences, restrictions and limitations of the Interests are set forth in, and this Certificate and the Interests represented hereby are issued and shall in all respects be subject to the terms and provisions of the Limited Liability Company Act, Title 6, Chapter 18, Delaware Code.

Each Interest shall constitute a "security" within the meaning of, and governed by, (i) Article 8 of the Uniform Commercial Code (including Section 8-102(a)(15) thereof) as may be in effect from time to time in the State of Delaware and (ii) Article 8 of the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995 (and each Interest shall be treated as such a "security" for all purposes, including, without limitation perfection of the security interest therein under Article 8 of each applicable Uniform Commercial Code). Notwithstanding any provision of the Limited Liability Company Agreement to the contrary, to the extent that any provision of the Limited liability Company Agreement is inconsistent with any non-waivable provision of Article 8 of the Uniform Commercial Code as in effect in the State of Delaware, such provision of Article 8 shall be controlling.

This Certificate and the Interests evidenced hereby shall be governed by and construed in accordance with the laws of the State of Delaware without regard to principles of conflicts of laws.

IN WITNESS WHEREOF, the Company has caused this Certificate to be executed as of the date set forth below.

Dated: March __, 2019

EMPIRE EQ HOTEL LLC, a Delaware limited

**(REVERSE SIDE OF CERTIFICATE)**
**ASSIGNMENT OF INTEREST**

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto

_____

(print or typewrite name of transferee),

_____

insert Social Security or other taxpayer identification number of transferee

100% of the Interests in the Company, represented by the foregoing certificate effective as of ___, ___ (effective date), and irrevocably constitutes and appoints_____, and attorney-in-fact, to transfer the same on the books and records of the Company, with full power of substitution in the premises.

Dated: ___,

**Empire EQ WGI LLC,**

# EXHIBIT

# A-6

## WRITTEN CONSENT OF MANAGER
### EMPIRE EQ HOTEL LLC, A DELAWARE LIMITED LIABILITY COMPANY

The undersigned, being the Manager of Empire EQ Hotel LLC, a Delaware limited liability company (the "**Company**"), hereby consents to and adopts the following resolutions:

**WHEREAS**, the Company desires to become a subsidiary of Empire EQ WGI LLC, a Delaware limited liability company (the "**Parent**") and, in connection therewith, the current members of the Company have agreed to assign and transfer their membership interests in the Company to the Parent and, in exchange, will receive the same membership percentage interests in the Company that each member had in the Subsidiary (the "**Reorganization**"), and

**WHEREAS**, the Manager's consent is required for effectuate transfer of the limited liability company interests in the Company and the Manager has consented to the assignment of the limited liability company interests from Avi Leshes, Joseph Harris, EDJF Holdings LTD, David Eyzenberg, Dovi Leshes S Trust and Abes Corner LLC to the Parent, to effectuate the Reorganization.

**NOW, THEREFORE, BE IT RESOLVED**, that Dov Lesches, be and hereby is authorized, acting alone, to execute, pay, and deliver the necessary documents (and any other agreements) on behalf of the Company and to perform such other actions in the name and on behalf of the Company, with such changes therein as counsel to the Company shall deem necessary or appropriate to permit the Company to effectuate the Reorganization.

**FURTHER RESOLVED**, that the Manager expressly waives any and all requirements that may conflict with the foregoing resolutions. Based on the foregoing approval, Dov Lesches, is hereby authorized and empowered and directed in the name on and on behalf of the Company, to execute and deliver any and all documents necessary to effectuate the Reorganization, and any related documents necessary or advisable to effectuate the foregoing resolutions; and

**IT IS FURTHER CERTIFIED** that said action of the Manager of the Company was duly authorized and that the following is the duly qualified and acting Manager of the Company and nothing limits the power of the Manager of the Company to pass the foregoing consent.

<u>NAME</u>

Dov Lesches                Manager

**IN WITNESS WHEREOF**, the below Manager has hereunto subscribed his/her/its names as the Manager of the Company entitled to vote.

**Manager:**

BY: Dov Lesches, Manager

# EXHIBIT

# A-7

PLAN OF CONVERSION
FOR EMPIRE EQ HOTEL, LLC, a
Florida Limited Liability Company
TO
EMPIRE EQ HOTEL, LLC, a
Delaware Limited Liability Company

This Plan of Conversion (this "**Plan of Conversion**") of Empire EQ Hotel, LLC, a Florida Limited Liability Company (the "**Empire**"), is made and entered into effective as of February 21, 2019, in accordance with the terms of Empire's Operating Agreement, dated _____, to convert Empire from a Florida Limited Liability Company into a Delaware Limited Liability Company, in accordance with the Florida Limited Liability Company Act and Delaware Limited Liability Company Act.

## RECITALS

1.      Empire was formed on June 3, 2015, under the laws of the State of Florida by filing Articles of Organization for Florida Limited Liability Company with the Secretary of State of the State of Florida. Empire was assigned State of Florida Document Number L15000097817.

2.      Empire desires to convert from a Florida limited liability company to a Delaware limited liability company.

3.      The Member(s) of Empire upon unanimous decision have approved the conversion of Empire from a Florida limited liability company into a Delaware limited liability company.

4.      A conversion of a Non-Delaware limited liability company into a Delaware limited liability company may be made under Title 6, Section 18-214 of the Delaware Limited Liability Company Act.

## TERMS AND CONDITIONS
## OF CONVERSION

NOW, THEREFORE, Empire does hereby adopt this Plan of Conversion to effectuate the Conversion as follows:

5.      The name of the converting entity is Empire EQ Hotel, LLC, a Florida limited liability company, and the name of the converted entity is Empire EQ Hotel, LLC, a Delaware limited liability company ("**Empire DE**").

6.      The Conversion shall become effective at the time of the filing of the Certificate of Conversion and Certificate of Formation (the "**Effective Time**") with the Secretary of State for the State of Delaware.

7.    At the Effective Time, Empire shall continue its existence in the organizational form of a Florida limited liability company. All of the rights, privileges and powers of Empire and all property and all debts due to Empire, as well as all other things and causes of action belonging to Empire, shall remain vested in Empire and shall be the property Empire DE. All actions and resolutions of the Manager(s) and Member(s), as applicable, taken or adopted from the inception of Empire prior to the Effective Time shall continue in full force and effect as if Empire DE's Member(s) and Manager(s), respectively, had taken such actions and adopted such resolutions. All rights of creditors and all liens upon any property of Empire shall be preserved unimpaired, and all debts, liabilities and duties of Empire shall remain attached to Empire and may be enforced against Empire DE to the same extent as if said debts, liabilities and duties had originally been incurred or contracted by Empire DE in its capacity as a Delaware limited liability company.

8.    At the Effective Time, all membership interest of Empire shall be automatically converted into membership interest in Empire DE having the respective rights, preferences and privileges set forth in the Operating Agreement of Empire.

9.    Empire shall vest an authorized agent full authority to execute, enter, delegate, or otherwise take any action necessary to effectuate this conversion.

10.    This Plan of Conversion shall be governed under the laws of the State of Florida and where applicable under the laws of the State of Delaware.

The undersigned Members of Empire EQ Hotel, LLC, a Florida limited liability company hereby execute, agree to and approve this Plan of Conversion as of the date set forth above.

HF 12676803v.;

AVI LESHES

_____

JOSEPH HARRIS

_____

EDJF HOLDINGS LTD

_____

By: _____

Its: _____

DAVID EYZENBERG

_____

DOV LESHES

_____

ABES CORNER LLC

_____

By: _____

Its: _____

EMPIRE EQ HOTEL OWNER LLC

_____

By: Dov Leshes

Its: Manager

The undersigned, having received the required approval from the Member(s) of Empire EQ Hotel, LLC, a Florida limited liability company, hereby adopts this Plan of Conversion as of the date set forth above.

Dov Lesches, Manager

HF 126788/03v.1

# EXHIBIT

# A-8

# Delaware

### The First State

Page 1

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF CONVERSION OF A FLORIDA LIMITED LIABILITY COMPANY UNDER THE NAME OF "EMPIRE EQ HOTEL LLC" TO A DELAWARE LIMITED LIABILITY COMPANY, FILED IN THIS OFFICE ON THE TWENTY-SECOND DAY OF FEBRUARY, A.D. 2019, AT 2:27 O'CLOCK P.M.

Jeffrey W. Bullock, Secretary of State

7292999  8100F
SR# 20191286311
You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 202311876
Date: 02-22-19

State of Delaware
Secretary of State
Division of Corporations
Delivered 02:27 PM 02/22/2019
FILED 02:27 PM 02/22/2019
SR 20191286311 - File Number 7292999

# STATE OF DELAWARE
## CERTIFICATE OF CONVERSION
### FROM A NON-DELAWARE LIMITED LIABILITY COMPANY TO A DELAWARE LIMITED LIABILITY COMPANY PURSUANT TO SECTION 18-214 OF THE LIMITED LIABILITY ACT

1.) The jurisdiction where the Non-Delaware Limited Liability Company first formed is Florida

2.) The jurisdiction immediately prior to filing this Certificate is Florida

3.) The date the Non-Delaware Limited Liability Company first formed is 06/03/2015

4.) The name of the Non-Delaware Limited Liability Company immediately prior to filing this Certificate is EMPIRE EQ HOTEL LLC

5.) The name of the Limited Liability Company as set forth in the Certificate of Formation is EMPIRE EQ HOTEL LLC

IN WITNESS WHEREOF, the undersigned have executed this Certificate on the 22nd day of February , A.D. 2019

By: _____
Authorized Person

Name: Dovi Leschea
Print or Type

# EXHIBIT

# B-1

# Delaware

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF

DELAWARE DO HEREBY CERTIFY THAT THE ATTACHED IS A TRUE AND

CORRECT COPY OF THE CERTIFICATE OF FORMATION OF "EMPIRE EQ

HOTEL LLC" FILED IN THIS OFFICE ON THE TWENTY-SECOND DAY OF

FEBRUARY, A.D. 2019, AT 2:27 O`CLOCK P.M.

Jeffrey W. Bullock, Secretary of State

7292999  8100F
SR# 20191286311

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 202311876
Date: 02-22-19

## STATE of DELAWARE
## LIMITED LIABILITY COMPANY
## CERTIFICATE of FORMATION

• First: The name of the limited liability company is EMPIRE EQ HOTEL LLC

• Second: The address of its registered office in the State of Delaware is 108 West
13th Street                          in the City of Wilmington
Zip Code 19801

The name of its Registered agent at such address is
Business Filings Incorporated

• Third: (Insert any other matters the members determine to include herein.)

In Witness Whereof, the undersigned have executed this Certificate of Formation this
22nd         day of February , 2019

By:
   Authorized Person(s)

Name: Dovi Leschea
   Typed or Printed

State of Delaware
Secretary of State
Division of Corporations
Delivered 02:27 PM 02/22/2019
FILED 02:27 PM 02/22/2019
SR 20191286311 - File Number 7292999

# EXHIBIT

# B-2

# Delaware

Page 1

### The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "EMPIRE EQ HOTEL LLC" IS DULY FORMED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE FIFTH DAY OF APRIL, A.D. 2019.

AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "EMPIRE EQ HOTEL LLC" WAS FORMED ON THE TWENTY-SECOND DAY OF FEBRUARY, A.D. 2019.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL TAXES HAVE BEEN ASSESSED TO DATE.

Jeffrey W. Bullock, Secretary of State

7292999  8300
SR# 20192590389
You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 202587809

Date: 04-05-19

# EXHIBIT

# B-3

## SECOND AMENDED AND REINSTATED OPERATING

## AGREEMENT OF

## EMPIRE EQ HOTEL LLC

THE MEMBERSHIP INTERESTS HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION (THE "COMMISSION") UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER THE SECURITIES LAWS OF ANY JURISDICTION, AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH STATE LAWS. THE MEMBERSHIP INTERESTS HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE COMMISSION, ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF AN INVESTMENT IN THE LIMITED LIABILITY COMPANY. A MEMBERSHIP INTEREST ALSO MAY NOT BE TRANSFERRED OR ENCUMBERED UNLESS THE PROVISIONS OF THIS AGREEMENT ARE SATISFIED.

## SECOND AMENDED AND REINSTATED OPERATING

## AGREEMENT OF EMPIRE EQ HOTEL LLC

**THIS SECOND AMENDED AND REINSTATED OPERATING AGREEMENT** is made effective as of the 1ST day of February, 2019 (as amended from time to time, this "Agreement"), by and among EMPIRE EQ HOTEL LLC, a Delaware limited liability company (the "Company") and the member executing this Agreement as member (the "Member"), in consideration of the mutual covenants expressed herein.

**1.    Definitions.**

1.1    *Definitions*. Unless the context otherwise requires, capitalized terms used in this Agreement and not otherwise defined herein shall have the following meanings:

"Act" shall mean the Delaware Limited Liability Company Act, as amended from time to time.

"Affiliate" shall mean (a) any Person directly or indirectly owning, controlling or holding the power to vote 10% or more of the outstanding voting securities of an identified other Person; (b) any Person 10% or more of whose voting securities are directly or indirectly owned, controlled or held with power to vote, by such other Person; (c) any Person directly or indirectly controlling, controlled by, or under common control with such other Person; (d) any officer, director, member, manager or partner of such other Person; (e) if such other Person is an officer, director, member, manager or partner, any entity for which such Person acts in any such capacity; and (f) any spouse, lineal ancestor or descendant of such other Person.

"Approved Budget" means the then effective approved annual budget of the Company.

"Capital Contribution" means contributions of cash or other property made by the Member to the Company, from time to time, pursuant to Section 5.

"Certificate" shall mean the Certificate of Formation of the Company, as amended from time to time.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, or corresponding provisions of future laws.

"Initial Capital Contribution" shall mean the Capital Contribution set forth opposite the name of each Member in Exhibit A to this Agreement.

"Internal Rate of Return" means an annualized effective compounded rate of return on capital.

"Manager" shall have the meaning set forth in Section 12.1.

"Member" shall mean the Person executing this Agreement as member and each Person who may become a substituted or additional Member pursuant to the provisions hereof and applicable law, each in its capacity as a member of the Company.

"Net Cash Flow" shall mean, for each year, the Company's gross operating receipts during such year (not including Capital Contributions, loans from the Member to the Company, proceeds from the sale or refinancing within a twelve-month period of all or substantially all of the assets of the Company, insurance proceeds, or similar capital events) and any cash reserves to be distributed to the Member, less the sum of (a) operating expenses paid in cash during such year to the extent such expenses have not been reserved against in a prior fiscal year; (b) the aggregate of all other cash amounts expended by the Company during such year (except distributions made pursuant to Sections 7.1, 7.2 and 7.3 hereof); and (c) any increases in reasonable amounts set aside for contingencies, taxes, insurance and similar items.

"Owner" shall mean EMPIRE EQ HOTEL LLC, a Delaware limited liability company formed for the purpose of acquiring, owning, developing, holding, selling, assigning, transferring, operating, leasing, mortgaging, and otherwise dealing with the Property.

"Percentage Interests" shall mean, initially, the percentages set forth on Exhibit A to this Agreement, as such percentages may be adjusted from time to time pursuant to Section 5.2 and to reflect the admission of new members pursuant to the terms hereof.

"Person" shall mean a natural person, corporation, limited liability company, trust, partnership, estate, unincorporated association or other entity.

"Property" shall mean that certain approximately 5 acre site located at Westwood Boulevard, Orlando, Florida acquired by Owner, together with all improvements currently on such land and all subsequent or additional improvements on such land. The legal description of the Property is attached hereto as Exhibit C.

"Independent Director" means a Person bound by this Agreement as an Independent Director pursuant to Section 3.3. Such Independent Director shall only have the rights and duties expressly set forth in this Agreement.

"Unrecovered Capital Contribution" shall mean any Capital Contribution that is made by a Member and is not repaid pursuant to Section 7.

2.    **Organization and Purpose.**

2.1    *Organization.* The Company was formed by the filing of the Certificate dated June 3rd, 2015 with the Secretary of the State of Delaware pursuant to the Act. Dov Leshes is hereby designated as an "authorized person" within the meaning of the Act, and has executed, delivered and filed the Certificate with the Delaware Secretary of State. Upon the filing of the Certificate, his powers as an "authorized person" ceased, and Manager thereupon became the designated "authorized person" and shall continue as the designated "authorized person" with the meaning of the Act. The existence of the Company as a separate legal entity shall continue until cancellation of the Certificate as provided in the Act.

2.2   *Company Name.* The name of the Company shall be "Empire Eq Hotel LLC" and all business of the Company shall be conducted under that name.

2.3   *Place of Business.* The mailing and business office address of the Company shall be 3 Columbus Circle 15th Floor, New York, New York 10019. The Company address may be changed from time to time by Manager in its sole discretion.

2.4   *Term.* The term of the Company shall commence on the date of this Agreement and shall continue thereafter until December 31, 2065.

2.5   *Company's Purpose.* The Company has been formed solely for the purpose of being the sole member of Owner, the fee owner of the Property.

2.6   *Single Purpose Entity.* The Company is a single purpose entity and until such time as the loan from Orlando Lender LLC to Empire EQ WGI, LLC (the Company's Member) in the amount of One Million Give Hundred Thousand and 00/100 Dollars ($1,500,000) as secured by the Promissory Note of even date herewith (the "<u>Mezzanine Loan</u>") is repaid, the Company shall continue to be, organized solely for the purpose of (i) acquiring, developing, owning, managing or operating the Property, (ii) entering into this Agreement and the documents related hereto, and (iii) engaging in any activity that is incidental, necessary or appropriate to accomplish the foregoing. So long as any part of the Mezzanine Loan remain unpaid and undischarged, the Company shall not (a) engage in any business or activity other than the ownership, operation and maintenance of the Property, and activities incidental thereto; (b) acquire or own any material assets other than the Property; (c) merge into or consolidate with any Person or dissolve, terminate or liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure; (d) fail to maintain separate financial statements and accounting records, showing its assets and liabilities separate and apart from those of any other Person; (e) have its assets listed on the financial statement of any other entity; and (f) fail to maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person.

3.   **Membership.**

3.1   *Member.* The name, Capital Contribution and Percentage Interest of the Member is set forth on <u>Exhibit A</u> to this Agreement, as such Exhibit may be amended from time to time by the Manager.

3.2   *Admission of Additional Members.* Additional Members may be admitted to the Company only upon and subject to the terms and conditions set forth in this Agreement.

3.3   *Independent Director.* The Member hereby appoints Colonial Charter Company, a Delaware corporation, as the Independent Director. The Independent Director shall be required to consent to the following actions of the Company:

3.3.1 filing a voluntary bankruptcy petition;

3.3.2 instituting proceedings to have the Company adjudicated bankrupt or

insolvent;

   3.3.3 consenting to the institution of bankruptcy or insolvency proceedings against the Company;

   3.3.4 filing a petition seeking, or consenting to, reorganization or relief as to the Company under any applicable federal or state law relating to or similar to bankruptcy;

   3.3.5 consenting to the appointment of a receiver or liquidator over the Company;

   3.3.6 dissolving the Company;

   3.3.7 making any assignment for the benefit of creditors; and

   3.3.8 admitting in writing that the Company is unable to pay its debts as they become due, or take action in furtherance of any such action.

To the fullest extent permitted by applicable law, including Section 18-1101(e) of the Act, the Independent Director shall not be liable to the Company, its Members or any other Person for breach of contract or breach of duties (including fiduciary duties), unless the Independent Director acted in bad faith or engaged in willful misconduct.

   3.4 *Article 8 Opt-in.* The Company and its Member hereby irrevocably elects that the limited liability company interests in the Company shall constitute securities governed by Article 8 of the UCC in effect in the Law of Delaware in effect as of the effective date and as further amended. Each membership certificate of the Company shall bear a legend evidencing such opt-in as set forth in the form attached hereto as **Exhibit B**. This provisions shall not be amended until such time as the Mezzanine Loan is repaid in full.

  4. **Title to Company Property.**

   All property owned by the Company shall be owned by the Company as an entity and, insofar as permitted by applicable law, no Member shall have any ownership interest in any Company property in its individual name or right, and each Member's interest in the Company shall be personal property for all purposes. The foregoing provisions shall govern over any contrary or inconsistent provision in this Agreement or any other document or instrument governing the affairs of the Company.

  5. **Capital Contributions.**

   5.1 *Initial Capital Contributions.* The Initial Capital Contribution of each Member as of the date hereof is set forth on Exhibit A.

   5.2 *Additional Capital Contributions.*

    (a) The Member acknowledges and agrees that the Manager may, from time to time, at his discretion, determine that an amount of additional cash capital is required by the Company or Owner for the development, improvement, maintenance and/or operation of the Property or other assets of the Company or Owner or for the payment of the Company's or Owner's obligations (such amount hereinafter referred to as a "Capital Shortfall"), and that, in such instance, the Capital Shortfall shall be resolved as provided in this Section 5.2.

    (b) In the event of a Capital Shortfall, Manager may arrange to obtain

that capital by one or a combination of (i) borrowing from the Member and/or third parties, or (ii) additional Capital Contributions from the Member (an "Additional Capital Contribution"). If Manager determines that Additional Capital Contributions are required, Manager shall send a notice (the "Call Notice") to the Member stating the aggregate amount of the additional capital required (the "Capital Call"). The Member shall, within twenty (20) days after the date of the Call Notice (the "Call Period"), contribute to the Company. Any such Additional Capital Contributions shall be made in cash or by wire transfer of immediately available funds into the Company's bank account, or intra-bank transfer and such contribution, when made, shall be credited to such Member's capital account.

5.3    *No Withdrawals.* No Member shall be entitled to resign as a Member or withdraw any part of such Member's Capital Contribution from the Company and no Member shall be entitled to receive any distributions from the Company except as expressly provided in this Agreement.

5.4    *No Liability for Capital Contributions.* No Member shall be personally liable for the return of any portion of the Capital Contributions of the Member; rather, the return of the Member's respective Capital Contributions shall be made solely from the Company's assets. No Member shall have the right to demand or receive property other than cash for its interest in the Company.

5.5    *No Interest.* No Member shall receive any interest on its Unrecovered Capital Contributions.

6.    **Company Shares.**

6.1    *Description.* The Member and the number of shares held by each such Member ("Company Shares") are set forth on Exhibit A. The voting powers and rights of the Company Shares, and the qualifications, limitations or restrictions thereon, are as follows:

(a)    General. The Company Shares shall not have a stated value and shall not have any rights to distributions unless Manager shall have declared such a distribution to be made pursuant to Section 7 out of funds lawfully available therefor.

(b)    Voting. The holders of Company Shares shall be entitled to one vote per Company Share.

6.2    *Compliance with Securities Laws and Other Laws and Obligations.* Each Member hereby represents and warrants to the Company and to each other Member and acknowledges that (a) it has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of an investment in the Company and making an informed decision with respect thereto, (b) it is able to bear the economic and financial risk of investment in the Company for an indefinite period of time and understands that it has no right to withdraw and have its interest repurchased by the Company, (c) it is acquiring an interest in the Company for investment only and not with a view to, or for resale in connection with, any distribution to the public or public offering thereof, (d) it understands that the equity interests in the Company have not been registered under the securities laws of any jurisdiction and cannot be disposed of unless they are subsequently registered and/or qualified under applicable securities

laws and the provisions of this Agreement have been complied with.

### 7.    Distributions.

7.1    *Distribution of Net Cash Flow.* Manager, in its sole discretion, may cause the Company to distribute to the Member in accordance with this subparagraph, from time to time prior to dissolution of the Company, cash or other assets or property, in such aggregate amounts as Manager shall deem appropriate; provided that any such distribution shall be made in the order of priority set forth below.

The Net Cash Flow of the Company shall be distributed to the Member after maintain sufficient reserves to satisfy the Company's obligations.

### 8.    Capital Accounts.

8.1    *Maintenance of Capital Accounts.* A capital account shall be maintained for the Member on the Company's books of account in accordance with Section 1.704-1(b)(2)(iv) of the Treasury Regulations, and this Section 8 shall be interpreted and applied in a manner consistent with such Section of the Treasury Regulations. In the event that Manager determines it is prudent to modify the manner in which Capital Accounts are adjusted and/or maintained in order to comply with the requirements of such Regulation, Manager may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any member upon dissolution of the Company.

8.2. *Basic Rules for Capital Account Entries.* The amount of the Member's capital account shall equal the aggregate amount of cash and the fair market value of any property contributed by that Member to the Company (less any liabilities assumed by the Company with respect to such contribution), and shall be increased by the aggregate amount of income allocated to that Member (or a predecessor) pursuant to Sections 9.2 and 9.3, and decreased by (a) the aggregate amount of losses allocated to that Member (or a predecessor) pursuant to Section 9.4, and (b) the aggregate amount of cash and the fair market value of any property distributed to that Member (or a predecessor) (less any liabilities assumed by the Member with respect to such distribution).

### 9.    Income, Gains and Losses.

9.1    *Computation of Net Income, Gains and Losses.* Net income, gains and losses as set forth on the books of account of the Company shall be computed in the same manner as net income, gains and losses are computed for federal income tax purposes, except that (i) items of income, gain, loss and deduction relating to the assets contributed to the Company by the Member shall be based on the fair market values of those assets (rather than their basis for federal income tax purposes) at the time of contribution, and (ii) items of tax exempt income and non- deductible expense shall be taken into account.

9.2    *Gross Income and Gain.* For any fiscal year of the Company, prior to any allocation of net income or net loss, pursuant to Sections 9.3 and 9.4, as the case may be, gross income and gain of the Company shall be allocated to the Member in an amount equal to the

aggregate amount distributed to the Member during such fiscal year and all prior fiscal years pursuant to Sections 7.1, 7.2 and 7.3, reduced by all amounts of gross income and gain previously allocated to the Member in all prior fiscal years pursuant to this Section 9.2 (the "Allocation Shortfall"). In the event that the aggregate Allocation Shortfalls of the Member exceeds the Company's gross income and gain for the fiscal year, there shall be allocated to each Member an amount of gross income and gain equal to the product of (i) the amount of the Company's gross income and gain and (ii) a fraction, the numerator of which is the amount of such Member's Allocation Shortfall and the denominator of which is the aggregate amount of Allocation Shortfalls for the Member. In the event that the Company's gross income and gain for the fiscal year exceeds the aggregate Allocation Shortfall of all holders of Company Shares, prior to any allocation of capital gain, there shall first be allocated items of ordinary gross income.

9.3    *Net Income.* Net income of the Company for any fiscal year, calculated after any allocation of gross income pursuant to Section 9.2, shall be allocated in full to the Member.

9.4    *Net Loss.*

Net loss of the Company for any fiscal year, calculated after allocation of gross income and gain pursuant to Section 9.2, shall be allocated in full to the Member.

9.5    *Special Allocations.*

The following special allocations shall be made in the following order:

(a)    Gain Chargeback. Notwithstanding any other provision of this Section 9, if there is a net decrease in the Company's minimum gain (as calculated in accordance with the principles of Treasury Regulation Section 1.704-2(d)(1)) during any fiscal year, the Member, but only to the extent required by Treasury Regulation Section 1.704-2(f), shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to the portion of such Member's share of the net decrease in Company minimum gain, determined in accordance with Treasury Regulation Section 1.704(g)(2). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j) of the Treasury Regulations. This Section 9.5(a) is intended to comply with the minimum gain chargeback requirement in such Sections of the Treasury Regulations and shall be interpreted consistently therewith.

(b)    Member Nonrecourse Debt Minimum Gain Chargeback. Notwithstanding any other provision of this Section 9 except Section 9.5(a), if there is a net decrease in Member nonrecourse debt minimum gain (calculated in accordance with the principles of Treasury Regulation Section 1.704(2)(i)(3)) during any Company fiscal year, each Member who has a share of that Member nonrecourse debt minimum gain, determined in accordance with the principles of Treasury Regulation Section 1.704-2(i)(5), as of the beginning of such fiscal year, but only to the extent required by Treasury Regulation Section 1.704-2(i) and not subject to the exceptions set forth in Treasury Regulation Section 1.704-2(i)(4), shall be specially allocated items of Company income and gain for such year (and, if necessary,

subsequent years) in an amount equal to such Member's share of the net decrease in Member nonrecourse debt minimum gain, determined in accordance with Treasury Regulation Sections 1.704-2(i)(4) and 1.704-2(g)(2). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with, and only to the extent required by, Sections 1.704-2(i) and 1.704-2(j) of the Regulations. This Section 9.5(b) is intended to comply with the minimum gain chargeback requirements in such Sections of the Treasury Regulations and shall be interpreted consistently therewith.

(c)    Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulation Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) or 1.704-1(b)(2)(ii)(d)(6), items of Member income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the capital account deficit of such Member adjusted in the manner set forth in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6) ("Adjusted Capital Account Deficit") as quickly as possible, provided that an allocation pursuant to this Section 9.5(c) shall be made if and only to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 9 have been tentatively made as if this Section 10.5(c) were not in the Agreement. This Section 9.5(c) is intended to be a qualified income offset in compliance with Treasury Regulation Sections 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

## 10.    Fiscal Year Reports.

10.1    *Fiscal Year.* The Company's fiscal year shall be the calendar year unless changed by Manager.

10.2    *Books of Account.* Complete and accurate books of account shall be kept by the Company at the principal office of the Company (or at such other office as Manager may designate). The determinations of Manager with respect to the treatment of any item or its allocation for federal, state or local income tax purposes shall be binding upon the Member so long as that determination is not inconsistent with any express provision of this Agreement or applicable law.

10.3    *Reports.* No later than January 31st, after the close of each fiscal year, Manager shall furnish to each Member financial statements (which need not be audited) for that fiscal year. The financial statements shall include a balance sheet of the Company as of the end of the year and a statement of income and a statement of changes in financial position of the Company for the year, setting forth in each case in comparative form the figures as of the end of and for the previous fiscal year.

10.4    *K-1 Reports.* Within 105 days after the end of each calendar year, Manager shall furnish to each Member a copy of Schedule K-1 to the Company's federal income tax return for that year.

## 11.    Tax Matters.

11.1    *Allocations.* For federal, state and local income tax purposes, all items of income, deduction and loss shall be allocated to the Member on the same basis as profits are allocated and losses are charged as provided in Section 9 and all items of credit and other items not so allocated shall be allocated to the Member in the manner provided for in the Code and the applicable Treasury Regulations issued thereunder. Notwithstanding the foregoing, tax items relating to property subject to Section 704(c) of the Code and the applicable Treasury Regulations issued thereunder shall be allocated in accordance therewith.

11.2    *Consistency.* No Member shall treat a Company item on its federal, state or local income tax returns in a manner inconsistent with the treatment of the Company item on the Company's federal, state or local income tax return.

11.3    *Elections.* Upon a transfer of Company Shares described in Code Section 743(b) or upon a distribution of Company assets, Manager, in its sole discretion, may file an election pursuant to Code Section 754 to adjust the basis of Company property.

11.4    *Tax Matters Partner.* Manager shall be the tax matters partner as that term is defined in Section 6231 of the Code for the Company.

11.5    *Tax Classification.* It is the intention of the Member that the Company be treated, for all federal, state and local tax proposes, as a partnership and not as an association taxable as a corporation, and the Member, and Manager on behalf of the Company, shall take all actions consistent with the foregoing.

**12.    Operation of Business.**

12.1    *Management of Business.* Except for (i) duties specifically delegated to a Member pursuant to the terms of this Agreement, and/or (ii) as specifically provided elsewhere in this Agreement, the full right, power, authority and discretion to conduct the business and affairs of the Company, and to do all things necessary to carry on the business of the Company, shall be vested in a manager (the "Manager"), acting alone and without the consent of the Member. The Member hereby designates Dov Lesches as the Manager with the authority to bind the Company as set forth herein.

12.2    In the event of a willing withdrawal of Manager, Manager shall notify its Member in writing thirty days (30) prior to the intended withdrawal date. If the Manager withdraws due to death, sickness or if the Manager is no longer able to fulfill its duties, a successor Manager shall be elected by the majority in interest of the Persons holding membership interests. The newly elected Manager shall be entitled to one third (1/3) of net proceeds.

12.3    *Day-to-Day Management.* In addition to, and not in limitation of Section 12.1 above, but subject to Section 12.3 below, Manager is hereby authorized on behalf of the Company in its individual capacity and in its capacity as a manager of Owner to follow the Approved Budget and to:

(a)    Incur all expenditures and pay all obligations of the Company and Owner;

(b)    Execute any and all documents or instruments of any kind which Manager may deem necessary or appropriate for carrying out the daily purposes of the Company or Owner;

(c)    Purchase or lease equipment for the Company's or Owner's purposes;

(d)    Cause the Company to borrow funds, and, in connection with such borrowing, mortgage real property, grant security interests in real property and/or any other property owned by the Company and execute documents as necessary to accomplish such borrowing;

(e)    Procure and maintain, at the expense of the Company or Owner, as applicable, with responsible companies, such insurance in such amounts and covering such risks as are appropriate in the judgment of Manager;

(f)    Receive and disburse any Net Cash Flow in accordance with Section 7;

(g)    Supervise the preparation and filing of all Company and Owner tax returns;

(h)    Make any tax elections on behalf of the Company and Owner;

(i)    Engage and terminate any attorneys, accountants, brokers or sales, agents, and determine the terms of such engagements, except for sale of the Property;

(j)    Supervise the preparation and filing of all Company and Owner tax returns;

(k)    Make any tax elections on behalf of the Company and Owner;

(l)    Engage and terminate any attorneys, accountants, brokers or sales;

(m)    agents, and determine the terms of such engagements, except for sale of the Property; and

(n)    Perform any and all other acts or activities customary or incidental to the purpose of the Company's daily operations.

124    *Services of Manager; Other Activities*. Manager shall devote such time to the affairs of the Company as it may determine necessary to conduct them properly. Notwithstanding any other duty at law or in equity, Manager may engage or have an interest in other business ventures of any kind, independently or with others (which ventures may compete with the business of the Company or the Owner) and neither the Company nor any other Member

shall have any rights in or to those independent ventures. In addition, the Member and its direct or indirect owners or any other Affiliate of any Member may have other business interests and may engage in other activities in addition to those relating to the Company, whether or not such business interests or activities may be competitive with those of the Company. None of the Company, any Member or Manager shall have any right pursuant to this Agreement to share or participate in such other business interests or activities or to the income or proceeds derived therefrom.

12.5   *Officers.* Manager may appoint such officers of the Company as it deems desirable, including, but not limited to, a president, one or more vice-presidents, a secretary, a treasurer, and one or more assistant secretaries and assistant treasurers. Except as Manager shall otherwise determine, each of the officers of the Company shall have the powers and duties that a person holding that office in a corporation customarily has.

12.6   *No Partition, Sale or Partition.* No Member shall have the right to require partition of any of the Company's property or to compel any sale or appraisal of the Company's assets.

12.7   *Reliance by Third Parties.* Any person dealing with the Company, Manager or any Member or any officer of the Company may rely upon a certificate signed by Manager as to (a) the identity of Manager, any Member or officer of the Company, (b) any factual matters relevant to the affairs of the Company, (c) the persons who are authorized to execute and deliver any document on behalf of the Company or (d) any action taken or omitted by the Company, Manager or any Member.

12.8   *Discretion.* Whenever in this Agreement Manager is permitted or required to make a decision in its "discretion" or "sole discretion" or under a grant of similar authority or latitude, Manager shall have no duty or obligation to consider any interest of or factors affecting some or the Member so long as such Manager acts in good faith and in a manner which it reasonably believes is in or not opposed to the best interest of the Company. Each Member hereby agrees that any standard of care or duty imposed under the Act or any other applicable law shall be modified, waived or limited in each case as required to permit Manager to act under this Agreement and to make any decision pursuant to the authority prescribed in this Section 12.9 so long as such action or decision does not constitute willful or wanton misconduct, gross negligence or a material breach of the terms of this Agreement and is reasonably believed by Manager to be consistent with the overall purposes and objectives of the Company.

13.   **Meetings.**

13.1   *Quorum; Majority Vote.* A majority of Persons holding membership interests entitled to vote shall constitute a quorum at the member meeting. If a quorum is present, the affirmative vote of the majority in interest represented at the meeting and entitled to vote on the subject matter shall constitute the act of the Member.

14.   **Mezzanine Provisions.**

14.1   Notwithstanding anything contained herein to the contrary, the Member and the Company each hereby irrevocably acknowledge and agree that upon the foreclosure, sale and/or other

transfer of Member's limited liability company interest(s) in the Company pursuant to that certain Pledge and Security Agreement in favor of Orlando Lender, LLC, as lender, dated March __, 2019, (the "Pledge Agreement"), the foreclosing party, assignee and/or the purchaser of the Member's limited liability company interest(s) in the Company shall, upon execution of a counterpart signature page of this Agreement, be automatically admitted and substituted as the sole member of the Company. Upon such a foreclosure, sale and/or other transfer, such foreclosing party, assignee and/or purchaser shall have all of the rights, title, interest and powers of the Member, including, without limitation, the Member's voting, managerial and control rights with respect to the affairs of the Company and the Member's right to receive profits and a return on the Member's capital account, if any. Such foreclosing party, assignee and/or purchaser shall also have the right to replace any or all independent managers, special members, officers and independent directors of Company. The Company acknowledges that the pledge of the limited liability company interest(s) in the Company made by the Member under the Pledge Agreement shall be a pledge not only of the profits and losses of the Company, but also a pledge of all rights and powers of the Member, including, without limitation, all voting, managerial and other rights.

14.2    Pledge of LLC Interests. The Member is hereby authorized to pledge and grant a security interest in its limited liability company interests in the Membership Interests to or in favor of Mezzanine Lender as collateral for the Mezzanine Loan. The Company acknowledges that the pledge of the Member's membership interests in the Company in connection with the Pledge Agreement shall be a pledge not only of profits and losses of the Company, but also a pledge of all rights and obligations of the Member, including all voting rights and the right to manage and control the affairs of the Company. Upon foreclosure, sale or transfer of the Member's limited liability company interests in the Company, pursuant to that Pledge Agreement, the holder of such membership interests shall be automatically admitted as a member of the Company, effective as of such foreclosure, sale or transfer, with all of the rights and obligations of the Member hereunder. For the avoidance of doubt, such rights, powers and benefits shall include all voting and other rights and not merely the rights of an economic interest holder. Upon a foreclosure, sale or other transfer of the limited liability company interests of the Company pursuant to the Pledge Agreement, the successor Member may transfer its interests in the Company, subject to this Agreement. Notwithstanding any provision in the Act or any other provision contained herein to the contrary, the Member shall be permitted to pledge and upon any foreclosure of such pledge in connection with the admission of the Mezzanine Lender or its designee as a member, transfer to the Mezzanine Lender or its designee its rights and powers to manage and control the affairs of the Company pursuant to the terms of the Pledge Agreement. Upon the exercise of its rights under the Pledge Agreement following a foreclosure, sale or other transfer of the limited liability company interests of the Company pursuant to the Pledge Agreement, the Mezzanine Lender or its designee shall have, among its other powers, the right to appoint and remove directors and officers pursuant to the terms of this Agreement.

14.3    Notwithstanding anything to the contrary contained herein, the Member shall not, without the prior written consent of the Mezzanine Lender, issue and shall not permit the issuance of any additional limited liability company interests of the Company other than its initial issuance of limited liability company interests issued on or prior to the date of this Agreement.

15.    **Assignment of Interest.**

15.1    *General Rules.* A Member may not sell, transfer, assign, pledge, hypothecate or otherwise dispose (the foregoing collectively referred to as a "Transfer") of all or any portion of its interest in the Company without the consent of Manager. Upon the grant of such consent a transferee may become a substitute Member upon its execution of a counterpart to this Agreement. Such admission shall be deemed immediately prior to the Transfer and, immediately

following such admission, the transferor Member shall cease to be a member of the Company. Any Transfer or purported Transfer that does not conform to the requirements of this Section 15 shall be void and ineffective, and shall not be recognized by the Company for any purpose, subject to Section 15.2. Notwithstanding the foregoing, a Transfer within the meaning of this Section 15 shall, to the fullest extent permitted by law, be deemed not to occur upon (a) a Transfer by devise or descent or by operation of law upon the death of partner, stockholder or member of any entity owning, directly or indirectly, an interest in the Company, (b) any transfer between partners, stockholders or members of an entity which owns, directly or indirectly, an interest in the Company, (c) any transfer by an indirect beneficial owner of interest in the Company to (i) his spouse, partners or siblings, (ii) his children or grandchildren, or (iii) to a trust for the primary benefit of any of the foregoing, or (d) any Transfer by a trust to its beneficiaries (each an "Exempted Transfer").

15.2    *Transfers Resulting in Default Under the Terms of a Mortgage Agreement.* Not in limitation of the foregoing, any Transfer of an interest in the Company, or in any entity holding a direct or indirect interest in the Company, which would result in a default pursuant to any mortgage agreement with respect to the Property or any other Company asset is hereby declared, to the fullest extent permitted by law, null and void ab initio.

15.3    *Transferee Not a Member.* Without limiting the generality of Section 15.1 hereof, and notwithstanding any other provision of this Agreement, no Person acquiring a Member interest, other than a Person who is a Member prior to the applicable Transfer, shall become substituted or admitted as a Member (a) unless such Person (i) executes a counterpart signature page to this Agreement agreeing to be bound by the terms thereof and (ii) pays all costs reasonably incurred by the Company incidental to the Transfer including, without limitation, attorneys' fees, and (b) if such substitution or admission would constitute a violation of the Securities Act or of any other applicable state or federal securities laws. In addition, in the event of an Exempted Transfer, the transferee shall not become a Member hereunder without Manager's consent. If Manager does not (or is not requested to) grant its consent to the admission of any such transferee as a Member, then such transferee shall be entitled to receive any distributions to which it would be entitled if it were a Member and shall be treated as a Member for tax purposes, but shall not have any other rights or privileges of a Member.

15.4    *Effective Date.* Any authorized Transfer of a Member interest or admission or substitution of a Member pursuant to this Section 15 shall be deemed effective as of the last day of the calendar month in which such Transfer or admission occurs.

15.5    *Survival of Obligations.* No Transfer by any Member of all or any portion of its Member interest shall relieve such Member from any of the liabilities or obligations, including any indemnification obligations under Section 17, of such Member to the Company existing or arising out of actions that occurred on or prior to the date of such Transfer.

16.    **Dissolution; Liquidation.**

16.1    *Dissolution.* The following provisions shall govern over this Agreement or any other document or instrument governing the affairs of the Company:

(a)    The Company shall be dissolved, and its affairs shall be wound up upon the first to occur of the following: (i) the termination of the legal existence of the last remaining member of the Company or the occurrence of any other event which terminates the continued membership of the last remaining member of the Company in the Company unless the Company is continued without dissolution in a manner permitted by this Agreement or the Act or (ii) the entry of a decree of judicial dissolution under Delaware Law. Upon the occurrence of any event that causes the last remaining member of the Company to cease to be a member of the Company, to the fullest extent permitted by law, the personal representative of such member is hereby authorized to, and shall, within 90 days after the occurrence of the event that terminated the continued membership of such member in the Company, agree in writing (i) to continue the Company and (ii) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of the Company, effective as of the occurrence of the event that terminated the continued membership of the last remaining member of the Company in the Company.

(b)    Notwithstanding any other provision of this Agreement, the Bankruptcy of the Member shall not cause the Member to cease to be a member of the Company and upon the occurrence of such an event, the Company shall continue without dissolution. Bankruptcy means, with respect to any Person, if such Person (i) makes an assignment for the benefit of creditors, (ii) files a voluntary petition in bankruptcy, (iii) is adjudged a bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (iv) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (vi) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (vii) if 120 days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, if the proceeding has not been dismissed, or if within 90 days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all of any substantial part of its properties, the appointment is not vacated or stayed, or within 90 days after the expiration of any such stay, the appointment is not vacated. The foregoing definition of "Bankruptcy" is intended to replace and shall supersede and replace the definition of "Bankruptcy."

16.2    *Liquidation and Distribution of Assets.* Upon dissolution of the Company, Manager shall proceed to sell or liquidate the Company's assets within a reasonable time and, shall distribute the Company's cash and other assets to the Member in accordance with the provisions of Section 7.3 of this Agreement.

16.3    *Termination.* The Company shall terminate when all property owned by the Company has been disposed of and the assets, after payment of or provisions for liabilities to the Company's creditors, have been distributed to the Member as provided in Section 16.2 and the Certificate shall not have been cancelled in the manner required under the Act.

16.4    *Internal Revenue Code Section 1031 Tax Deferred Exchange.* At the request of either Member, the Member agrees to reasonably cooperate in structuring and documenting the

sale of all or any portion of a Member's interest in the Company to effect a tax deferred exchange in accordance with the provisions of Section 1031 of the Internal Revenue Code and its corresponding regulations. Such cooperation shall be at no cost to the other Member (i.e., the cooperating Member).

## 17.    Exculpation, Indemnification, Limitation of Liability of the Member.

17.1    *Liability of Member and Manager.* The Member and Manager shall no liability for the obligations or liabilities of the Company except to the extent provided in the Act and other applicable law. A Member and/or Manager shall not be personally liable for any indebtedness, liability or obligation of the Company, except as otherwise set forth under the Act and any other applicable law. Without limiting the generality of the preceding sentence, a Member or Manager does not in any way guaranty the return of any Capital Contribution to any other Member or a profit for the Member from the operations of the Company. No Member shall be obligated to restore by way of Capital Contribution or otherwise any deficit in its Capital Account or the Capital Account of any Member (if such deficits occur). Except as may otherwise be specifically provided in this Agreement, each Member's and Manager's personal liability shall be limited to the fullest extent under the Act and other applicable law.

17.2    *No Binding Authority of Member.* The Member is not an agent of the Company solely by virtue of being the Member, and the Member has authority to act for the Company solely by virtue of being a Member. Any Member that takes any action or binds the Company in violation of this Agreement shall be solely responsible for, and indemnify the Company and each other Member against, any losses that the Company, or such other Member, as the case may be, may at any time become subject to or liable for by reason of the actions specified above.

17.3    *Indemnification by the Company.* Subject to the standards and restrictions, if any, set forth in this Agreement, the Company shall, to the fullest extent permitted by law, indemnify and hold harmless each Member of the Company, or any executor or administrator of the estate of such Member, made, or threatened to be made, party to an action or proceeding, whether civil or criminal, by reason of the fact that such Person is or was a Member of the Company, against amounts paid in settlement and reasonable expenses, including attorneys' fees, actually or necessarily incurred by it in connection with the defense or settlement of such action, or in connection with an appeal therein; *provided, however,* that no indemnification shall be made to or on behalf of any Member (a) if a judgment or other final adjudication adverse to such Person establishes (i) that its acts were committed in bad faith or were the result of active and deliberate dishonesty and were material to the cause of action so adjudicated or (ii) that it personally gained in fact a financial profit or other advantage to which such person was not legally entitled or (b) in connection with any dispute regarding the Member.

17.4    *Indemnification by Member.* Subject to the terms of this Agreement and the Act, each Member hereby indemnifies each and every other Member from and against all losses resulting from the breach by any such first Member of any of terms or conditions of this Agreement.

17.5    *Indemnification of Manager.* The Company shall indemnify, defend, and hold harmless Manager and its respective employees, agents, shareholders, directors, officers,

representatives, and attorneys and any officers or agents of the Company (each, an "Indemnified Person"), on demand of and to the reasonable satisfaction of the Indemnified Person, from and against any and all liabilities, obligations, losses, damages, penalties, actions, suits, proceedings, judgments, costs, expenses, and disbursements of any kind or nature whatsoever including, without limitation, all costs and expenses of investigation, defense, appeal and settlement ("Indemnity Damages"), which may be incurred by or asserted against the Indemnified Person in any way relating to or arising out of, or alleged to relate or arise out of any action or inaction on the party of the Indemnified Person other than the portion of the Indemnity Damages resulting from the Indemnified Person's own willful or wanton misconduct, gross negligence or breach of fiduciary duty.

18.    **Other Action.**

Each Member shall execute and deliver such additional documents and instruments, and shall perform such additional acts, as may be necessary or appropriate to carry out the terms of this Agreement.

19.    **Admission of Additional Members.**

19.1    *Consent required.* No Person may be admitted to the Company as a Member without the prior written consent of Manager.

19.2    *Manager to set Criteria.* Manager shall determine the financial and other criteria for entry of new Members into the Company and shall accept all new subscriptions on behalf of the Company.

20.    **Miscellaneous.**

20.1    *Entire Agreement; Amendment.* This Agreement contains a complete statement of the arrangements among the Member with respect to the Company, and supersedes all prior agreements and understandings among them with respect to the Company. This Agreement may be amended only by a written agreement of the Member or as otherwise provided in the Act.

20.2    *Notices.* Any notice or other communications under this Agreement shall be in writing and shall be considered given when delivered in person or mailed by registered mail, postage prepaid and return receipt requested, addressed to the party intended as the recipient at the address listed on the Company's records or at such other address as a Member may designate by written notice to the other Member.

20.3    *Governing Law.* This Agreement shall be governed by, and construed in accordance with, the law of the State of Delaware applicable to agreements made and to be performed in the State of Delaware.

20.4    *Counterparts; Facsimile and PDF Signatures.* This Agreement may be executed in multiple counterparts with separate signature pages, each such counterpart shall be

considered an original, but all of which together shall constitute one and the same instrument. For purposes of execution of this Agreement, signatures transmitted via facsimile or Portable Document Format (or "PDF") shall be deemed original ink signatures.

20.5    *Attorneys' Fees.* If any action or proceeding is instituted regarding the Member arising from or related to or with this Agreement, the Member prevailing in such action or arbitration shall be entitled to recover from the non-prevailing party for its or their costs of action or arbitration, including, without limitation, reasonable attorneys' fees and costs as fixed by the court or arbitrator therein.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

COMPANY:

EMPIRE EQ HOTEL LLC

By: _____
Name: Dov Leshes
Title:   Manager

MEMBER:

EMPIRE EQ WGI LLC

By: _____
Name: Dov Leshes
Title: Manager

INDEPENDENT DIRECTOR:

COLONIAL CHARTER COMPANY, a
Delaware Corporation

By: _____
Name: Karen Elliott
Title:  Authorized Representative

## EXHIBIT A

### EMPIRE EQ HOTEL LLC

| Members | Percentage Interest/Voting |
|---|---|
| Empire EQ WGL, LLC | 100% |
| TOTAL | 100% |

# EXHIBIT

# B-4

## UNANIMOUS WRITTEN CONSENT TO ACTION IN LIEU OF MEETING
### BY THE MEMBER OF
### EMPIRE EQ WGI LLC, A DELAWARE LIMITED LIABILITY COMPANY

The undersigned, being the Members of Empire EQ WGI LLC, a Florida limited liability company (the "**Company**"), hereby consents to and adopts the following resolutions:

**WHEREAS**, the Company desires to enter into an agreement with Orlando Lender LLC, an affiliate of Arch Real Estate Holdings LLC and Arch Advisors LLC, to borrow $1,500,000 of mezzanine funding as set forth in **Exhibit A** (the "**Mezzanine Loan**"), and

**WHEREAS**, the members, upon careful and diligent investigation, has determined that it is in the best interest of the Company to enter into the forgoing Mezzanine Loan, and to perform such acts necessary, including but not limited to, the execution and delivery of any documentation required to effectuate the Mezzanine Loan.

**NOW, THEREFORE, BE IT RESOLVED**, that Dov Lesches, be and hereby is authorized, acting alone, to execute, pay, and deliver the necessary documents (and any other agreements) on behalf of the Company and to perform such other actions in the name and on behalf of the Company, with such changes therein as counsel to the Company shall deem necessary or appropriate to permit the Company to effectuate the Mezzanine Loan.

**FURTHER RESOLVED**, that the Members expressly waives any and all requirements that may conflict with the foregoing resolutions. Based on the foregoing approval, Dov Lesches, is hereby authorized and empowered and directed in the name on and on behalf of the Company, to execute and deliver any and all documents necessary to effectuate the Mezzanine Loan, and any related documents necessary or advisable to effectuate the foregoing resolutions; and

**IT IS FURTHER CERTIFIED** that said action of the Members of the Company was duly authorized and that the following is the duly qualified and acting Members of the Company and nothing limits the power of the Members of the Company to pass the foregoing resolution.

<u>NAME</u>

| | |
|---|---|
| Avi Leshes | Member |
| Joseph Harris | Member |
| EDJF Holdings LTD | Member |
| David Eyzenberg | Member |
| Dov Leshes | Member |
| Empire EQ Hotel Owner LLC | Member |
| Abes Corner LLC | Member |

**IN WITNESS WHEREOF**, we have hereunto subscribed our names as all Members of the Company entitled to vote.

Empire EQ WGI LLC
Unanimous Member Consent
Page 2

**AVI LESHES**

**JOSEPH HARRIS**

**EDJF HOLDINGS LTD**

By: _MANAGER_
Its: _most opparatiun_

**DAVID EYZENBERG**

**DOV LESHES**

**ABES CORNER LLC**

By: _owner_
Its: _Abe Silkenfitt_

**EMPIRE EQ HOTEL OWNER LLC**

By: Dov Lesches
Its: Manager

**EXHIBIT A**

**EXECUTION COPY**

**PROMISSORY NOTE**

$1,500,000.00

March 29, 2019
New York, New York

FOR VALUE RECEIVED, the undersigned, **EMPIRE EQ WGI LLC**, a Delaware limited liability company, having its principal place of business at c/o Empire Equities, 3 Columbus Circle, 15th Floor, New York, New York 10019 (the "Borrower"), hereby unconditionally promises to pay to the order of **ORLANDO LENDER LLC**, a New York limited liability company (together with its successors and assigns, the "Lender"), at its principal place of business c/o Arch Companies, 524 Broadway, Suite 405, New York, NY 10012, or at such other place as the Lender may from time to time designate in writing the principal amount of up to One Million Five Hundred Thousand and 00/100 U.S. Dollars (US $1,500,000.00) or so much thereof as may be outstanding from time to time (the "Loan") in lawful money of the United States of America, with interest thereon to be computed from the date of this Promissory Note (as amended or modified from time to time, this "Note") at the interest rate provided below, and to be paid in accordance with the further terms and conditions of this Note and the other Loan Documents (as defined below). Borrower is the sole member of **EMPIRE EQ HOTEL LLC**, a Delaware limited liability company ("Owner").

1.    Pledge Agreement. As security for the performance of the Obligations (as defined below), pursuant to that certain Pledge Agreement by and between the Borrower and the Lender dated as of the date hereof and being executed and delivered simultaneously herewith substantially in the form of Exhibit A attached hereto (as amended or modified from time to time, the "Pledge Agreement" and, together with this Note and any other document, agreement or instrument executed and delivered in connection with the Note and/or the Pledge Agreement, as each of the same may be amended or modified from time to time, the "Loan Documents"), Borrower is pledging and granting a security interest in 100% of the limited liability company membership interest in and issued by Owner to and for the benefit of the Lender. As used herein, "Obligations" means the Loan and all other indebtedness and obligations now or hereafter existing under this Note and the other Loan Documents, including, without limitation, (i) principal, (ii) interest, (iii) fees, costs and expenses, (iv) future advances, (v) all amounts owed under any extension, renewal or modification of any of the foregoing and (vi) any of the foregoing that arises after the filing of a petition by or against the Borrower under any federal, state or foreign bankruptcy, insolvency, receivership or similar law. Lender is entitled to exercise the rights and remedies with respect to the Obligations provided for under this Note and the other Loan Documents or otherwise available at law or in equity.

2.    Prepayments; No Additional Borrowings. This Note may be prepaid in whole or in part at any time prior to the Maturity Date (as defined below), at the Borrower's sole election, upon the payment to Lender of the Exit Fee. "Exit Fee" means, with respect to any repayment or prepayment of the outstanding principal amount of the Loan, an amount equal to One Hundred Eighty Thousand and 00/100 Dollars ($180,000.00), less any amounts actually paid to Lender on account of regular Interest on the outstanding principal amount of the Loan, but in no event less than Zero Dollars ($0.00). All payments hereunder shall be made in lawful money of the United States of America at such place as the Lender may from time to time designate in writing to the Borrower. Payments shall be credited first to the costs associated with collection and enforcement

of this Note, then to all other costs, expenses and indemnification obligations payable hereunder, then to default interest, if any, due hereunder, then to the accrued and unpaid interest then due and payable, then to the Exit Fee and thereafter the remainder shall be applied to principal hereof. Borrower may request and receive only one borrowing hereunder in respect of the Loan and any amount borrowed and repaid hereunder in respect of the Loan may not be reborrowed.

3.      Maturity Date; Interest; Refinance.

(a)      The Obligations shall be due and payable in full on July 19, 2019 (as the same may be accelerated, the "Maturity Date").

(b)      The Borrower promises to pay interest ("Interest") on the outstanding principal amount of the Loan from the date hereof through and including the Maturity Date at the rate of fifteen percent (15%) per annum compounded monthly (computed on the basis of a 360-day year) (the "Interest Rate").  Interest shall accrue on the outstanding principal amount of the Loan. On or before the fifth (5th) day of each calendar month (or, if any such date shall not be a Business Day, on the next succeeding Business Day to occur after such date) (each, a "Payment Date"), Borrower shall pay to Lender interest that has accrued on the outstanding principal balance of the Loan for the immediately preceding calendar month by wire transfer of immediately available funds to an account designated by the Lender. Notwithstanding the foregoing, if this Note is executed on any day other than the first (1st) day of the calendar month in which the Note is executed, then the first interest payment shall be prorated for the number of days that the Loan is outstanding during such calendar month (the "Stub Amount"). "Business Day" or "business day" means any day other than a Saturday or a Sunday, a Non-Working Jewish Holiday or any day on which banks are required or permitted to be closed in the State of New York.  "Non-Working Jewish Holiday" means from sundown through one hour following sundown based upon Eastern Standard Time on the two days of Rosh Hashanah, Yom Kippur, the first two days of Sukkot, Shmini Atzeret, Simchat Torah, the first two days and the seventh and eighth days of Passover, the two days of Shavuot and Tisha Be'Av.

(c)      Anything to the contrary in Section 3(b) notwithstanding, upon the occurrence and during the continuance of an Event of Default (as defined below), interest on the outstanding principal balance of the Loan shall accrue from the date of the occurrence of such Event of Default until such Event of Default is cured or waived, payable on demand in immediately available funds, at a rate (the "Default Rate") equal to the lesser of (i) twenty-two percent (22%) per annum, compounded monthly, and (ii) the maximum rate of interest permitted under applicable law.

(d)      Anything in this Note or any other Loan Document notwithstanding, all proceeds received by Borrower and/or Owner from any refinancing of the existing land loan encumbering the Property (the "Bridge Loan") and/or such future loan which Owner borrows to refinance the Bridge Loan (the "Construction Loan") shall be referred to herein, as context may require, as the "Senior Loan", will be used to repay the Loan and all other sums due Lender under the Loan Documents to Lender, as a mandatory prepayment, as set forth in the introductory paragraph of this Note prior to the payment of any sum to any other party and prior to any distribution by Borrower or Owner to their respective direct or indirect members, partners and/or shareholders except Borrower shall cause Owner to make a distribution to Borrower in an amount

- 2 -

sufficient to repay the Loan and all other sums due Lender under the Loan Documents, and Borrower shall use such distribution to pay the same to Lender. For the purpose of clarity and avoidance of doubt, the Loan and all other sums due Lender under the Loan Documents shall be repaid in full simultaneously with, and as a condition precedent to, the closing of the Construction Loan.

     4.   <u>Conditions Precedent to Initial Advance</u>.  Lender shall have no obligation to fund the initial advance of Loan proceeds to Borrower in the amount of up to Eight Hundred Thousand and 00/100 Dollars ($800,000.00) (the "<u>Initial Advance</u>") unless the following conditions shall have been satisfied as determined by Lender in its sole discretion (unless otherwise expressly noted):

     (a)   Borrower shall deliver to Lender a Phase I environmental report that is satisfactory to Lender with no Phase II recommendation;

     (b)   Owner shall have entered into a Development Advisory Services Agreement with Arch Advisors LLC (collectively, "<u>Arch</u>"), which is reasonably satisfactory to Lender (the "<u>Arch Agreement</u>");

     (c)   Owner shall have entered into a Development Advisory Services Agreement with AWH Development Services, LLC or one or more of its affiliates ("<u>AWH</u>"), which is reasonably satisfactory to Lender (the "<u>AWH Agreement</u>"; and together with the Arch Agreement, the "<u>Development Advisory Agreements</u>" and each a "<u>Development Advisory Agreement</u>");

     (d)   [Reserved];

     (e)   Lender shall be satisfied in its sole and absolute discretion with its due diligence regarding Lesches, the Owner, the Project and any other entities or matters related the foregoing as Lender deems necessary in its sole and absolute discretion;

     (f)   Lesches shall have provided to Lender proof of at least Seven Million and 00/100 Dollars ($7,000,000.00) of readily available cash (to be verified in a format acceptable to Lender in its sole and absolute discretion) (the "<u>Liquidity Requirement</u>"), which proof Lesches shall be required to update on a regular basis promptly upon the reasonable request of Lender;

     (g)   The existing development consulting agreement between Lesches and AWH dated November 5, 2018 shall have been terminated and evidence of the same has been delivered to Lender;

     (h)   Lender shall have received evidence that the title report from PropertyInfo Title Search Services (File #: 12-24-28-9655-00-024; Associated File # 12346902) (the "<u>Title Report</u>") remains current with no new exceptions thereto and that the Owner is still the sole fee owner of the Property. ;

     (i)   Borrower has (1) delivered to Lender a true and complete copy of the executed Settlement Agreement and Mutual Release, dated March 25, 2019, by and among Owner, Stantec Consulting Services Inc. and Behar Peteranecz, Inc. (the "<u>Settlement Agreement</u>") in

- 3 -

substance and form previously approved by Lender and Owner, providing, that, among other things, the Settlement Payment Schedule (as defined in the Settlement Agreement) has been established and implemented and (2) delivered evidence satisfactory to Lender that Owner has made all payments currently due, and is not otherwise in default, under such Settlement Agreement; and

(j)    Skorman Development Corp. has either dismissed the appeal it filed to the Development Review Committee of Owner's approval to build the Project or Owner has obtained approval from the Orange County Board of County Commissioners to build the Project.

(k)    Borrower shall have satisfied the Ongoing Equity Obligation (as defined below).

5.    <u>Conditions Precedent to Subsequent Funding</u>.

(a)    Lender shall have no obligation to fund any subsequent advance of Loan proceeds to Borrower in the amount of up to Two Hundred Thousand and 00/100 Dollars ($200,000.00) (each such advance, a "<u>Initial Subsequent Advance</u>") unless the following conditions shall have been satisfied as determined by Lender in its sole discretion (unless otherwise expressly noted):

(i)    A letter of intent reasonably acceptably to Lender shall have been executed and delivered by Owner and Construction Lender;

(ii)    Borrower shall have satisfied the Ongoing Equity Obligation (as defined below);

(iii)    Initial Subsequent Advance request is utilized for the items identified under "Targeted Lender LOI Executed" on <u>Schedule 4</u>, in each of the foregoing instances subject to any reallocation of line items on Schedule 4 acceptable to Lender in its sole discretion; and

(iv)    No Event of Default shall have occurred and be continuing.

(b)    Lender shall have no obligation to fund any subsequent advance of Loan proceeds to Borrower in the amount of up to Five Hundred Thousand and 00/100 Dollars ($500,000.00) (each such advance, a "<u>Secondary Subsequent Advance</u>"; Initial Subsequent Advance and Secondary Subsequent Advance are collectively "<u>Subsequent Advance</u>") unless the following conditions shall have been satisfied as determined by Lender in its sole discretion (unless otherwise expressly noted):

(i)    All conditions set forth in <u>Section 5(a)</u> have been previously satisfied;

(ii)    Lender shall have approved of the use of such Subsequent Advance subject to any reallocation of line items on <u>Schedule 4</u> acceptable to Lender in its sole discretion;

- 4 -

(iii)     The holder of any Construction Loan (the "Construction Lender"; the holder of the Bridge Loan and the Construction Lender shall be referred to herein, as context may require, as the "Senior Lender") shall have approved of AWH and Arch or a joint venture consisting of affiliates of AWH and Arch ("AWH/Arch"), as the developer and asset manager for the Project;

(iv)     Owner shall have entered into an Asset Management Agreement with AWH/Arch which is reasonably satisfactory to Lender (the "Asset Management Agreement"), and such Asset Management Agreement shall have been approved by the Construction Lender;

(v)     The Development Advisory Agreements shall have been approved by the Bridge Lender and Construction Lender and Lender has determined, in its sole discretion, that Owner is not in default under such Development Advisory Agreements and that all Development Fee (as defined in the Development Advisory Agreement) then due and owing have been paid in full;

(vi)     AWH/Arch shall have reviewed and approved of the Project Budget, which will include a detailed description of sources and uses;

(vii)     Borrower shall have (1) received all construction design documents from the architect of the Project and shall have promptly delivered the same to Lender (as such construction design documents have been approved by Lender, the "Plans and Specifications"); and (2) delivered evidence satisfactory to Lender that it is not in default of the Settlement Agreement;

(viii)     Any other items requested by Lender is its sole discretion;

(ix)     Borrower shall deliver to Lender a title commitment which shall not reflect any encumbrances, exceptions or other matters except (i) any security document which secures the Senior Loan, and (ii) any other encumbrances, exceptions or other matters which are acceptable to Lender in its sole and absolute discretion;

(x)     Borrower shall have satisfied the Ongoing Equity Obligation (as defined below);

(xi)     Lender shall have reviewed and approved of the equity investment by each of Owner and Dov Lesches, an individual ("Lesches"), in the Project, as well as detailed historical financials of Owner and Lesches; and

(xii)     No Event of Default shall have occurred and be continuing.

6.     Representations and Warranties.  The Borrower hereby represents and warrants as follows:

- 5 -

(a)      <u>Organization, Good Standing, Power and Qualification</u>.    Each of the Borrower and Owner is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization and has all requisite power and authority to carry on its business as presently conducted and as proposed to be conducted.  Each of the Borrower and Owner is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have a Material Adverse Effect (as defined below).  For purposes of this Note and the other Loan Documents, "<u>Material Adverse Effect</u>" means a material adverse effect on the business, assets (including intangible assets), liabilities, condition (financial or otherwise), property, prospects, operations or results of operations of the Borrower or any of its Affiliates having a direct or indirect interest in the Property.  "<u>Affiliates</u>" means, as to any person or entity (a "<u>Person</u>"), any other Person that (i) owns directly or indirectly twenty percent (20%) or more of all equity interests in such Person or is under common ownership, directly or indirectly, with twenty percent (20%) or more of all equity interests of such Person, and/or (ii) is in direct and/or indirect Control of, is directly and/or indirectly Controlled by or is under common direct and/or indirect ownership or Control with such Person, and/or (iii) is a direct director, officer or manager of such Person, and/or (iv) is the spouse, issue, parent of any of the foregoing Persons.  "<u>Control</u>" means with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, through the ownership of voting securities, by contract or otherwise.  The terms "<u>Controlled</u>", "<u>Controlling</u>" and common "<u>Control</u>" shall have correlative meanings

(b)      <u>Single Purpose Entity</u>.  Each of Borrower and Owner have been and shall at all times continue to be a Single Purpose Entity.  Neither Borrower nor Owner has made or will make any loans or advances to any third party (including any Affiliate).  "<u>Single Purpose Entity</u>" means a Person, other than an individual, which (a) is formed or organized solely for the purpose of (i) in the case of Borrower, owning of its equity interest in the Owner and activities incidental thereto and obtaining the Loan, or (ii) in the case of the Owner, owning, developing, using and operating the Property and the Project, (b) does not engage in any business unrelated to the Property and the Project and activities incidental thereto and financing thereof, (c) has not and will not have any assets other than those related to its interest in the Property or the financing thereof or any indebtedness other than the any third party mortgage loan secured by the Property and any third party mezzanine financing relating to or secured by the direct or indirect ownership of the Property or the Project, (d) maintains its own separate books and records and its own accounts, in each case which are separate and apart from the books and records and accounts of any other Person, (e) holds itself out as being a Person, separate and apart from any other Person, (f) does not and will not commingle its funds or assets with those of any other Person, (g) conducts its own business in its own name, (h) maintains separate financial statements, (i) pays its own liabilities and expenses out of its own funds, (j) observes all partnership, corporate or limited liability company formalities, as applicable, (k) pays the salaries of its own employees, if any, and maintains a reasonable number of employees, if any, in light of its contemplated business operations, (l) does not guarantee or otherwise obligate itself with respect to the debts of any other Person or hold out its credit as being available to satisfy the obligations of any other Person, (m) does not acquire obligations or securities of any other Person, including its partners, members or shareholders, (n) allocates fairly and reasonably shared expenses, including, without limitation, any overhead for shared office space, if any, (o) uses separate stationery, invoices, and checks, (p) maintains an arms-length relationship with its affiliates, (q) does not and will not pledge its assets for the benefit of any other Person or make any loans or advances to any other Person,

- 6 -

(r) does and will continue to correct any known misunderstanding regarding its separate identity, (s) maintains adequate capital in light of its contemplated business operations, provided, however, that nothing contained herein shall require any member of Borrower to contribute additional capital to Borrower, (t) has and will continue to have an operating agreement, certificate of formation or other organizational document which has been approved by Lender, (u) has not and will not engage in, seek, or consent to the dissolution, winding up, liquidation, consolidation or merger and has not and will not engage in, seek or consent to any asset sale, transfer of the partnership, membership or shareholder interests, or amendments of its operating agreement, certificate of formation or other organizational documents, and (v) will file its own tax returns.

(c)    Authorization; No Contravention; Enforceability.  The execution, delivery and performance by the Borrower of this Note and the other Loan Documents (i) is within its power and authority and has been duly authorized by all necessary limited liability action; (ii) does not contravene the terms of its certificate of formation, operating agreement (or similar agreement) or any other organizational documents (including any amendments to any of the foregoing; (iii) will not violate, conflict with, result in any breach or contravention of or default under any law, statute, rule, regulation, judgment, order, writ or decree, or under any contract, agreement or contractual obligation, or any order or decree directly relating to it; and (iv) will not result in any violation or be in conflict with or constitute an event which results in the creation of any Lien (as defined below).  All action required to be taken by the Borrower and its direct and indirect members, partners and shareholders in order to authorize the Borrower to execute, deliver and perform its obligations under the Loan Documents has been taken prior to the date hereof.  This Note and the other Loan Documents, when executed and delivered by the Borrower to the extent party thereto, shall constitute valid and legally binding obligations of the Borrower, enforceable against the Borrower in accordance with their respective terms.

(d)    No Consents.  No consent, approval, authorization or other action by, or filing or registration with, any governmental authority of the United States of America, the State of New York, the State of Florida, the State of Delaware or any other state or jurisdiction of any of the foregoing (each, a "Governmental Authority"), nor any other Person is required by or on behalf of the Borrower to execute and deliver the Loan Documents and to close the Loan other than those consents, approvals, authorizations, actions filings and registrations as to which the requisite consents, approvals, or authorizations have been obtained, the requisite actions have been taken and the requisite filings and registrations have been accomplished.

(e)    Litigation.  Except as set forth on Schedule 1 attached hereto, there is no claim, action, suit, proceeding, arbitration, complaint, charge or investigation pending or, to the Borrower's knowledge, threatened (i) against or involving the Borrower or any of its Affiliates or (ii) that questions the validity, enforceability or priority of the liens and security granted under Loan Documents or the right of the Borrower to enter into and perform its obligations thereunder.

(f)    Compliance with Other Instruments.  The Borrower is not in violation or default (i) of any provisions of its organizational documents or any amendment thereto, (ii) of any instrument, judgment, order, writ or decree, (iii) under any note, indenture or mortgage, or (iv) under any lease, agreement, Material Contract (defined below) or other contract or purchase order to which it is a party or by which it is bound, or, of any provision of statute, rule or regulation

applicable to the Borrower which could reasonably be expected to result in a Material Adverse Effect.

(g)     Title; Absence of Liens; Insurance.  Each of the Borrower and Owner has good and valid title to all of its property and assets, free and clear of all Liens, claims, charges, mortgages, pledges, security interests, restrictions or other encumbrances (collectively, "Liens"), except as set forth on Schedule 2 attached hereto.  Each of the Borrower and Owner keeps its property adequately insured and maintains (i) insurance to such extent and against such risks, including fire, as is customary with companies in the same or similar businesses, and (ii) such other insurance as may be required by law. A true and correct copy of the Title Report is attached hereto as Exhibit 6(g).

(h)     Liabilities.  Borrower does not have any liability or obligation, absolute or contingent (individually or in the aggregate) other than those previously disclosed to Lender.

(i)     Disclosure.  The Borrower has disclosed to the Lender all agreements, instruments and corporate or other restrictions to which it or its affiliates are subject, and all other matters known to it, Owner and their respective manager.  Attached hereto as Schedule 3 is a true, complete and correct list of all material contracts, agreements or understandings to which the Borrower or Owner is a party (each, a "Material Contract").  Other than the Settlement Agreement, there are no other prior or current agreements with any other architect with respect to the Property or the Project.

(j)     Reliance.  The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Loan Documents and that such Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same. Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Lender or any parent, subsidiary or affiliate of Lender. Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or Affiliate of Lender of any equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies. Borrower acknowledges that Lender engages in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Borrower or its affiliates.

(k)     Property Development. Owner is the fee owner of property located on a portion of Lot 2, Plat of Westwood Section 12, Township 24 South, Range 28 East, Orange County, Florida (the "Property"), on which Owner shall develop an approximately 299-key Le Meridian branded hotel to be managed by Spire with approximately 10,010 square feet of food and beverage space to be managed by an affiliate of The ONE Group Hospitality, Inc. and 21,825 square feet of conference space (the "Project"), with a development cost not to exceed $110,000,000 (the "Project Budget"; the Project and the Project Budget are hereinafter referred to collectively as the "Business Plan").

- 8 -

(l)    <u>Recycled Entity</u>.

(1)    Borrower and Owner are and always have been duly formed, validly existing, and in good standing in the state of its formation and in all other jurisdictions where it is qualified to do business.

(2)    Borrower and Owner are not now, nor have they ever been, party to any lawsuit, arbitration, summons, or legal proceeding that is still pending or that resulted in a judgment against it that has not been paid in full, and there are no liens of any nature against Borrower or Owner except as set forth on <u>Schedule 6(l)(2)</u>.

(3)    Borrower and Owner are in compliance with all laws, regulations, and orders applicable to it and have received all permits necessary for it to operate.

(4)    Borrower and Owner are not involved in any dispute with any taxing authority.

(5)    Borrower and Owner have paid all taxes which it owes.

(6)    Borrower and Owner have never owned any property other than the Property and Pledged Collateral, respectively, and personal property necessary or incidental to its ownership or operation of the Property and Pledged Collateral, as applicable, and has never engaged in any business other than the ownership and operation of the Property and Pledged Collateral, as applicable.

(7)    Borrower and Owner have provided Lender with complete financial statements that reflect a fair and accurate view of the entity's financial condition.

(8)    Borrower and Owner have no material contingent or actual obligations not related to the Property and Pledged Collateral, as applicable.

(9)    Borrower and Owner have at all times since the date of its respective formation been a Single Purpose Entity.

All of the representations and warranties made herein shall survive the execution and delivery of this Note and the other Loan Documents and the making of the Loan.

7.    <u>Covenants</u>.  Until the payment in full of all Obligations, the Borrower covenants and agrees as follows:

(a)    <u>Certain Notices</u>. The Borrower shall immediately notify the Lender, in writing, of (i) any actual or threatened actions, suits, claims, investigations or proceedings (each a "<u>Proceeding</u>") with respect to which it or any of its Affiliates may be subject, (ii) any Event of Default or any default under any document, agreement or instrument evidencing any other indebtedness of the Borrower or the Owner, including, without limitation, the documents evidencing the Senior Loan (the "<u>Senior Loan Documents</u>"), (iii) any default under any Material Contract, (iv) any actual event, change, condition or effect which could reasonably be expected to result in a Material Adverse Effect on the Pledged Collateral (as defined in the Pledge Agreement), (v) any notice, approval, denial or other written correspondence from any Governmental Authority with respect to the Property or the Project (and shall provide Lender with a copy of the same), (vi) any notice or report delivered in connection with the Senior Loan or any other loan which encumbers the Property from time to time (and shall provide Lender with a copy of the same), and

- 9 -

(vii) any notice given by, or sent to, Starwood (M) International, Inc., including, without limitation, any notice given by, or sent to, Owner, Borrower, or, to Borrower's knowledge, AWH (and, if such notice is in writing, shall provide Lender with a copy of the same).

       (b)    <u>Payment of Obligations</u>.  The Borrower shall, or shall cause Owner to, pay or discharge when due or cause to be paid or discharged all claims or demands, and all taxes levied or imposed upon the Borrower or the Owner upon the income, profits or property of the Borrower or the Owner; provided, however, that the Borrower or the Owner shall not be required to pay or discharge or cause to be paid or discharged any such claim, demand, or tax the amount, applicability or validity of which is being contested in good faith by appropriate proceedings and for which adequate provision has been made.

       (c)    <u>Liquidity Requirement</u>.  Lesches shall maintain the Liquidity Requirement until the Loan has been indefeasibly repaid in full.  If Lesches shall fail to maintain the Liquidity Requirement at any time during the term of the Loan and such failure results in a Material Adverse Effect (as determined by Lender in its sole discretion), such failure shall be an Event of Default hereunder.

       (d)    <u>Conduct of Business</u>.

       (i)    The Borrower shall, and shall cause the Owner to, (i) take all actions required to assure that it remains duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation, (ii) take all actions required to assure that it maintains all permits to conduct its business as currently conducted and proposed to be conducted, and (iii) conduct its business in compliance in all material respects with all applicable laws.

       (ii)    The Borrower shall, and shall cause the Owner to, maintain insurance with responsible and reputable insurance companies or associations (including comprehensive general liability, hazard, property, rent and business interruption insurance) with respect to the Property and the Project, in such amounts and covering such risks as is required by law or as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and located and in any event in amount, adequacy and scope as in effect on the date hereof.

       (e)    <u>Reporting</u>.  Borrower shall promptly furnish the Lender with (i) copies of all financial reports and statements required pursuant to the terms of the Senior Loan Documents as and when required pursuant thereto, (ii) monthly financial reports with respect to Borrower and Owner including copies of all invoices and proof of payment of such invoices, and (iii) any other financial reports that Lender shall reasonably request.

       (f)    <u>Protective Provisions</u>.  Absent prior written consent of the Lender, the Borrower shall not, and shall not permit or cause the Owner or their manager to:

       (i)    enter into or otherwise permit any merger, consolidation or other business combination, or refinancing or recapitalization, or any other transaction or series of transaction resulting in (a "<u>Change of Control</u>") the Project and the Property not being under the Control of Lesches (the "<u>Key Person</u>");

(ii)     create or permit the creation of any liens, claims or encumbrances on its assets (including the Property and the Pledged Collateral) other than those under the Senior Loan Documents;

(iii)    sell, transfer, convey, assign or otherwise dispose of any its assets (including the Property and the Pledged Collateral);

(iv)    create or incur any liability or obligation, absolute or contingent (individually or in the aggregate) (including executing and delivering any agreement with a contractor or construction consultant);

(v)     commence (or permit any Affiliate to commence) any case, proceeding or other action relating to bankruptcy, insolvency, liquidation or reorganization or other relief for debtors, or take any action (or permit any Affiliate to take any action) to dissolve, liquidate or wind up;

(vi)    take any action (or permit any Affiliate to take any action) that could impair its ability to perform any of its payment or other obligations under the Senior Loan Documents or otherwise;

(vii)   enter into, amend, assume, incur or permit to exist any agreement or other arrangement (other than the Senior Loan Documents) that prohibits, restricts or imposes any condition upon the ability of the Borrower to create, incur or permit to exist any lien, claim or encumbrance upon any of Borrower's assets or property (whether now owned or hereafter acquired);

(viii)  enter into any agreement, settlement or other arrangement, or enter into any amendment or modification to any currently existing agreement or other arrangement, that by its terms restricts or prohibits the ability of the Borrower to pay or perform the Obligations;

(ix)    amend, modify or terminate the Development Advisory Agreement;

(x)     amend, modify or terminate the Senior Loan Documents;

(xi)    amend, modify or terminate any Material Contract;

(xii)   cause or permit Owner to consent to or cause changes to zoning, development rights or other entitlements pertinent to the Property that would result in a Material Adverse Effect with respect to Owner's ability to construct the Project;

(xiii)  commence demolition or construction of the Project;

(xiv)   cause or permit the expiration of any building permit in connection with the Project;

(xv)    modify the Business Plan or Plans and Specifications in connection with the Project;

- 11 -

(xvi)    execute any document listed in Section 4 or 5 hereof as a condition precedent to funding of Loan proceeds; or

(xvii)    take any action or commit to do (or permit any Affiliate to take any action or commit to do) any of the foregoing unless the consummation of such action or commitment will result in payment in full of all Obligations.

If Borrower shall take any of the foregoing actions without the prior written consent of the Lender, such action shall constitute an Event of Default hereunder.

8.    Use of Proceeds.

(a)    Lender shall be entitled to an origination fee in the amount of $257,400.00 (the "Origination Fee"), which Origination Fee shall be deemed fully-earned and payable upon execution of this Note; provided that Lender agrees to defer the payment of the Origination Fee to such date that is the earliest to occur of  the sale of the Property or the Pledged Collateral, the occurrence of an Event of Default, or repayment of Loan, in each instance, as determined by Lender.

(b)    Borrower will use the proceeds of the Loan solely to pay for verifiable expenses in connection with the Project which have been approved by Lender in advance, including (i) payment of a development fee to Arch Advisors LLC, (ii) payment of up to four (4) months of interest payments on the Senior Loan, (iii) payment to the Interest Reserve as described in Section 8(c) below or any reserve account described in Section 8(d) below, and (iv) any other uses approved by Lender.

(c)    On the date hereof, an amount equal to four (4) months of interest payments on the Loan and the Stub Amount shall be deposited into a reserve account held by Lender (the "Interest Reserve") and applied to pay interest on the Loan on each Payment Date.  At such time as the balance of the Interest Reserve drops to $0, Borrower shall immediately replenish the Interest Reserve with an amount equal to three (3) months of interest payments on the Loan. Borrower's failure to comply with the provisions of this Section 8(c) shall constitute an Event of Default hereunder.

(d)    To the extent the Senior Loan Documents do not require reserves for monthly payments of insurance premiums and/or real estate taxes with respect to the Property, Borrower shall reserve an amount equal to three (3) months' worth of insurance premiums and/or real estate taxes with Lender in reserve account(s) held by Lender, and when the balance of such reserve account(s) drops to $0, Borrower shall immediately replenish the applicable reserve account with an amount equal to three (3) months' worth of insurance premiums and/or real estate taxes, as applicable.  Borrower's failure to comply with the provisions of this Section 8(d) shall constitute an Event of Default hereunder.

(e)    Borrower hereby irrevocably authorizes and directs Lender to make the payments set forth on the Schedule of Permitted Payments attached hereto as Schedule 4 from proceeds of the Initial Advance.  With respect to any Subsequent Advance, Borrower hereby irrevocably authorizes and directs Lender (but Lender shall not have an obligation) to (i) make any payments due and payable to Senior Lender under the Senior Loan Documents if Borrower has

- 12 -

not timely delivered such payments to Senior Lender, and Lender shall otherwise have prior approval over the use of Loan proceeds in any Subsequent Advance as set forth in Section 5(a) hereof, and (2) extend the maturity date of the existing Bridge Loan and make any and all payments to Senior Lender therefor if Borrower has not delivered evidence satisfactory to Lender that Borrower has extended such Senior Loan at least ten (10) days prior to the expiration of the notice period to extend the Senior Loan.  Lender may advance funds in excess of the stated amount of this Loan in order to make payments under the Senior Loan as herein provided and such payments shall be deemed to increase the Loan evidenced hereby as protective advances secured by the Pledge Agreement.

(f)     Borrower shall deposit from the Initial Advance at Closing into an account held by Lender (the "DMA Reserve Account") the sum of $30,000 on the date hereof and thereafter by no later than the 25th day of each calendar month for payments of the fees due to AWH and Arch under the Development Advisory Agreement, respectively and the sum of $291,666.68 for the Secondary Subsequent Advance.  On the 1st day of each calendar month immediately succeeding the date of this Note, Borrower directs Lender to disburse to AWH $8,744.94 and to Arch $21,255.06 from the funds in the DMA Reserve Account, if any, in satisfaction of Owner's obligations thereunder, which disbursement shall be treated as a capital contribution by Borrower to Owner.  Notwithstanding the foregoing, Borrower directs Lender to disburse any Monthly Development Fee Catch-up Payments (as defined within the Development Advisory Agreement) as and when due. Borrower grants to Lender a first-priority perfected security interest in the DMA Reserve Account and any and all sums now or hereafter deposited in the DMA Reserve Account as additional security for payment of the Obligations.  Until expended or applied in accordance herewith, the DMA Reserve Account and the funds deposited therein shall constitute additional security for the Obligations.  The provisions of this Section (together with the other related provisions of the other Loan Documents) are intended to give Lender "control" of the DMA Reserve Account and serve as a "security agreement" and a "control agreement" with respect to the same, in each case, within the meaning of the UCC.  Borrower acknowledges and agrees that the DMA Reserve Account is subject to the sole dominion, control and discretion of Lender, its authorized agents or designees, subject to the terms hereof, and Borrower shall have no right of withdrawal with respect to the DMA Reserve Account except with the prior written consent of Lender or as otherwise provided herein.  The funds on deposit in the DMA Reserve Account shall not constitute trust funds and may be commingled with other monies held by Lender.

9.     Defaults and Remedies.

(a)     An "Event of Default" shall occur if:

(i)     the Borrower shall (A) default in the payment of any interest that has accrued on the Loan (including Default Interest) pursuant to the terms of any Loan Document (without any notice from Lender), (B) fail to pay the outstanding principal balance of the Loan (together with all accrued and unpaid interest due thereon and all other amounts due hereunder) on the Maturity Date (without any notice from Lender), (C) fail to provide Lender with evidence acceptable to Lender in its sole discretion that Borrower (or Lesches or the Owner) has paid any and all payments set forth on Schedule 4 in full (whether or not proceeds of the Loan are available therefor) by the date set forth on the respective line item therefor either directly to the payee thereunder or to an account designated by Lender or otherwise consented by Lender (the "Ongoing

- 13 -

Equity Obligation"), or (D) fail to pay any other amount due and payable to Lender under the Loan Documents within five (5) Business days after delivery of notice of non-payment (only with respect to this clause (C));

(ii)    any representation, warranty, certification or statement made by or on behalf of the Borrower or the Owner in this Note or any of the other Loan Documents or in any certificate or other document delivered pursuant hereto or thereto shall have been incorrect in any material respect when made and such inaccuracy has a Material Adverse Effect;

(iii)    the Borrower or Owner shall default beyond the expiration of any applicable notice and/or cure periods (as principal or guarantor) in the payment of principal of any indebtedness (other than this Note) when and as the same shall become due and payable whether at stated maturity, by acceleration or otherwise, unless diligently contested in good faith by Borrower or Owner;

(iv)    any event or condition shall occur that results in the acceleration of the maturity of any indebtedness of the Borrower or Owner (other than this Note), unless diligently contested in good faith by Borrower or Owner;

(v)    any provision of any Loan Document shall for any reason cease to be valid, binding and enforceable in accordance with its terms (or the Borrower shall challenge the enforceability of any Loan Document or shall assert in writing, or engage in any action based on any such assertion, that any provision of any of the Loan Documents has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms), or any security interest created under any Loan Document shall cease to be a valid and perfected first priority security interest (including the Pledged Collateral) purported to be covered thereby;

(vi)    an involuntary proceeding shall be commenced or an involuntary petition shall be filed in a court of competent jurisdiction by a party other than Lender seeking (a) relief in respect of the Borrower or Owner, or of a substantial part of its property or assets, under Title 11 of the United States Code, as now constituted or hereafter amended, or any other Federal, state or foreign bankruptcy, insolvency, receivership or similar law, (b) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or Owner, or for a substantial part of any of its property or assets, or (c) the winding up or liquidation of the Borrower or Owner; and such proceeding or petition shall continue undismissed for ninety (90) days, or an order or decree approving or ordering any of the foregoing shall be entered;

(vii)    the Borrower or Owner shall (a) voluntarily commence any proceeding or file any petition seeking relief under Title 11 of the United States Code, as now constituted or hereafter amended, or any other Federal, state or foreign bankruptcy, insolvency, receivership or similar law, (b) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or the filing of any petition described in clause (a) of this Section 9(a)(vii), (c) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or Owner, or for a substantial part of its property or assets, (d) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (e) make a general assignment for the benefit of creditors, (f) become

- 14 -

unable, admit in writing its inability or fail generally to pay its debts as they become due or (g) take any action for the purpose of effecting any of the foregoing;

(viii)   the occurrence of any event described as an Event of Default in any other Loan Document or any Development Advisory Agreement;

(ix)   the occurrence of an Event of Default under any loan or other credit facility secured by the Property or any interest therein, including, without limitation, the Senior Loan;

(x)   a Change of Control shall have occurred with respect to the Borrower or Owner;

(xi)   one or more judgments for the payment of money in an aggregate amount in excess of $10,000 (to the extent not covered by insurance) shall be rendered against the Borrower or any Affiliate and the same shall remain undischarged for a period of ninety (90) days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to levy upon assets or properties of the Borrower or Affiliate to enforce any such judgment;

(xii)   Borrower shall, or shall cause or permit Owner to, lease, license or otherwise grant an option to lease or buy the Property or any interest therein;

(xiii)   Lesches shall fail to maintain the Liquidity Requirement, resulting in a Material Adverse Effect, as set forth in Section 7(c) hereof;

(xiv)   the Borrower shall violate any covenant set forth in Section 7(f) hereof;

(xv)   failure by the Borrower to fund and maintain reserve accounts as described in Sections 8(c) and 8(d) hereof; or

(xvi)   the Borrower's members and/or managers resolve by proper procedure to, or an order, judgment or decree is entered to, wind-up, dissolve or liquidate the Borrower;

(xvii)   Any mortgagee of Owner breach the terms and conditions of the intercreditor agreement with Lender;

(xviii)   Borrower defaults in the performance of its monetary and/or non-monetary obligations under the Settlement Agreement; or

(xix)   Borrower permits or causes Owner or its manager to, or Borrower or its manager terminates the Development Advisory Agreement.

(b)   Upon the occurrence of an Event of Default, Lender shall have the right in its sole and absolute discretion, but not the obligation, to market the Property for sale; provided, however, that Lender agrees to market the Property for no less than six (6) weeks before Lender

shall exercise its rights or remedies provided at law, in equity or under the Loan Documents to cause a sale of the Property.

(c) <u>Acceleration</u>.  If an Event of Default occurs under clauses (a)(i), (vi), or (vii) of this Section 9, then the outstanding principal of and all accrued interest on this Note shall automatically and without any action on the part of the Lender, become immediately due and payable, without presentment, demand, protest or notice of any kind, all of which are expressly waived.  If any other Event of Default occurs and is continuing, the Lender, by written notice to the Borrower, may declare the entire principal of and accrued interest on the Loan to be due and payable immediately.  Upon such declaration, such principal and interest shall become immediately due and payable.  The Lender may rescind an acceleration and its consequences if all existing Events of Default have been cured or waived, except nonpayment of principal or interest that has become due solely because of the acceleration, and if the rescission would not conflict with any judgment or decree.  Any notice or rescission shall be given in the manner specified in Section 17.

10. <u>Suits for Enforcement</u>.

(a) Upon the occurrence and during the continuance of any one or more Events of Default, the Lender may proceed to protect and enforce its rights by suit in equity, action at law or by other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Note or any other Loan Document or in aid of the exercise of any power granted in this Note or any other Loan Document, or may proceed to enforce the payment of the Obligations, or to enforce any other legal, beneficial or equitable right of the Lender of this Note or any other Loan Documents.

(b) The Lender may direct the time, method and place of conducting any proceeding for any remedy available to it.

(c) Should the indebtedness evidenced by this Note or any other Loan Document or any part hereof or thereof be collected at law or in equity or in bankruptcy, receivership or other court proceedings, or this Note or any other Loan Documents placed in the hands of attorneys for collection, the Borrower agrees to pay, in addition to principal and interest due and payable hereon, all costs of collection, including reasonable attorneys' fees and expenses, incurred by the Lender in collecting or enforcing this Note or any such other Loan Document.

11. <u>Indemnification</u>.  The Borrower agrees to indemnify, defend and hold the Lender, its employees, members, shareholders, directors, officers, employees, managers, affiliates, consultants and agents (the "<u>Lender Indemnitees</u>") harmless from and against any liability, obligation, claim, cost, loss, judgment, damage or expense (including reasonable legal fees and expenses) (collectively, "<u>Liabilities</u>") incurred or suffered by any of the Lender Indemnitees as a result of or arising out of or in connection with (i) the Loan Documents, (ii) any breach by the Borrower of any representation, warranty, covenant or agreement contained herein (or any facts or circumstances constituting any such breach or violation), (iii) any proceeding initiated or brought by any third party relating to or involving the Borrower or any of its Affiliates, or (iv) any liability for brokerage or finders' fees or other commissions based on agreements, arrangements or understandings made by the Borrower or any of its Affiliates for services rendered for or on

- 16 -

behalf of the Borrower or any such Affiliate in connection with the transactions contemplated hereby.

12.   <u>No Impairment</u>.   The Borrower shall not, by amendment of its organizational documents or agreements or through reorganization, consolidation, merger, dissolution, sale of assets or another voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Note or any other Loan Document, but will at all times in good faith assist in the carrying out of all such terms and in the taking of all such action as may be necessary or appropriate in order to protect the rights of the holder of this Note against impairment.

13.   <u>Remedies Cumulative</u>.   No remedy herein conferred upon the Lender is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or otherwise.   To the extent permitted by applicable law and notwithstanding anything contained in the Loan Documents to the contrary, the Borrower and the Lender severally hereby waive presentment for payment, demand, protest and notice of dishonor.

14.   <u>Waivers; Amendment; Remedies</u>.

(a)   No course of dealing between the Borrower and the Lender or any delay on the part of the Lender in exercising any rights hereunder shall operate as a waiver of any right. The Borrower and all endorsers, sureties and guarantors of this Note hereby jointly and severally waive presentment, demand for payment, notice of dishonor, notice of protest, and protest in connection with the delivery, acceptance, performance, default, endorsement or guaranty of this Note.   No delay by the Lender hereof in exercising any power or right hereunder shall operate as a waiver of any power or right, nor shall an single or partial exercise of any power or right preclude other or further exercise thereof, or the exercise of any other power or right hereunder or otherwise. No waiver or modification of the terms hereof shall be valid unless set forth in writing by the Lender and then only to the extent set forth therein.

(b)   Any amendment, supplement or modification of or to any provision of this Note or any other Loan Document shall be effective only if it is made or given in writing and signed by all of the parties hereto or thereto.   Any waiver of any provision of this Note or any other Loan Document, and any consent to any departure by any party from the terms of any provision of this Note or any other Loan Document shall be effective (i) if in writing and (ii) only in the specific instance and for the specific purpose for which made or given.   Except where notice is specifically required by this Note or any other Loan Document, no notice to or demand on any party in any case shall entitle such party to any other or further notice or demand in similar or other circumstances.   The Borrower recognizes that, in general, borrowers who experience difficulties in honoring their loan obligations, in an effort to inhibit or impede lenders from exercising the rights and remedies available to lenders pursuant to mortgages, notes, loan agreements or other instruments evidencing or affecting loan transactions, frequently present in court the argument, without merit, that some loan officer or administrator of the lender made an oral modification or made some statement (including, without limitation, a statement via email) that could be interpreted as an extension or modification or amendment of one or more debt instruments and that the borrower relied to its detriment upon such "oral or de facto modification of the loan document."   For that reason, and in order to protect the Lender from such allegations in connection

- 17 -

with the transactions contemplated by the Loan Documents, the Borrower acknowledges that this Note, the other Loan Documents, and all instruments referred to in any of them can be extended, modified or amended only by a written agreement executed by the both Borrower and Lender and that none of the rights or benefits of the Lender can be waived permanently except in a written instrument executed by the Lender, and then only to the extent expressly set forth in such instrument.  The Borrower further acknowledges the Borrower's understanding that no officer or administrator of the Lender has the power or the authority from the Lender to make an oral or de facto extension or modification or amendment of any such instrument or agreement on behalf of the Lender and that the Borrower cannot reasonably or justifiably rely on any unwritten or unsigned extension or modification or amendment or waiver, including, without limitation, any email correspondence purportedly effecting such extension or modification or amendment or waiver.

(c)    The parties hereto agree that the breach by any party of the provisions of this Note would result in substantial damage to the other parties which would be difficult, if not impossible, to ascertain, and by reason of that fact the parties agree that in the event of any such breach, the Lender shall have the right to enforce this Note by injunction or other proceeding in equity without the posting of a bond or other security.  The remedies provided for herein are cumulative and are not exclusive of any remedies that may be available to the parties hereto at law, in equity or otherwise, and without the posting of a bond or other security.

15.    Successors and Assigns; Transfer.

(a)    This Note shall inure to the benefit of and be binding upon the successors and permitted assigns of the parties hereto.  All of the covenants, stipulations, promises and agreements in this Note contained by or on behalf of the Borrower shall bind its successors and assigns, whether so expressed or not.  The Lender may not assign any of its rights under this Note and any other Loan Document, except to an affiliate.  The Borrower may not assign any of its rights or obligations under this Note (including by way of merger, sale of equity interests, by operation of law or otherwise) without the prior written consent of the Lender, and any such purported assignment by the Borrower without the written consent of the Lender shall be void and of no effect.

(b)    Each transferee of this Note acknowledges that this Note has not been registered under the Securities Act of 1933, as amended, and may not be transferred except pursuant to an applicable exemption from the requirements thereof.

16.    Replacement of Note.  On receipt by the Borrower of an affidavit of an authorized signatory of the Lender stating the circumstances of the loss, theft, destruction or mutilation of this Note (and in the case of any such mutilation, on surrender and cancellation of such Note), the Borrower, at Borrower  expense, will promptly execute and deliver, in lieu thereof, a new Note of like tenor.  If required by the Borrower, such Lender must provide indemnity sufficient in the reasonable judgment of the Borrower to protect the Borrower from any loss which it may suffer if a lost, stolen or destroyed Note is replaced.

- 18 -

17.     <u>Notices</u>.

(a)     All notices, demands, approvals, consents, authorizations and other communications provided for or permitted hereunder shall be made in writing and shall be (I) mailed by first-class, registered or certified mail, return receipt requested, postage prepaid, (II) sent by nationally recognized overnight courier, or (III) delivered by hand delivery (including delivery by nationally recognized courier), and in addition to one of the foregoing methods shall also be contemporaneously delivered via e-mail, addressed as follows:

(i)     If to the Lender:

c/o Arch Companies,
524 Broadway, Suite 405
New York, NY 10012
Attn:  Jeffrey Simpson
E-mail: jsimpson@archcre.com

With a copy to:

Herrick Feinstein LLP
2 Park Avenue
New York, New York 10016
Attention: Yariv C. Ben-Ari, Esq.
E-mail: ybenari@herrick.com

(ii)     if to the Borrower:

c/o Empire Equities
3 Columbus Circle, 14th Floor
New York, NY 10019
Attn:  Dov Lesches
E-mail: dovi@empireeq.com

with a copy to:

The Bernstein Law Firm
3050 Biscayne Boulevard, Suite #403
Miami, FL 33137
Attention: Jason Pear, Esq.
E-mail:  Jason@bernstein-lawfirm.com  and  Michael@bernstein-lawfirm.com

(b)     All such notices and communications which shall be mailed, sent, delivered or transmitted in the manner described above shall be deemed given, served or delivered at such time as it is received by the addressee upon presentation or at such times as delivery is attempted in the case of any change in address as to which notice was not given to the other party as required hereunder or in the case of a refusal to accept delivery.

- 19 -

(c)    A notice given by a counsel to, and on behalf of, a party to this Note shall have the same force and effect as a notice given by such party.  Any party may change its notice address hereunder by delivering a notice of such changed address in accordance with the terms and conditions of this Section 17.

18.    <u>Creditor/Debtor Relationship</u>.

(a)    Borrower acknowledges and agrees that the Loan and the Loan Documents have been negotiated at arm's length with the benefit of advice of counsel and is in the best interests of the Borrower.

(b)    Borrower agrees and acknowledges that notwithstanding the fact that one or more direct or indirect partners, members and shareholders of Lender may now or in the future be the same as one or more of the direct or indirect partners, members and shareholders of the Borrower, Lender is a wholly separate and distinct Person, separate and distinct from the Borrower and neither Lender nor Borrower shall be deemed to be Controlled by, under common Control with or Controlling the other.

(c)    Borrower recognizes, acknowledges and agrees that the relationship created between the Lender and Borrower by the Lender making the Loan and Lender's execution, delivery and performance of the Loan Documents is solely and exclusively that of debtor/borrower and creditor/lender.  Nothing in the Loan Documents shall be construed to create or give rise to (i) any joint venture, partnership, tenancy-in-common, or joint tenancy relationship, or any other relationship other than debtor/borrower and creditor/lender, between Lender, on the one hand, and Borrower and any Affiliates of Borrower, on the other hand, or (ii) any rights, duties or obligations of the Lender to any of Borrower or any of its Affiliates of any kind or nature except as expressly set forth in the Loan Documents.  Borrower agrees never to institute or cause to be instituted or continue prosecution of, directly or indirectly, derivatively or otherwise, any suit or cause of action or proceeding against the Lender, in its capacity as lender or otherwise, in contravention of the foregoing.

(d)    Borrower waives and releases any and all defenses, affirmative defenses, set-offs, claims, counterclaims or causes of action of any kind or nature which any of Borrower or any of its Affiliates might assert on behalf of itself or any such Affiliates against the Lender in its capacity as lender, relating to the Loan or to the Loan Documents, or the enforcement by the Lender of its rights and remedies thereunder, to the extent arising out of or relating to the fact and circumstance that Lender or any Affiliate of Lender is providing services to Owner, Borrower or any of their respective Affiliates, and Borrower agrees never to institute or cause to be instituted or continue prosecution of, directly or indirectly, derivatively or otherwise any suit or cause of action or proceeding of any kind or nature whatsoever against the Lender, in its capacity as lender or otherwise, in contravention of the foregoing.

(e)    Borrower, on behalf of itself and its Affiliates hereby agrees not to directly or indirectly assert against any of the Lender or any Affiliate of Lender any claim, argument or defense, whether grounded on equitable subordination principles under Section 510 of the United States Bankruptcy Code or under any other section contained in Chapter 5 of the United States Bankruptcy Code, or otherwise, that the relationship of the Lender and the Borrower as evidenced

by the Loan Documents is not solely and exclusively that of debtor/borrower and creditor/lender or that the liens and security interests granted to the Lender in the Pledged Collateral as security for the Loan is not fully perfected and enforceable first-priority liens and security interests.

(f)     Reference is made to that certain Letter of Intent (the "LOI") dated as of January 11, 2019 by and among Arch Real Estate Holdings LLC, AWH Development Services, LLC and Owner, and accepted and agreed to by Lesches.  The parties hereto acknowledge and agree that this Loan constitutes the "Interim Funds" referenced in the LOI and that if the transactions contemplated by the LOI (which the Parties hereby acknowledge shall continue to be of full force and effect) do not occur, the Borrower shall have no defenses, affirmative defenses, set-offs, claims, counterclaims or causes of action of any kind or nature against Lender in connection therewith.  Borrower hereby waives and releases any and all defenses, affirmative defenses, set-offs, claims, counterclaims or causes of action of any kind or nature which any of Borrower or any of its Affiliates might assert on behalf of itself or any such Affiliates against the Lender to the extent arising out of or relating to the fact and circumstance that any transactions contemplated by the LOI did not occur.

19.     Signatures; Counterparts.  Telefacsimile or other electronic transmissions of any executed original document and/or retransmission of any executed telefacsimile or other electronic transmission shall be deemed to be the same as the delivery of an executed original.  At the request of any party hereto, the other parties hereto shall confirm telefacsimile or other electronic transmissions by executing duplicate original documents and delivering the same to the requesting party or parties.  This Note may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.

20.     Governing Law; Jurisdiction; Waiver of Jury Trial.

(a)     **THIS NOTE SHALL BE GOVERNED BY, CONSTRUED IN ACCORDANCE WITH, AND ENFORCED UNDER THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS OR INSTRUMENTS ENTERED INTO AND PERFORMED ENTIRELY WITHIN SUCH STATE.**

(b)     **THE BORROWER HEREBY IRREVOCABLY AGREES THAT ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS NOTE OR ANY OTHER TRANSACTION DOCUMENT OR ANY AGREEMENTS OR TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY MAY BE BROUGHT IN COURTS HAVING JURISDICTION OVER THE DISPUTE AND LOCATED IN THE COUNTY OF NEW YORK, NEW YORK AND HEREBY EXPRESSLY SUBMITS TO THE PERSONAL JURISDICTION AND VENUE OF SUCH COURTS FOR THE PURPOSES THEREOF AND EXPRESSLY WAIVES ANY CLAIM OF IMPROPER VENUE AND ANY CLAIM THAT SUCH COURTS ARE AN INCONVENIENT FORUM. THE BORROWER HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO ITS ADDRESS SET FORTH IN SECTION 17, OR TO THE BERNSTEIN LAW FIRM, WHICH IS HEREBY**

- 21 -

**APPOINTED BY BORROWER AS ITS AUTHORIZED AGENT TO TAKE, RECEIVE AND FORWARD COPIES OF SUCH PROCESS TO BORROWER, SUCH SERVICE TO BECOME EFFECTIVE TEN (10) DAYS AFTER SUCH MAILING.**

(c)    **THE LENDER AND BORROWER HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS NOTE OR ANY OF THE OTHER DOCUMENTS CONTEMPLATED HEREBY, ANY RIGHTS OR OBLIGATIONS HEREUNDER OR THEREUNDER OR THE PERFORMANCE OF SUCH RIGHTS AND OBLIGATIONS.**

21.    <u>Severability</u>.  If any one or more of the provisions contained herein, or the application thereof in any circumstance, is held invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions hereof shall not be in any way impaired, unless the provisions held invalid, illegal or unenforceable shall substantially impair the benefits of the remaining provisions hereof.

22.    <u>Entire Agreement</u>.  This Note (together with the exhibits and schedules hereto, and the other Loan Documents) is intended by the parties as a final expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the parties hereto in respect of the subject matter contained herein and therein.  There are no restrictions, promises, warranties or undertakings, other than those set forth or referred to herein or therein.  This Note (together with the exhibits and schedules hereto, and the other Loan Documents) supersede all prior agreements, term sheets, letters of intent, and understandings between the parties with respect to such subject matter.

23.    <u>Certain Expenses</u>.  The Borrower will pay all actual out of pocket expenses of the Lender (including, without limitation, all fees, charges and disbursements of Lender's counsel) in connection with this Note, the other Loan Documents, the transactions contemplated hereby and thereby and any amendments, consents, waivers and/or investigations related thereto and enforcement of rights thereunder. Lender and Borrower acknowledge and agree that on or prior to the date hereof, Borrower has deposited with Lender a deposit in the amount of $65,000.00, which deposit has been expended on actual out of pocket due diligence and legal expenses.

24.    <u>Publicity</u>.  Except as may be required by applicable law, Borrower shall not issue a publicity release or announcement or otherwise make any public disclosure concerning this Note, the other Loan Documents or the transactions contemplated hereby or thereby, without prior written approval from the Lender.  If any announcement is required by law to be made by Borrower, prior to making such announcement Borrower will deliver a draft of such announcement to Lender and shall give Lender an opportunity to comment thereon.

25.    TIME IS OF THE ESSENCE AGAINST BORROWER WITH RESPECT TO ALL PROVISIONS OF THIS NOTE AND THE OTHER LOAN DOCUMENTS.

26.    <u>Headings</u>.  The headings in this Note are for convenience of reference only and shall not limit or otherwise affect the meaning hereof.

- 22 -

27.    <u>Usury</u>.  This Note is subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the principal balance due hereunder at a rate which could subject Lender to either civil or criminal liability or would otherwise cause any provision of this Note to be rendered unenforceable as a result of being in excess of the maximum interest rate which Borrower is permitted by applicable law.  If by the terms of this Note, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of such maximum rate, the interest rate hereunder shall be deemed to be immediately and retroactively reduced to such maximum rate and all previous payments in excess of the maximum rate shall be deemed to have been payments in reduction of the principal amount of this Note and not on account of the interest due hereunder.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the Borrower has executed this Note as of the date first written above.

**EMPIRE EQ WGI LLC,**
a Delaware limited liability company

By: _____
    Name:  Dov Lesches
    Title:   Manager

STATE OF NEW YORK    )
                          )                  SS.:
COUNTY OF NEW YORK  )

On the __ day of March in the year 2019 before me the undersigned, personally appeared **DOV LESCHES**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacit(ies) and that by his/her/their signature(s) on the instrument the individual(s) or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

ACKNOWLEDGED AND ACCEPTED:

**ORLANDO LENDER LLC**
a New York limited liability company
p
By:_____
    Name:  Jeffrey Simpson
    Title:   Authorized Signatory

[Signature Page to Promissory Note]

**Schedule 1**

**LITIGATION**


A.  *Behar Peteranecz, Inc. v. Empire EQ Hotel, LLC*, 2018-CA-010690 pending in the Circuit Court of the Ninth Judicial Circuit, in and for Orange County, Florida; and

B.  *Stantec Consulting Services Inc. v. Empire EQ Hotel, LLC*, which was assigned case number 2019-CA-002655-O pending in the Circuit Court of the Ninth Judicial Circuit, in and for Orange County, Florida.

**Schedule 2**

**ENCUMBRANCES**

None other than as indicated on Title Commitment attached as Exhibit 6(G), in particular 4(A) and 8 of the Requirements on same.

## **Schedule 3**

## **Material Contracts**

a.   Behar Peteranecz, Inc.

b.   Engagement Letter with Eyzenberg and Company dated May 29, 2018

c.   Mortgages as set forth on Schedule 2.

**Schedule 4**

**Schedule of Permitted Payments**

[attached]

## **Schedule 6(l)(2)**

### **Liens of any nature against Borrower or Owner**

A. Claim of Lien filed by Behar Peteranecz, Inc. and recorded in the public records of Orange County, Florida at Doc #20180477490

B. Claim of Lien filed by Stantec Consulting Services Inc. and recorded in the public records of Orange County, Florida at Doc #20180687830

**<u>Schedule 6(g)</u>**

**<u>Title Report</u>**

[SEE ATTACHED]

**<u>EXHIBIT A</u>**

[SEE ATTACHED]

**EXECUTION COPY**

## **PLEDGE AGREEMENT**

THIS **PLEDGE AGREEMENT**, dated as of March 29, 2019 (this "Agreement"), by and between **EMPIRE EQ WGI LLC**, a Delaware limited liability company (the "Pledgor"), and **ORLANDO LENDER LLC**, a New York limited liability company (hereinafter referred to herein as the "Lender").

**WHEREAS**, pursuant to a Promissory Note, dated as of the date hereof (as amended, supplemented, restated or otherwise modified from time to time, the "Note") between the Pledgor and the Lender, the Lender agreed to make a loan (the "Loan") to the Pledgor as provided therein;

**WHEREAS**, as a condition to making the Loan, the Lender required the Pledgor to secure Pledgor's obligations under the Note by entering into this Agreement; and

**WHEREAS**, Pledgor wishes to secure its obligations under the Note by entering into this Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Pledgor hereby agrees as follows:

1.    Definitions.  (a) Capitalized terms used but not defined in this Agreement shall have the meanings assigned thereto in the Note; and (b) the following terms when used in this Agreement shall have the following meanings:

"Pledged Collateral" means (i) all right, title and interest of the Pledgor in and to the limited liability company interests in the Subsidiary, whether now existing or hereafter arising, including without limitation, all rights of the Pledgor in and to the Pledgor's capital accounts and Capital Accounts (as defined in the Subsidiary LLCA), the Pledgor's Percentage Interests (as defined in the Subsidiary LLCA), and all rights of the Pledgor as a Member under (and as defined in) the Subsidiary LLCA, including all rights to secure distributions thereunder and all rights to request and obtain withdrawal of Pledgor's capital thereunder; (ii) any and all securities (both certificated and uncertificated) and financial assets, and all other property interests which may subsequently be delivered or transferred by or for the account of the Pledgor to the Lender pursuant to any Loan Document as additional security for the Obligations; (iii) any of the foregoing when put in transit to the Lender; (iv) all dividends of every kind which shall become and be due and payable or distributable on or in respect of all or any of the securities and financial assets referred to in clauses (i) and (ii); (v) all payments and other distributions of every kind whatsoever which shall become and be due and payable or distributable on account of the purchase, redemption, repurchase or other retirement of all or any of such securities and financial assets; (vi) all of the Pledgor's now owned or hereafter acquired or arising "accounts", "supporting obligations", "deposit accounts", "goods", "documents", "chattel paper" (including electronic chattel paper), in each case as defined in the UCC, including any rights to payment for the sale or lease of goods or rendition of services, whether or not they have been earned by performance; (vii) all contract rights; (viii) all money, cash, cash equivalents, securities and other property of any kind of the Pledgor held directly or indirectly by the Lender; (ix) all other property of the Pledgor in which the Lender may at any time be granted a Lien as collateral for the Obligations; and (x) all Proceeds of the foregoing, including, without limitation, the roll-over or reinvested proceeds of the foregoing.  Any delivery or transfer

- 1 -

**EXECUTION COPY**

of any of the Pledged Collateral to an agent or custodian designated by the Lender shall be deemed a delivery or transfer to the Lender.

"<u>Pledged Interests</u>" means the limited liability company interests of the Pledgor in the Subsidiary constituting Pledged Collateral, together with all certificates evidencing ownership of such interests, and all claims, powers, privileges, benefits, remedies, voting rights, options or rights of any nature whatsoever which currently exist or may be issued or granted by the Subsidiary to Pledgor while this Agreement is in effect.

"<u>Proceeds</u>" means all "proceeds" as such term is defined in Section 9-102(a)(64) of the Uniform Commercial Code and, in any event, shall include, without limitation, all dividends or other income from the Pledged Interests, collections thereon or distributions with respect thereto.

"<u>Subsidiary</u>" means EMPIRE EQ HOTEL LLC, a Delaware limited liability company.

"<u>Subsidiary LLCA</u>" means the Limited Liability Company Agreement of the Subsidiary, dated as of February 1, 2019, a true, correct and complete copy of which is attached as <u>Exhibit 1</u> to this Agreement.

"<u>UCC</u>" or "<u>Uniform Commercial Code</u>" shall mean the Uniform Commercial Code as in effect in the State of New York.

2.    <u>Security Interest</u>.  The Pledgor hereby irrevocably and unconditionally pledges and grants to the Lender a first priority security interest and continuing Lien on the Pledged Collateral, to secure the punctual payment and performance of all Obligations.

3.    <u>Perfection</u>.  At any time and from time to time, at the expense of the Pledgor, the Pledgor will promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable, or that the Lender may reasonably request, to perfect and protect any security interest granted or purported to be granted hereby or to enable the Lender to exercise and enforce its rights and remedies hereunder with respect to any Pledged Collateral.  Without limiting the generality of the foregoing, (i) whether or not the Pledged Collateral is evidenced by certificates, the Pledgor hereby authorizes and permits the Lender to file in such places as the Lender may determine a UCC Financing Statement naming the Pledgor as debtor and the Lender as secured party with respect to the Pledged Collateral, in form and substance satisfactory to the Lender in its sole and reasonable determination, and without the requirement of the Pledgor's signature; and (ii) with respect to the Pledged Collateral that is not evidenced by certificates, the Pledgor agrees to execute and deliver to the issuer of such securities and such other third parties as may be determined to be necessary or appropriate by the Lender, such instruments in form and substance satisfactory to the Lender in its sole and reasonable determination to acknowledge and register the pledge of the securities hereunder in their books and records and to deliver statements of account upon the Lender's request therefore.  Without limiting the generality of the foregoing, Pledgor hereby authorizes the filing of financing statements (and amendments of financing statements and continuation statements) that name Pledgor as debtor and Lender as secured party and that cover all personal property or all assets of Pledgor, whether now owned or hereafter acquired and the proceeds thereof.  Pledgor hereby

**EXECUTION COPY**

ratifies the filing of any such financing statements (or amendments of financing statements or continuation statements) that were filed prior to the execution hereof.

Concurrently with the execution and delivery of this Agreement, the Pledgor shall (a) cause the Subsidiary to execute and deliver to Lender an Acknowledgment and Consent with respect to this Agreement in the form of <u>Exhibit 2</u> hereto and (b) send written instructions in the form of <u>Exhibit 3</u> hereto to the Subsidiary, and (c) cause the Subsidiary to, and the Subsidiary shall, deliver to the Lender the Confirmation Statement and Instruction Agreement in the form of <u>Exhibit 4</u> hereto pursuant to which the Subsidiary will confirm that it has registered the pledge effected by this Agreement on its books and agrees to comply with the instructions of the Lender in respect of the Pledged Interests without further consent of the Pledgor or any other Person.

If the interests underlying the Pledged Interests have been (or subsequently are) certificated, then concurrently with the execution and delivery of this Agreement (or promptly after certification), the Pledgor shall deliver to the Lender each original certificate, if any, evidencing the Pledged Interests (which certificates shall constitute "security certificates" (as defined in the Uniform Commercial Code)), together with an undated, irrevocable membership power and power of attorney, coupled with an interest covering each such certificate duly executed in blank in the form approved by Lender (in its sole discretion).

Upon the occurrence and during the continuance of an Event of Default, Lender shall have the right, at any time, in its discretion upon written notice to Pledgor, to transfer to or to register in the name of Lender or its nominee any or all of the Pledged Collateral. Prior to or concurrently with the execution and delivery of this Agreement, Pledgor shall deliver to Lender an assignment of limited liability company interest endorsed by Pledgor in blank (an "<u>Assignment of Interest</u>"), in the form set forth on <u>Exhibit 5</u> hereto, for the Pledged Interests, transferring all of such Pledged Interests in blank, duly executed by Pledgor and undated. Lender shall have the right, at any time in its discretion upon the occurrence and during the continuance of an Event of Default and without notice to Pledgor, to transfer to, and to designate on such Pledgor's Assignment of Interest, any Person to whom the Pledged Interests are sold in accordance with the provisions hereof. In addition, Lender shall have the right at any time to exchange any Assignment of Interest representing or evidencing the Pledged Interests or any portion thereof for one or more additional or substitute Assignments of Interest representing or evidencing smaller or larger percentages of the Pledged Interests represented or evidenced thereby, subject to the terms thereof.

4.    <u>Representations and Warranties</u>. The Pledgor represents and warrants as follows:

(a)    The Subsidiary has opted in to Article 8 of the UCC. The Subsidiary has not previously issued any certificates evidencing the Pledged Collateral.

(b)    The Pledgor is the legal and beneficial owner of all the Pledged Collateral free and clear of any Lien, security interest or other encumbrance except in favor of the Lender. No effective financing statement or other instrument similar in effect covering all or any part of the Pledged Collateral is on file in any recording office except naming the Lender as secured party.

(c)    The pledge of the Pledged Collateral pursuant to this Agreement creates a valid first priority security interest in the Pledged Collateral, securing the payment of the

Obligations, and all filings and other actions necessary or desirable to perfect and protect such security interest have been duly made or taken.

(d)    No authorization, approval or consent of, and no notice to or filing with or action by, any governmental authority or regulatory body or under the operating agreement of Pledgor or the Subsidiary LLCA is required for (i) the pledge by the Pledgor of the Pledged Collateral pursuant to this Agreement, the grant by the Pledgor of the security interest hereby granted or the execution, delivery or performance of this Agreement by the Pledgor, (ii) the perfection of or exercise by the Lender of its rights and remedies provided for in this Agreement or (iii) the exercise by the Lender of the voting or other rights provided for in this Agreement or the remedies in respect of the Pledged Collateral pursuant to this Agreement (and upon such exercise, for Lender or the purchaser of such Pledged Collateral to be admitted as a member of the Subsidiary to the full extent of the Pledged Interests).

(e)    The Pledgor has full right, power and authority to enter into this Agreement and to grant the security interest in the Pledged Collateral made hereby, and this Agreement constitutes the legal, valid and binding obligation of the Pledgor enforceable against the Pledgor in accordance with its terms.

(f)    The Pledged Interests constitute 100% of the limited liability company interests in the Subsidiary. The Pledgor neither owns nor holds any interest, right or claim in the Subsidiary other than the Pledged Interests.  Pledgor will not, nor will Pledgor permit or cause the Subsidiary to issue any additional equity interest, including limited liability company interests without the Lender's prior written consent.  A true, correct and complete organizational and ownership chart of the Pledgor, the Subsidiary and the Property is attached hereto as Exhibit 6 and is hereby incorporated by reference.

(g)    The execution, delivery and performance by the Pledgor of this agreement are within the powers of the Pledgor, and do not or will not (i) violate any law or regulation, or any other decree of any court or governmental authority or regulatory body, (ii) violate the operating agreement of Pledgor or the Subsidiary LLCA, or (iii) result in or require the creation or imposition of any Lien, security interest or other encumbrance upon any of the property of the Pledgor except in favor of the Lender.

(h)    Except as expressly set forth in the Subsidiary LLCA, there are no restrictions on the transfer of the Pledged Interests pledged by Pledgor hereunder, and the Pledgor has the right to transfer such Pledged Interests free and clear of any Lien, security interest or other encumbrance and without the consent of the creditors of the Pledgor or the consent of any other person, entity or governmental authority and upon the occurrence of an Event of Default and the transfer of the Pledged Interests to the Lender, the Lender will have all of the rights of the Pledgor with respect thereto.

(i)    The Pledgor is, and at all times has been, organized exclusively under the laws of the State of Delaware.

(j)    The exact name of the Pledgor is: **EMPIRE EQ WGI LLC**.

- 4 -

**EXECUTION COPY**

(k)        The Subsidiary LLCA provides that the limited liability company interests in the Subsidiary are "securities" governed by and within the meaning of Article 8 of the UCC (including Section 8-102(a)(15) thereof).

(l)        Except as otherwise disclosed by that certain Phase I environmental report dated February 5, 2018 issued by Terracon Consultants, Inc. as project H1187044 (or Phase II environmental report, if required) in respect of the Property delivered to Lender (referred to below as the "Environmental Report"), a copy of which has been provided to Lender, (a) there are no Hazardous Substances (defined below) or underground storage tanks in, on, or under the Property, except those that are both (i) in compliance with all Environmental Laws (defined below) and with permits issued pursuant thereto and (ii) fully disclosed to Lender in writing pursuant to the Environmental Report; (b) there are no past, present or threatened Releases (defined below) of Hazardous Substances in, on, under or from the Property which have not been fully remediated in accordance with Environmental Law; (c) there is no threat of any Release of Hazardous Substances migrating to the Property; (d) there is no past or present non-compliance with Environmental Laws, or with permits issued pursuant thereto, in connection with the Property which has not been fully remediated in accordance with Environmental Law; (e) Pledgor does not know of, and has not received, any written or oral notice or other communication from any Person (including but not limited to a governmental entity) relating to Hazardous Substances or Remediation (defined below) thereof, of possible liability of any Person pursuant to any Environmental Law, other environmental conditions in connection with the Property, or any actual or potential administrative or judicial proceedings in connection with any of the foregoing; and (f) Pledgor has truthfully and fully provided to Lender, in writing, any and all information relating to conditions in, on, under or from the Property that is known to Pledgor and that is contained in files and records of Pledgor, including but not limited to any reports relating to Hazardous Substances in, on, under or from the Property and/or to the environmental condition of the Property.

(i)        "Environmental Law" means any present and future federal, state and local laws, statutes, ordinances, rules, regulations and the like, as well as common law, relating to protection of human health or the environment, relating to Hazardous Substances, relating to liability for or costs of other actual or threatened danger to human health or the environment.

(ii)        "Environmental Law" includes, but is not limited to, the following statutes, as amended, any successor thereto, and any regulations promulgated pursuant thereto, and any applicable state or local statutes, ordinances, rules, regulations and the like addressing similar issues: the Comprehensive Environmental Response, Compensation and Liability Act; the Emergency Planning and Community Right-to-Know Act; the Hazardous Substances Transportation Act; the Resource Conservation and Recovery Act (including but not limited to Subtitle I relating to underground storage tanks); the Solid Waste Disposal Act; the Clean Water Act; the Clean Air Act; the Toxic Substances Control Act; the Safe Drinking Water Act; the Occupational Safety and Health Act; the Federal Water Pollution Control Act; the Federal Insecticide, Fungicide and Rodenticide Act; the Endangered Species Act; the National Environmental Policy Act; and the River and Harbors Appropriation Act.

(iii)        "Environmental Law" also includes, but is not limited to, any applicable present and future federal, state and local laws, statutes ordinances, rules, regulations and the like, as well as common law: conditioning transfer of property upon a negative declaration

- 5 -

or other approval of a governmental authority of the environmental condition of the Property; requiring notification or disclosure of Releases of Hazardous Substances or other environmental condition of the Property to any Governmental Authority or other Person, whether or not in connection with transfer of title to or interest in property; imposing conditions or requirements in connection with permits or other authorization for lawful activity; relating to nuisance, trespass or other causes of action related to the Property; and relating to wrongful death, personal injury, or property or other damage in connection with any physical condition or use of the Property.

(iv)    "Hazardous Substances" includes but is not limited to any and all substances (whether solid, liquid or gas) defined, listed, or otherwise classified as pollutants, hazardous wastes, hazardous substances, hazardous materials, extremely hazardous wastes, or words of similar meaning or regulatory effect under any present or future Environmental Laws or that may have a negative impact on human health or the environment, including but not limited to Microbial Matter, petroleum and petroleum products, asbestos and asbestos-containing materials, polychlorinated biphenyls, lead, radon, radioactive materials, flammables and explosives, but excluding substances of kinds and in amounts ordinarily and customarily used or stored in similar properties for the purposes of cleaning or other maintenance or operations and otherwise in compliance with all Environmental Laws.

(v)    "Release" with respect to any Hazardous Substance includes but is not limited to any release, deposit, discharge, emission, leaking, leaching, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing or other movement of Hazardous Substances.

(vi)    "Remediation" includes but is not limited to any response, remedial, removal, or corrective action; any activity to clean up, detoxify, decontaminate, contain or otherwise remediate any Hazardous Substance; any actions to prevent, cure or mitigate any Release of any Hazardous Substance; any action to comply with any Environmental Laws or with any permits issued pursuant thereto; any inspection, investigation, study, monitoring, assessment, audit, sampling and testing, laboratory or other analysis, or evaluation relating to any Hazardous Substances or to anything referred to herein.

5.    Distributions.  The Pledgor agrees that: (i) any distribution in kind received by the Pledgor from any party for or on account of the Pledged Collateral, including distributions of stock as a dividend or split of any of the Pledged Collateral, shall be immediately delivered to the Lender in the form received with any required endorsement; and (ii) any note or other instrument executed and delivered to the Pledgor by any party to evidence any obligation of such party with respect to the Pledged Collateral shall be immediately delivered with any required endorsement to the Lender.  All such items shall be held by the Lender in accordance with the terms of this Agreement. Until the Obligations are repaid in full, the Pledgor shall not have the right to receive any distributions for or on account of the Pledged Collateral.  Notwithstanding the foregoing to the contrary, to the extent the Pledgor receives any distributions, it shall hold same in trust for the benefit of the Lender and shall immediately deliver all distributions for or on account of the Pledged Collateral to the Lender in the form received.

6.    Certain Rights and Duties of Lender.  The Pledgor acknowledges that:

- 6 -

(a)      the Lender has no duty of any type with respect to the Pledged Collateral except for the use of due care in safekeeping any of the Pledged Collateral actually in the physical custody of the Lender;

(b)      prior to the occurrence of any Event of Default, the Lender's rights with respect to the Pledged Collateral shall be limited to the Lender's rights as a secured party and pledgee and the right to perfect its security interest, preserve, enforce and protect the Lien granted hereunder and its interest in the Pledged Collateral; and

(c)      the Lender may sell, assign or grant participations in any of the Obligations and any of the Pledged Collateral and that the Lender's purchaser, assignee or participant shall have the same rights and privileges with respect to such Obligations and Pledged Collateral as the Pledgor grants to the Lender under this Agreement.

7.      <u>Events of Default; Remedies.</u>

(a)      Solely upon the occurrence of any Event of Default, the Lender, with or without notice to the Pledgor and without demand for additional collateral, may (i) transfer the Pledged Collateral into the name of the Lender or its nominee and vote any Pledged Collateral constituting securities or closely held capital stock; (ii) sell at public or private sale any or all of the Pledged Collateral, which the Lender may purchase free from any right of redemption; (iii) exercise any rights that may be available to the owner of the Pledged Collateral under any governing documents of the issuer of any such Pledged Collateral, including exercising any rights of redemption or withdrawal; or (iv) at its discretion in its own name or in the name of the Pledgor take any action for the collection of the Pledged Collateral, including the filing of a proof of claim in insolvency proceedings, and may receive the proceeds thereof and execute releases therefor.

(b)      Notwithstanding anything else to the contrary herein, after deducting its reasonable expenses, including reasonable attorney's fees, incurred in the sale or collection of the Pledged Collateral, the Lender shall apply the proceeds to the Obligations and shall account to the Pledgor for any surplus.

(c)      The Pledgor agrees that (i) the Lender has no obligation to sell or otherwise liquidate the Pledged Collateral in any particular order or to apply the proceeds thereof to any particular portion of the Obligations, and (ii) in connection with any secured party's sale, the Lender is authorized, if it deems it advisable to do so, in order to comply with any applicable securities laws, to restrict the prospective bidders or purchasers to persons who will represent and agree that they are purchasing the Pledged Collateral for their own account for investment, and not with a view to the distribution or re-sale thereof.  Sales made subject to such restriction shall be deemed to have been made in a commercially reasonable manner.

8.      <u>Rights of the Pledgor; Voting.</u>  So long as no Event of Default has occurred and is continuing, the Pledgor shall have the right to vote and any other consensual rights with respect to any of the Pledged Collateral except (unless the Lender consents thereto) those which, in the Lender's reasonable discretion, would contravene the Note, this Agreement or any other Loan Document, or any other agreement between the Pledgor and the Lender or which might materially reduce the value of the Pledged Collateral.  The Pledgor shall not take any such action without the

prior written approval of the Lender (which approval the Lender may withhold in its sole discretion). Upon the occurrence and during the continuance of an Event of Default, the Lender shall have the exclusive right to exercise such rights, and the Pledgor shall take all such steps as may be necessary to effectuate such rights until the Lender notifies the Pledgor of the release of such rights, including without limitation, the right to provide a loan directly to the Subsidiary or any of its subsidiaries for the purposes of covering any shortfall in necessary capital, provided, Pledgor fails to do so within the time required under the Subsidiary LLCA. Without the prior written consent of the Lender, which shall not be unreasonably withheld or delayed, the Pledgor shall not, directly or indirectly (i) vote to enable, or take any other action to permit the Subsidiary to issue any additional limited liability company interests, or to issue any other securities convertible into or granting the right to purchase or exchange for any limited liability company interests in the Subsidiary, (ii) except as permitted by the Loan Documents, sell, assign, transfer, exchange or otherwise dispose of, or grant any option with respect to, the Pledged Collateral, or (iii) create, incur, authorize or permit to exist any Lien or option in favor of, or any claim of any person or entity with respect to, any of the Pledged Collateral, or any interest therein, except for the Lien provided for by this Agreement and otherwise permitted under the Note. The Pledgor shall defend the right, title and interest of the Lender in and to the Pledged Collateral against the claims and demands of all persons or entities whomsoever. Any violation of the preceding sentence shall also constitute an Event of Default. The Pledgor will not, unless all actions necessary, in the Lender's reasonable opinion, to protect and perfect the Liens and security interests intended to be created hereunder with respect to the Pledged Interests shall have been taken, (A) change its name, identity, chief executive office, or structure, or (B) reorganize or reform under the laws of another jurisdiction.

9.  <u>Transfer or Liens</u>. The Pledgor agrees that Pledgor will not sell, transfer or convey any interest in, grant any option with respect to, or suffer or permit any Lien, security interest or other encumbrance to be created upon or with respect to, any of the Pledged Collateral during the term of this Agreement, except to or in favor of the Lender.

10.  <u>Power of Attorney, Etc</u>. The Pledgor hereby irrevocably constitutes and appoints the Lender the true and lawful attorney-in-fact for and on behalf of the Pledgor with full power of substitution and revocation in its own name or in the name of the Pledgor to make, execute, deliver and record any and all financing statements, continuation statements, assignments, proofs of claim, powers of attorney, leases, discharges or other instruments or agreements which the Lender in its sole but reasonable discretion may deem necessary or advisable to perfect, preserve, enforce or protect the Lien granted hereunder and its interest in the Pledged Collateral and to carry out the purposes of this Agreement, including but without limiting the generality of the foregoing, any and all proofs of claim in bankruptcy or other insolvency proceedings of the Pledgor, with the right to collect and apply to the Obligations all distributions and dividends made on account of the Pledged Collateral. The rights and powers conferred on the Lender by the Pledgor are expressly declared to be coupled with an interest and shall be irrevocable until all the Obligations are paid and performed in full. A carbon, photographic, or other reproduction of a security agreement (including this Agreement) or a financing statement is sufficient as a financing statement.

11.  <u>Indemnity and Expenses</u>.

(a)     The Pledgor agrees to and hereby indemnifies the Indemnified Parties from and against any and all claims, damages, losses, liabilities and expenses arising out of, or in connection with, or resulting from, this Agreement (including, without limitation, enforcement of this Agreement) other than such as arise from the gross negligence or willful misconduct of the Indemnified Parties, its agents and/or employees.

(b)     Pledgor covenants and agrees, at its sole cost and expense, to protect, defend, indemnify, release and hold Indemnified Parties harmless from and against any and all Environmental Losses (as defined below) imposed upon or incurred by or asserted against any Indemnified Parties (as defined below) and directly or indirectly arising out of or in any way relating to any one or more of the following: (a) any presence of any Hazardous Substances in, on, above, or under the Property; (b) any past, present or threatened Release of Hazardous Substances in, on, above, under or from the Property; (c) any activity by Pledgor, any Person affiliated with Pledgor, and any tenant or other user of the Property in connection with any actual, proposed or threatened use, treatment, storage, holding, existence, disposition or other Release, generation, production, manufacturing, processing, refining, control, management, abatement, removal, handling, transfer or transportation to or from the Property of any Hazardous Substances at any time located in, under, on or above the Property; (d) any activity by Pledgor, any Person affiliated with Pledgor, and any tenant or other user of the Property in connection with any actual or proposed Remediation of any Hazardous Substances at any time located in, under, on or above the Property, whether or not such Remediation is voluntary or pursuant to court or administrative order, including but not limited to any removal, remedial or corrective action; (e) any past, present or threatened non-compliance or violations of any Environmental Laws (or permits issued pursuant to any Environmental Law) in connection with the Property or operations thereon, including but not limited to any failure by Pledgor, any Person affiliated with Pledgor, and any tenant or other user of the Property to comply with any order of any governmental authority in connection with any Environmental Laws; (f) the imposition, recording or filing or the threatened imposition, recording or filing of any Environmental Lien encumbering the Property; (g) any administrative processes or proceedings or judicial proceedings in any way connected with any matter addressed in this Agreement; (h) any past, present or threatened injury to, destruction of or loss of natural resources in any way connected with the Property, including but not limited to costs to investigate and assess such injury, destruction or loss; (i) any acts of Pledgor, any Person affiliated with Pledgor, and any tenant or other user of the Property in arranging for disposal or treatment, or arranging with a transporter for transport for disposal or treatment, of Hazardous Substances at any facility or incineration vessel containing such or similar Hazardous Substances; (j) any acts of Pledgor, any Person affiliated with any Pledgor, and any tenant or other user of the Property in accepting any Hazardous Substances for transport to disposal or treatment facilities, incineration vessels or sites from which there is a Release, or a threatened Release of any Hazardous Substance which causes the incurrence of costs for Remediation; (k) any personal injury, wrongful death, or property or other damage arising under any statutory or common law or tort law theory, including but not limited to damages assessed for private or public nuisance or for the conducting of an abnormally dangerous activity on or near the Property; and (l) any misrepresentation or inaccuracy in any representation or warranty or material breach or failure to perform any covenants or other obligations pursuant to this Agreement or the other Loan Documents.  The term "Indemnified Parties" includes Lender, any Person who is or will have been involved in the origination of the Loan, any Person who is or will have been involved with the servicing of the Loan, any Person in whose name the liens created by this Agreement is or will have been recorded, Persons who may

hold or acquire or will have held a full or partial interest in the Loan, as well as custodians, trustees and other fiduciaries who hold or have held a full or partial interest in the Loan for the benefit of third parties) as well as the respective directors, officers, shareholders, partners, employees, agents, servants, representatives, contractors, subcontractors, affiliates, subsidiaries, participants, successors and assigns of any and all of the foregoing (including but not limited to any other Person who holds or acquires or will have held a participation or other full or partial interest in the Loan or the Property, whether during the term of the Loan or as a part of or following a foreclosure of the Loan and including, but not limited to, any successors by merger, consolidation or acquisition of all or a substantial portion of Lender's assets and business).  The term "Environmental Losses" includes any actual losses, damages, costs, fees, expenses, claims, suits, judgments, awards, liabilities (including but not limited to strict liabilities), obligations, debts, diminutions in value, fines, penalties, charges, costs of Remediation (whether or not performed voluntarily), amounts paid in settlement, foreseeable and unforeseeable consequential damages, litigation costs, reasonable attorneys' fees, engineers' fees, environmental consultants' fees, and investigation costs (including but not limited to costs for sampling, testing and analysis of soil, water, air, building materials, and other materials and substances whether solid, liquid or gas), of whatever kind or nature, and whether or not incurred in connection with any judicial or administrative proceedings, actions, claims, suits, judgments or awards.

(c)     The Pledgor will upon demand pay to the Lender the amount of any and all out-of-pocket reasonable expenses, including the reasonable fees and expenses of its counsel and of any experts and agents, that the Lender may incur in connection with (i) the sale of, collection from, or other realization upon, any of the Pledged Collateral, (ii) the exercise or enforcement of any of the rights of the Lender hereunder, or (iii) any action taken by the Lender pursuant to this Agreement and the other Loan Documents.

(d)     By execution of this Agreement, Dov Leshes agrees to guaranty Pledgor's obligations and liabilities under this Section 11.

(e)     For purposes of this Section 11 only, Pledgor shall mean **EMPIRE EQ WGI LLC** and Dov Leshes, jointly and severally. This indemnity shall survive the repayment and the performance of the Obligations by Pledgor.

12.     Amendments.  No amendment of any provision of this Agreement shall in any event be effective unless the same shall be in writing and signed by the Pledgor and the Lender.  No waiver of any provision of this Agreement, nor consent to any departure by the Pledgor herefrom, shall in any event be effective unless the same shall be in writing and signed by the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  No failure to exercise or any delay in exercising on the part of the Lender any right, power or privilege under this Agreement shall operate as a waiver thereof.  No single or partial exercise of any right, power or privilege under this Agreement shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

13.     Security Interest Absolute.   All rights of the Lender and security interests hereunder, and all obligations of the Pledgor hereunder, shall be absolute and unconditional irrespective of:

(a)    any lack of validity or enforceability of the Note or any other Loan Document;

(b)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to departure from any of the Loan Documents;

(c)    any taking and holding of collateral or guarantees for all or any of the Obligations, or any amendment, alteration, exchange, substitution, transfer, enforcement, waiver, subordination, termination or release of any collateral or such guarantees, or any non-perfection of any collateral, or any consent to departure from any such guaranty;

(d)    any manner of application of collateral, or proceeds thereof, to all or any of the Obligations, or the manner of sale of any collateral;

(e)    any consent by the Lender to the restructuring of the Obligations, or any other restructuring or refinancing of the Obligations or any portion thereof.

(f)    any modification, compromise, settlement or release by the Lender, by operation of law or otherwise, collection or other liquidation of the Obligations or the liability of any guarantor, or of any collateral, in whole or in part, and any refusal of payment by the Lender, in whole or in part, from any obligor or guarantor in connection with any of the Obligations, whether or not with notice to, or further assent by, or any reservation of rights against, the Pledgor; or

(g)    any other circumstance (including, without limitation, any statute of limitations) which might otherwise constitute a defense available to, or a discharge of, any third party pledgor.

14.    <u>Certain Understandings of Parties</u>. The parties hereto acknowledge and agree that the Pledged Interests and the Certificate of Limited Liability Company Interest in the Subsidiary which has been delivered to Lender on the date hereof constitute and will constitute "certificated securities" (as defined in the UCC). Pledgor therefore covenants and agrees that Pledgor shall not, directly or indirectly, without the prior written consent of Lender, alter, amend modify, supplement or change in any way, Section 3.4 of the Subsidiary LLCA as in effect on the date hereof.

15.    <u>Irrevocable Proxy</u>.  Solely with respect to Article 8 Matters (defined below), Pledgor hereby unconditionally and Irrevocably grants and appoints Lender, from the date of this Agreement until the termination of this Agreement in accordance with its terms, as Pledgor's true and lawful proxy, for and in Pledgor's name, place and stead to vote the Pledged Collateral in the Subsidiary by Pledgor, whether directly or indirectly, beneficially or of record, now owned or hereafter acquired, with respect to such Article 8 Matters.  The proxy and powers granted to Lender by Pledgor pursuant to this Agreement are coupled with an interest and are given to secure the performance of Pledgor's obligations under this Agreement. The proxy granted and appointed in this Section 15 shall include the right to sign Pledgor's name (as a member of the Subsidiary) to any consent, certificate or other document relating to an Article 8 Matter and the Pledged Collateral that applicable law may permit or require, to cause the Pledged Collateral to be voted in accordance with the preceding sentence.  Pledgor hereby represents and warrants that there are no other proxies

and/or powers of attorney with respect to any Article 8 Matter and the Pledged Collateral that Pledgor may have granted or appointed.  Pledgor will not give a subsequent proxy or power of attorney or enter into any other voting agreement with respect to the Pledged Collateral with respect to any Article 8 Matter and any attempt to do so with respect to an Article 8 Matter shall be void and of no effect.  As used herein, an "Article 8 Matter" means any action, decision, determination or election by the Subsidiary or its members that its limited liability company interests or other equity interests be, or cease to be, a "security" within the meaning of Article 8 of the Uniform Commercial Code (including Section 8-102(a)(15) thereof), and all other matters related to any such action, decision, determination or election.

16.    Termination.  This Agreement shall automatically terminate upon the satisfaction of the Note and all Obligations under the Loan Documents, except that any provisions that are expressly stated to survive the satisfaction or termination of this Agreement shall survive such satisfaction or termination.

17.    Notices.  Except as otherwise specifically provided for herein, any notice, demand, authorization, approval, consent or communication hereunder shall be given in accordance with Section 17 of the Note.

18.    Construction.  The term "Pledgor" and all pronouns referring thereto as used herein shall be construed in the masculine, feminine, neuter or singular or plural as the context may require.

19.    Successors and Assigns; Binding Effect.  This Agreement shall inure to the benefit of the Lender and its successors and assigns and shall bind the Pledgor and the successors, representatives, legal representatives and/or heirs and assigns of the Pledgor.

20.    Choice of Law; Waiver Of Jury Trial; Jurisdiction.

(i)    THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, AND MADE BY PLEDGOR AND ACCEPTED BY LENDER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE  NOTE SECURED HEREBY WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT TO THE EXTENT THAT THE UNIFORM COMMERCIAL CODE REQUIRES THE APPLICATION OF THE LAW OF ANOTHER JURISDICTION WITH RESPECT TO THE PERFECTION, PRIORITY OR ENFORCEMENT OF THE SECURITY INTERESTS CREATED HEREBY.   TO THE FULLEST EXTENT PERMITTED BY LAW, PLEDGOR HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT (OTHER THAN ANY ACTION IN

19-23188-rdd    Doc 6    Filed 06/27/19    Entered 06/27/19 15:33:55    Main Document
Pg 297 of 411

EXECUTION COPY

RESPECT OF THE CREATION, PERFECTION OR ENFORCEMENT OF A LIEN OR SECURITY INTEREST CREATED PURSUANT TO ANY LOAN DOCUMENTS NOT GOVERNED BY THE LAWS OF THE STATE OF NEW YORK), AND THE NOTE, AND THIS AGREEMENT AND THE NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK INCLUDING SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(ii)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR PLEDGOR ARISING OUT OF OR RELATING TO THIS AGREEMENT (OTHER THAN ANY ACTION IN RESPECT OF THE CREATION, PERFECTION OR ENFORCEMENT OF A LIEN OR SECURITY INTEREST CREATED PURSUANT TO ANY LOAN DOCUMENTS NOT GOVERNED BY THE LAWS OF THE STATE OF NEW YORK) SHALL BE INSTITUTED SOLELY IN THE FEDERAL OR STATE COURTS LOCATED IN THE COUNTY OF NEW YORK, STATE OF NEW YORK ONLY PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND PLEDGOR WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND PLEDGOR HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.

(iii)    PLEDGOR, DOV LESHES AND LENDER EACH HEREBY AGREES TO WAIVE ITS RIGHTS TO A JURY TRIAL ON ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, OR ANY DEALINGS BETWEEN PLEDGOR, DOV LESHES AND LENDER. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. PLEDGOR, DOV LESHES AND LENDER EACH ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO LENDER TO ENTER INTO A BUSINESS RELATIONSHIP WITH PLEDGOR. PLEDGOR AND DOV LESHES EACH REPRESENTS AND WARRANTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH WAIVER IS KNOWINGLY AND VOLUNTARILY GIVEN FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED, EITHER ORALLY OR IN WRITING, AND THE WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, REPLACEMENTS, REAFFIRMATIONS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT, OR ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(iv)    <u>Counterpart Signatures</u>. This Agreement, and any notices to be given pursuant to this Agreement, may be executed in any number of counterparts and by the parties hereto or thereto, as applicable, in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same

instrument. Any counterpart delivered electronically (including as a .pdf attachment to an e-mail) shall constitute an original for all purposes hereunder.

21.    <u>Acknowledgments and Agreement of Pledgor</u>.  Pledgor hereby acknowledges and agrees as follows:

(a)    Pledgor recognizes, acknowledges and agrees that the relationship created between the Lender and Pledgor by the Lender making the Loan and Lender's execution, delivery and performance of the Loan Documents is solely and exclusively that of debtor/borrower and creditor/lender.  Nothing in the Loan Documents shall be construed to create or give rise to (i) any joint venture, partnership, tenancy in common, or joint tenancy relationship, or any other relationship other than debtor/borrower and creditor/lender, between Lender and Pledgor or any Subsidiary Company, or (ii) any rights, duties or obligations of the Lender to any of Pledgor or the Subsidiary of any kind or nature except as expressly set forth in the Loan Documents.  Pledgor agrees never to institute or cause to be instituted or continue prosecution of, directly or indirectly, derivatively or otherwise, any suit or cause of action or proceeding against the Lender in its capacity as lender or otherwise in contravention of the foregoing.

(b)    Pledgor, on behalf of itself and the other Subsidiary Companies hereby agrees not to directly or indirectly assert against the Lender any claim, argument or defense, whether grounded on equitable subordination principles under Section 510 of the United States Bankruptcy Code or under any other section contained in Chapter 5 of the United States Bankruptcy Code, or otherwise, that the relationship of the Lender and the Pledgor as evidenced by the Loan Documents is not solely and exclusively that of debtor/borrower and creditor/lender or that the liens and security interests granted to the Lender in the Pledged Collateral as security for the Loan is not fully perfected and enforceable first priority liens and security interests.

**[Remainder of Page Intentionally Left Blank]**

**IN WITNESS HEREOF**, this Agreement has been executed by the Pledgor and the Lender.

<u>**PLEDGOR:**</u>

**EMPIRE EQ WGI LLC**, a Delaware limited liability company

By: _____
     Name: Dov Lesches
     Title:  Manager

<u>**LENDER:**</u>

**ORLANDO LENDER LLC**, a New York limited liability company

By: _____
     Name: Jeffrey Simpson
     Title:  Authorized Signatory

**The undersigned hereby agrees to be bound by the obligations under <u>Section 11</u>**

_____
**DOV LESCHES**, an individual

| STATE OF NEW YORK | ) |
|---|---|
| | ) ss: |
| COUNTY OF NEW YORK | ) |

On the ___ day of March in the year 2019, before me, the undersigned, personally appeared **DOV LESCHES**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
NOTARY PUBLIC

[Signature Page – Pledge Agreement]

## **Exhibit 1 to Pledge Agreement**

**Subsidiary LLCA**

[See attached]

**<u>Exhibit 2 to Pledge Agreement</u>**

**FORM OF ACKNOWLEDGMENT AND CONSENT**

**[attached]**

## ACKNOWLEDGMENT AND CONSENT

Reference is made to that certain Pledge Agreement, dated as of March 29, 2019 (as amended, supplemented or otherwise modified from time to time, the "Pledge Agreement"), by **EMPIRE EQ WGI LLC**, a Delaware limited liability company ("Pledgor"), in favor of **ORLANDO LENDER LLC**, a New York limited liability company (together with its successors and assigns, "Lender").  For the purposes of this Acknowledgement and Consent, all initially capitalized terms not herein defined shall have the respective meanings ascribed thereto in the Pledge Agreement or in the Note referred to therein.

The Subsidiary hereby (a) acknowledges receipt of a copy of the executed Pledge Agreement and the other Loan Documents, (b) consents to the Pledge Agreement and the other Loan Documents, (c) agrees to comply with the terms and provisions of the Pledge Agreement and the other Loan Documents, (d) agrees not to do anything or cause, permit or suffer anything to be done which is prohibited by, or contrary to, the terms of the Pledge Agreement or the other Loan Documents, and (e) agrees to notify Lender promptly in writing of the occurrence of any Event of Default. Subsidiary agrees to register on its books and records Lender's security interest in the Pledged Interests as provided in the Pledge Agreement.

[SIGNATURES FOLLOW]

Date:   March __, 2019

<div align="right">

**SUBSIDIARY:**

**EMPIRE EQ HOTEL LLC**, a Delaware limited liability company

By:   _____
        Name: Dov Lesches
        Title:   Manager

</div>

STATE OF NEW YORK            )
                                            ) ss:
COUNTY OF NEW YORK        )

On the ___ day of March in the year 2019, before me, the undersigned, personally appeared **DOV LESCHES**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.


_____
NOTARY PUBLIC

**<u>Exhibit 3 to Pledge Agreement</u>**

**Form of Instruction to Register Pledge**

**[attached]**

**Instruction to Register Pledge**

March 29, 2019

To:     **EMPIRE EQ HOTEL LLC**, a Delaware limited liability company ("Subsidiary")

In accordance with the requirements of that certain Pledge Agreement, dated as of March 29, 2019 (as amended, supplemented or otherwise modified from time to time, the "Pledge Agreement"), by **EMPIRE EQ WGI LLC**, a Delaware limited liability company ("Pledgor"), in favor of **ORLANDO LENDER LLC**, a New York limited liability company (together with its successors and assigns "Lender") (for the purposes of this Instruction to Register Pledge, all initially capitalized terms not herein defined shall have the respective meanings ascribed thereto in the Pledge Agreement), you are hereby instructed to register the pledge of the following interests in the name of Lender as follows:

The 100% limited liability company interests in Subsidiary, including without limitation all of the following property now owned or at any time hereafter acquired by Pledgor or in which Pledgor now has or at any time in the future may acquire any right, title or interest:

(a)     all additional limited liability company interests of, or other equity interests in, the Issuer and options, warrants, and other rights hereafter acquired by Pledgor in respect of such limited liability company or other equity interests (whether in connection with any capital increase, recapitalization, reclassification, or reorganization of the Issuer or otherwise) (all such limited liability company and other equity interests, including the Pledged Interests, and all such options, warrants and other rights being hereinafter collectively referred to as the "Pledged Interests");

(b)     all certificates, instruments, or other writings representing or evidencing the Pledged Interests, and all accounts and general intangibles arising out of, or in connection with, the Pledged Interests;

(c)     any and all moneys or property due and to become due to Pledgor now or in the future in respect of the Pledged Interests, or to which Pledgor may now or in the future be entitled to in its capacity as a partner of the Issuer, whether by way of a dividend, distribution, return of capital, or otherwise;

(d)     all other claims which Pledgor now has or may in the future acquire in its capacity as a partner of the Issuer against the Issuer and its property;

(e)     all rights of Pledgor under the Subsidiary LLCA (and all other agreements, if any, to which Pledgor is a party from time to time which relate to its ownership of the Pledged Interests), including, without limitation, all voting and consent rights of Pledgor arising thereunder or otherwise in connection with Pledgor's ownership of the Pledged Interests; and

(f)     to the extent not otherwise included, all Proceeds of any or all of the foregoing.

You are hereby further authorized and instructed to execute and deliver to Lender the Confirmation Statement and Instruction Agreement in the form of Exhibit 4 to the Pledge Agreement pursuant to which you will confirm that you have registered the pledge effected by the Pledge Agreement on your books and agree to comply with the instructions of Lender in respect of the Pledged Interests without further consent of Pledgor or any other Person.

[SIGNATURE FOLLOWS]

Date:    March 29, 2019

**PLEDGOR:**

**EMPIRE EQ WGI LLC**, a Delaware limited liability company

By: _____

Name: Dov Lesches
Title:   Manager

STATE OF NEW YORK            )
                                              ) ss:
COUNTY OF NEW YORK       )

      On the ___ day of March in the year 2019, before me, the undersigned, personally appeared **DOV LESCHES**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.


_____
NOTARY PUBLIC

**Exhibit 4 to Pledge Agreement**

**Form of Confirmation Statement and Instruction Agreement**

**[attached]**

**Confirmation Statement and Instruction Agreement**

March 29, 2019

To:     Orlando Lender LLC
        c/o Arch Companies
        524 Broadway, Suite 405
        New York, NY 10012
        Attn:  Jeffrey Simpson

Pursuant to the requirements of that certain Pledge Agreement, dated as of March 29, 2019 (as amended, supplemented or otherwise modified from time to time, the "Pledge Agreement"), by **EMPIRE EQ WGI LLC**, a Delaware limited liability company ("Pledgor") in favor of **ORLANDO LENDER LLC**, a New York limited liability company (together with its successors and assigns "Lender") (for the purpose of this Confirmation Statement and Instruction Agreement, all initially capitalized terms not herein defined shall have the respective meanings ascribed thereto in the Pledge Agreement), this Confirmation Statement and Instruction Agreement relates to the Pledged Interests (as defined in the Pledge Agreement), issued by **EMPIRE EQ HOTEL LLC**, a Delaware limited liability company (the "Issuer").

Issuer hereby (a) acknowledges receipt of a copy of the executed Pledge Agreement and the other Loan Documents, (b) consents to the Pledge Agreement and the other Loan Documents, (c) agrees to comply with the terms and provisions thereof, (d) agrees not to do anything or cause, permit or suffer anything to be done which is prohibited by, or contrary to, the terms of the Pledge Agreement or the other Loan Documents, and (e) agrees to notify Lender promptly in writing of the occurrence of any Event of Default.

On the date hereof, Issuer hereby confirms that the registered owner of 100% of the limited liability company interests in Issuer is: **EMPIRE EQ WGI LLC**, a Delaware limited liability company.  The registered pledgee of the Pledged Interests is:  **ORLANDO LENDER LLC**, a New York limited liability company limited liability company, together with its successors and assigns.

In connection with the pledge of the Pledged Collateral to Lender by the Pledgor, the Issuer hereby represents, warrants and agrees with Lender as follows:

Issuer has registered the Pledged Interests in the name of the registered pledgee on the date hereof. No other pledge or other interest adverse to that of the registered pledgee is currently registered on the books and records of the Issuer.

The Issuer shall deliver directly to Lender at its address set forth above, any and all instruments and/or certificates evidencing any right, option or warrant, and all new, additional or substituted securities issued to, or to be received by, the Pledgor by virtue of its ownership of the Pledged Interest issued by the Issuer or upon exercise by the Pledgor of any option, warrant or right attached to such Pledged Interest;

The Issuer shall pay directly to Lender any and all cash distributions which might be declared and payable (including any unpaid distributions accrued prior to the date hereof) on any of the Pledged Interests or any of the other Pledged Collateral issued by the Issuer;

At any time upon and during the continuance of an Event of Default, upon Lender's written instructions, the Issuer shall register the transfer of such Pledged Interests to Lender or its nominee, as applicable;

The Pledged Interest has been duly authorized and validly issued and is not subject to, nor will the Issuer at any time permit it to become subject to, any restrictions governing its issuance, transfer, ownership or control other than those currently set forth in the Subsidiary LLCA; and

Until the Obligations are paid in full (exclusive of provisions which shall survive full payment), the Issuer agrees to comply with the instructions of Lender, without any further consent from Pledgor or any other person or entity.

Notwithstanding any other right or remedy to which Lender is entitled under the Pledge Agreement or the Loan Documents, the Issuer agrees that, upon the occurrence and continuance of an Event of Default, Lender shall determine to exercise its right to sell all or any of the Pledged Collateral issued by the Issuer, the Issuer will, upon Lender's request and at the Pledgor's expense: (a) provide Lender with such other information and projections as may be necessary or, in Lender's opinion, advisable to enable Lender to effect the sale of such Pledged Collateral; (b) do or cause to be done all such other acts and things as may be necessary to make the sale of such Pledged Collateral or any part thereof valid and binding and in compliance with applicable law; and (c) do or cause to be done all such other acts and things as may be necessary to constitute Lender or Lender's designees or transferees a member of the Issuer.

Lender is hereby authorized, upon the occurrence and continuance of an Event of Default, and in connection with any sale of the Pledged Collateral issued by the Issuer, to deliver or otherwise disclose to any prospective purchaser of such Pledged Collateral (i) any information and projections provided to Lender by Issuer and/or Pledgor and (ii) any other information in Lender's possession relating to the Issuer, Pledgor or such Pledged Collateral.

**[Signature page follows]**

Date:   March 29, 2019

<u>Very truly yours</u>:

**EMPIRE EQ HOTEL LLC**, a Delaware limited liability company

By:   _____
      Name: Dov Lesches
      Title:   Manager

**ACKNOWLEDGED AND AGREED**:

**PLEDGOR:**

**EMPIRE EQ WGI LLC**, a
Delaware limited liability company

By:   _____
      Name: Dov Lesches
      Title:   Manager

**LENDER:**

**ORLANDO LENDER LLC,**
a New York limited liability company

By:   _____
      Name: Jeffrey Simpson
      Title:   Authorized Signatory

STATE OF NEW YORK          )
                           ) ss:
COUNTY OF NEW YORK         )

On the ___ day of March in the year 2019, before me, the undersigned, personally appeared **DOV LESCHES**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
**NOTARY PUBLIC**

[Signature Page – Confirmation Statement and Instruction Agreement]

**Exhibit 5 to Pledge Agreement**

**FORM OF ASSIGNMENT OF LIMITED LIABILITY COMPANY INTEREST**

**[attached]**

## ASSIGNMENT OF LIMITED LIABILITY COMPANY INTEREST

THIS **ASSIGNMENT OF LIMITED LIABILITY COMPANY INTEREST** (this "Assignment of Limited Liability Company Interest"), dated as of _____ __, 20__ (the "Effective Date"), is made by **EMPIRE EQ WGI LLC**, a Delaware limited liability company (together with its successors and assigns, the "Assignor") to _____ (the "Assignee").

## RECITALS

Assignor has entered into a certain Pledge Agreement dated as of March 29, 2019 (as amended, supplemented or otherwise modified from time to time, the "Pledge Agreement"), with **ORLANDO LENDER LLC**, a New York limited liability company (together with its successors and assigns, "Lender"). Unless otherwise noted, terms defined in the Pledge Agreement are used herein as defined therein.

The Assignor is the registered owner of 100% of the limited liability company interests in EMPIRE EQ HOTEL LLC, a Delaware limited liability company ("Subsidiary"), existing under and evidenced by the Subsidiary LLCA. Under the Subsidiary LLCA, the Assignor has certain rights, title and interest in and to Subsidiary and its assets and distributions (collectively, the "Interest").

Lender has required that the Assignor shall have executed and delivered this Assignment of Limited Liability Company Interest.

NOW THEREFORE, in consideration of the premises and of the mutual covenants and agreements contained herein, the parties hereto agree as follows:

Section 1.  Assignment and Acceptance of Assigned Interest.  As of the Effective Date, the Assignor hereby sells, transfers, conveys and assigns (without recourse and, except as set forth herein, representation or warranty) to the Assignee all of the Assignor's right, title and interest in and to the Interest and of its rights under the Subsidiary LLCA, including, without limitation, all its (a) rights to receive moneys due and to become due under or pursuant to the Subsidiary LLCA, (b) rights to receive proceeds of any insurance, indemnity, warranty or guaranty with respect to the Jo Subsidiary LLCA, (c) claims for damages arising out of or for breach of or default under the Subsidiary LLCA, and (d) rights to perform thereunder and to compel performance, and otherwise exercise all rights and remedies thereunder. The Assignor's right, title and interest in the Interest and of the Assignor's rights under the Subsidiary LLCA that are being assigned to the Assignee pursuant to the Pledge Agreement are hereinafter referred to as the "Assigned Interest". The Assignee, upon the execution of this Assignment of Limited Liability Company Interest, hereby accepts from the Assignor the Assigned Interest and agrees to become a successor member of Subsidiary in the place and stead of the Assignor to the extent of the Assigned Interest and to be bound by the terms and provisions of the Subsidiary LLCA.

Section 2.   Capital Account.  On or prior to the Effective Date, the Assignee shall notify each of the other members in Subsidiary, if any, required to be so notified under the terms of the Subsidiary LLCA and thereafter, the portion of all profits and losses, and all other items of income, gain, loss, deduction or credit, allocable to the Assigned Interest shall be credited or charged, as the case may be, to the Assignee and the Assignee shall be entitled to the portion of all distributions, payments or other allocations payable in respect of the Assigned Interest, regardless of the source of such distributions, payments or other allocations or the date on which they were earned.

- 1 -

Section 3.   Representations and Warranties of the Assignor.  The Assignor represents to Assignee, as of the Effective Date of this Assignment of Limited Liability Company Interest, and to Lender as of the Effective Date of the Pledge Agreement, that:

(a)  This Assignment of Limited Liability Company Interest has been duly executed and delivered by the Assignor and is a valid and binding obligation of the Assignor, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and general principles of equity; and

(b)  The Assignor is the sole owner of the Assigned Interest free and clear of any liens, except for the liens created by the Pledge Agreement.

Section 4.   Filings.  On or as soon as practicable after the Effective Date, the Assignee shall file and record or cause to be filed and recorded with all proper offices or agencies all documents and instruments required to effect the terms herein, if any, including, without limitation, (a) this Assignment of Limited Liability Company Interest and (b) any limited liability company and assumed or fictitious name certificate or certificates and any amendments thereto.

Section 5.   Future Assurances.  Each of the Assignor and the Assignee mutually agrees to cooperate at all times from and after the date hereof with respect to any of the matters described herein, and to execute such further deeds, bills of sale, assignments, releases, assumptions, notifications or other documents as may be reasonably requested for the purpose of giving effect to, evidencing or giving notice of the assignment evidenced hereby.

Section 6.   Successors and Assigns.  This Assignment of Limited Liability Company Interest shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns.

Section 7.   Modification and Waiver.  No supplement, modification, waiver or termination of this Assignment of Limited Liability Company Interest or any provisions hereof shall be binding unless executed in writing by all parties hereto and the original or a copy of such writing has been delivered to Assignee.

Section 8.   Counterparts.  Any number of counterparts of this Assignment of Limited Liability Company Interest may be executed (including via .pdf).  Each counterpart will be deemed to be an original instrument and all counterparts taken together will constitute one agreement.  Delivery of an executed counterpart of a signature page to this Assignment of Limited Liability Company Interest by facsimile, telecopier or other electronic means shall be as effective as delivery of a manually executed counterpart of this Assignment of Limited Liability Company Interest.

Section 9.   Execution; Effective Date.  This Assignment of Limited Liability Company Interest will be binding and effective and will result in the assignment of the Assigned Interest on the Effective Date.

Section 10.  Governing Law.  This Assignment of Limited Liability Company Interest will be governed by the laws of the State of New York.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Assignor has caused this Assignment of Limited Liability Company Interest to be executed and delivered as of the Effective Date.

**ASSIGNOR:**

**EMPIRE EQ WGI LLC**, a Delaware limited liability company

By: _____
Name: Dov Lesches
Title:  Manager

STATE OF NEW YORK          )
                                      ) ss:
COUNTY OF NEW YORK       )

On the ___ day of March in the year 2019, before me, the undersigned, personally appeared **DOV LESCHES**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
NOTARY PUBLIC

[Signature Page – Assignment of Limited Liability Company Interest]

**<u>Exhibit 6 to Pledge Agreement</u>**

**<u>Organizational chart of the Pledgor, the Subsidiary and the Property</u>**

(see attached)



# EXHIBIT

# B-5

## ASSIGNMENT OF MEMBER UNIT INTERESTS

KNOW THAT, DAVID EYZENBERG ("**Assignor**"), in consideration for receiving membership interests in the Assignee, for hereby assigns to the assignee Empire EQ WGI LLC ("**Assignee**"), all Assignor's membership interests in Empire EQ Hotel LLC (the "**Company**") as set forth on Exhibit A of the First Amended and Reinstated Operating Agreement of Empire EQ Hotel LLC dated May 30, 2018 (attached hereto as **Exhibit A**).  Assignor shall deliver such additional documentation to evidence this assignment as requested by the Company.

TO HAVE AND TO HOLD the same unto the Assignee and its successors and assigns forever.

**IN WITNESS WHEREOF**, Assignor has duly executed this Assignment effective as of ___April 3rd, 2019. ___

**ASSIGNOR:**

DAVID EYZENBERG

By:_____

## ASSIGNMENT OF MEMBER UNIT INTERESTS

KNOW THAT, ABES CORNER LLC ("Assignor"), in consideration for receiving membership interests in the Assignee, for hereby assigns to the assignee Empire EQ WGI LLC. ("Assignee"), all Assignor's membership interests in Empire EQ Hotel LLC (the "Company") as set forth on Exhibit A of the First Amended and Reinstated Operating Agreement of Empire EQ Hotel LLC dated May 30, 2018 (attached hereto as **Exhibit A**). Assignor shall deliver such additional documentation to evidence this assignment as requested by the Company.

TO HAVE AND TO HOLD the same unto the Assignee and its successors and assigns forever.

IN WITNESS WHEREOF, Assignor has duly executed this Assignment effective as of January 30, 2019.

ASSIGNOR:

ABES CORNER LLC

By: _____

Its: _____

## ASSIGNMENT OF MEMBER UNIT INTERESTS

KNOW THAT, AVI LESCHES ("Assignor"), in consideration for receiving membership interests in the Assignee, for hereby assigns to the assignee Empire EQ WGI LLC ("Assignee"), all Assignor's membership interests in Empire EQ Hotel LLC (the "Company") as set forth on Exhibit A of the First Amended and Reinstated Operating Agreement of Empire EQ Hotel LLC dated May 30, 2018 (attached hereto as **Exhibit A**).  Assignor shall deliver such additional documentation to evidence this assignment as requested by the Company.

TO HAVE AND TO HOLD the same unto the Assignee and its successors and assigns forever.

IN WITNESS WHEREOF, Assignor has duly executed this Assignment effective as of January 2́5, 2019.

ASSIGNOR:

AVI LESCHES

By: _____

## ASSIGNMENT OF MEMBER UNIT INTERESTS

KNOW THAT, EDJF HOLDINGS LTD ("Assignor"), in consideration for receiving membership interests in the Assignee, for hereby assigns to the assignee Empire EQ WGI LLC ("Assignee"); all Assignor's membership interests in Empire EQ Hotel LLC (the "Company") as set forth on Exhibit A of the First Amended and Reinstated Operating Agreement of Empire EQ Hotel LLC dated May 30, 2018 (attached hereto as **Exhibit A**). Assignor shall deliver such additional documentation to evidence this assignment as requested by the Company.

TO HAVE AND TO HOLD the same unto the Assignee and its successors and assigns forever.

IN WITNESS WHEREOF, Assignor has duly executed this Assignment effective as of January 30, 2019.

ASSIGNOR:

EDJF HOLDINGS LTD

By: _____

Its: _____

## ASSIGNMENT OF MEMBER UNIT INTERESTS

KNOW THAT, DOVI LESCHES S TRUST ("Assignor"), in consideration for receiving membership interests in the Assignee, for hereby assigns to the assignee Empire EQ WGI LLC ("Assignee"), all Assignor's membership interests in Empire EQ Hotel LLC (the "Company") as set forth on Exhibit A of the First Amended and Reinstated Operating Agreement of Empire EQ Hotel LLC dated May 30, 2018 (attached hereto as **Exhibit A**). Assignor shall deliver such additional documentation to evidence this assignment as requested by the Company.

TO HAVE AND TO HOLD the same unto the Assignee and its successors and assigns forever.

IN WITNESS WHEREOF, Assignor has duly executed this Assignment effective as of January 32, 2019.

ASSIGNOR:

DOVI LESCHES S TRUST

By: _____

Its: _____

## ASSIGNMENT OF MEMBER UNIT INTERESTS

KNOW THAT, JOSEPH HARRIS ("Assignor"), in consideration for receiving membership interests in the Assignee, for hereby assigns to the assignee Empire EQ WGI LLC ("Assignee"), all Assignor's membership interests in Empire EQ Hotel LLC (the "**Company**") as set forth on Exhibit A of the First Amended and Reinstated Operating Agreement of Empire EQ Hotel LLC dated May 30, 2018 (attached hereto as **Exhibit A**). Assignor shall deliver such additional documentation to evidence this assignment as requested by the Company.

TO HAVE AND TO HOLD the same unto the Assignee and its successors and assigns forever.

IN WITNESS WHEREOF, Assignor has duly executed this Assignment effective as of January 31, 2019.

ASSIGNOR:

JOSEPH HARRIS

By: _____

# EXHIBIT

# B-6

## SCRIVENER'S AFFIDAVIT

BEFORE ME appeared the undersigned authority, duly authorized to take acknowledgements and administer oaths, personally appeared DOV LESCHES ("Affiant") who upon being duly sworn by me, deposes and says that:

1.      That the Affiant has personal knowledge of preparation of the operating agreements and assignments of various membership interests in Empire EQ Hotel LLC (the "Company").

2.      That on June 3, 2015, Affiant executed the Operating Agreement of the Company whereby he was the sole member of the Company.

3.      That on January 7, 2019, Affiant executed the First Amended Operating Agreement of the Company which, *inter alia*, purported that the Affiant's membership interests in the Company were transferred to the Dovi Lesches S Trust (the "DLST").

4.      That on January 30, 2019, Affiant executed, on behalf of the DLST an assignment of these membership interests to Empire EQ WGI LLC (the "Assignor").

5.      Other than those actions set forth herein, the DLST has not demanded ownership of these membership interests and makes no demand hereby. Moreover, DLST has not paid taxes, filed or received K-1 returns, or otherwise made any claim of ownership regarding these membership interests.

6.      That the actions described in paragraphs 2 and 3 above were in error (the "Scrivener's Error").

7.      That the Affiant recognizes the Scrivener's Error, and hereby confirms that the same was in error.

8.      That the Affiant desires to evidence the correction and remedying of the Scrivener's Error by (a) execution of the Assignment of Member Unit Interests from DLST to the Affiant as set forth on Exhibit A hereto and (b) execution of the Assignment of Member Unit Interests from Affiant to Assignor as set forth on Exhibit B hereto.

9.      This Affidavit is made under the full understanding of the law regarding liability for any misrepresentations herein.

DOV LESCHES

STATE OF NEW YORK          )
                          ) SS.:
COUNTY OF NEW YORK         )

On the 5 day of _March_ in the year 2019 before me the undersigned, personally appeared DOV LESCHES, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacit(ies) and that by his/her/their signature(s) on the instrument the individual(s) or the person upon behalf of which the individual(s) acted, executed the instrument.

Notary Public
Print Name: JUDITH J. SHENKER
My Commission Expires: 6/30/2022

JUDITH J. SHENKER
Notary Public, State of New York
No. 02SH4757608
Qualified in New York County
Commission Expires June 30, 2022

**IN WITNESS WHEREOF,** the below listed members have hereunto subscribed our names as all Members of the Company entitled to vote and have recognized and consented to the above Scrivener's Affidavit.

**AVI LESHES**

_____

**JOSEPH HARRIS**

_____

**EDJF HOLDINGS LTD**

_____
By: _____
Its: _____

**DAVID EYZENBERG**

_____

**DOV LESHES**

_____

**ABES CORNER LLC**

_____
By: _____
Its: _____

**EXHIBIT A**

## ASSIGNMENT OF MEMBER UNIT INTERESTS

KNOW THAT, DOVI LESCHES S TRUST ("Assignor"), through a scrivener's error was granted membership interests in Empire EQ Hotel LLC (the "Company") as evidenced solely by the First Amended Operating Agreement of the Company dated January 7, 2019. On January 30, 2019, also through a scrivener's error, the Assignor assigned these membership interests to Empire EQ WGI LLC ("WGI"). In order to correct such scrivener's error, Assignor hereby assigns to the assignee DOV LESCHES ("Assignee"), all Assignor's membership interests in Empire EQ Hotel LLC (the "Company"). Contemporaneously herewith, Assignee will assign such membership interests to WGI by separate assignment. Assignor shall deliver such additional documentation to evidence this assignment as requested by the Company.

TO HAVE AND TO HOLD the same unto the Assignee and its successors and assigns forever.

IN WITNESS WHEREOF, Assignor has duly executed this Assignment effective as of ___3rd___, March, 2019.

ASSIGNOR:

DOVI LESCHES S TRUST

By:_____

**EXHIBIT B**

## ASSIGNMENT OF MEMBER UNIT INTERESTS

KNOW THAT, DOV LESCHES ("Assignor"), in consideration for receiving membership interests in the Assignee, for hereby assigns to the assignee Empire EQ WGI LLC ("Assignee"), all Assignor's membership interests in Empire EQ Hotel LLC (the "Company") as set forth on the Assignment of Member Unit Interests of even date herewith.  Assignor shall deliver such additional documentation to evidence this assignment as requested by the Company.

TO HAVE AND TO HOLD the same unto the Assignee and its successors and assigns forever.

IN WITNESS WHEREOF, Assignor has duly executed this Assignment effective as of _____3ʳᵈ_____, March, 2019.

ASSIGNOR:

DOV LESCHES

By: _____

# EXHIBIT

# B-7

## WRITTEN CONSENT OF MANAGER
## EMPIRE EQ HOTEL LLC, A DELAWARE LIMITED LIABILITY COMPANY

The undersigned, being the Manager of Empire EQ Hotel LLC, a Delaware limited liability company (the "**Company**"), hereby consents to and adopts the following resolutions:

**WHEREAS**, the Company desires to become a subsidiary of Empire EQ WGI LLC, a Delaware limited liability company (the "**Parent**") and, in connection therewith, the current members of the Company have agreed to assign and transfer their membership interests in the Company to the Parent and, in exchange, will receive the same membership percentage interests in the Company that each member had in the Subsidiary (the "**Reorganization**"), and

**WHEREAS**, the Manager's consent is required for effectuate transfer of the limited liability company interests in the Company and the Manager has consented to the assignment of the limited liability company interests from Avi Leshes, Joseph Harris, EDJF Holdings LTD, David Eyzenberg, Dovi Leshes S Trust and Abes Corner LLC to the Parent, to effectuate the Reorganization.

**NOW, THEREFORE, BE IT RESOLVED**, that Dov Lesches, be and hereby is authorized, acting alone, to execute, pay, and deliver the necessary documents (and any other agreements) on behalf of the Company and to perform such other actions in the name and on behalf of the Company, with such changes therein as counsel to the Company shall deem necessary or appropriate to permit the Company to effectuate the Reorganization.

**FURTHER RESOLVED**, that the Manager expressly waives any and all requirements that may conflict with the foregoing resolutions. Based on the foregoing approval, Dov Lesches, is hereby authorized and empowered and directed in the name on and on behalf of the Company, to execute and deliver any and all documents necessary to effectuate the Reorganization, and any related documents necessary or advisable to effectuate the foregoing resolutions; and

**IT IS FURTHER CERTIFIED** that said action of the Manager of the Company was duly authorized and that the following is the duly qualified and acting Manager of the Company and nothing limits the power of the Manager of the Company to pass the foregoing consent.

<u>NAME</u>

Dov Lesches                    Manager

**IN WITNESS WHEREOF,** the below Manager has hereunto subscribed his/her/its names as the Manager of the Company entitled to vote.

Manager:

By: Dov Lesches, Manager

# EXHIBIT

# C-1

State of Delaware
Secretary of State
Division of Corporations
Delivered 03:09 PM 04/01/2016
FILED 03:09 PM 04/01/2016
SR 20162031273 - File Number 6005876

## CERTIFICATE OF FORMATION

Of

## EMPIRE EQ WGI LLC

**First:** The name of the Limited Liability Company is EMPIRE EQ WGI LLC

**Second:** The address of its registered office in the state of Delaware is 3500 South DuPont Highway Dover, DE 19901, County of Kent, Delaware. The name of its registered agent at such address is Interstate Agent Services, LLC.

**IN WITNESS WHEREOF**, the undersigned has executed this Certificate of Formation as of the date April 1st, 2016.

By: /S/ DOV LESCHES
Name: DOV LESCHES, Authorized Person

# EXHIBIT

# C-2

# Delaware

Page 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "EMPIRE EQ WGI LLC" IS DULY FORMED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE TWENTY-SECOND DAY OF FEBRUARY, A.D. 2019.

Jeffrey W. Bullock, Secretary of State

6005876  8300

SR# 20191288509

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 202311904

Date: 02-22-19

# EXHIBIT

# C-3

**OPERATING AGREEMENT OF**

**EMPIRE EQ WGI LLC**

THE MEMBERSHIP INTERESTS HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION (THE "COMMISSION") UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER THE SECURITIES LAWS OF ANY JURISDICTION, AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH STATE LAWS. THE MEMBERSHIP INTERESTS HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE COMMISSION, ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF AN INVESTMENT IN THE LIMITED LIABILITY COMPANY. A MEMBERSHIP INTEREST ALSO MAY NOT BE TRANSFERRED OR ENCUMBERED UNLESS THE PROVISIONS OF THIS AGREEMENT ARE SATISFIED.

<div align="center">

**OPERATING AGREEMENT OF**

**EMPIRE EQ WGI LLC**

</div>

**THIS OPERATING AGREEMENT** is made effective as of the 31ST day of January, 2019 (as amended from time to time, this "Agreement"), by and among EMPIRE EQ WGI LLC, a Delaware limited liability company (the "Company") and the Persons executing this Agreement as members (collectively, the "Members"), in consideration of the mutual covenants expressed herein.

1.    **Definitions.**

    1.1    *Definitions.* Unless the context otherwise requires, capitalized terms used in this Agreement and not otherwise defined herein shall have the following meanings:

"Act" shall mean the Delaware Limited Liability Company Act, as amended from time to time.

"Affiliate" shall mean (a) any Person directly or indirectly owning, controlling or holding the power to vote 10% or more of the outstanding voting securities of an identified other Person; (b) any Person 10% or more of whose voting securities are directly or indirectly owned, controlled or held with power to vote, by such other Person; (c) any Person directly or indirectly controlling, controlled by, or under common control with such other Person; (d) any officer, director, member, manager or partner of such other Person; (e) if such other Person is an officer, director, member, manager or partner, any entity for which such Person acts in any such capacity; and (f) any spouse, lineal ancestor or descendant of such other Person.

"Approved Budget" means the then effective approved annual budget of the Company.

"Capital Contribution" means contributions of cash or other property made by the Members to the Company, from time to time, pursuant to Section 5.

"Certificate" shall mean the Certificate of Formation of the Company, as amended from time to time.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, or corresponding provisions of future laws.

"Initial Capital Contribution" shall mean the Capital Contribution set forth opposite the name of each Member in Exhibit A to this Agreement.

"Internal Rate of Return" means an annualized effective compounded rate of return on capital.

"Manager" shall have the meaning set forth in Section 12.1.

"Member(s)" shall mean the Persons executing this Agreement as members and each Person who may become a substituted or additional Member pursuant to the provisions hereof and applicable

law, each in its capacity as a member of the Company.

"Net Cash Flow" shall mean, for each year, the Company's gross operating receipts during such year (not including Capital Contributions, loans from Members to the Company, proceeds from the sale or refinancing within a twelve-month period of all or substantially all of the assets of the Company, insurance proceeds, or similar capital events) and any cash reserves to be distributed to the Members, less the sum of (a) operating expenses paid in cash during such year to the extent such expenses have not been reserved against in a prior fiscal year; (b) the aggregate of all other cash amounts expended by the Company during such year (except distributions made pursuant to Sections 7.1, 7.2 and 7.3 hereof); and (c) any increases in reasonable amounts set aside for contingencies, taxes, insurance and similar items.

"Owner" shall mean EMPIRE EQ HOTEL LLC, a Florida limited liability company formed for the purpose of acquiring, owning, developing, holding, selling, assigning, transferring, operating, leasing, mortgaging, and otherwise dealing with the Property.

"Percentage Interests" shall mean, initially, the percentages set forth on Exhibit A to this Agreement, as such percentages may be adjusted from time to time pursuant to Section 5.2 and to reflect the admission of new members pursuant to the terms hereof.

"Person" shall mean a natural person, corporation, limited liability company, trust, partnership, estate, unincorporated association or other entity.

"Property" shall mean that certain approximately 5 acre site located at Westwood Boulevard, Orlando, Florida acquired by Owner, together with all improvements currently on such land and all subsequent or additional improvements on such land. The legal description of the Property is attached hereto as Exhibit C.

"Independent Director" means a Person bound by this Agreement as an Independent Director pursuant to Section 3.3. Such Independent Director shall only have the rights and duties expressly set forth in this Agreement.

"Unrecovered Capital Contribution" shall mean any Capital Contribution that is made by a Member and is not repaid pursuant to Section 7.

2.      **Organization and Purpose.**

        2.1     *Organization.* The Company was formed by the filing of the Certificate dated April 1st, 2016 with the Secretary of the State of Delaware pursuant to the Act. Dov Leshes is hereby designated as an "authorized person" within the meaning of the Act, and has executed, delivered and filed the Certificate with the Delaware Secretary of State. Upon the filing of the Certificate, his powers as an "authorized person" ceased, and Manager thereupon became the designated "authorized person" and shall continue as the designated "authorized person" with the meaning of the Act. The existence of the Company as a separate legal entity shall continue until cancellation of the Certificate as provided in the Act.

        2.2     *Company Name.* The name of the Company shall be "Empire EQ WGI

LLC" and all business of the Company shall be conducted under that name.

2.3     *Place of Business.*  The mailing and business office address of the Company shall be 3 Columbus Circle 15th Floor, New York, New York 10019. The Company address may be changed from time to time by Manager in its sole discretion.

2.4     *Term.*  The term of the Company shall commence on the date of this Agreement and shall continue thereafter until December 31, 2065.

2.5     *Company's Purpose.*  The Company has been formed solely for the purpose of being the sole member of Owner, the fee owner of the Property.

2.6     *Single Purpose Entity.*  The Company is a single purpose entity and until such time as the loan from Orlando Lender LLC to the Company in the amount of One Million Give Hundred Thousand and 00/100 Dollars ($1,500,000) as secured by the Promissory Note of even date herewith (the "Mezzanine Loan") is repaid, the Company shall continue to be, organized solely for the purpose of (i) owning the membership interest of Owner, (ii) entering into this Agreement and the documents related hereto, and (iii) engaging in any activity that is incidental, necessary or appropriate to accomplish the foregoing. So long as any part of the Mezzanine Loan remain unpaid and undischarged, the Company shall not (a) engage in any business or activity other than the ownership, operation and maintenance of the Property, and activities incidental thereto; (b) acquire or own any material assets other than the membership interests in Owner; (c) merge into or consolidate with any Person or dissolve, terminate or liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure; (d) fail to maintain separate financial statements and accounting records, showing its assets and liabilities separate and apart from those of any other Person; (e) have its assets listed on the financial statement of any other entity; and (f) fail to maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person.

3.     **Membership.**

3.1     *Members.*  The name, Capital Contribution and Percentage Interest of each of the Members is set forth on Exhibit A to this Agreement, as such Exhibit may be amended from time to time by the Manager.

3.2     *Admission of Additional Members.*  Additional Members may be admitted to the Company only upon and subject to the terms and conditions set forth in this Agreement.

3.3     *Independent Director.*  The Manager hereby appoints Colonial Charter Company, a Delaware Corporation as the Independent Director.  The Independent Director shall be required to consent to the following actions of the Company:

> 3.3.1 filing a voluntary bankruptcy petition;
> 3.3.2 instituting proceedings to have the Company adjudicated bankrupt or insolvent;
> 3.3.3 consenting to the institution of bankruptcy or insolvency proceedings

against the Company;

    3.3.4 filing a petition seeking, or consenting to, reorganization or relief as to the Company under any applicable federal or state law relating to or similar to bankruptcy;

    3.3.5 consenting to the appointment of a receiver or liquidator over the Company;

    3.3.6 dissolving the Company;

    3.3.7 making any assignment for the benefit of creditors; and

    3.3.8 admitting in writing that the Company is unable to pay its debts as they become due, or take action in furtherance of any such action.

To the fullest extent permitted by applicable law, including Section 18-1101(e) of the Act, the Independent Director shall not be liable to the Company, its Members or any other Person for breach of contract or breach of duties (including fiduciary duties), unless the Independent Director acted in bad faith or engaged in willful misconduct.

### 4.    Title to Company Property.

All property owned by the Company shall be owned by the Company as an entity and, insofar as permitted by applicable law, no Member shall have any ownership interest in any Company property in its individual name or right, and each Member's interest in the Company shall be personal property for all purposes. The foregoing provisions shall govern over any contrary or inconsistent provision in this Agreement or any other document or instrument governing the affairs of the Company.

### 5.    Capital Contributions.

5.1    *Initial Capital Contributions.* The Initial Capital Contribution of each Member as of the date hereof is set forth on <u>Exhibit A</u>. The Members acknowledge, however, that the Initial Capital Contribution of Dovi Leshes S Trust as reflected on <u>Exhibit A</u>.

5.2    *Additional Capital Contributions.*

    (a)    The Members acknowledge and agree that Manager may, from time to time, at his discretion, determine that an amount of additional cash capital is required by the Company or Owner for the development, improvement, maintenance and/or operation of the Property or other assets of the Company or Owner or for the payment of the Company's or Owner's obligations (such amount hereinafter referred to as a "<u>Capital Shortfall</u>"), and that, in such instance, the Capital Shortfall shall be resolved as provided in this <u>Section 5.2</u>.

    (b)    In the event of a Capital Shortfall, Manager may arrange to obtain that capital by one or a combination of (i) borrowing from Members and/or third parties, or (ii) additional Capital Contributions from the Members (each, an "<u>Additional Capital Contribution</u>"). If Manager determines that Additional Capital Contributions are required, Manager shall send a notice (the "<u>Call Notice</u>") to each Member stating the aggregate amount of the additional capital required (the "<u>Capital Call</u>"). Each Member shall, within twenty (20) days after the date of the Call Notice (the "<u>Call Period</u>"), contribute to the Company, it's Ratable Share (as hereinafter defined) of the Capital Call. Any such Additional Capital Contributions shall be made in cash or by wire transfer of immediately available funds into the Company's bank account, or intra-bank

transfer and such contribution, when made, shall be credited to such Member's capital account. Each such Member's "Ratable Share" of the Capital Call shall be determined by multiplying (i) a fraction, the numerator of which is the Unrecovered Capital Contribution of the Member at the time of the Call Notice and the denominator of which is the Unrecovered Capital Contributions of all Members at such time, by (ii) the aggregate amount of the Capital Call.

(c)    If any Member shall fail to contribute an amount (the "Default Amount") equal to its Ratable Share of the Capital Call within the time period prescribed by Section 5.2(b) above (the "Defaulting Member"), Manager shall give written notice (the "Second Call Notice") to the other Members (the "Non-Defaulting Members") stating the amount of the Default Amount and giving the Non-Defaulting Members the option to make further Additional Capital Contributions (each, a "Default Capital Contribution"). Within ten (10) days after the date of the Second Call Notice, each of the Non-Defaulting Members shall elect to make a Default Capital Contribution in an amount equal to all or a portion of the Default Amount, which election shall be made by written notice to Manager (the "Response Notice") given prior to the expiration of the aforesaid ten (10) day period.

(d)    Each Member who exercises the option to make a Default Capital Contribution shall be deemed to have offered to make a Default Capital Contribution in the amount of the lesser of (i) the amount of Default Capital Contributions such member elects to make in the Response Notice, and (ii) the product of (A) a fraction, the numerator of which is the amount of Default Capital Contributions that such Member elects to make in the Response Notice and the denominator of which is the aggregate amount of the Default Capital Contributions that all Members elected to make in their respective Response Notices, multiplied by (B) the Default Amount. Such offers shall be accepted or rejected (in whole or in part, proportionately, or disproportionately) by Manager by giving written notice to the responding Members within thirty (30) days after the date of the Second Call Notice, in which case those Members shall be obligated to make their Default Capital Contributions immediately. If and to the extent that Manager does not accept any offers within the time period stated in the preceding sentence, such offers shall be deemed rejected.

(e)    If any Defaulting Member fails to timely make its required Additional Capital Contribution and one or more Non-Defaulting Members make Default Capital Contributions, then the Defaulting Member's Percentage Interest immediately following the making of the Default Capital Contributions by Non-Defaulting Members shall be reduced by subtracting from such Defaulting Member's Percentage Interest the product of (i) the excess of (A) over (B), where (A) is such Defaulting Member's then Percentage Interest and (B) is the percentage determined by reference to a fraction, the numerator of which is the aggregate Capital Contributions of such Defaulting Member through the date of such determination, and the denominator of which is the aggregate Capital Contributions (including the Default Capital Contribution made by the Non-Defaulting Members) made by all Members (including the Defaulting Member) through the date of such determination. The Percentage Interests of each of the Members making Default Capital Contributions shall be increased by each such Member's proportionate share (based on the ratio of such Member's Default Capital Contribution to the total Default Capital Contributions) of the number of percentage points by which the Defaulting Member(s) Percentage Interest were decreased pursuant to this Section 5.2(f). If a Defaulting Member fails to timely make his required Additional Capital Contribution and other Members do

not make Default Capital Contributions in the full Default Amount, then the Defaulting Member's Percentage Interest shall be reduced by the product of (i) the excess of (A) over (B), where (A) is such Defaulting Member's then Percentage Interest and (B) is the percentage determined by reference to a fraction, the numerator of which is the aggregate Capital Contributions of such Defaulting Member through the date of such determination, and the denominator of which is the aggregate Capital Contributions made by all Members (including the Defaulting Member) through the date of such determination. The Percentage Interests of each of the Non-Defaulting Members shall be increased by each such Member's proportionate share (based on the ratio of such Member's Capital Contributions to the Capital Contributions of all Members) of the number of percentage points by which the Defaulting Member's Percentage Interest were decreased pursuant to this Section 5.2(f).

5.3    *No Withdrawals.* No Member shall be entitled to resign as a Member or withdraw any part of such Member's Capital Contribution from the Company and no Member shall be entitled to receive any distributions from the Company except as expressly provided in this Agreement.

5.4    *No Liability for Capital Contributions.* No Member shall be personally liable for the return of any portion of the Capital Contributions of the Members; rather, the return of the Members' respective Capital Contributions shall be made solely from the Company's assets. No Member shall have the right to demand or receive property other than cash for its interest in the Company.

5.5    *No Interest.* No Member shall receive any interest on its Unrecovered Capital Contributions.

6.    **Company Shares.**

6.1    *Description.* The Members and the number of shares held by each such Member ("Company Shares") are set forth on Exhibit A. The voting powers and rights of the Company Shares, and the qualifications, limitations or restrictions thereon, are as follows:

(a)    General. The Company Shares shall not have a stated value and shall not have any rights to distributions unless Manager shall have declared such a distribution to be made pursuant to Section 7 out of funds lawfully available therefor.

(b)    Voting. The holders of Company Shares shall be entitled to one vote per Company Share.

6.2    *Compliance with Securities Laws and Other Laws and Obligations.* Each Member hereby represents and warrants to the Company and to each other Member and acknowledges that (a) it has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of an investment in the Company and making an informed decision with respect thereto, (b) it is able to bear the economic and financial risk of investment in the Company for an indefinite period of time and understands that it has no right to withdraw and have its interest repurchased by the Company, (c) it is acquiring an interest in the Company for investment only and not with a view to, or for resale in connection with, any distribution to the public or public offering thereof, (d) it understands that the equity interests in

the Company have not been registered under the securities laws of any jurisdiction and cannot be disposed of unless they are subsequently registered and/or qualified under applicable securities laws and the provisions of this Agreement have been complied with.

## 7. Distributions.

7.1    *Distribution of Net Cash Flow*. Manager, in its sole discretion, may cause the Company to distribute to the Members in accordance with this subparagraph, from time to time prior to dissolution of the Company, cash or other assets or property, in such aggregate amounts as Manager shall deem appropriate; provided that any such distribution shall be made in the order of priority set forth below.

The Net Cash Flow of the Company shall be distributed to the Members in the following order of priority:

(a)    First, to all the Members, pro rata in accordance with their Percentage Interests until they have received aggregate distributions of Net Cash Flow in an amount equal to their Capital Contributions from the date of each contribution through the date of the distribution;

(b)    Second, the balance of Net Cash Flow shall be distributed eighty percent (80.0%) to the Members, pro rata in accordance with their Percentage Interests and twenty percent (20.0%) to the Manager, pro rata.

(c)    Third, once 10% (ten percent) is returned above principal, the balance of Net Cash Flow shall be distributed seventy percent (70.0%) to the Members, pro rata in accordance with their Percentage Interests and thirty percent (30.0%) to the Manager, pro rata.

(d)    Fourth, once 15% (fifteen percent) is returned above principal, the balance of Net Cash Flow shall be distributed sixty percent (60.0%) to the Members, pro rata in accordance with their Percentage Interests and forty percent (40.0%) to the Manager, pro rata.

(e)    Last, once 25% (twenty five percent) is returned above principal, the balance of Net Cash Flow shall be distributed fifty percent (50.0%) to the Members, pro rata in accordance with their Percentage Interests and fifty percent (50.0%) to the Manager, pro rata and remains there.

7.2    *Distribution of Proceeds of Refinancing*. Proceeds from any refinancing of the Property or other Company assets, reduced by the expenses attributable thereto, in such aggregate amounts as Manager shall deem appropriate, shall be distributed in the following order of priority:

(a)    First, to all the Members, pro rata in accordance with their Percentage Interests until they have received aggregate distributions of Net Cash Flow in an amount equal to their Capital Contributions from the date of each contribution through the date of the distribution;

(b)     Second, the balance of Net Cash Flow shall be distributed eighty percent (80.0%) to the Members, pro rata in accordance with their Percentage Interests and twenty percent (20.0%) to the Manager, pro rata.

(c)     Third, once 10% (ten percent) is returned above principal, the balance of Net Cash Flow shall be distributed seventy percent (70.0%) to the Members, pro rata in accordance with their Percentage Interests and thirty percent (30.0%) to the Manager, pro rata.

(d)     Fourth, once 15% (fifteen percent) is returned above principal, the balance of Net Cash Flow shall be distributed sixty percent (60.0%) to the Members, pro rata in accordance with their Percentage Interests and forty percent (40.0%) to the Manager, pro rata.

(e)     Thereafter, the balance of the proceeds shall be distributed fifty percent (50.0%) to the Class A Members, pro rata in accordance with their Class A Percentage Interests and fifty percent (50.0%) to the Class B Members, pro rata in accordance with their Class B Percentage Interests.

7.3     *Distribution of Proceeds from Sale or Disposition of Company Assets and Upon Dissolution.* Proceeds from the sale or other disposition of the assets of the Company (including the proceeds of any taking of the Property by eminent domain or condemnation and the proceeds of insurance received upon a partial or a complete destruction of the Property, to the extent that such proceeds have not been applied to the repair or reconstruction of the Property) and upon the dissolution of the Company shall be distributed in the following order of priority:

(a)     First, to all the Members, pro rata in accordance with their Percentage Interests until they have received aggregate distributions of Net Cash Flow in an amount equal to their Capital Contributions from the date of each contribution through the date of the distribution;

(b)     Second, the balance of Net Cash Flow shall be distributed eighty percent (80.0%) to the Members, pro rata in accordance with their Percentage Interests and twenty percent (20.0%) to the Manager, pro rata.

(c)     Third, once 10% (ten percent) is returned above principal, the balance of Net Cash Flow shall be distributed seventy percent (70.0%) to the Members, pro rata in accordance with their Percentage Interests and thirty percent (30.0%) to the Manager, pro rata.

(d)     Fourth, once 15% (fifteen percent) is returned above principal, the balance of Net Cash Flow shall be distributed sixty percent (60.0%) to the Members, pro rata in accordance with their Percentage Interests and forty percent (40.0%) to the Manager, pro rata.

(e)     Thereafter, the balance of the proceeds shall be distributed fifty percent (50.0%) to the Class A Members, pro rata in accordance with their Class A Percentage Interests and fifty percent (50.0%) to the Class B Members, pro rata in accordance with their Class B Percentage Interests.

## 8.    Capital Accounts.

8.1    *Maintenance of Capital Accounts*. A capital account shall be maintained for each Member on the Company's books of account in accordance with Section 1.704-1(b)(2)(iv) of the Treasury Regulations, and this <u>Section 8</u> shall be interpreted and applied in a manner consistent with such Section of the Treasury Regulations. In the event that Manager determines it is prudent to modify the manner in which Capital Accounts are adjusted and/or maintained in order to comply with the requirements of such Regulation, Manager may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any member upon dissolution of the Company.

8.2. *Basic Rules for Capital Account Entries*. The amount of each Member's capital account shall equal the aggregate amount of cash and the fair market value of any property contributed by that Member to the Company (less any liabilities assumed by the Company with respect to such contribution), and shall be increased by the aggregate amount of income allocated to that Member (or a predecessor) pursuant to <u>Sections 9.2</u> and <u>9.3</u>, and decreased by (a) the aggregate amount of losses allocated to that Member (or a predecessor) pursuant to <u>Section 9.4</u>, and (b) the aggregate amount of cash and the fair market value of any property distributed to that Member (or a predecessor) (less any liabilities assumed by the Member with respect to such distribution).

## 9.    Income, Gains and Losses.

9.1    *Computation of Net Income, Gains and Losses*. Net income, gains and losses as set forth on the books of account of the Company shall be computed in the same manner as net income, gains and losses are computed for federal income tax purposes, except that (i) items of income, gain, loss and deduction relating to the assets contributed to the Company by the Members shall be based on the fair market values of those assets (rather than their basis for federal income tax purposes) at the time of contribution, and (ii) items of tax exempt income and non- deductible expense shall be taken into account.

9.2    *Gross Income and Gain*. For any fiscal year of the Company, prior to any allocation of net income or net loss, pursuant to <u>Sections 9.3</u> and <u>9.4</u>, as the case may be, gross income and gain of the Company shall be allocated to the Members in an amount equal to the aggregate amount distributed to such Members during such fiscal year and all prior fiscal years pursuant to <u>Sections 7.1</u>, <u>7.2</u> and <u>7.3</u>, reduced by all amounts of gross income and gain previously allocated to such Members in all prior fiscal years pursuant to this <u>Section 9.2</u> (the "<u>Allocation Shortfall</u>"). In the event that the aggregate Allocation Shortfalls of all Members exceeds the Company's gross income and gain for the fiscal year, there shall be allocated to each Member an amount of gross income and gain equal to the product of (i) the amount of the Company's gross income and gain and (ii) a fraction, the numerator of which is the amount of such Member's Allocation Shortfall and the denominator of which is the aggregate amount of Allocation Shortfalls for all Members.  In the event that the Company's gross income and gain for the fiscal year exceeds the aggregate Allocation Shortfall of all holders of Company Shares, prior to any allocation of capital gain, there shall first be allocated items of ordinary gross income.

9.3    *Net Income*. Net income of the Company for any fiscal year, calculated

after any allocation of gross income pursuant to Section 9.2, shall be allocated as follows:

(a)    To all Members with a deficit in their capital accounts, pro rata to the amount of such deficits; then

(b)    To the Members, in each case, in an amount equal to the excess of (i)(A) such Member's capital contributions, reduced by (B) amounts distributed to such Member pursuant to Sections 7.2 and 7.3 (the "Entitlement Amount") over (ii) the capital account of such Member ("Entitlement Shortfall"). In the event that the aggregate Entitlement Shortfalls of all Members exceeds the amount of net income to be allocated under this Section 9.3(b), there shall be allocated to each Member an amount equal to the product of (i) the Company's net income allocable under this Section 9.3(b) and (ii) a fraction, the numerator of which is the amount of such Member's Entitlement Shortfall and the denominator of which is the aggregate Entitlement Shortfalls of all Members; then

(c)    To the Members in such amounts and proportions as will cause the excess of the capital account balance of each Member over that Member's Entitlement Amount ("Excess Entitlement") to be in proportion to the percentage of Company Shares owned by that Member; and

(d)    The balance to the Members pro rata in accordance with their respective Percentage Interests.

9.4    *Net Loss.*

Net loss of the Company for any fiscal year, calculated after allocation of gross income and gain pursuant to Section 9.2, shall be allocated in the following order:

(a)    To the Members in such amounts and proportions as will cause the Excess Entitlement amount of each Member to be in proportion to the percentage of Company Shares owned by the Member; then

(b)    To the Members in an amount equal to such Member's Excess Entitlement. In the event that the aggregate Excess Entitlements of all Members exceeds the amount of net loss of the Company, there shall be allocated to each Member an amount equal to the product of (i) the Company's net loss and (ii) a fraction, the numerator of which is the amount of the Member's Excess Entitlement and the denominator of which is the aggregate Excess Entitlements of all Members; then

(c)    To all Members in an amount equal to the aggregate positive capital account balances of all of them. In the event that such aggregate capital account balances exceed the amount of net loss allocable under this Section 9.4, there shall be allocated to each Member an amount of net loss equal to the product of (i) the net loss and (ii) a fraction, the numerator of which is such Member's positive capital account balance and the denominator of which is the positive capital account balances of all of them; and

(d)     The balance to the Members pro rata in accordance with their respective Percentage Interests.

9.5     *Special Allocations.*

The following special allocations shall be made in the following order:

(a)     Gain Chargeback. Notwithstanding any other provision of this Section 9, if there is a net decrease in the Company's minimum gain (as calculated in accordance with the principles of Treasury Regulation Section 1.704-2(d)(1)) during any fiscal year, each Member, but only to the extent required by Treasury Regulation Section 1.704-2(f), shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to the portion of such Member's share of the net decrease in Company minimum gain, determined in accordance with Treasury Regulation Section 1.704(g)(2). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j) of the Treasury Regulations. This Section 9.5(a) is intended to comply with the minimum gain chargeback requirement in such Sections of the Treasury Regulations and shall be interpreted consistently therewith.

(b)     Member Nonrecourse Debt Minimum Gain Chargeback. Notwithstanding any other provision of this Section 9 except Section 9.5(a), if there is a net decrease in Member nonrecourse debt minimum gain (calculated in accordance with the principles of Treasury Regulation Section 1.704(2)(i)(3)) during any Company fiscal year, each Member who has a share of that Member nonrecourse debt minimum gain, determined in accordance with the principles of Treasury Regulation Section 1.704-2(i)(5), as of the beginning of such fiscal year, but only to the extent required by Treasury Regulation Section 1.704-2(i) and not subject to the exceptions set forth in Treasury Regulation Section 1.704-2(i)(4), shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Member nonrecourse debt minimum gain, determined in accordance with Treasury Regulation Sections 1.704-2(i)(4) and 1.704-2(g)(2). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with, and only to the extent required by, Sections 1.704-2(i) and 1.704-2(j) of the Regulations. This Section 9.5(b) is intended to comply with the minimum gain chargeback requirements in such Sections of the Treasury Regulations and shall be interpreted consistently therewith.

(c)     Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulation Sections 1.704-1(b)(2)(ii)(*d*)(4), 1.704-1(b)(2)(ii)(*d*)(5) or 1.704-1(b)(2)(ii)(*d*)(6), items of Member income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the capital account deficit of such Member adjusted in the manner set forth in Treasury Regulation Section 1.704-1(b)(2)(ii)(*d*)(4), (5) and (6) ("Adjusted Capital Account Deficit") as quickly as possible, provided that an allocation pursuant to this Section 9.5(c) shall be made if and only to the extent that such

Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 9 have been tentatively made as if this Section 10.5(c) were not in the Agreement. This Section 9.5(c) is intended to be a qualified income offset in compliance with Treasury Regulation Sections 1.704-1(b)(2)(ii)(*d*) and shall be interpreted consistently therewith.

## 10.    Fiscal Year Reports.

10.1    *Fiscal Year*. The Company's fiscal year shall be the calendar year unless changed by Manager.

10.2    *Books of Account*. Complete and accurate books of account shall be kept by the Company at the principal office of the Company (or at such other office as Manager may designate). The determinations of Manager with respect to the treatment of any item or its allocation for federal, state or local income tax purposes shall be binding upon the Members so long as that determination is not inconsistent with any express provision of this Agreement or applicable law.

10.3    *Reports*. No later than January 31st, after the close of each fiscal year, Manager shall furnish to each Member financial statements (which need not be audited) for that fiscal year. The financial statements shall include a balance sheet of the Company as of the end of the year and a statement of income and a statement of changes in financial position of the Company for the year, setting forth in each case in comparative form the figures as of the end of and for the previous fiscal year.

10.4    *K-1 Reports*. Within 105 days after the end of each calendar year, Manager shall furnish to each Member a copy of Schedule K-1 to the Company's federal income tax return for that year.

## 11.    Tax Matters.

11.1    *Allocations*. For federal, state and local income tax purposes, all items of income, deduction and loss shall be allocated among the Members on the same basis as profits are allocated and losses are charged as provided in Section 9 and all items of credit and other items not so allocated shall be allocated among the Members in the manner provided for in the Code and the applicable Treasury Regulations issued thereunder. Notwithstanding the foregoing, tax items relating to property subject to Section 704(c) of the Code and the applicable Treasury Regulations issued thereunder shall be allocated in accordance therewith.

11.2    *Consistency*. No Member shall treat a Company item on its federal, state or local income tax returns in a manner inconsistent with the treatment of the Company item on the Company's federal, state or local income tax return.

11.3    *Elections*. Upon a transfer of Company Shares described in Code Section 743(b) or upon a distribution of Company assets, Manager, in its sole discretion, may file an election pursuant to Code Section 754 to adjust the basis of Company property.

11.4    *Tax Matters Partner*. Manager shall be the tax matters partner as that term is defined in Section 6231 of the Code for the Company.

11.5   *Tax Classification*. It is the intention of the Members that the Company be treated, for all federal, state and local tax proposes, as a partnership and not as an association taxable as a corporation, and the Members, and Manager on behalf of the Company, shall take all actions consistent with the foregoing.

## 12.   Operation of Business.

12.1   *Management of Business*. Except for (i) duties specifically delegated to a Member pursuant to the terms of this Agreement, and/or (ii) as specifically provided elsewhere in this Agreement, the full right, power, authority and discretion to conduct the business and affairs of the Company, and to do all things necessary to carry on the business of the Company, shall be vested in a manager (the "Manager"), acting alone and without the consent of any other Members. The Members hereby designate Dov Lesches as the Manager. The Members hereby authorize Manager to execute and deliver, on behalf of the Company and Owner, all documents reasonably required in connection with the acquisition of debt of, or direct and indirect interests in, the Owner, and the acquisition by Owner of the Property.

12.2   In the event of a willing withdrawal of Manager, Manager shall notify its Members in writing thirty days (30) prior to the intended withdrawal date. If the Manager withdraws due to death, sickness or if the Manager is no longer able to fulfill its duties, a successor Manager shall be elected by the majority in interest of the remaining Members. The newly elected Manager shall be entitled to one third (1/3) of net proceeds.

12.3   *Day-to-Day Management*. In addition to, and not in limitation of Section 12.1 above, but subject to Section 12.3 below, Manager is hereby authorized on behalf of the Company in its individual capacity and in its capacity as a manager of Owner to follow the Approved Budget and to:

(a)   Incur all expenditures and pay all obligations of the Company and Owner;

(b)   Execute any and all documents or instruments of any kind which Manager may deem necessary or appropriate for carrying out the daily purposes of the Company or Owner;

(c)   Purchase or lease equipment for the Company's or Owner's purposes;

(d)   Cause the Company to borrow funds, and, in connection with such borrowing, mortgage real property, grant security interests in real property and/or any other property owned by the Company and execute documents as necessary to accomplish such borrowing;

(e)   Procure and maintain, at the expense of the Company or Owner, as applicable, with responsible companies, such insurance in such amounts and covering such risks as are appropriate in the judgment of Manager;

(f)   Receive and disburse any Net Cash Flow in accordance with Section 7;

(g)   Supervise the preparation and filing of all Company and Owner tax returns;

(h)   Make any tax elections on behalf of the Company and Owner;

(i)   Engage and terminate any attorneys, accountants, brokers or sales, agents, and determine the terms of such engagements, except for sale of the Property;

(j)   Supervise the preparation and filing of all Company and Owner tax returns;

(k)   Make any tax elections on behalf of the Company and Owner;

(l)   Engage and terminate any attorneys, accountants, brokers or sales;

(m)   agents, and determine the terms of such engagements, except for sale of the Property; and

(n)   Perform any and all other acts or activities customary or incidental to the purpose of the Company's daily operations.

12.4   *Services of Manager; Other Activities*. Manager shall devote such time to the affairs of the Company as it may determine necessary to conduct them properly. Notwithstanding any other duty at law or in equity, Manager may engage or have an interest in other business ventures of any kind, independently or with others (which ventures may compete with the business of the Company or the Owner) and neither the Company nor any other Member shall have any rights in or to those independent ventures. In addition, each of the Members and their direct or indirect owners or any other Affiliate of any Member may have other business interests and may engage in other activities in addition to those relating to the Company, whether or not such business interests or activities may be competitive with those of the Company. None of the Company, any Member or Manager shall have any right pursuant to this Agreement to share or participate in such other business interests or activities or to the income or proceeds derived therefrom.

12.5   *Officers*. Manager may appoint such officers of the Company as it deems desirable, including, but not limited to, a president, one or more vice-presidents, a secretary, a treasurer, and one or more assistant secretaries and assistant treasurers. Except as Manager shall otherwise determine, each of the officers of the Company shall have the powers and duties that a person holding that office in a corporation customarily has.

12.6   *No Partition, Sale or Partition*. No Member shall have the right to require partition of any of the Company's property or to compel any sale or appraisal of the Company's assets.

12.7   *Reliance by Third Parties*. Any person dealing with the Company, Manager or any Member or any officer of the Company may rely upon a certificate signed by Manager as to (a) the identity of Manager, any Member or officer of the Company, (b) any factual matters relevant to the affairs of the Company, (c) the persons who are authorized to execute and deliver

any document on behalf of the Company or (d) any action taken or omitted by the Company, Manager or any Member.

128   *Discretion.* Whenever in this Agreement Manager is permitted or required to make a decision in its "discretion" or "sole discretion" or under a grant of similar authority or latitude, Manager shall have no duty or obligation to consider any interest of or factors affecting some or all the Members so long as such Manager acts in good faith and in a manner which it reasonably believes is in or not opposed to the best interest of the Company. Each Member hereby agrees that any standard of care or duty imposed under the Act or any other applicable law shall be modified, waived or limited in each case as required to permit Manager to act under this Agreement and to make any decision pursuant to the authority prescribed in this <u>Section 12.9</u> so long as such action or decision does not constitute willful or wanton misconduct, gross negligence or a material breach of the terms of this Agreement and is reasonably believed by Manager to be consistent with the overall purposes and objectives of the Company.

### 13.   Meetings.

13.1   *Quorum; Majority Vote.* A majority of Members in interest entitled to vote shall constitute a quorum at the meeting of Members. If a quorum is present, the affirmative vote of the majority in interest of Members represented at the meeting and entitled to vote on the subject matter shall constitute the act of the Members. In casting their votes, the Members shall, to the fullest extent permitted by law, take into account the interests of the Company's creditors, as well as those of the Members. For the avoidance of doubt, class of Company Shares will not affect voting rights.

### 14.   Independent Counsel; Conflict Waiver.

14.1   Each of the Members acknowledges that in connection with the negotiation and/or review of this Agreement and all transactions contemplated herein, each Member has had the benefit of its own independent legal counsel. Each of the Members further acknowledges that The Bernstein Law Firm ("<u>BLF</u>") does not represent in connection with the negotiation of this Agreement and all transactions contemplated herein. BLF provides legal services to the Company, Owner, and Manager (and its affiliates) and certain individuals and corporate investors in the Company (the "<u>Representation Parties</u>") in connection with other matters. The interests of the Representation Parties may be adverse to one another. Each Member hereby waives any conflict of interest of BLF or claim against BLF in connection with BLF's legal representation of the Company, the Owner, Manager (and its Affiliates) and any other Members. Each Member hereby waives any conflict of interest in connection with the negotiation of this Agreement whether apparent, actual or potential and agrees that it has or had the opportunity to consult with its own independent counsel (with the recommendation by Manager that it do so) and waives, releases and surrenders any and all claims or defenses pertaining to the enforcement of this Agreement that a conflict of interest exists or that it was not represented by counsel in connection with the execution of this Agreement or it entered the Agreement without understanding its legal terms or binding effect.

### 15.   Assignment of Interest.

15.1   *General Rules.* A Member may not sell, transfer, assign, pledge, hypothecate or otherwise dispose (the foregoing collectively referred to as a "Transfer") of all or any portion of its interest in the Company without the consent of Manager. Upon the grant of such consent a transferee may become a substitute Member upon its execution of a counterpart to this Agreement. Such admission shall be deemed immediately prior to the Transfer and, immediately following such admission, the transferor Member shall cease to be a member of the Company. Any Transfer or purported Transfer that does not conform to the requirements of this Section 15 shall be void and ineffective, and shall not be recognized by the Company for any purpose, subject to Section 15.2. Notwithstanding the foregoing, a Transfer within the meaning of this Section 15 shall, to the fullest extent permitted by law, be deemed not to occur upon (a) a Transfer by devise or descent or by operation of law upon the death of partner, stockholder or member of any entity owning, directly or indirectly, an interest in the Company, (b) any transfer between partners, stockholders or members of an entity which owns, directly or indirectly, an interest in the Company, (c) any transfer by an indirect beneficial owner of interest in the Company to (i) his spouse, partners or siblings, (ii) his children or grandchildren, or (iii) to a trust for the primary benefit of any of the foregoing, or (d) any Transfer by a trust to its beneficiaries (each an "Exempted Transfer").

15.2   *Transfers Resulting in Default Under the Terms of a Mortgage Agreement.* Not in limitation of the foregoing, any Transfer of an interest in the Company, or in any entity holding a direct or indirect interest in the Company, which would result in a default pursuant to any mortgage agreement with respect to the Property or any other Company asset is hereby declared, to the fullest extent permitted by law, null and void ab initio.

15.3   *Transferee Not a Member.* Without limiting the generality of Section 15.1 hereof, and notwithstanding any other provision of this Agreement, no Person acquiring a Member interest, other than a Person who is a Member prior to the applicable Transfer, shall become substituted or admitted as a Member (a) unless such Person (i) executes a counterpart signature page to this Agreement agreeing to be bound by the terms thereof and (ii) pays all costs reasonably incurred by the Company incidental to the Transfer including, without limitation, attorneys' fees, and (b) if such substitution or admission would constitute a violation of the Securities Act or of any other applicable state or federal securities laws. In addition, in the event of an Exempted Transfer, the transferee shall not become a Member hereunder without Manager's consent. If Manager does not (or is not requested to) grant its consent to the admission of any such transferee as a Member, then such transferee shall be entitled to receive any distributions to which it would be entitled if it were a Member and shall be treated as a Member for tax purposes, but shall not have any other rights or privileges of a Member.

154   *Buy-Sell Procedure.* Prior to a Member selling any portion of its Member interest in the Company, the Selling Member shall first make a written offer ("Offer") to sell its Interest to the other Members at a price equal to (a) the Fair Market Value (as defined below) of Seller's Member interest minus (b) Seller's proportionate share of any selling, prepayment or other costs that would apply in the event the Property was sold on the date of the offer. The other Members shall be entitled to purchase the Selling Member's Member interest in the Company. "Fair Market Value", which shall not be discounted based on amount of ownership, shall mean the fair market value of Seller's Member interest in the Company (reduced by liabilities secured by the Property or liabilities taken subject to) on the date the Offer is made as determined in

accordance with the procedures set forth below. The other Members shall have sixty (60) days after delivery of the Offer to accept the Offer. If the other Members or any of them (the "Purchaser") accepts the Offer, Selling Member and Purchaser shall commence negotiation of the Fair Market Value within fifteen (15) days after the Offer is accepted. If the parties do not agree, after good faith negotiations, within ten (10) days, then each party shall submit to the other a proposal containing the Fair Market Value the submitting party believes to be correct (each a "Proposal"). If either Purchaser or Seller fails to timely submit a Proposal, the other party's submitted Proposal shall determine the Fair Market Value. If both Purchaser and Seller timely submit Proposals, then the Fair Market Value shall be determined by final and binding arbitration in accordance with the procedures set forth below. Purchaser and Seller shall meet, telephonically or at a mutually agreeable location, within seven (7) days after delivery of the last Proposal and make a good faith attempt to mutually appoint a certified MAI real estate appraiser who shall have been active full-time over the previous five (5) years in the appraisal of comparable properties located in Orlando, Florida to act as the arbitrator. If Purchaser and Seller are unable to agree upon a single arbitrator, then Purchaser and Seller each, within five (5) days after the meeting, shall select an arbitrator that meets the foregoing qualifications. The two (2) arbitrators so appointed, within fifteen (15) days after their appointment, shall appoint a third arbitrator meeting the foregoing qualifications; provided, however, if one party fails to appoint an arbitrator in such period, then the one appointed arbitrator shall make such determination itself without the need for an additional, or third, arbitrator to be appointed or chosen. The determination of the arbitrator(s) shall be limited solely to the issue of whether Seller's or Purchaser's Proposal most closely approximates the Fair Market Value. The decision of the single arbitrator or of the arbitrator(s) shall be made within thirty (30) days after the appointment of a single arbitrator or the third arbitrator, as applicable. The arbitrator(s) shall have no authority to create an independent structure of fair market value or prescribe or change any or several of the components or the structure thereof; the sole decision to be made shall be which of the parties' Proposals most closely corresponds to the Fair Market Value. The decision of the single arbitrator or majority of the three (3) arbitrators shall be binding upon Purchaser and Seller. If Purchaser or Seller fails to appoint an arbitrator within the time period specified above, the arbitrator appointed by one of them shall reach a decision that shall be binding upon the parties. The cost of the arbitrators shall be paid equally by Seller and Purchaser. The arbitration shall be conducted in Orlando, Florida, in accordance with applicable Florida law, as modified by this Agreement. The parties agree that Federal Arbitration Act, Title 9 of the United States Code, shall not apply to any arbitration hereunder. The parties shall have no discovery rights in connection with the arbitration. The decision of the arbitrator(s) may be submitted to any court of competent jurisdiction by the party designated in the decision. Such party shall submit to the applicable court having subject matter jurisdiction a form of judgment incorporating the decision of the arbitrator(s), and such judgment, when signed by a judge of such court, shall become final for all purposes and shall be entered by the clerk of the court on the judgment roll of the court. If either Purchaser or Seller refuses to arbitrate an arbitrable dispute and the party demanding arbitration obtains a court order directing the other to arbitrate, the party demanding arbitration shall be entitled to all of its reasonable attorneys' fees and costs in obtaining such order, regardless of which party ultimately prevails in the matter. **BY EXECUTING THIS AGREEMENT, EACH MEMBER AGREES TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE ARBITRATION OF DISPUTES PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY FLORIDA LAW AND EACH TENANT IN COMMON KNOWINGLY GIVES UP ANY RIGHTS IT MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR**

**JURY TRIAL. BY EXECUTING THIS AGREEMENT EACH TENANT IN COMMON GIVES UP ITS JUDICIAL RIGHTS TO APPEAL. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF FLORIDA LAW. EACH MEMBER'S AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY.** Once the Fair Market Value is determined, the Purchaser shall be obligated to acquire the Seller's Member interest. The closing of the purchase shall occur and be administered by the Manager within ninety (90) days from the date a Fair Market Value is determined, whether by agreement or arbitration.

15.5    *Effective Date.* Any authorized Transfer of a Member interest or admission or substitution of a Member pursuant to this <u>Section 15</u> shall be deemed effective as of the last day of the calendar month in which such Transfer or admission occurs.

15.6    *Survival of Obligations.* No Transfer by any Member of all or any portion of its Member interest shall relieve such Member from any of the liabilities or obligations, including any indemnification obligations under <u>Section 17</u>, of such Member to the Company existing or arising out of actions that occurred on or prior to the date of such Transfer.

16.    **Dissolution; Liquidation.**

16.1    *Dissolution.* The following provisions shall govern over this Agreement or any other document or instrument governing the affairs of the Company:

(a)    The Company shall be dissolved, and its affairs shall be wound up upon the first to occur of the following: (i) the termination of the legal existence of the last remaining member of the Company or the occurrence of any other event which terminates the continued membership of the last remaining member of the Company in the Company unless the Company is continued without dissolution in a manner permitted by this Agreement or the Act or (ii) the entry of a decree of judicial dissolution under Florida Law. Upon the occurrence of any event that causes the last remaining member of the Company to cease to be a member of the Company, to the fullest extent permitted by law, the personal representative of such member is hereby authorized to, and shall, within 90 days after the occurrence of the event that terminated the continued membership of such member in the Company, agree in writing (i) to continue the Company and (ii) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of the Company, effective as of the occurrence of the event that terminated the continued membership of the last remaining member of the Company in the Company.

(b)    Notwithstanding any other provision of this Agreement, the Bankruptcy of the Member shall not cause the Member to cease to be a member of the Company and upon the occurrence of such an event, the Company shall continue without dissolution. Bankruptcy means, with respect to any Person, if such Person (i) makes an assignment for the benefit of creditors, (ii) files a voluntary petition in bankruptcy, (iii) is adjudged a bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (iv) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against

it in any proceeding of this nature, (vi) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (vii) if 120 days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, if the proceeding has not been dismissed, or if within 90 days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all of any substantial part of its properties, the appointment is not vacated or stayed, or within 90 days after the expiration of any such stay, the appointment is not vacated. The foregoing definition of "Bankruptcy" is intended to replace and shall supersede and replace the definition of "Bankruptcy."

16.2     *Liquidation and Distribution of Assets.* Upon dissolution of the Company, Manager shall proceed to sell or liquidate the Company's assets within a reasonable time and, shall distribute the Company's cash and other assets among the Members in accordance with the provisions of Section 7.3 of this Agreement.

16.3     *Termination.* The Company shall terminate when all property owned by the Company has been disposed of and the assets, after payment of or provisions for liabilities to the Company's creditors, have been distributed among the Members as provided in Section 16.2 and the Certificate shall not have been cancelled in the manner required under the Act.

16.4     *Internal Revenue Code Section 1031 Tax Deferred Exchange.* At the request of either Member, the Members agree to reasonably cooperate with the other in structuring and documenting the sale of all or any portion of a Member's interest in the Company to effect a tax deferred exchange in accordance with the provisions of Section 1031 of the Internal Revenue Code and its corresponding regulations. Such cooperation shall be at no cost to the other Member (i.e., the cooperating Member).

## 17.   Exculpation, Indemnification, Limitation of Liability of Members.

17.1     *Liability of Members and Manager.* No Member or Manager shall have any liability for the obligations or liabilities of the Company except to the extent provided in the Act and other applicable law. A Member and/or Manager shall not be personally liable for any indebtedness, liability or obligation of the Company, except as otherwise set forth under the Act and any other applicable law. Without limiting the generality of the preceding sentence, a Member or Manager does not in any way guaranty the return of any Capital Contribution to any other Member or a profit for the Members from the operations of the Company. No Member shall be obligated to restore by way of Capital Contribution or otherwise any deficit in its Capital Account or the Capital Account of any Member (if such deficits occur). Except as may otherwise be specifically provided in this Agreement, each Member's and Manager's personal liability shall be limited to the fullest extent under the Act and other applicable law.

17.2     *No Binding Authority of Members.* No Member is an agent of the Company solely by virtue of being a Member, and no Member has authority to act for the Company solely by virtue of being a Member. Any Member that takes any action or binds the Company in violation of this Agreement shall be solely responsible for, and indemnify the Company and each other Member against, any losses that the Company, or such other Member, as the case may be, may at

any time become subject to or liable for by reason of the actions specified above.

17.3    *Indemnification by the Company*. Subject to the standards and restrictions, if any, set forth in this Agreement, the Company shall, to the fullest extent permitted by law, indemnify and hold harmless each Member of the Company, or any executor or administrator of the estate of such Member, made, or threatened to be made, party to an action or proceeding, whether civil or criminal, by reason of the fact that such Person is or was a Member of the Company, against amounts paid in settlement and reasonable expenses, including attorneys' fees, actually or necessarily incurred by it in connection with the defense or settlement of such action, or in connection with an appeal therein; *provided, however*, that no indemnification shall be made to or on behalf of any Member (a) if a judgment or other final adjudication adverse to such Person establishes (i) that its acts were committed in bad faith or were the result of active and deliberate dishonesty and were material to the cause of action so adjudicated or (ii) that it personally gained in fact a financial profit or other advantage to which such person was not legally entitled or (b) in connection with any dispute between or among the Members.

17.4    *Indemnification by Members*. Subject to the terms of this Agreement and the Act, each Member hereby indemnifies each and every other Member from and against all losses resulting from the breach by any such first Member of any of terms or conditions of this Agreement. Without limiting the generality of the foregoing, any Member who or which engages in a Transfer of any Member interest or any interest therein or associated rights relating thereto, or who or which permits any Person owning an equity interest in such Member to engage in a Transfer of such equity interest or part thereof, agrees to indemnify and hold harmless the Company and the other Members from any federal, state or local income taxes, or transfer taxes arising from any such Transfer.

17.5    *Indemnification of Manager*. The Company shall indemnify, defend, and hold harmless Manager and its respective employees, agents, shareholders, directors, officers, representatives, and attorneys and any officers or agents of the Company (each, an "Indemnified Person"), on demand of and to the reasonable satisfaction of the Indemnified Person, from and against any and all liabilities, obligations, losses, damages, penalties, actions, suits, proceedings, judgments, costs, expenses, and disbursements of any kind or nature whatsoever including, without limitation, all costs and expenses of investigation, defense, appeal and settlement ("Indemnity Damages"), which may be incurred by or asserted against the Indemnified Person in any way relating to or arising out of, or alleged to relate or arise out of any action or inaction on the party of the Indemnified Person other than the portion of the Indemnity Damages resulting from the Indemnified Person's own willful or wanton misconduct, gross negligence or breach of fiduciary duty.

**18.    Other Action.**

Each Member shall execute and deliver such additional documents and instruments, and shall perform such additional acts, as may be necessary or appropriate to carry out the terms of this Agreement.

**19.    Admission of Additional Members.**

19.1    *Consent required.* No Person may be admitted to the Company as a Member without the prior written consent of Manager.

19.2    *Manager to set Criteria.* Manager shall determine the financial and other criteria for entry of new Members into the Company and shall accept all new subscriptions on behalf of the Company.

## 20.    Miscellaneous.

20.1    *Entire Agreement; Amendment.* This Agreement contains a complete statement of the arrangements among the Members with respect to the Company, and supersedes all prior agreements and understandings among them with respect to the Company. This Agreement may be amended only by a written agreement of the Members or as otherwise provided in the Act.

20.2    *Notices.* Any notice or other communications under this Agreement shall be in writing and shall be considered given when delivered in person or mailed by registered mail, postage prepaid and return receipt requested, addressed to the party intended as the recipient at the address listed on the Company's records or at such other address as a Member may designate by written notice to the other Members.

20.3    *Governing Law.* This Agreement shall be governed by, and construed in accordance with, the law of the State of Delaware applicable to agreements made and to be performed in the State of Delaware.

20.4    *Counterparts; Facsimile and PDF Signatures.* This Agreement may be executed in multiple counterparts with separate signature pages, each such counterpart shall be considered an original, but all of which together shall constitute one and the same instrument. For purposes of execution of this Agreement, signatures transmitted via facsimile or Portable Document Format (or "PDF") shall be deemed original ink signatures.

20.5    *Attorneys' Fees.* If any action or proceeding is instituted between all or any of the Members arising from or related to or with this Agreement, the Member or Members prevailing in such action or arbitration shall be entitled to recover from the other Member or Members all of its or their costs of action or arbitration, including, without limitation, reasonable attorneys' fees and costs as fixed by the court or arbitrator therein.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

**COMPANY:**

EMPIRE EQ WGI LLC

By: _____

Name: Dov Leshes

Title:   Managing Member

**MEMBERS:**

By: _____

Name:

Title:

**INDEPENDENT DIRECTOR:**

COLONIAL CHARTER COMPANY, a
Delaware Corporation

By: _____

Name:  Karen Elliott

Title:   Authorized Representative

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

COMPANY:

EMPIRE EQ WG1 LLC

By:
Name: Dovi Leshes
Title:    Managing Member

MEMBERS:

ABES CORNER LLC

By: _____

Its: _____

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

COMPANY:

EMPIRE EQ WGI LLC

By: _____
Name: Dov Leshes
Title:  Managing Member

MEMBERS:

JOSEPH HARRIS

By: _____

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

COMPANY:

EMPIRE EQ WOH LLC

By: _____
Name: Dov Lesches
Title:   Managing Member

MEMBER:

DOV LESCHES

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**COMPANY:**

EMPIRE EQ WGI LLC

By: _____

Name: Dovi Leshes

Title:   Managing Member

**MEMBERS:**

AVI LESHES

By: _____

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

COMPANY:

EMPIRE EQ WG1 LLC

By: _____

Name: Dovi Leshes

Title:  Managing Member

MEMBERS:

EDJF HOLDINGS LTD

By:_____

Its:_____

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

COMPANY:

EMPIRE EQ WGI LLC

By: _____
Name: Dov Leshes
Title:   Managing Member


MEMBER:

DAVID EYZENBERG

By: _____

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the date first above written.

<u>COMPANY</u>:

EMPIRE EQ WGH LLC

By: _____
Name: Dov Leshes
Title:   Managing Member

<u>MEMBERS</u>:

EMPIRE EQ HOTEL OWNER LLC

By: _____
Name: Dov Lesches
Title:   Manager

### EXHIBIT A

### EMPIRE EQ WGI LLC

| Members | Initial Capital Contributions |
|---|---|
| Avi Leshes | $150,000 |
| Joseph Harris | $58,741 |
| EDJF Holdings LTD | $250,000 |
| David Byzenberg | $430,000 |
| Empire Eq Hotel Owner LLC | $100,000 |
| Dov Leshes | $11,600,873 |
| Abes Corner LLC | $50,000 |
| **TOTAL** | $12,639,614 |

# EXHIBIT

# C-4

# UNANIMOUS WRITTEN CONSENT TO ACTION IN LIEU OF MEETING
## BY THE MEMBER OF
### EMPIRE EQ WGI LLC, A DELAWARE LIMITED LIABILITY COMPANY

The undersigned, being the Sole Member of Empire EQ WGI LLC, a Florida limited liability company (the "**Company**"), hereby consents to and adopts the following resolutions:

**WHEREAS**, the Company desires to become the parent company of Empire EQ Hotel LLC, a Delaware limited liability company (the "**Subsidiary**") and, in connection therewith, the current members of the Subsidiary will assign and transfer their membership interests in the Subsidiary to the Company and, in exchange, will receive the same membership percentage interests in the Company that each member had in the Subsidiary (the "**Reorganization**"), and

**WHEREAS**, the member, upon careful and diligent investigation, has determined that it is in the best interest of the Company to enter into the Reorganization, and to perform such acts necessary, including but not limited to, the execution and delivery of any documentation required to effectuate the Reorganization.

**NOW, THEREFORE, BE IT RESOLVED**, that Dov Lesches, be and hereby is authorized, acting alone, to execute, pay, and deliver the necessary documents (and any other agreements) on behalf of the Company and to perform such other actions in the name and on behalf of the Company, with such changes therein as counsel to the Company shall deem necessary or appropriate to permit the Company to effectuate Reorganization.

**FURTHER RESOLVED**, that the Sole Member expressly waives any and all requirements that may conflict with the foregoing resolutions. Based on the foregoing approval, Dov Lesches, is hereby authorized and empowered and directed in the name on and on behalf of the Company, to execute and deliver any and all documents necessary to effectuate the Reorganization, and any related documents necessary or advisable to effectuate the foregoing resolutions; and

**IT IS FURTHER CERTIFIED** that said action of the Sole Member of the Company was duly authorized and that the following is the duly qualified and acting Sole Member of the Company and nothing limits the power of the Member of the Company to pass the foregoing resolution.

<u>NAME</u>

Dov Lesches          Member

**IN WITNESS WHEREOF**, the below Sole Member has hereunto subscribed his/her/its names as the Sole Member of the Company entitled to vote.

DOV LESCHES

# EXHIBIT

# D



# Exhibit D












# Amid fraud case, a bevy of Brooklyn properties end up in bankruptcy court

*Two accused fraudsters and a mysterious real estate investor are linked in a recent series of Chapter 11 filings*

By *Mary Diduch and Eddie Small* | *June 17, 2019 07:00AM*



*Clockwise from left: 119 Rogers Avenue, 325 Franklin Avenue, 53-55 Stanhope Street and 73 Empire Boulevard (Credit: Google Maps)*

Nearly 20 limited liability companies for individual multifamily buildings that are linked to a federal fraud complaint are now bankrupt.

The filings late last month in a U.S. bankruptcy court in White Plains also relate to over a dozen foreclosure cases initiated by an affiliate of Maverick Real Estate Partners, which in court filings is seeking information on the identity of the owner behind the low-rise, residential properties, all of which are scattered throughout Brooklyn.

In April 2017, Israeli investors Jacob and Binyomin Schonberg, Binyomin Halpern and Raphael Barouch Elkaim alleged in a complaint filed in federal court in Brooklyn that Yechezkel Strulovich and Yechiel

Oberlander defrauded them out of more than *$20 million* in a scheme carried out "in the style of Bernie Madoff."

Eleven properties that are now in Chapter 11 proceedings — located predominantly in the neighborhoods surrounding Williamsburg and Crown Heights — were also named as defendants in the fraud case against Strulovich and Oberlander. That case, which a judge dismissed in part and sent to arbitration in 2017, included more than 40 defendants, mostly LLCs that have not filed for bankruptcy.



The LLCs that are bankrupt and own the underlying Brooklyn properties all list David Goldwasser of GC Realty Advisors as their authorized signatory, according to court filings. GC Realty is described as a commercial real estate advisory firm, *per its LinkedIn page*, which notes that it is based in Boca Raton, Florida, and has offices in New York. The state's Division of Corporations shows that GC Realty has an address in East Midwood, Brooklyn.

Goldwasser is also listed as a principal at FIA Capital Partners, which is also based out of Florida and New York, according to his apparent *LinkedIn profile*. A message left with FIA was not returned by the time of this story. The firm specializes in acquiring distressed properties and portfolios, *according to its website.*

*GC Realty Advisors' David Goldwasser (Credit: LinkedIn)*

**Questions over control**

The series of bankruptcies filed in White Plains starting on May 20 show that all of the properties, which number at least 18, are also affiliated with 73 Empire Development LLC. The latter owns the ground lease on a roughly 30,000-square-foot development site — it's currently a vacant one-story retail building — at 73 Empire Boulevard in Crown Heights.

Empire Development, which is one of the defendants in the fraud case against Strulovich and Oberlander, also filed for bankruptcy in February. The debtor's plan, according to court records in White Plains, is to build a 58,000-square-foot, two-story retail property at 73 Empire Boulevard.



But the connection between Goldwasser's GC Realty, Empire Development and the 18 other bankrupt properties is not yet clear. Maverick, the debt fund led by *David Aviram* that buys distressed mortgages, wants some clarity on the matter.

A recent filing from the debtors claims that one of Maverick's affiliates, Brooklyn Lender LLC, took on 13 notes and mortgages — totaling $36 million — on 26 properties that originated with Signature Bank. As a result of the Chapter 11 filings, Maverick wants a judge to allow a full examination into who controls the various debtors, pointing to Goldwasser's name in court documents.

*Maverick's David Aviram (Credit: LinkedIn)*

*"To Brooklyn Lender's knowledge, Goldwasser was not previously involved with the Debtors, and understanding his new role and responsibilities with respect to these Bankruptcy Cases and the Debtors' management is of paramount importance," Maverick said in a recent filing.*

*Maverick noted that when the Signature Bank loans were made, Strulovich maintained that he was the 100 percent sole member of the debtor entities. In the fraud case, however, he admitted this was not the case. In October 2017, Maverick's Brooklyn Lender filed 14 foreclosure cases against the now bankrupt properties, alleging that the loans were in default, in part due to misrepresentations by their owners.*

*The petition made by Maverick in bankruptcy court now asserts that a further examination is needed to determine who actually owns the Brooklyn properties, citing a guilty plea by Goldwasser to defrauding two banks in the early 2000s. Goldwasser was sentenced to 27 months in federal prison — Federal Bureau of Prisons records show he was released in September 2005 — and ordered to pay $2.8 million in restitution. A judge also ordered that Goldwasser "is not to be employed in any position requiring fiduciary responsibilities."*

*All of the debtors in the bankruptcy cases, except Empire Development, have opposed the motion by Brooklyn Lender, claiming that its parent Maverick has an "unspoken agenda" and that they are working on a plan that includes paying back Maverick. Lists of unsecured creditors in the various bankruptcy cases show that Brooklyn Lender is owed between $2.7 million and nearly $5 million, while the New York-based law firm Abrams Fensterman is owed a little more than $150,000.*

*Mark Frankel, an attorney with New York's Backenroth Frankel & Krinsky representing the debtors in bankruptcy proceedings, declined to comment, as did Maverick's Aviram, which is being represented in bankruptcy court by Stroock & Stroock & Lavan. Strulovich and Oberlander could not be reached and their lawyers did not return requests for comment.*

## Unresolved fraud claims

*In the fraud case against Strulovich and Oberlander, the defendants said that the money they received from the plaintiffs would be invested in Brooklyn properties that they would buy, develop and rent out, with returns on those investments coming in six to seven months. The plaintiffs also would receive 45 percent of the profits from the multifamily purchases.*

*But plaintiffs claimed that Strulovich, Oberlander and other defendants inflated the value of that real estate and used their money to acquire and develop properties for their own personal benefit, pay off personal debts and support their "lavish lifestyles," according to the civil complaint filed two years ago. The Brooklyn sites purchased with their funds were "left to languish, undeveloped and dilapidated," alleged the plaintiffs.*

*"The entire process was nothing more than an elaborate fraud to personally enrich the individual defendants," said their lawsuit.*

*Court filings in that litigation claim that Oberlander allegedly approached the plaintiffs in early 2012 about investing in a project with him and Strulovich at 908 Bergen Street in Crown Heights. Oberlander*

sent prospectuses for 19 properties between 2012 and 2014 that were meant to entice the plaintiffs into make more investments, they asserted in the dispute.

The defendants repeatedly told the plaintiffs it would cost more to buy the Brooklyn buildings than it actually did, according to court filings in the case. As an example, the plaintiffs claimed they were told that the cost of buying 908 Bergen Street would be $425,000, when the actual cost was $200,000. The plaintiffs ultimately gave more than $20 million to Strulovich and Oberlander, they claimed.

As for the defendants, they did enough work on the Brooklyn properties to renovate some of the smaller ones, refinance the original loans on them and refund the principal investments of the plaintiffs so they would be "lulled into a false sense of security," according to their lawsuit.

By early 2016, court records show that the plaintiffs became suspicious about the state of their investments when some of the larger properties, such as 657 Fifth Avenue and 980 Atlantic Avenue in Brooklyn, had not progressed. The plaintiffs soon found out that Strulovich and Oberlander were looking to sell some of the Brooklyn properties they had invested in, without their knowledge.

Despite the partial dismissal and arbitration ruling, the dispute between the parties appears to remain unresolved. The last court filing in the fraud case came in late February. Yitzchack Soloveichik of Bronstein, Gewirtz & Grossman, a new lawyer representing the plaintiffs, did not return a request for comment about the ongoing dispute.

---

*Tags:* *bankruptcy*, *Multifamily Market*, *Real Estate Lawsuits*

Recommended videos                                    Powered by AnyClip



# Exhibit E



**Yariv Ben-Ari**
**Partner**

Phone: 212.592.1440
Fax: 212.545.3460
ybenari@herrick.com

April 23, 2019

VIA FEDERAL EXPRESS &
VIA E-MAIL

Empire EQ WGI LLC
c/o Empire Equities
3 Columbus Circle, 14th Floor
New York, NY 10019
Attn:  Dov Lesches
E-mail: dovi@empireeq.com

      Re:  <u>Notice of Default and Acceleration</u>

This firm represents ORLANDO LENDER LLC (the "<u>Lender</u>").  Reference is hereby made to that certain loan (the "Loan") evidenced by, among other documents, that certain Promissory Note, dated April 5, 2019, in the maximum principal amount of $1,500,000.00, executed by Empire EQ WGI LLC (the "<u>Borrower</u>") in favor of Lender (the "<u>Note</u>"), and secured by that certain Pledge Agreement, dated April 5, 2019, between Borrower, as pledgor, and Lender, as pledgee (the "<u>Pledge Agreement</u>"). The Note, the Pledge Agreement and all other documents, instruments and agreements at any time executed and delivered in connection therewith, each as amended, restated, supplemented or otherwise modified from time to time, are collectively referred to as the "Loan Documents." All capitalized terms not defined herein shall have the meaning ascribed to them in the Loan Documents.

We are writing to notify Borrower of certain Events of Default under the Loan Documents:

(a)     On April 19, 2019, the Borrower failed to make payments in the amounts of $25,000.00 for Legal Fees and $75,000.00 to the Behar Peteranecz, Inc. ("Architect"), pursuant to the Schedule 4 to the Note which constitutes a default.

(b)     As you are well aware, pursuant to Section 9(a)(xviii) of the Note, it shall be an Event of Default if, "Borrower defaults in the performance of its monetary and/or non-monetary obligations under the Settlement Agreement".  On April 22, 2019, Lender was advised that counsel for the Architect issued a default notice under the Settlement Agreement. A copy of such notice is attached hereto as Exhibit A (the "<u>Architect's Notice</u>").

Furthermore, pursuant to Section 7(a) of the Note, Borrower was required to immediately provide Lender with certain notices of Proceedings, including:

"… (i) any actual or threatened actions, suits, claims, investigations or proceedings (each a "Proceeding") with respect to which it or any of its Affiliates may be subject, (ii) any Event of Default or any default under any document, agreement or instrument evidencing any other indebtedness of the Borrower or the Owner, including, without limitation, the documents evidencing the Senior Loan (the "Senior Loan Documents"), (iii) any default under any Material Contract, (iv) any actual event, change, condition or effect which could reasonably be expected to result in a Material Adverse Effect on the Pledged Collateral (as defined in the Pledge Agreement) …"

Borrower has failed to notice Lender of the Proceeding as set forth in the Architect Notice, which omission constitutes an Event of Default under the Note.

Pursuant to Section 7(f) of the Note it is an Event of Default if, without the prior written consent of the Lender, the Borrower permits or causes the Owner or their manager to:

"… (ii) create or permit the creation of any liens, claims or encumbrances on its assets (including the Property and the Pledged Collateral) other than those under the Senior Loan Documents …

(xi) amend, modify or terminate any Material Contract …"

Pursuant to the Architect's Notice, the agreement with the Architect, which was identified as a Material Contract, was terminated and the Architect was re-asserting its liens and claims. These actions constitute further Events of Default under the Note.

**NOTICE IS HEREBY GIVEN** that Borrower has breached the Loan Documents and is in default of its obligations under the Loan Documents as such Events of Default are enumerated above.

**FURTHER NOTICE IS HEREBY GIVEN** that, pursuant to Section 3 of the Pledge Agreement, Lender intends to (i) transfer the Pledged Collateral into the name of the Lender or its nominee and vote any Pledged Collateral; (ii) sell at public or private sale any or all of the Pledged Collateral, which the Lender may purchase free from any right of redemption; and (iii) exercise any rights that may be available to the owner of the Pledged Collateral under any governing documents of the issuer of any such Pledged Collateral, including exercising any rights of redemption or withdrawal.

**FURTHER NOTICE IS HEREBY GIVEN,** that in accordance with Section 9(b) of the Note, Lender intends to exercise its right in its sole and absolute discretion to market the Property for sale.

**ACCORDINGLY, DEMAND IS HEREBY MADE** for Borrower immediately to pay in full the entire outstanding principal sum of the Note, as well as all interest, late charges, and other amounts due under the Loan Documents, including interest at the rate as set forth in the Loan Documents.

You may contact Lender, at the address noted below, for a current statement of the amount of interest accrued on the principal balance of the Note at the applicable interest rate and/or for an itemization of all other amounts due and owing under the Loan.

In addition to the foregoing, you are or may be indebted to Lender, pursuant to the terms of the Loan Documents, for other charges and expenses, including, *inter alia*, (a) costs and expenses (including attorneys' fees) incurred, or to be incurred, in connection with the collection of the Loan and the sale under the Pledge Agreement, and (b) any sums advanced, paid, or to be advanced, or paid, by Lender on behalf of Borrower at the default rate.

Nothing contained in this letter shall be construed to (i) limit Lender's right to receive any and all sums which may be or become due or payable under the Loan Documents, or otherwise, including, without limitation, costs of collection, costs of enforcement, late payment charges and interest at the default rate, (ii) waive, limit, prejudice or otherwise adversely affect any rights, remedies or powers of Lender under the Loan Documents, by statute, at law, in equity, or otherwise, all of which rights, remedies and powers are hereby expressly reserved, or (iii) waive any other default, whether known or unknown to Lender, under the Loan Documents.

Nothing contained in this letter shall be construed to (i) limit Lender's right to receive any and all sums which may be or become due or payable under the Loan Documents, or otherwise, including, without limitation, costs of collection, costs of enforcement, late payment charges and interest at the Default Rate, (ii) waive, limit, prejudice or otherwise adversely affect any rights, remedies or powers of Lender, under the Loan Documents, by statute, at law, in equity, or otherwise, all of which rights, remedies and powers are hereby expressly reserved, or (iii) waive any other default, whether known or unknown to Lender, under the Loan Documents.

Lender further expressly reserves the right to take such action and to refrain from taking any action as it may deem prudent, necessary or desirable in the exercise of its sole judgment and discretion under the circumstances known to it, and such action or non-action shall not be deemed to be a waiver of any of such rights, powers, privileges, remedies and interest. Nothing herein constitutes a forbearance by, or an agreement to forebear by, Lender. Lender's voluntary forbearance, if any, from exercising any of its rights or remedies is not intended (and should not be construed) as a waiver thereof or Lender's rights and remedies with respect thereto, all of which are reserved and preserved by Lender to be executed at any time. Without limiting the foregoing, nothing contained herein shall limit in any manner whatsoever Borrower's obligations to comply with, and Lender's right to insist on Borrower's compliance with, each and every term of the Note and the Loan Documents.

You are advised that no oral communication from or on behalf of Lender by any party shall constitute any agreement, commitment or evidence of any assurance or intention of Lender with respect to any aspect of the Loan and that you may not rely on any such oral communication. Any agreement, commitment, assurance or intention of Lender with respect to any aspect of the Loan shall be effective only if in writing, duly executed and delivered by or on behalf of Lender.

Borrower is further advised that this law firm has been authorized to give notices and demands, and otherwise to communicate with Borrower, on behalf of Lender, and Borrower should hereafter rely on such notices, demands and communications as if given by Lender.

Very truly yours,

Yariv C. Ben-Ari

cc:     The Bernstein Law Firm
        3050 Biscayne Boulevard, Suite #403
        Miami, FL 33137
        Attention: Jason Pear, Esq.
        E-mail: Jason@bernstein-lawfirm.com and
        Michael@bernstein-lawfirm.com

        Orlando Lender LLC
        c/o Arch Companies,
        524 Broadway, Suite 405
        New York, NY 10012
        Attn:  Jeffrey Simpson
        E-mail: jsimpson@archcre.com

EXHIBIT A

-----Original Message-----
From: Brad Bell <bbell@bbellpa.com>
Sent: Monday, April 22, 2019 5:21 PM
To: Laurie A Stanziale <lstanziale@tarterkrinsky.com>; Jason@bernstein-lawfirm.com; David.Archer@stantec.com
Cc: pbeach@bbellpa.com
Subject: [EXT] Behar v Empire EQ

All,

The first $75,000 payment was due on Friday.  Unfortunately that payment was not made.  Jordan Behar allowed today as a grace period to make the overdue payment, yet the payment still was not made.

Please be advised that Empire EQ is in breach of the Settlement Agreement.  BPA is stopping all work on the project and will be reasserting it's lien and moving forward with the litigation.

The meeting scheduled for this Wednesday is hereby cancelled.

This is unfortunate.

Thank you,
Brad

Sent from my iPhone

**HERRICK, FEINSTEIN LLP** ● Two Park Avenue ● New York, NY 10016 ● Phone: 212.592.1400 ● Fax: 212.592.1500

HF 12724386v.2

# Exhibit F



Yariv Ben-Ari
Partner

Phone: 212.592.1440
Fax: 212.545.3460
ybenari@herrick.com

April 26, 2019

VIA FEDERAL EXPRESS &
VIA E-MAIL

Empire EQ WGI LLC
c/o Empire Equities
3 Columbus Circle, 14th Floor
New York, NY 10019
Attn: Dov Lesches
E-mail: dovi@empireeq.com

Re: Notice of Additional Default under section 8(f) of the Promissory Note

Reference is made to the Notice of Default and Acceleration dated April 23, 2019 (the "April 23rd Default Notice"). Terms not defined herein shall have the meaning set forth in the Promissory Note.

We are writing to notify Borrower, that in addition to the defaults listed in the April 23rd Default Letter, Borrower is in further default due to its failure to deposit $30,000.00 into the DMA Reserve Account on or before April 25, 2019 as required by the Section 8(f) of the Promissory Note.

**ACCORDINGLY, DEMAND IS HEREBY MADE** for Borrower immediately to pay in full the entire outstanding principal sum of the Promissory Note, as well as all interest, late charges, and other amounts due under the Loan Documents, including interest at the rate as set forth in the Loan Documents.

You may contact Lender, at the address noted below, for a current statement of the amount of interest accrued on the principal balance of the Note at the applicable interest rate and/or for an itemization of all other amounts due and owing under the Loan.

In addition to the foregoing, you are or may be indebted to Lender, pursuant to the terms of the Loan Documents, for other charges and expenses, including, *inter alia,* (a) costs and expenses (including attorneys' fees) incurred, or to be incurred, in connection with the collection of the Loan and the sale under the Pledge Agreement, and (b) any sums advanced, paid, or to be advanced, or paid, by Lender on behalf of Borrower at the default rate.

Nothing contained in this letter shall be construed to (i) limit Lender's right to receive any and all sums which may be or become due or payable under the Loan Documents, or otherwise, including, without limitation, costs of collection, costs of enforcement, late payment charges and interest at the default rate, (ii) waive, limit, prejudice or otherwise adversely affect any rights, remedies or powers of Lender under the Loan Documents, by statute, at law, in equity, or otherwise, all of

which rights, remedies and powers are hereby expressly reserved, or (iii) waive any other default, whether known or unknown to Lender, under the Loan Documents.

Nothing contained in this letter shall be construed to (i) limit Lender's right to receive any and all sums which may be or become due or payable under the Loan Documents, or otherwise, including, without limitation, costs of collection, costs of enforcement, late payment charges and interest at the Default Rate, (ii) waive, limit, prejudice or otherwise adversely affect any rights, remedies or powers of Lender, under the Loan Documents, by statute, at law, in equity, or otherwise, all of which rights, remedies and powers are hereby expressly reserved, or (iii) waive any other default, whether known or unknown to Lender, under the Loan Documents.

Lender further expressly reserves the right to take such action and to refrain from taking any action as it may deem prudent, necessary or desirable in the exercise of its sole judgment and discretion under the circumstances known to it, and such action or non-action shall not be deemed to be a waiver of any of such rights, powers, privileges, remedies and interest. Nothing herein constitutes a forbearance by, or an agreement to forebear by, Lender. Lender's voluntary forbearance, if any, from exercising any of its rights or remedies is not intended (and should not be construed) as a waiver thereof or Lender's rights and remedies with respect thereto, all of which are reserved and preserved by Lender to be executed at any time. Without limiting the foregoing, nothing contained herein shall limit in any manner whatsoever Borrower's obligations to comply with, and Lender's right to insist on Borrower's compliance with, each and every term of the Note and the Loan Documents.

You are advised that no oral communication from or on behalf of Lender by any party shall constitute any agreement, commitment or evidence of any assurance or intention of Lender with respect to any aspect of the Loan and that you may not rely on any such oral communication. Any agreement, commitment, assurance or intention of Lender with respect to any aspect of the Loan shall be effective only if in writing, duly executed and delivered by or on behalf of Lender.

Borrower is further advised that this law firm has been authorized to give notices and demands, and otherwise to communicate with Borrower, on behalf of Lender, and Borrower should hereafter rely on such notices, demands and communications as if given by Lender.

Very truly yours,

*Yariv C. Ben-Ari / L.P.*

Yariv C. Ben-Ari

cc:   The Bernstein Law Firm
      3050 Biscayne Boulevard, Suite #403
      Miami, FL 33137
      Attention: Jason Pear, Esq.
      E-mail: Jason@bernstein-lawfirm.com and
      Michael@bernstein-lawfirm.com

Orlando Lender LLC
c/o Arch Companies,
524 Broadway, Suite 405
New York, NY 10012
Attn:  Jeffrey Simpson
E-mail: jsimpson@archcre.com

# Exhibit G

# ORLANDO LENDER LLC

c/o Arch Companies,
524 Broadway, Suite 405
New York, NY 10012
Attn:  Jeffrey Simpson
E-mail: jsimpson@archcre.com

# Notice of Sale

**FEDERAL EXPRESS AND ELECTRONIC MAIL**

Empire EQ WGI LLC
c/o Empire Equities
3 Columbus Circle, 14th Floor
New York, NY 10019
Attn:  Dov Lesches
E-mail: dovi@empireeq.com

The Bernstein Law Firm
3050 Biscayne Boulevard, Suite #403
Miami, FL 33137
Attention: Jason Pear, Esq.
E-mail: Jason@bernstein-lawfirm.com
          Michael@bernstein-lawfirm.com

PARADIGM CREDIT CORPORATION II
c/o Berlandi Nussbaum & Reitzas LLP
445 Hamilton Avenue, 14th Floor
White Plains, NY 10601
Attention: David Kushner
E-mail: kush@paradigmcf.com

Berlandi Nussbaum & Reitzas LLP
527 Route 22, Suite 2
Pawling, NY 12564
Attention: Brian L. Berlandi, Esq.
E-mail: bberlandi@bnrllp.com

        This constitutes formal notice that the collateral described below (the "Pledged
Collateral") will be sold at a public sale (the "Sale") held to enforce the rights of ORLANDO
LENDER LLC ("Lender") in the Pledged Collateral.  The Pledged Collateral is the subject of
that certain Pledge Agreement (the "Pledge Agreement"), dated as of April 5, 2019, between
Empire EQ WGI LLC (the "Pledgor") and Lender.   The Pledged Collateral secures the
obligations (the "Obligations") of the Debtor to Lender arising under that certain Promissory

Note dated April 5, 2019, made by Debtor to the order of Lender in the maximum principal amount of ONE MILLION FIVE HUNDRED THOUSAND DOLLARS ($1,500,000), together with interest and other charges and expenses thereon that have accrued and continue to accrue pursuant to such Promissory Note, and under all other documents executed, delivered and/or otherwise concerning the Obligations (the "Loan Documents"). Debtor is in default of the Obligations under the Loan Documents.

THE CONDITIONS OF THIS PUBLIC SALE ARE AS FOLLOWS:

1.      Pledged Collateral. The Pledged Collateral is defined in the Pledge Agreement, and includes, without limitation, the limited liability company interests of the Pledgor in the EMPIRE EQ HOTEL LLC, a Delaware limited liability company, together with all certificates evidencing ownership of such interests, and all claims, powers, privileges, benefits, remedies, voting rights, options or rights of any nature whatsoever which currently exist or may be issued or granted by the EMPIRE HOTEL LLC to Pledgor while this Agreement is in effect.

2.      Time and Place of Public Sale. The Sale is a public sale that that will be conducted by Mannion Auctions LLC, by William Mannion, NYC DCA Lic. # 796322, an auctioneer licensed in the City of New York. The Sale will take place on June 18, 2019 at 9:00AM (the "Sale Date") in the Rotunda of the New York County Courthouse, 60 Centre Street, New York, New York 10007. Lender reserves the right to determine the date and manner of publication of any notice of the Sale. Lender shall have the right to adjourn the Sale one or more times on such terms and conditions as shall be announced at the Sale. No further publication or other notice of any kind of such adjournment shall be required for any such adjournment.

3.      Method of Sale. The Sale shall be a public sale on terms and conditions to be provided at the Sale.

4.      No Warranties. The Pledged Collateral is being sold on an "as is, where is" basis. There is no warranty relating to title, possession, quiet enjoyment or the like in this Sale.

5.      Existing Liens. In addition, the Sale of the Pledged Collateral is subject to all liens, security interests and charges and encumbrances of any kind (any hereinafter, a "Lien") that have priority over the Lien(s) of Lender under the Loan Documents, if any. Lender remains entitled immediately to exercise all of its rights and remedies under the Loan Documents, at law or at equity singularly, consecutively and cumulatively, against the Debtor and any other persons or entities that may be liable on account of any of the Obligations, at such times, with such frequency and in such order as Lender may elect, with respect to the Obligations. Neither the conduct of the Sale nor the delivery of the Pledged Collateral to the buyer shall derogate from any right, privilege or power granted to Lender under any of the Loan Documents.

6.      Accounting. If you are the Debtor or other obligor of the Obligations, you are entitled to an accounting of the unpaid indebtedness secured by the Pledged Collateral at your sole cost and expense, which cost will equal approximately $1,000.00. You may request an accounting by contacting the Lender at the address set forth above.

7.      Right of Redemption. Any person or entity entitled to redeem the Pledged Collateral may do so by paying the full amount of the Obligations secured by the Pledged Collateral (including the expenses of preparing for and conducting the sale) prior to the Sale.

2

8.    <u>Deficiency</u>.  To the extent that any Obligations remain unpaid after the Sale, the Lender reserves all right to recover such remaining Obligations from the Debtor or any other obligor to the extent that Lender may recover from such other obligor.

9.    <u>Controlling Notice</u>.  This Notice supersedes any and all previous sale notices issued by Lender with respect to the Pledged Collateral.

10.    <u>Further Inquiries</u>.  For further information, please contact counsel for Lender, Herrick, Feinstein LLP, 2 Park Avenue, Attn:  Avery Mehlman, 212-592-1400 (Phone), 212-592-1500 (Fax).

THIS NOTICE IS GIVEN IN SATISFACTION OF §  9-613 OF THE UNIFORM COMMERCIAL CODE AS IN EFFECT IN NEW YORK.

May 16, 2019

**ORLANDO LENDER LLC**

**Lender**

By: HERRICK, FEINSTEIN LLP

By: _____

2 Park Avenue
New York, New York 10016
Attention: Avery Mehlman
Tel. (212) 592-1400

# Exhibit H

P.O. Box 66
Howey in the Hills, Fl. 34737

**CLD**
Celebration Landscape Design, Inc.

# Invoice

| Invoice # |
|-----------|
| 842 |

| Bill To |
|---------|
| Empire Equities |
| Dovi Leshes |
| 3 Collumbus Circle 15th Floor |
| New York, New York 10019 |

| Date |
|------|
| 1/15/2018 |

| Project | | Terms | Due Date |
|---------|---|-------|----------|
| | **Empire Eq Hotel, LLC** | | 1/15/2018 |

| Serviced | Item | Description | Qty | Rate | Amount |
|----------|------|-------------|-----|------|--------|
| | Landscape Design | Landscape Planting Plan | | 10,000.00 | 8,000.00 |
| | Irrigation Design | Irrigation System Design | | 5,000.00 | 4,000.00 |

| | **Total** | $12,000.00 |
|---|-----------|------------|

# Exhibit I

# INVOICE



Harris Civil Engineers, LLC

**Empire Equities**
3 Columbus Circle
15th Floor
New York, NY 10019

January 04, 2019
Invoice No. 1011563

---

### Empire EQ Hotel
**7020000**
For Services Rendered Through 12/31/2018

---

## Professional Services

| | Contract Amount | % Complete | Amount Billed | Previously Billed | Invoice Amount |
|---|---|---|---|---|---|
| Development Plan | $14,990.00 | 100.00 | $14,990.00 | $14,990.00 | $0.00 |
| Schematic Design | $14,600.00 | 100.00 | $14,600.00 | $14,600.00 | $0.00 |
| Design Development | $29,100.00 | 100.00 | $29,100.00 | $29,100.00 | $0.00 |
| CDs | $36,810.00 | 100.00 | $36,810.00 | $36,810.00 | $0.00 |
| Construction Admin | $14,500.00 | 0.00 | $.00 | $.00 | $0.00 |
| Continued Development Plan Support | $15,750.00 | 65.00 | $10,237.50 | $8,662.50 | $1,575.00 |
| Additional Drainage Design | $15,750.00 | 0.00 | $.00 | $.00 | $0.00 |
| **Total Professional Services** | **$141,500.00** | | **$105,737.50** | **$104,162.50** | **$1,575.00** |

## Reimbursable Expenses

| | Amount |
|---|---|
| Empire Equities Plots log - Dec 2018 | $99.95 |
| **Total Reimbursable Expenses** | **$99.95** |
| **Invoice Total** | **$1,674.95** |

Page 1 of 1

1200 East Hillcrest Street
Suite 200
Orlando, Florida 32803
Telephone: 407.629.4777
Fax: 407.629.7888
www.harriscivilengineers.com

17889~ 17923

Billable Plots December 2018

| PROJECT | TOTAL |
|---------|-------|
| 6008060 | $6.30 |
| 6042031 | $155.31 |
| 6051061 | $6.11 |
| 6065026 | $169.48 |
| 6065033 | $161.23 |
| 6073051 | $6.36 |
| | |
| 6209019 | $8.92 |
| 6217003 | $46.57 |
| 6217005 | $208.35 |
| 6274007 | $103.98 |
| 6275005 | $79.84 |
| 6297002 | $16.50 |
| 6377005 | $17.35 |
| 6421003 | $114.12 |
| 6480001 | $107.54 |
| 6572004 | $50.44 |
| 6670003 | $25.56 |
| 6671005 | $4.20 |
| 6712006 | $700.50 |
| 6712012 | $18.60 |
| 6712015 | $2.10 |
| 6722001 | $421.11 |
| 6727007-1 | $32.43 |
| 6871001 | $37.80 |
| 6885001 | $1.53 |
| 6885002 | $14.65 |
| 6892000 | $20.70 |
| 6895005 | $31.79 |
| 6901002 | $3.06 |
| 6901003 | $3.09 |
| 6943000 | $61.83 |
| 6958024 | $37.41 |
| 6961000 | $201.68 |
| 6975002 | $450.22 |
| 7013001 | $32.82 |
| 7016002 | $125.70 |
| 7018002 | $32.44 |
| 7020000 | $99.95 |
| 7033001 | $539.35 |
| 7070001 | $104.76 |
| 7132000 | $25.86 |
| | $4,288.31 |

# Exhibit J



# Singer Equipment Design Invoice
# Le Meridien for Empire Equities

Invoice Number: KCLM072018

| | |
|---|---|
| Project Name: | Le Meridien Hotel |
| Project Location: | NWC of Westwood BLVD and West Entrance Drive, Orlando FL. |
| Client Name: | Empire Eq Hotel, LLC. |
| Client Address: | 3 Columbus Circle 15th Floor NY NY 10019 |
| Client Contact Name: | Dovi Leshes |
| Client Phone: | 212-520-6677 |
| Client Email: | Dovi@empireeq.com |

| Design Name | Le Meridien for Empire Equities |
|---|---|
| Phase: | KEC Concept Design – Kitchen Layouts |
| Amount Due: | $30,000.00 |
| Invoice Date: | 10/05/2015 |

Please remit payment to:

Singer Equipment 180
Heller Place
Bellmawr, NJ 08031

Failure to process payment may result in the delay of future KEC submittals.



# Singer Equipment Design Invoice
# Le Meridien for Empire Equities

Invoice Number: KCLM072018

| | |
|---|---|
| Project Name: | Le Meridien Hotel |
| Project Location: | NWC of Westwood BLVD and West Entrance Drive, Orlando FL. |
| Client Name: | Empire Eq Hotel, LLC. |
| Client Address: | 3 Columbus Circle 15th Floor NY NY 10019 |
| Client Contact Name: | Dovi Leshes |
| Client Phone: | 212-520-6677 |
| Client Email: | Dovi@empireeq.com |

| Design Name | Le Meridien for Empire Equities |
|---|---|
| Phase: | KEC Convention/Ballroom Concept Design – Kitchen Layouts |
| Amount Due: | $65,000.00 |
| Invoice Date: | 07/01/2015 |

Please remit payment to:

Singer Equipment 180
Heller Place
Bellmawr, NJ 08031

Failure to process payment may result in the delay of future KEC submittals.



# Singer Equipment Design Invoice
## Le Meridien for Empire Equities

| Invoice Number: KCLM072018 |
|---|

| | |
|---|---|
| Project Name: | Le Meridien Hotel |
| Project Location: | NWC of Westwood BLVD and West Entrance Drive, Orlando FL. |
| Client Name: | Empire Eq Hotel, LLC. |
| Client Address: | 3 Columbus Circle 15th Floor NY NY 10019 |
| Client Contact Name: | Dovi Leshes |
| Client Phone: | 212-520-6677 |
| Client Email: | Dovi@empireeq.com |

| Design Name | Le Meridien for Empire Equities |
|---|---|
| Phase: | KEC Concept Design – Kitchen Layouts |
| Amount Due: | **$35,000.00** |
| Invoice Date: | 01/05/2016 |

Please remit payment to:

Singer Equipment 180
Heller Place
Bellmawr, NJ 08031

Failure to process payment may result in the delay of future
KEC submittals.



# Singer Equipment Design Invoice
# Le Meridien for Empire Equities

| Invoice Number: KCLM072018 |
|---|

| Project Name: | Le Meridien Hotel |
|---|---|
| Project Location: | NWC of Westwood BLVD and West Entrance Drive, Orlando FL. |
| Client Name: | Empire Eq Hotel, LLC. |
| Client Address: | 3 Columbus Circle 15th Floor NY NY 10019 |
| Client Contact Name: | Dovi Leshes |
| Client Phone: | 212-520-6677 |
| Client Email: | Dovi@empireeq.com |

| Design Name | **Le Meridien for Empire Equities** |
|---|---|
| Phase: | KEC Design Development/Progress Set – Kitchen Layouts |
| Amount Due: | **$35,000.00** |
| Invoice Date: | 06/01/2018 |

Please remit payment to:

Singer Equipment 180
Heller Place
Bellmawr, NJ 08031

Failure to process payment may result in the delay of future KEC submittals.



# Singer Equipment Design Invoice
## Le Meridien for Empire Equities

| Invoice Number: KCLM072018 |
| --- |

| | |
| --- | --- |
| Project Name: | Le Meridien Hotel |
| Project Location: | NWC of Westwood BLVD and West Entrance Drive, Orlando FL. |
| Client Name: | Empire Eq Hotel, LLC. |
| Client Address: | 3 Columbus Circle 15th Floor NY NY 10019 |
| Client Contact Name: | Dovi Leshes |
| Client Phone: | 212-520-6677 |
| Client Email: | Dovi@empireeq.com |

| Design Name | Le Meridien for Empire Equities |
| --- | --- |
| Phase: | KEC Schematic Progress Set |
| Amount Due: | $15,000.00 |
| Invoice Date: | 12/22/2016 |

Please remit payment to:

Singer Equipment 180
Heller Place
Bellmawr, NJ 08031

Failure to process payment may result in the delay of future KEC submittals.



# Singer Equipment Design Invoice
# Le Meridien for Empire Equities

Invoice Number: KCLM072018

| | |
|---|---|
| Project Name: | Le Meridien Hotel |
| Project Location: | NWC of Westwood BLVD and West Entrance Drive, Orlando FL. |
| Client Name: | Empire Eq Hotel, LLC. |
| Client Address: | 3 Columbus Circle 15th Floor NY NY 10019 |
| Client Contact Name: | Dovi Leshes |
| Client Phone: | 212-520-6677 |
| Client Email: | Dovi@empireeq.com |

| Design Name | Le Meridien for Empire Equities |
|---|---|
| Phase: | KEC Schematic Design |
| Amount Due: | $25,000.00 |
| Invoice Date: | 10/01/2016 |

Please remit payment to:

Singer Equipment 180
Heller Place
Bellmawr, NJ 08031

Failure to process payment may result in the delay of future KEC submittals.

# Exhibit K

Cohen, Norris, Wolmer, Ray, Telepman & Cohen

BORROWER'S AND SELLER'S COMBINED CLOSING STATEMENT

| . Type of Loan | |
|---|---|
| 1. EJ FHA  2.0  RHS  3. EJ Conv. Unlns. | 7. Loan Number | 8. Insurance Case Number |
| 4. CJ VA  5. Cg  Conv. Ins. | 51288001 | |

C. Note: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for information purposes and are not included in the totals.

| D. Name and Address of Borrower | E. Name and Address of Seller | F. Name and Address of Lender |
|---|---|---|
| EMPIRE EQ HOTEL LLC | WESTWOOD (ORLAND) ASLI V.L.L.L.P | WESTWOOD (ORLANDO) ASLI V. L.L.L.P. |

| G. Property Location | H. Settlement Agent | |
|---|---|---|
| XXXX WesMood Boulevard | Cohen Norris Wolmer Ray Telepman & Cohan | |
| Orlando, Florida 32821 | 712 US Highway One, #400, NPB, FL 3M08 | |
| | Placa of Settlement | I. Settlement Date |
| | 712 US Highway One | 08/15/17 |
| | Suite 400 | |
| | North Palm Beach, Florida 33408 | DD: 08/15/17 |

| J. SUMMARY OF BORROWER'S TRANSACTION: | | K. SUMMARY OF SELLER'S TRANSACTION: | |
|---|---|---|---|
| 100. GROSS AMOUNT DUE FROM BORROWER | | 400. GROSS AMOUNT DUE TO SELLER | |
| 101. Contract sale rice | 8,400,000.00 | 401. Contract sales price | 8 400,00 |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (line 14ooj | 51,888.70 | 403. | |
| 104. | | 404. | |
| 05. | | 405. | |
| Adjustmenta ror items pala by seller In advance | | Adjustment for items paid by seller in advance | |
| 100. City/town taxos | to | 40S. City/town taxos | to |
| 107. County taxea | to | 407. County taxes | to |
| 108. Assessments 08/15/17 to 00/30/17 | 165.47 | 408. Assessments 08/15/17 to 09/30/17 | 16 |
| 106. | | 409. | |
| 110. | | 410. | |
| 111. Closing Coat Credit | 22,975.00 | 411. Closing Cost Credit | 22 675 |
| 112. | | 412. | |
| 120. GROSS AMOUNT DUE FROM BORROWER | 8,475,020.17 | 420 GROSS AMOUNT DUE TO SELLER | 8,423,14 |
| 200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER | | 500. REDUCTIONS IN AMOUNT TO SELLER | |
| 20J. Deposit or earnest money | 2,950,000.00 | 501. Excess Deposit (see Instructions) | |
| 202. New Loan and Note | 5,450,000.00 | 502. Settlement charges to seller (line 1400) | 102,42 |
| 203. Existing loan(s) taken subject to | | 503. Msting loans taken subl> cl to | |
| 204 | | 504 PayoP of flmt mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 208. | | 50B. blew Loan and Note | 5,450,000 |
| 207. | | 507. | |
| 208. | | 508. | |
| 201. | | 506. | |
| Adjustmenta for items unpald by seller | | Adjustments for items unpald by seller | |
| 210. City/town taxes to | | 510. City/town taxes to | |
| 211. County taxes 01/01/17 to 08/15/17 | 24,386.64 | 511. County taxes 01/01/17 to 08/15/17 | 24,386 |
| 212. Assessments to | | 512. Assessments to | |
| 213. | | 513. | |
| 2J4. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 218. | | 516. | |
| 220. TOTAL PAID BY / FOR BORROWER | 8,451,888.70 | 520 YOTAL REDUCTION AMOUNT DUE SELLER | 5,576,811 |
| 300. | | 600 | |
| 301. | | 601 Gross amount due to seller/line 420 | 8,423,440 |
| 302. Less amounts paid by/for borrower (line 220a | 2,950,000.00 | 802. Lese reduction amount due to (line 520) | 5,570,811 |
| 303. CASH FROM BORROWER | 51,888.70 | 603 CASH TO SELLER | 46,328.0 |

| | | | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|---|---|
| 700. | TOTAL SALES/BROKER'S COMMISSION based on price $    980,000.00 @    8.00    =    57,000.00 | | | | |
| | Division of commission (line 700 as follows: | | | | |
| 701. | $    57,000.00    to    Hunter Realty Associates, Inc. | | | | |
| 702. | $    to | | | | |
| 703. | Commission paid at Settlement | | | | 57 |
| 704. | | | | | |
| 800. | ITEMS PAYABLE IN CONNECTION WITH LOAN | | P.O.C. | | |
| 801. | % | | | | |
| 6O2. | | | | | |
| 803. | Appraisal fee | | | | |
| 804. | Credit report | | | | |
| 8O5. | Lender's Inspection fee | | | | |
| eOe. | Mtg ins application fee | | | | |
| 807. | Assumption fee | | | | |
| 808. | | | | | |
| 800. | | | | | |
| 810. | | | | | |
| 811. | | | | | |
| 813. | | | | | |
| 814. | | | | | |
| 815. | | | | | |
| 600. | ITEMS REQUIRED BY LENDER TO BE PAJD IN ADVANCE | | | | |
| 01. | Interest    from    to    /day | | | | |
| 902. | Mortgage Issuance premium    to | | | | |
| 803. | Hazard Insurance premium    yrs. to | | | | |
| 1000. | RESERVES DEPOSITED WITH LENDER FOR | | | | |
| 1001. | Homeowner's Insurance | | | | |
| 1002. | Mortgage Insurance    mo. @$ | | | | |
| 1003. | City property taxes | | | | |
| 1004. | County property taxes | | | | |
| 1005. | Annual Assessments | | | | |
| 1006. | | | | | |
| 1007. | | | | | |
| 1008. | Aggregate Reserve for Hazard/Flood Ins, City/County Prop Taxes, Annual Asse. | | | | |
| 1100. | TITLE CHARGES | | | | |
| 1101. | Settlement or closing fee    to    Cohen Norris Wolmer Ray Telapman & Cohen | | | 1,500.00 | |
| 1102. | Abstract or title search    to    Cohen Norris Wolmer Ray Telepman & Cohen | | | 500.00 ] | |
| 1103. | Title examination    to | | | | |
| 1104. | Title Insurance binder    to | | | | |
| 1105. | Document preparation    to | | | | |
| 1106. | Notary fees    to | | | | |
| 1107. | Attorney's fees    to    Cohen Norris Wolmer Ray Telepman & Cohen | | | | |
| | (Includes above Item No: ) | | | | |
| 1108. | Title Insurance    to    Cohan Norris Wolmer Ray Telepman & Cohen | | | 10,250.00 ] | |
| | (Includes above Item No. ) | | | | |
| 1100 | Lender's coverage    5,450,000.00 --- 25.00 | | | | |
| 1110. | Owners coverage    ,400,000 00 --- 18,225 00 | | | | |
| 1111. | Municipal Lien Search    Skyline Lien Search | | | 125 00 ] | |
| J112. | FedEx/Wire    Cohen Noels Wolmer Ray Telepman & Cohen | | | 145.00 | |
| 1113. | Closing Fee    First American Title Insurance Company | | | 25.00 ] | 8 |
| 1200. | GOVERNMENT RECORDING AND TRANSFER CHARGES | | | | |
| 1201. | Recording fees    Oead $    36 10    ; Mortgage S    401.60    ; Releases S | | | 437.70 | |
| 1202. | City/county/stamps    Deed $    ; Mortgage S | | | 18,075.00 | 44,8 |
| 1203. | State tax/stamps    Deed S    44,800.00    ; Mortgage $    19,07500 | | | 10,600.00 ] | |
| 1204. | Intangible Tax    Deed S    10,000 00 | | | | |
| 1205. | UCC County | | | 44 00 ] | |
| 1300. | ADDITIONAL SETTLEMENT CHARGES | | | | |
| 1301. | Survey    to | | | | |
| J302. | Pest Inspection    to | | | | |
| 1303. | UCC - State    FLORIDAUCC, LLC | | | 47.00 ] | |
| 1304. | Estoppel Fee    TruManagement Group, LLC | | | 240.00 | |
| 1305. | | | | | |
| 1306. | Statutory Policy Surcharge | | | | |
| 1307 | | | | | |
| 1308. | | | | | |
| 1400. | TOTAL SETTLEMENT CHARGES | | | 51,888.70 ] | 102,42 |

# Exhibit L



https://www.ocpafl.org/searches/parcelsearch.aspx

Home    Search    Feedback    Accessibility

Connect with us  

ORANGE COUNTY
PROPERTY APPRAISER
RICK SINGH
Certified Florida Appraiser

CERTIFICATE OF EXCELLENCE
In Assessment
Administration

Learn more...

State Certified Residential Real Estate Appraiser RD3141

| Searches | Sales Search | Results | Property Record Card | My Favorites | | Sign up for e-Notify... |

## Westwood Blvd  < 12-24-28-9655-00-024 >

**Name(s)**
Empire Eq Hotel LLC

**Property Name** (i)
N/A. Click information icon to contribute.

**Mailing Address On File**
3 Columbus Cir Fl 15
New York, NY 10019-8716
Incorrect Mailing Address?

**Physical Street Address**
Westwood Blvd

**Postal City and Zipcode**
Orlando, Fl 32821

**Property Use**
1000 - Vacant Commercial

**Municipality**
Un-Incorporated

 SAVE   PRINT  SEND
MAP  STREET  BIRDEYE
FAVS  TRIM  PORT
ESTIMATE  TAXES  SETTINGS
OLD MAP


**Contribute** An Image
For This Parcel
**IMAGE UPLOAD**

### View 2018 Property Record Card

| Property Features | Values, Exemptions and Taxes | Sales Analysis | Location Info | Market Stats | Update Information |

**Parcel Sales History**

| Sale Date | Sale Amount | Instrument # | Book/Page | Seller(s) | Buyer(s) | Deed Code | Vac/Imp |
|---|---|---|---|---|---|---|---|
| 08/11/2017 | $6,400,000 | 20170458664 | / | Westwood (Orlando) Asli V Lllp | Empire Eq Hotel LLC | Special Warranty (i) | Vacant |
| 06/30/2011 | $100 | 20110383049 | 10243 / 6328 | BVC Partners XII LLC | Westwood (Orlando) Asli V Lllp | Certificate of Title (i) | Vacant |
| 01/03/2008 | $100 | 20080011067 | 09556 / 3069 | BVC Partners Ix LLC | BVC Partners XII LLC | Special Warranty (i) | Vacant |

# Exhibit M

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
In re                                                    Chapter 11

EMPIRE EQ WGI, LLC,                                      Case No. 19-23188 (RDD)

        Debtor.
--------------------------------------------------------x

## ORDER DISMISSING CASE WITH PREJUDICE

Upon the motion (the "Motion") of Orlando Lender LLC ("Lender"), by its counsel Herrick, Feinstein LLP, for entry an order dismissing the above-captioned chapter 11 case (the "Case") of Empire EQ WGI, LLC. (the "Debtor") with prejudice, and enjoining the Debtor from filing a petition for relief under any chapter of title 11 of the United States Code (the "Bankruptcy Code") for a period of one hundred eighty (180) days following the entry of an order of dismissal, or, in the alternative, granting Lender relief from the automatic stay to continue certain state court litigation involving the Debtor; and due and proper notice of the Motion having been made on all necessary parties; and the Court having held a hearing on the Motion on August 6, 2019; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing, it is hereby:

ORDERED that the Motion is granted as provided herein; and it is further

ORDERED that the Case is dismissed with prejudice for a period of one hundred eighty (180) days from the date this Order becomes final and non-appealable, or, if any timely appeal of this Order is taken or any petition for certiorari is filed, one hundred eighty (180) days from the date the appeal or petition for certiorari is resolved by the highest court to which the Order is appealed or from which certiorari is sought; and it is further

ORDERED that the Debtor and any of its principals are hereby enjoined from filing any case under any chapter of the Bankruptcy Code in any district, either individually or for any of their related corporations, limited liability companies, trusts, or other entities for a period of one hundred eighty (180) days from the date this Order becomes final and non-appealable, or, if any timely appeal of this Order is taken or any petition for certiorari is filed, one hundred eighty (180) days from the date the appeal or petition for certiorari is resolved by the highest court to which the Order is appealed or from which certiorari is sought.

Dated: _____, 2019
      White Plains, New York


_____
UNITED STATES BANKRUPTCY JUDGE